**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATHIE FUNG, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| SUNLIGHT FINANCIAL HOLDINGS INC. f/k/a SPARTAN ACQUISITION CORP. II, GEOFFREY STRONG, MATTHEW POTERE, JAMES CROSSEN, BARRY EDINBURG, and RODNEY YODER, | |
| Defendant. | |

Plaintiff Kathie Fung ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Sunlight Financial Holdings Inc. f/k/a Spartan Acquisition Corp. II ("Sunlight" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Sunlight; and (c) review of other publicly available information concerning Sunlight.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a class action on behalf of persons and entities that purchased or otherwise acquired Sunlight securities between January 25, 2021 and September 28, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       Sunlight claims to be a business-to-business-to-consumer point-of-sale ("POS") financing platform that provides residential solar and home improvement contractors the ability to offer seamless POS financing to their customers when purchasing residential solar systems or other home improvements. The Company claims the resulting loans are facilitated by Sunlight's proprietary technology platform, Orange® ("Orange®" or the "Platform"), through which Sunlight offers instant credit decisions to homeowners at the POS on behalf of Sunlight's various capital providers.

3.       Sunlight became a publicly traded company in July 2021 via the business combination of Spartan Acquisition Corp. II, a publicly traded special purpose acquisition company, with Sunlight Financial LLC ("Legacy Sunlight") (the "Business Combination").

4.      On September 28, 2022, after the market closed, Sunlight disclosed that it would record a "non-cash advance receivables impairment charge of $30 million to $33 million during the Company's fiscal quarter ending September 30, 2022." The Company explained that "the Company was informed of certain actions taken by one of its installer partners to address liquidity issues faced by the installer" which "would likely result in an inability of the Company to collect on advances outstanding to such installer."

5.      The same day, the Company also issued a press release withdrawing its full-year 2022 outlook due to the "installer liquidity event." Defendant Matthew Potere was quoted stating, "While our risk exposure with other contractor advances is much smaller (the next three largest partner advances being $10 million, $7 million, and $5 million respectively), ***we are re-underwriting all contractor partners' advances to further mitigate risk going forward.***" (Emphasis added.)

6.      On this news, the Company's stock price fell $1.44 per share, or 57.1%, to close at $1.08 per share on September 29, 2022, thereby injuring investors.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company lacked effective underwriting and risk evaluation with respect to its contractor advance program; (2) that Sunlight lacked the oversight and periodic monitoring systems necessary to timely detect bad debt associated with its contractor advance program; (3) that the Company lacked effective internal controls over accounting and reporting of non-cash advance receivables; (4) that, as a result, the Company would be forced to take a non-cash advance receivables impairment charge exceeding $30 million; and (5) that, as a result of the foregoing, Defendant's positive

statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

11.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.    Plaintiff Kathie Fung, as set forth in the accompanying certification, incorporated by reference herein, purchased or acquired Sunlight securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant Sunlight is incorporated under the laws of Delaware. The Company's headquarters are in Charlotte, North Carolina. Sunlight's Class A common stock trades on the New

York Stock Exchange ("NYSE") under the symbol "SUNL." Its warrants trade under the symbol "SUNL.WS." When Sunlight was known as Spartan Acquisition Corp. II, its common stock traded on the NYSE under the symbol "SPRQ."

14.     Defendant Geoffrey Strong ("Strong") was the Company's Chief Executive Officer ("CEO") from before the start of the Class Period until the Business Combination.

15.     Defendant Matthew Potere ("Potere") was the Company's CEO from the Business Combination through the end of the Class Period.

16.     Defendant James Crossen ("Crossen") was the Company's Chief Financial Officer ("CFO") and Chief Accounting Officer from before the start of the Class Period until the Business Combination.

17.     Defendant Barry Edinburg ("Edinburg") was the Company's CFO from the Business Combination until March 31, 2022.

18.     Defendant Rodney Yoder ("Yoder") was the Company's Chief Financial Officer from April 1, 2022 through the end of the Class Period.

19.     Defendants Strong, Potere, Crossen, Edinburg, and Yoder (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being

4

concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Sunlight claims to be a business-to-business-to-consumer POS financing platform that provides residential solar and home improvement contractors the ability to offer seamless POS financing to their customers when purchasing residential solar systems or other home improvements. The Company claims the resulting loans are facilitated by Sunlight's proprietary technology platform, Orange®, through which Sunlight offers instant credit decisions to homeowners at the POS on behalf of Sunlight's various capital providers.

### Materially False and Misleading

### Statements Issued During the Class Period

21.     The Class Period begins January 25, 2021. On that day, the Company published a press release titled "Sunlight Financial LLC, a Premier Residential Solar Financing Platform, to List on NYSE Through Merger With Apollo-Affiliated Spartan Acquisition Corp. II." Therein, the Company, in relevant part, stated:

> Sunlight Financial LLC ("Sunlight"), a premier U.S. residential solar financing platform, and Spartan Acquisition Corp. II (NYSE: SPRQ) ("Spartan"), a publicly-traded special purpose acquisition company sponsored by funds managed by an affiliate of Apollo Global Management, Inc. (NYSE: APO) (together with its consolidated subsidiaries, "Apollo"), today announced that they have entered into a definitive agreement for a business combination that will result in Sunlight becoming a publicly listed company.
>
> Upon closing of the transaction, the combined public company will be named Sunlight Financial Holdings Inc. Sunlight Financial LLC will be the new public holding company's sole operating subsidiary and Sunlight's existing management team will continue to lead the business.

**Sunlight Overview**

Sunlight is a B2B2C fintech platform that provides residential solar contractors with seamless point-of-sale ("POS") financing capabilities and delivers unique, attractive assets to capital providers. ***Through its proprietary technology and deep contractor network, Sunlight offers instant credit decisions and affordable solar loans to homeowners nationwide. Sunlight prides itself on creating value for all constituents it serves – solar contractors, capital providers, and consumers***.

Residential solar is a multibillion-dollar market at the forefront of the fast-growing clean energy industry. To date, Sunlight has funded over $3.5 billion of loans through its proprietary platform. ***Sunlight's best-in-class underwriting has delivered the industry's strongest-performing residential solar loans to its funding partners***. As a tech-enabled solar financing provider, Sunlight is committed to strong environmental, social and governance ("ESG") principles. Sunlight has arranged financing for more than an estimated 100,000 residential solar systems, which will produce over 500 megawatts of solar-generated electricity and avoid more than 10 million metric tons of carbon dioxide emissions.

Sunlight's existing investors include Tiger Infrastructure Partners, FTV Capital, and founder Hudson Sustainable Group.

**Management Comments**

"Sunlight partners with contractors and capital providers to accelerate the United States' transition to a clean energy future," said Matt Potere, Chief Executive Officer of Sunlight. "We are proud to have built a profitable, capital-light company that generates significant free cash flow and is poised for strong, sustainable growth. ***Our proprietary technology platform offers contractors robust tools to sell more solar systems and consumers a fast, fully-digital, and frictionless experience. Our risk management drives industry-low credit losses and results in strong risk-adjusted returns for capital providers. This, in turn, reduces our cost of capital and facilitates the deployment of financial products that help contractors grow***."

\*       \*       \*

**Sunlight Highlights**

Leading POS platform through which over $3.5 billion of loans have been originated in the rapidly growing residential solar market

Proprietary, scalable and highly-rated Orange® technology platform provides more than 14,000+ users a seamless experience, with instant credit decision making and automated loan underwriting, processing and funding

> *Diversified mix of more than 800 solar and home improvement contractors, including national, regional and local installers and contractors*
>
> *Industry-leading credit quality and loan performance with industry-low credit losses*
>
> Broad and diverse network of capital providers that have consistently extended and upsized their commitments
>
> Profitable – strong free cash flow, strong operating leverage and expanding margins
>
> *Robust risk management and compliance underpin stellar portfolio performance for premier capital providers*
>
> Strong management team with expertise in specialty finance, fintech and renewable energy

(Emphasis added.)

22.    In a presentation regarding the proposed business combination, a transcript of which was filed with the SEC on January 25, 2021, Defendant Potere stated, in relevant part:

> Also, like many businesses, contractors need to manage cashflow. With a 90 day cycle from sale to installation, managing liquidity is a key consideration. With Orange® *we provide contractors with fast and predictable next day funding, and for a subset of contractors, we provide advance funding before the system is installed on the roof. We structure these advances such that they're low risk to Sunlight, but provide significant benefit to our contractors*. This is another example of how at Sunlight we use credit experience and access to capital to differentiate our value proposition.

(Emphasis added.)

23.    On March 22, 2021, the Company filed the Registration Statement in connection with the Business Combination on Form S-4 with the SEC (the "Registration Statement"). Therein, the Company stated, in relevant part:

> *Sunlight's short-term capital advance program exposes it to potential losses in the event that a contractor fails to fully perform under its agreements with Sunlight or becomes insolvent prior to completion of the underlying installation or construction, which losses could have an adverse impact on Sunlight's business, results of operations and financial condition.*

Sunlight maintains a short-term capital advance program with certain contractors that provides such contractors with up-front working capital to pay for certain expenses for installation or the construction of solar systems and home improvements. Such short-term capital advances may be paid to contractors prior to the commencement of such installation or construction, or at specified periods during the installation or construction process. The aggregate amount of advances available to a given contractor is based on a risk evaluation and tiering conducted by Sunlight's commercial risk team that performs contractor underwriting generally, as well as additional oversight and periodic monitoring requirements. At any time prior to completion of installation or construction of solar systems or home improvements, Sunlight is at risk for defaults if a contractor to whom short-term advances have been made fails to fully perform under its agreements with Sunlight or becomes insolvent prior to the completion of installation or construction. The ability of contractors to fully perform or maintain their solvency depends on a number of factors, including, but not limited to, changes in economic conditions, adverse trends or events affecting the solar system and home improvement industries, lack of availability of, and/or access to, materials or labor for the installation or construction of solar systems or home improvements, natural disasters and management and cash flow levels. As of December 31, 2020, Sunlight had an aggregate of $35.4 of outstanding advances to 141 contractors. Approximately 60.1% of those advances were made to four of Sunlight's largest contractor relationships in terms of funded loan volume. In the event that one or more contractors who receive short-term capital advances are unable to fully perform under their agreements with Sunlight or maintain their solvency, Sunlight may lose a portion or all of the funds advanced to such contractor, which may have an adverse impact on Sunlight's business, results of operations and financial condition.

Further, Sunlight advances funding payments to contractors in order to ensure payment to its contractors within 24 hours. If a capital provider fails to reimburse Sunlight for such advances as anticipated, Sunlight may need write-off such advances, subjecting Sunlight to consumer credit risk. Alternatively, if the contractor funded by Sunlight declares bankruptcy prior to Sunlight being reimbursed, the capital provider is not likely to fund the loan and reimburse Sunlight. Sunlight could be subject to losses if the consumers borrowing funds from Sunlight under these loans do not pay as and when required.

(Underline emphasis added.)

24.     The Registration Statement also stated the following about the Contractor Advance Funding Program:

### Contractor Advance Funding Program and Prefunding Program

An important part of Sunlight's value proposition to residential solar contractors is the opportunity to participate in Sunlight's advance program, which,

Sunlight believes, is offered on more flexible terms (subject to commercial underwriting qualification) than those offered by Sunlight's competitors, if offered at all. Residential solar system contractors face significant upfront costs prior to installation and receipt of payment for the installation by their customers. The Sunlight advance program is designed to support the related liquidity and cash flow management needs of its qualifying contractors. Sunlight's advance program has two components: (1) milestone advances and (2) contractor prefunding advances.

Sunlight's milestone advance program provides qualifying solar contractors with short-term capital advances to support upfront costs and liquidity needed to purchase equipment and pay third party contractors in the due course of its installation business. Milestone advances are generally required to be repaid in 90 days or less from the advance date and are typically repaid by Sunlight deducting the related amounts from the loan funding to the contractor upon completion of a given project. Sunlight's milestone advance program is generally offered to contractors in Sunlight's top risk tiers which have the strongest commercial risk assessment results. While Sunlight has advanced approximately $527 million to contractors in its network since inception, Sunlight has only experienced approximately $0.4 million in losses on those advances.

Sunlight also offers the contractors in its network prefunding advances. Prefunding advances are advances made by Sunlight to a contractor within 24 hours of a request for funding on a specific Sunlight-offered loan at installation of a given project. Sunlight offers its contractors prefunding advances to bridge the time that it takes for the relevant capital provider to review relevant documents and execute on its funding commitment. Sunlight is reimbursed for prefunding advances when Sunlight receives the funds from the relevant capital provider for the related loans. Typically, Sunlight is reimbursed for prefunding advances within 24 to 72 hours. Because the risk in prefunding advances tends to be short-term and the contractors are not specifically responsible for the repayment obligation, Sunlight's prefunding advance program is offered to contractors in Sunlight's network across the spectrum of Sunlight's assigned contractor risk tiers.

(Underline emphasis added.)

25.    The Registration Statement also stated the following about risk management processes and procedures:

Sunlight's risk management processes and procedures may not be effective.

*Sunlight's risk management processes and procedures seek to appropriately balance risk and return and mitigate risks, and intend to identify, measure, monitor and control the types of risk to which Sunlight, its contractors and its capital providers are subject, including credit risk, market risk, liquidity risk, strategic risk and operational risk.* Credit risk is the risk of loss that arises when an obligor fails to meet the terms of an obligation.

9

\*      \*      \*

Management of Sunlight's risks depends, in part, upon the use of analytical and forecasting models. If these models are ineffective at predicting future losses or are otherwise inadequate, Sunlight may incur unexpected losses or otherwise be adversely affected. In addition, the information Sunlight uses in managing its credit and other risks may be inaccurate or incomplete as a result of error or fraud, both of which may be difficult to detect and avoid. There also may be risks that exist, or that develop in the future, that Sunlight has not appropriately anticipated, identified or mitigated, including when processes are changed or new products and services are introduced. If Sunlight's risk management framework does not effectively identify and control its risks, Sunlight could suffer unexpected losses or be adversely affected, which could have a material adverse effect on its business, results of operations and financial condition.

(Emphasis added.)

26.     The Registration Statement also contained the following statements about its advances:

Advances—*For advances made by Sunlight, management performs an evaluation of impairment indicators using financial information obtained from its counterparties and third parties as well as historical experience. Such indicators may include the borrower's financial wherewithal and recent operating performance as well as macroeconomic trends. Management rates the potential for advance receivables by reviewing the counterparty*. The counterparty is rated by overall risk tier on a scale of "1" through "5," from less to greatest risk, which management reviews and updates on at least an annual basis. Counterparties may be granted advance approval within any overall risk tier, however tier "5" advance approvals are approved on an exception basis. A subset category of the overall risk tier is the financial risk of the counterparty. As with the overall risk tier, counterparties may be granted advance approval within any financial risk tier; however financial risk tier "5" advance approvals are approved on an exception basis. As part of that approval, management will set an individual counterparty advance dollar limit, which cannot be exceeded prior to additional review and approval.

(Emphasis added.)

27.     On June 21, 2021, the Company filed its Proxy Statement and Prospectus on Form 424b3 with the SEC (the "Proxy Statement"), in connection with the Business Combination. It contained substantially the same discussion as the S-4 regarding the Company's contractor advances and its risk management processes and procedures.

28.     On August 16, 2021, the Company filed its Form 10-Q with the SEC for the quarter ended June 30, 2021 (the "2Q21 10-Q"), incorporating by reference the previously discussed risks in the Proxy Statement.

29.     The 2Q21 10-Q also stated that the Company's "disclosure controls and procedures were not effective as of June 30, 2021, due solely to the material weakness in our financial reporting described below[.]" Specifically, the Company's "internal control over financial reporting did not result in the proper classification of warrants."

30.     On November 15, 2021, the Company filed its Form 10-Q for the quarter ended September 30, 2021 (the "3Q21 10-Q"), which stated that Sunlight's "disclosure controls and procedures were effective." In relevant part, the report also stated:

> ***Sunlight's capital advance program exposes it to potential losses in the event that a contractor fails to fully perform under its agreements with Sunlight or becomes insolvent prior to completion of the underlying installation or construction, which losses could have an adverse impact on Sunlight's business, results of operations and financial condition.***
>
> Sunlight maintains a primarily short-term capital advance program with certain contractors that provides such contractors with up-front working capital to pay for certain expenses for installation or the construction of solar systems and home improvements. Such capital advances may be paid to contractors prior to the commencement of such installation or construction, or at specified periods during the installation or construction process. The aggregate amount of advances available to a given contractor is based on a risk evaluation and tiering conducted by Sunlight's commercial risk team that performs contractor underwriting generally, as well as additional oversight and periodic monitoring requirements. At any time prior to completion of installation or construction of solar systems or home improvements, Sunlight is at risk for defaults if a contractor to whom such advances have been made fails to fully perform under its agreements with Sunlight or becomes insolvent prior to the completion of installation or construction. The ability of contractors to fully perform or maintain their solvency depends on a number of factors, including, but not limited to, changes in economic conditions, adverse trends or events affecting the solar system and home improvement industries, lack of availability of, and/or access to, as well as increases in the cost of, materials or labor for the installation or construction of solar systems or home improvements, due to global supply chain shortages and the increase in competition for skilled labor, permitting delays, natural disasters and management and cash flow levels. As of December 31, 2020, Sunlight had an aggregate of $35.4 million of

outstanding advances to 141 contractors. Approximately 60.1% of those advances were made to four of Sunlight's largest contractor relationships in terms of funded loan volume. <u>As of September 30, 2021, Sunlight had an aggregate of $71.3 million of outstanding advances to 141 contractors. Approximately 68.7% of those advances were made to five of Sunlight's largest contractor relationships in terms of funded loan volume.</u> In the event that one or more contractors who receive such capital advances are unable to fully perform under their agreements with Sunlight or maintain their solvency, Sunlight may lose a portion or all of the funds advanced to such contractor, which may have an adverse impact on Sunlight's business, results of operations and financial condition.

Further, Sunlight advances funding payments to contractors in order to ensure payment to its contractors within 24 hours. <u>If a capital provider fails to reimburse Sunlight for such advances as anticipated, Sunlight may need to write-off such advances, subjecting Sunlight to consumer credit risk.</u> Alternatively, if the contractor funded by Sunlight declares bankruptcy prior to Sunlight being reimbursed, the capital provider is not likely to fund the loan and reimburse Sunlight. Sunlight could be subject to losses if the consumers borrowing funds from Sunlight under these loans do not pay as and when required.

(Underline emphasis added.)

31.    On March 29, 2022, the Company filed its Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), which contained the same risk factors as discussed in the S-4.

**_Sunlight's capital advance program exposes it to potential losses in the event that a contractor fails to fully perform under_** its **_agreements with Sunlight or becomes insolvent prior to completion of the underlying installation or construction, which losses could have an adverse impact on Sunlight's business, results of operations and financial condition._**

Sunlight maintains a primarily short-term capital advance program with certain contractors that provides such contractors with up-front working capital to pay for certain expenses for installation or the construction of solar systems and home improvements. Such capital advances may be paid to contractors prior to the commencement of such installation or construction, or at specified periods during the installation or construction process. <u>The aggregate amount of advances available to a given contractor is based on a risk evaluation and tiering conducted by Sunlight's commercial risk team that performs contractor underwriting generally, as well as additional oversight and periodic monitoring requirements,</u> which may not be able to fully address all risks which could result in insufficient underwriting thereby resulting in an adverse impact to Sunlight's business, results of operations and financial condition. In addition, at any time prior to completion of installation or construction of solar systems or home improvements, Sunlight is at risk for defaults if a contractor to whom such advances have been made fails to fully perform under its agreements with Sunlight or becomes insolvent prior to the

12

completion of installation or construction. The ability of, or failure of, contractors to fully perform or maintain their solvency depends on a number of factors, including, but not limited to, changes in economic conditions, adverse trends or events affecting the solar system and home improvement industries, lack of availability of, and/or access to, as well as increases in the cost of, materials or labor for the installation or construction of solar systems or home improvements, due to global supply chain shortages and the increase in competition for skilled labor, permitting delays, natural disasters and management and cash flow levels. As of December 31, 2020, Sunlight had an aggregate of $35.4 million of outstanding advances to 141 contractors. Approximately 60.1% of those advances were made to four of Sunlight's largest contractor relationships in terms of funded loan volume. <u>As of December 31, 2021, Sunlight had an aggregate of $67.1 million of outstanding advances to 170 contractors. Approximately 71.6% of those advances were made to five of Sunlight's largest contractor relationships in terms of funded loan volume.</u> In the event that one or more contractors who receive such capital advances are unable to fully perform under their agreements with Sunlight or maintain their solvency, Sunlight may lose a portion or all of the funds advanced to such contractor, may need to modify the provisions of the capital advance program with such contractor on materially less favorable terms to Sunlight, or may incur additional operational and maintenance expenses, any of which may have an adverse impact on Sunlight's business, results of operations and financial condition.

Further, Sunlight advances funding payments to contractors in order to ensure payment to its contractors within 24 hours. <u>If a capital provider fails to reimburse Sunlight for such advances as anticipated, Sunlight may need to write-off such advances, subjecting Sunlight to consumer credit risk.</u> Alternatively, if the contractor funded by Sunlight declares bankruptcy prior to Sunlight being reimbursed, the capital provider is not likely to fund the loan and reimburse Sunlight. Sunlight could be subject to losses if the consumers borrowing funds from Sunlight under these loans do not pay as and when required.

(Underlined emphasis added.)

32.     The 2021 10-K also contained the following about risk management:

***Sunlight's risk management processes and procedures may not be effective.***

<u>Sunlight's risk management processes and procedures seek to appropriately balance risk and return and mitigate risks, and intend to identify, measure, monitor and control the types of risk to which Sunlight, its contractors and its capital providers are subject, including credit risk, market risk, liquidity risk, strategic risk and operational risk.</u> Credit risk is the risk of loss that arises when an obligor fails to meet the terms of an obligation.

\*       \*       \*

Management of Sunlight's risks depends, in part, upon the use of analytical and forecasting models. If these models are ineffective at predicting future losses or are otherwise inadequate, Sunlight may incur unexpected losses or otherwise be adversely affected. In addition, the information Sunlight uses in managing its credit and other risks may be inaccurate or incomplete as a result of error or fraud, both of which may be difficult to detect and avoid. There also may be risks that exist, or that develop in the future, that Sunlight has not appropriately anticipated, identified or mitigated, including when processes are changed or new products and services are introduced. If Sunlight's risk management framework does not effectively identify and control its risks, Sunlight could suffer unexpected losses or be adversely affected, which could have a material adverse effect on its business, results of operations and financial condition.

(Underline emphasis added.)

33.     The 2021 10-K also stated the following about the advances:

Advances—*For advances made by Sunlight, management performs an evaluation of impairment indicators using financial information obtained from its counterparties and third parties as well as historical experience. Such indicators may include the borrower's financial wherewithal and recent operating performance as well as macroeconomic trends. Management rates the potential for advance receivables by reviewing the counterparty.* The counterparty is rated by overall risk tier on a scale of "1" through "5," from least to greatest risk, which management reviews and updates on at least an annual basis. Counterparties may be granted advance approval within any overall risk tier, however tier "5" advance approvals are approved on an exception basis. A subset category of the overall risk tier is the financial risk of the counterparty. As with the overall risk tier, counterparties may be granted advance approval within any financial risk tier; however financial risk tier "5" advance approvals are approved on an exception basis. As part of that approval, management will set an individual counterparty advance dollar limit, which cannot be exceeded prior to additional review and approval.

(Emphasis added.)

34.     The 2021 10-K stated that "the Company's disclosure controls and procedures were effective."

35.     On May 16, 2022, the Company filed its Form 10-Q for the quarter ended March 31, 2022 (the "1Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K.

36.     The 1Q22 10-Q stated that "the Company's disclosure controls and procedures were effective."

37.     The 1Q22 10-Q also stated the following about advances:

> Advances—***For advances made by Sunlight, management performs an evaluation of impairment indicators using financial information obtained from its counterparties and third parties as well as historical experience. Such indicators may include the borrower's financial wherewithal and recent operating performance as well as macroeconomic trends. Management rates the potential for advance receivables by reviewing the counterparty***. The counterparty is rated by overall risk tier on a scale of "1" through "5," from least to greatest risk, which management reviews and updates on at least an annual basis. Counterparties may be granted advance approval within any overall risk tier, however tier "5" advance approvals are approved on an exception basis. A subset category of the overall risk tier is the financial risk of the counterparty. As with the overall risk tier, counterparties may be granted advance approval within any financial risk tier; however financial risk tier "5" advance approvals are approved on an exception basis. As part of that approval, management will set an individual counterparty advance dollar limit, which cannot be exceeded prior to additional review and approval.

(Emphasis added.)

38.     On August 15, 2022, the Company filed its Form 10-Q with the SEC for the quarter ended June 30, 2022 (the "2Q22 10-Q"), incorporating by reference the risk factors discussed in the 2021 10-K.

39.     The 2Q22 10-Q stated that "the Company's disclosure controls and procedures were effective."

40.     The above statements identified in ¶¶ 21-39 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company lacked effective underwriting and risk evaluation with respect to its contractor advance program; (2) that Sunlight lacked the oversight and periodic monitoring systems necessary to timely detect bad debt associated with its contractor advance program; (3) that the Company lacked effective internal

controls over accounting and reporting of non-cash advance receivables; (4) that, as a result, the Company would be forced to take a non-cash advance receivables impairment charge exceeding $30 million; and (5) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

41.    On September 28, 2022, after the market closed, Sunlight filed a Current Report on Form 8-K with the SEC. Therein, the Company disclosed that it was going to take a "non-cash advance receivables impairment charge of $30 million to $33 million during the Company's fiscal quarter ending September 30, 2022." The Company explained "the Company was informed of certain actions taken by one of its installer partners to address liquidity issues faced by the installer" which "would likely result in an inability of the Company to collect on advances outstanding to such installer." The Company also withdrew its fiscal 2022 guidance. In greater part, the Company stated:

**Item 2.06.    Material Impairment.**

Sunlight Financial Holdings Inc. (the "Company" or "Sunlight") records financing receivables for advances that Sunlight remits to contractors to facilitate the installation of residential solar systems to provide such contractors with up-front working capital to pay for certain expenses in connection with the installation or the construction of solar systems and home improvements***. In September 2022, the Company was informed of certain actions taken by one of its installer partners to address liquidity issues faced by the installer. As a result of this information and the Company's analysis that these actions would likely result in an inability of the Company to collect on advances outstanding to such installer, the Company determined on September 23, 2022 that it was appropriate to impair its advance receivables.*** The Audit Committee of the Board of Directors of the Company reviewed the Company's determination and ***the Company concluded to take a non-cash advance receivables impairment charge of $30 million to $33 million during the Company's fiscal quarter ending September 30, 2022.*** Although the Company does not anticipate that the impairment charges will result in future cash expenditures as the impairment is a non-cash charge, the Company expects to incur

16

certain non-recurring expenses in connection with its facilitation of solar loans where installation may not have not been fully completed.

(Emphasis added.)

42.     On September 28, 2022, the Company also issued a press release withdrawing its full-year 2022 outlook due to the "installer liquidity event." Defendant Potere was quoted stating that "While our risk exposure with other contractor advances is much smaller (the next three largest partner advances being $10 million, $7 million, and $5 million respectively), we are re-underwriting all contractor partners' advances to further mitigate risk going forward."

43.     On this news, the Company's stock price fell $1.44 per share, or 57.1%, to close at $1.08 per share on September 29, 2022, thereby injuring investors.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Sunlight securities between January 25, 2021 and September 28, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sunlight's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Sunlight shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be

identified from records maintained by Sunlight or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Sunlight; and

    (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

49.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

50.     The market for Sunlight's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Sunlight's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Sunlight's securities relying upon the integrity of the market price of the Company's securities and market information relating to Sunlight, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sunlight's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Sunlight's business, operations, and prospects as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Sunlight's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

53.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

54.     During the Class Period, Plaintiff and the Class purchased Sunlight's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

55.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Sunlight, their control over, and/or receipt and/or modification of Sunlight's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sunlight, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

56.     The market for Sunlight's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Sunlight's securities traded at artificially inflated prices during the Class Period.  On

January 25, 2021, the Company's share price closed at a Class Period high of $14.33 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Sunlight's securities and market information relating to Sunlight, and have been damaged thereby.

57.     During the Class Period, the artificial inflation of Sunlight's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Sunlight's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Sunlight and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

58.     At all relevant times, the market for Sunlight's securities was an efficient market for the following reasons, among others:

(a)     Sunlight shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Sunlight filed periodic public reports with the SEC and/or the NYSE;

(c)     Sunlight regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Sunlight was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

59.     As a result of the foregoing, the market for Sunlight's securities promptly digested current information regarding Sunlight from all publicly available sources and reflected such information in Sunlight's share price. Under these circumstances, all purchasers of Sunlight's securities during the Class Period suffered similar injury through their purchase of Sunlight's securities at artificially inflated prices and a presumption of reliance applies.

60.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**<u>NO SAFE HARBOR</u>**

61.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Sunlight who knew that the statement was false when made.

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

### Against All Defendants

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Sunlight's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

64.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Sunlight's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Sunlight's financial well-being and prospects, as specified herein.

66.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sunlight's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sunlight and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

67.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management

team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

68.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Sunlight's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Sunlight's securities was artificially inflated during the Class Period.  In ignorance of the fact that

market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Sunlight's securities during the Class Period at artificially high prices and were damaged thereby.

70.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Sunlight was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Sunlight securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

71.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     Individual Defendants acted as controlling persons of Sunlight within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76.     As set forth above, Sunlight and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 16, 2022              **GLANCY PRONGAY & MURRAY LLP**

By:  _/s/ Gregory B. Linkh_
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: clinehan@glancylaw.com
Email: prajesh@glancylaw.com

**THE PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 692-8883
Email: lesley@portnoylaw.com

*Counsel for Plaintiff Kathie Fung*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, _____Kathie Fung_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Sunlight Financial Holdings Inc. ("Sunlight") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Sunlight securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Sunlight securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Sunlight securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** _____
11/24/2022
        **(Date)**

_____
DocuSigned by:
5FCDD4F2E44642C...
        **(Signature)**

Kathie Fung
_____
        **(Type or Print Name)**

**Kathie Fung's Transactions in**
**Spartan Acquisition Corp II n/k/a Sunlight Financial Holdings Inc.**
**Common Stock**

| Settlement Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 1/27/2021 | Bought | 100 | $15.8250 |