**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW MILLUNCHICK and MIKE MARGENT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SUNLIGHT FINANCIAL HOLDINGS INC. f/k/a/ SPARTAN ACQUISITION CORP. II, MATTHEW POTERE, BARRY EDINBURG, RODNEY YODER, GEOFFREY STRONG, JAMES CROSSEN, OLIVIA WASSENAAR, WILSON HANDLER, CHRISTINE HOMMES, JOSEPH ROMEO, and SPARTAN ACQUISITION II SPONSOR LLC,<br><br>Defendants. | CASE No.: 1:22-cv-10658-AKH<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Matthew Millunchick and named plaintiff Mike Margent ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, (1) a review of the Defendants' public documents, conference calls and announcements; (2) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sunlight Financial Holdings Inc. ("Sunlight" or the "Company") f/k/a Spartan Acquisition Corp. II ("Spartan"); (3) communications with former employees of Sunlight; (4) analyst reports and

advisories; and (5) information readily available on the internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a federal class action brought individually and on behalf of all persons and entities other than Defendants who: (a) purchased the publicly traded common stock of Sunlight between January 25, 2021 and September 28, 2022, both dates inclusive (the "Class Period"),[1] and/or (b) beneficially owned and/or held Spartan common stock as of June 1, 2021 and were eligible to vote at Spartan's July 8, 2021 special meeting (collectively, the "Class"). Plaintiffs bring this action to recover damages caused by Defendants' violations of the federal securities laws, including Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Sunlight operates a digital platform that lets contractors offer instantaneous financing to customers buying residential solar or home improvement projects. The loans are financed by Sunlight's network of capital providers, which includes banks, credit unions, insurance companies, etc. Sunlight makes money by earning platform fees for connecting customers, contractors, and banks.

3.     Sunlight was formed in 2021 through the merger of Sunlight Financial LLC ("Legacy Sunlight") and Spartan. Spartan was a special purpose acquisition company, commonly known as a "SPAC," formed solely to combine with a private company seeking to go public while bypassing the traditional initial public offering process. On January 25, 2021,

---

[1] Prior to the closing of the "de-SPAC" transaction on July 9, 2021, Sunlight was Spartan and its common stock traded under the ticker symbol "SPRQ."

Spartan and Legacy Sunlight announced their plan to merge; the merger was consummated on July 9, 2021 (the "Business Combination") and the combined company began trading on the New York Stock Exchange ("NYSE") on July 12, 2021 as Sunlight under the new ticker symbol SUNL.

4.      Sunlight does not advertise directly to homeowners.  Instead, Sunlight relies on contractors to tell their customers about the ability to finance their purchase through the Sunlight platform.  Hence for Sunlight to make money, it needs to convince as many contractors as possible to use Sunlight's financing platform when signing up customers.

5.      Sunlight, however, does not have any "exclusivity" agreements with contractors. This means that a contractor in Sunlight's network is free to use any one of Sunlight's competitors when offering financing options to customers.

6.      An important way that Sunlight differentiated itself from competitor was by providing generous cash advances to contractors. Customarily, companies financing solar systems and other home improvements do not pay contractors until the project is completed. This forced contractors to incur substantial up-front costs before they received funding. Sunlight's cash advance program handed out money to contractors before any work was started. Sunlight credited the cash advance program as a major factor in its ability to get contractors to partner with it.

7.      While great for contractors, Sunlight's cash advances opened it up to substantial credit risk.  Sunlight, however, falsely represented the cash advance program as something that was of "low risk" to Sunlight, because it had a stringent process in place to "vigorously" vet which contractor it accepted into its network and gave cash advances to.  Moreover, Sunlight claimed that even after it accepted a contractor into its network, it would perform "ongoing

monitoring" to assess a contractor's financial condition, work quality, reputation, and legal compliance, among other things.

8.     In actuality, Sunlight's vetting and monitoring of contractors was extremely limited.  Former Sunlight employees said that Sunlight accepted any contractor willing to work with Sunlight, and that the "ongoing monitoring" consisted merely of checking a contractor's self-provided financial statements once a year.  Indeed, former Sunlight employees described Sunlight's vetting and monitoring of contractors as "lackadaisical" at best, and said that instead of vetting contractors, Sunlight was essentially "buying" contractors by luring them with cash advances.

9.     The truth emerged on September 28, 2022, when Sunlight revealed that one of its largest contractor partners had suffered a "liquidity event" and was not expected to pay back the more than $30 million in cash advances that it received from Sunlight.  This was devastating for Sunlight, as the loss exceeded Sunlight's *entire second quarter 2022 revenues*.  Consequently, Sunlight said that it would need to perform a "re-underwriting" of every contractor's cash advances in an effort to "further mitigate risk" – showing that the loss was not an isolated debacle that eluded Sunlight's otherwise vigorous vetting and monitoring process.

10.     Securities analysts quickly figured out that the contractor was a troubled solar systems installer known as Pink Energy, which had gone out of business a week earlier on September 21, 2022.

11.     The warning signs about Pink Energy were abundant. As early as the spring of 2022, news articles abound of Pink Energy engaging in deceptive marketing practices, of customers suing Pink Energy all over the country, launching websites and social media groups denouncing Pink Energy, etc.  Pink Energy itself admitted in a lawsuit that it filed against one of

its suppliers that starting from 2021, as a result of the supplier allegedly giving Pink Energy

defective components, Pink Energy received "overwhelming" negative reviews and complaints

on public platforms, that it faced a "public relations disaster," lost out on hundreds of millions in

revenue because of the deluge of negative publicity and because of the need to repair the

defective component, and that its valuation fell by more than half.  Sunlight was oblivious to all

of this, still assigning Pink Energy into the risk tier of contractors that had "excellent to average"

reputational risk and "excellent to average" overall risk as of June 30, 2022.  As late as August

15, 2022, Sunlight was still touting its cash advance program and assuring investors that Sunlight

would only incur very minimal losses from its cash advances program.

12.     Indeed, if Sunlight's contractor diligence and continued monitoring process was

as vigorous as Sunlight claimed, Sunlight would have known that Pink Energy was, by early

2022, a troubled company with a terrible reputation and suffering from major operational

problems – such that nobody could reasonably characterize Pink Energy as having "excellent to

average" reputational risk or "excellent to average" risk assessment.

13.     Sunlight's disclosure on September 28, 2022 of Pink Energy's default and the

need to "re-underwrite" all contractor cash advances caused a precipitous decline in the market

value of Sunlight's common stock, which fell by more than 57% to close at $1.08 per share on

September 29, 2022, causing significant losses and damages for Plaintiffs and other Class

members.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) and

20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rules 10b-5 and 14a-9

promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and subsequent damages took place in this judicial district.  Additionally, Sunlight common stock traded on the New York Stock Exchange ("NYSE") at all relevant times.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### Plaintiffs

18.     Lead Plaintiff Matthew Millunchick ("Millunchick"), as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased the publicly traded common stock of Sunlight at artificially inflated prices during the Class Period.

19.     Named plaintiff Mike Margent ("Margent"), as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased publicly traded common stock of Sunlight at artificially inflated prices during the Class Period. Mr. Margent also held Spartan common stock as of June 1, 2021 and was eligible to vote in Spartan's special meeting held on July 8, 2021.

### Sunlight Defendants

20.     Defendant Sunlight is organized under the laws of Delaware, with principal executive offices located in Charlotte, North Carolina. Sunlight's common stock trades on the

NYSE under the ticker symbol "SUNL." Prior to the Business Combination, Spartan's common

stock traded on the NYSE under the ticker symbol "SPRQ."

21.     Defendant Matthew Potere ("Potere") was the Chief Executive Officer ("CEO")

of Legacy Sunlight prior to the Business Combination, and the CEO of Sunlight after the

Business Combination.

22.     Defendant Barry Edinburg ("Edinburg") was the Chief Financial Officer ("CFO")

of Legacy Sunlight prior to the Business Combination, and the CFO of Sunlight after the

Business Combination until March 31, 2022.

23.     Defendant Rodney Yoder ("Yoder") was the CFO of Sunlight from April 1, 2022

through the end of the Class Period.

24.     All references to the "Sunlight Defendants" herein refer to Sunlight, Potere,

Edinburg, and Yoder.

25.     All references to the "Sunlight Individual Defendants" herein refer to Potere,

Edinburg, and Yoder.

***Spartan Defendants***

26.     Defendant Geoffrey Strong ("Strong") was the CEO and Chairman of Spartan

from its inception until the Business Combination.  Strong was also the CEO of Spartan's

sponsor, Spartan Acquisition Sponsor II LLC.

27.     Defendant James Crossen ("Crossen") was the CFO and Chief Accounting

Officer of Spartan from its inception until the Business Combination.

28.     Defendant Olivia Wassenaar ("Wassenaar") was a director of Spartan from

November 24, 2020 until the Business Combination.

29.     Defendant Wilson Handler ("Handler") was a director of Spartan from November 24, 2020 until the Business Combination.

30.     Defendant Christine Hommes ("Hommes") was a director of Spartan from November 24, 2020 until the Business Combination.

31.     Defendant Joseph Romeo ("Romeo") was a director of Spartan from November 24, 2020 until the Business Combination.

32.     Defendant Spartan Acquisition Sponsor II LLC ("Sponsor") is a Delaware corporation formed in August 2020 to act as the sponsor of Spartan.

33.     All references to the "Spartan Defendants" herein refer to Strong, Crossen, Wassenaar, Handler, Hommes, Romeo, and Sponsor.

34.     All references to the "Spartan Individual Defendants" herein refer to Strong, Crossen, Wassenaar, Handler, Hommes, and Romeo.

## FACTUAL BACKGROUND

### *Spartan's Formation and Purpose*

35.     Spartan was a "blank check" company, also known as a SPAC, incorporated in August 2020 for the sole purpose of effecting a merger or similar business combination with a privately-held business to enable the private company to go public.  Spartan itself had no business activities; it was formed specifically to acquire an existing operating business.

36.     SPACs raise capital for an acquisition through an initial public offering ("IPO"), and that capital is held in trust for a specific period of time – usually 24 months – until a merger can be completed. The SPAC's founders/sponsors award themselves millions of founder/sponsor shares, which are of a different class than the common shares sold to the public, typically in an amount of 20% of the total public shares issued.  If a merger is successfully made within the

allocated time frame, the founder/sponsor shares are converted to common public shares, earning sponsors tens of millions of dollars. However, if the SPAC does not complete a merger within that time frame, then the SPAC is dissolved, the money in the trust is returned to investors, and the sponsor/founder shares are cancelled.  Accordingly, the founders/sponsors and management team of a SPAC may profit even if they secure a bad deal for SPAC investors.

37.    SPACs became increasingly popular in the 2019-2021 time frame. For private companies seeking to go public, SPAC transactions are faster than traditional IPOs, and also let them bypass the regulatory scrutiny of going public via IPOs.

38.    However, because SPAC mergers allow companies to circumvent traditional underwriting and regulatory scrutiny, there is a higher risk that fraud and other irregularities will not be detected.  For example, in April 2023, the Public Company Accounting Oversight Board ("PCAOB") published a report titled: "Inspection Observations – Audits of Special Purpose Acquisition Companies and De-SPAC Transactions," in which it observed that, for the year 2021, 94% of SPAC audit engagements and 43% of de-SPAC audit engagements identified deficiencies.[2] SEC officials have also expressed concerns over the surge in SPACs in recent years, noting a number of risks to investors.[3]

---

[2] *See* https://assets.pcaobus.org/pcaob-dev/docs/default-source/documents/spacs-spotlight.pdf?sfvrsn=b6490773_2

[3] *See* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (John Coates, Acting Director, SEC Division of Corporation Finance: "Concerns include risks from fees, conflicts, and sponsor compensation, from celebrity sponsorship and the potential for retail participation drawn by baseless hype, and the sheer amount of capital pouring into the SPACs, each of which is designed to hunt for a private target to take public."); https://www.sec.gov/news/testimony/gensler-2021-05-26 (SEC Chair Gary Gensler testifies in front of the U.S. House Appropriations Committee: "The surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected?").

39.     On November 30, 2020, Spartan completed its IPO and became a publicly-traded company.  Spartan generated $300 million in gross proceeds from the IPO itself plus another $45 million from the underwriters' overallotment, which Spartan held in trust for investors while it sought a private company to acquire. In its Form S-1 filed with the SEC prior to the IPO, Spartan stated that, as is common with SPACs, it would be forced to "redeem 100% of our public shares if we have not consummated an initial business combination within 24 months from the closing of [the IPO.]"

***Sunlight and its Business Model***

40.     Founded in 2014, Sunlight[4] describes itself as a "business-to-business-to-consumer, technology-enabled point-of-sale (POS) financing platform" that provides residential solar and home improvement contractors with the ability to offer POS financing to their customers when purchasing residential solar systems or other home improvements. The resulting loans are financed by Sunlight's capital providers, which include banks, credit unions, insurance companies, pension funds, etc.

41.     Sunlight's revenue comes from the "platform fee" that it earns for each loan facilitated through Sunlight's financing platform.

42.     Sunlight does not advertise or market itself directly to homeowners (*i.e.* the customers who purchase solar systems or home improvements from Sunlight's network of contractors).  Instead, Sunlight relies on contractors to tell their customers they can finance their purchase through the Sunlight platform.

---

[4] Unless otherwise specified, references to Sunlight in this section, Sunlight and its Business Model, refer to both Legacy Sunlight and post-Business Combination Sunlight, as the pre-and-post-merger companies had the same purported business model.

43.    Nor does Sunlight have any exclusivity agreements with the contractors in its network.  This means that a contractor who is in Sunlight's network is free to offer any other financing platform it wishes when signing up a customer interested in financing.

44.    Hence for Sunlight to make money, it needs to convince as many *contractors* as possible to use Sunlight's financing platform when signing up customers.

45.    One way that Sunlight sought to differentiate itself from competitors was by offering generous cash advances to contractors.  Generally (and as is standard in the solar panel and home improvement industry), loans facilitated on Sunlight's platform are funded only after the contractor finishes each job.  This means that before a contractor gets paid for their work, they can expect to spend significant money up-front buying supplies, paying subtractors, etc.

46.    Sunlight's cash advance program provided contractors with liquidity to support those upfront costs.  Sunlight claimed that its cash advance program was "offered on more flexible" terms than its competitors, many of whom don't offer any cash advances at all. Emphasizing the importance of Sunlight's cash advances program, Defendant Potere stated on a conference call discussing Sunlight's fiscal year 2021 financial results that cash advances were a "highly effective" tool in developing relationships with new and existing contracts, and that its decision in 2021 to give even higher cash advances was a "material factor in signing significant contractor commitments for 2022."  Defendant Yoder stated on a conference call to discuss Sunlight's Q2 2022 financial results that the cash advance program "is a really good differentiator for us in terms of attracting new and maintaining deepening relationships with our installers, getting volume commitments and improving margins."

*The Business Combination*

47.     On January 25, 2021, Legacy Sunlight and Spartan issued a joint press release announcing that they had entered into a definitive agreement for the Business Combination, through which Legacy Sunlight would become a publicly-traded company.

48.     Spartan shareholders approved the Business Combination at a special meeting held on July 8, 2021.  The Business Combination closed the next day on July 9, 2021, and the combined company started trading on the NYSE on July 12, 2021 as Sunlight.

49.     The Sponsor's 8,625,000 founder shares were converted into 8,625,000 publicly-traded shares, valued at $86,250,000 at the IPO price.

## DETAILED ALLEGATIONS OF MISCONDUCT

*Defendants' False Representations about Sunlight's Cash Advances Program*

50.     Beginning on January 25, 2021, when Defendants Strong, Potere, and Edinburg held a conference call about the proposed Business Combination, and continuing through the Class Period, Defendants repeatedly misrepresented to investors that: (1) the cash advance program posed very little risk to Sunlight, and (2) it had stringent processes in place to vet which contractors it works with and gives cash advances to.

51.     On January 25, 2021, Defendants Strong, Potere, and Edinburg held a conference call with investors about the proposed Business Combination. During the call, Defendant touted the cash advance program, and falsely stated the advances were low risk to Sunlight: "We structure these advances such that ***they're low risk to Sunlight***, but provide significant benefit to

our contractors. This is another example of how at Sunlight we use credit experience and access to capital to differentiate our value proposition."[5]

52.     This is false because the cash advances that Sunlight gave to contractors created substantial risk for Sunlight.  As discussed in greater detail below, when Sunlight announced Pink Energy's anticipated default on September 28, 2022, it revealed that the total amount of advances receivable from Pink Energy represented almost half of Sunlight's total cash in hand at the time. After the Pink Energy default, Sunlight immediately reduced its cash advance program and then scrapped it altogether in March 2023 – in recognition of the unacceptable risk that these cash advances presented for Sunlight.

53.     The risk was not limited to Sunlight's business operations. After Sunlight's disclosure of the Pink Energy advance receivables impairment, Sunlight's stock plunged by 57% in value, wiping out more than half of Sunlight's market capitalization.

54.     Defendant Potere's statement at the January 25, 2021 conference call, made in the context of a proposed merger, was related to and about Spartan and the post-Business Combination Sunlight. Indeed, Defendant Strong, CEO of Spartan, was at this conference call and began the conference call saying: "we are excited to announce this morning that Spartan is **combining with** Sunlight Financial…and **bringing it to the public markets**." Spartan had no business operations of its own; its business post-Business Combination is that of Legacy Sunlight's.  Therefore, Defendant Potere's statements on this conference call were also about post-Business Combination Sunlight. Indeed, the conference call was intended to introduce Legacy Sunlight to Spartan investors. The targeted audience of this conference call was not

---

[5] All emphasis in this Complaint is added unless otherwise noted.

Legacy Sunlight investors, but rather, Spartan investors and those interested in the post-Business Combination Sunlight.

55.    Reinforcing the false notion that the cash advances were low risk to Sunlight, Defendants falsely stated that Sunlight had in place a vigorous process to vet and continually monitor contractors in its network, and that this strict vetting and continual monitoring process determined: (a) whether Sunlight would accept a contractor into its network, and (b) whether Sunlight would give cash advances to a particular contractor, and how much.

56.    As discussed in greater detail in the following subsection, these representations are false because there was very little vetting or continued monitoring of contractors at Sunlight; Sunlight accepted any contractor willing to work with Sunlight, and performed extremely limited monitoring of contractors once they are part of Sunlight's network.

57.    Defendants made the first of these misstatements on March 22, 2021, when Spartan filed with the SEC a Registration Statement and preliminary proxy statement and prospectus on Form S-4 in connection with the Business Combination.  The S-4 was signed by each of the Spartan Individual Defendants.  The S-4 stated that "Sunlight has adopted vigorous contractor diligence and monitoring procedures" and that:

> Upon the engagement of a contractor into Sunlight's network, Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

> [...]

14

Sunlight has established a ***robust commercial underwriting and ongoing monitoring process*** to assure that the quality of the work product, solar system construction, ***financial condition*** (to support construction processes and provide post construction warranty support) and ***legal compliance practices*** of the contractors in Sunlight's network.

58.    Sunlight made the identical misrepresentation in each of the following subsequent SEC filings and disclosures during the Class Period:

      a.    May 12, 2021: Amendment No. 1 to the March 22, 2021 S-4 and updated preliminary proxy statement, signed by each of the Spartan Individual Defendants.

      b.    June 1, 2021: Amendment No. 2 to the March 22, 2021 S-4 and updated preliminary proxy statement, signed by each of the Spartan Individual Defendants.

      c.    June 21, 2021: Proxy Statement and Prospectus, signed by Defendant Strong.

      d.    July 30, 2021: Registration Statement on Form S-1, signed by Defendants Potere and Edinburg.

      e.    September 2, 2021: Amendment No. 1 to the July 30, 2021 S-1, signed by Defendants Potere and Edinburg.

      f.    September 7, 2021: Prospectus (which forms part of the July 30, 2021 Registration Statement).

      g.    April 22, 2022: Prospectus (which forms part of the July 30, 2021 Registration Statement).

59.    While the March 22, 2021 S-4, the May 12, 2021 S-4/A, the June 1, 2021 S-4/A, and the June 21, 2021 Proxy Statement and Prospectus were disseminated prior to the Business Combination, the statements therein relate to Spartan and post-Business Combination Sunlight.

For example, each of the four documents contains this Question and Answer: "Q: Why am I receiving this proxy statement/prospectus?" "A: Spartan stockholders are being asked to consider and vote upon, among other things, the [Business Combination]."  Additionally, each of the four documents makes clear that the entire document, including information about Legacy Sunlight, was provided for the purpose of giving **Spartan shareholders** information about the proposed Business Combination: "We urge **Spartan stockholders** to carefully read this entire proxy statement/prospectus, including the annexes and other documents referred to herein."  Indeed, the target audience of these four documents is Spartan shareholders, and the information in each of these four documents relate to Spartan securities.

### *Sunlight's Contractor Diligence and Monitoring was Neither Vigorous nor Robust*

60.     Confidential Witness #1 ("CW1") was employed at Sunlight from December 2017 to March 2022.  CW1's most recent position at Sunlight was that of Senior Relationship Manager, a position that CW1 held from September 2020 until March 2022.  From December 2017 to approximately September 2019, CW1 reported to Brian Von Bergen, who served as Sunlight's Head of Operations during that time.  Von Bergen left Sunlight around September 2019, after which CW1 reported to Curtis Lynch, who took over as Sunlight's Head of Operations following Von Bergen's departure.  As a Senior Relationship Manager, CW1 managed all aspects of Sunlight's relationships with solar system contractors.

61.     CW1 described Sunlight's due diligence on contractors as "lackadaisical." Sunlight's initial vetting of contractors consisted of looking at the contractor's self-supplied financial statements. After a contractor is accepted into Sunlight's network, there was no "ongoing monitoring" other than an annual review of the contractor's self-supplied financial statements.  There was no additional due diligence for individual cash advances.

62.     According to CW1, starting from late 2019 Sunlight accepted any contractor willing to work with Sunlight: "[Sunlight] accepted everyone until they got screwed. Once they got screwed, they would cut ties with [the contractor]."

63.     Confidential Witness #2 ("CW2") worked as a Regional Sales Manager – Home Improvement from October 2021 to October 2022.  CW2 reported to Kevin Jurczyk, Sunlight's Head of Home Improvement.  As a Regional Sales Manager – Home Improvement, CW2 was responsible for finding contractors to work with Sunlight and growing the accounts (*i.e.* getting the contractors to do more business with Sunlight).  According to CW2, Sunlight was throwing around money in the form of cash advances to get "first look" agreements with contractors.  A "first look" agreement is when a contractor agrees to tell a customer about Sunlight's financing platform before showing them other financing platforms.  Indeed, rather than being judicious about which contractors to work with, Sunlight was practically begging and "buy[ing]" contractors.

64.     According to CW2, once Sunlight began working with a contractor and giving out cash advances, the money just kept going out: "there was never: this account's high risk…you need to call and find out what's going on[.]"  CW2 further stated that Sunlight's representations about a vigorous due diligence and ongoing monitoring process for contractors was "a bunch of bullshit" and that it was just "hey, this is what we're going to put on papers to say this is what we're doing…it's never executed."

65.     CW2 stated that the cash advances created a perverse system where Sunlight was forced to continue giving out cash advances to troubled contractors to ensure they stayed in business and could finish their projects. CW2 mentioned that during her time at Sunlight, one of Sunlight's customers, solar systems installer Vision Solar, was getting inundated with complaints

and government investigations. But Sunlight "was in so deep with them, we couldn't just cut

them off...if we were to cut them off knowing how bad of a company they are...they wouldn't

have any money to go complete the projects we need them to complete."

***Sunlight would have known about Pink Energy's Troubles if Sunlight did any Ongoing
Monitoring of Pink Energy***

66.    Based on cash advance amounts disclosed in Sunlight's quarterly report for the

second quarter of 2022 on Form 10-Q (the "2Q22 10-Q"), and confirmed by Credit Suisse's

analyst report on Sunlight dated September 28, 2022, Sunlight assigned Pink Energy a risk rating

of "3" in its 1-5 risk tier (with 1 being the least risky and 5 the most risky).  According to the

2022 10-Q, a risk rating of 3 means that the contractor has "medium commercial credit risk,

***excellent to average reputational risk*** (e.g., online ratings, average complaint levels), and/or an

***excellent to average risk assessment***."

67.    Had Sunlight conducted a "reputational review" of Pink Energy, or conducted

anything close to a "robust ongoing monitoring process" on Pink Energy for assurance on Pink

Energy's "quality of [] work product," "financial condition," and "legal compliance practices" as

Sunlight claims that it does for contractors, Sunlight would have known that Pink Energy was,

by early 2022, a troubled company with a terrible reputation and suffering from major

operational problems – such that no one could reasonably characterize Pink Energy as having

"excellent to average" reputational risk or "excellent to average" risk assessment.

68.    Indeed, by spring 2022, there were widespread media reports of Pink Energy

salespeople engaging in deceptive marketing practices and widespread complaints of Pink

Energy's shoddy workmanship.  For example, on March 22, 2022, an article appeared on WECT

News, a media company serving eastern North Carolina, reporting that residents in North

Carolina were getting duped by Pink Energy.  According to the WECT article: (a) one man even

started a website (www.PowerHomeLawsuit.com)[6] with the hope of filing a class action lawsuit against Pink Energy, and the website "took off" with more than 500 people signing up shortly after the site was launched; (b) in Ohio alone, the Attorney General received 57 complaints against Pink Energy in 2021 and 2022 alleging deceptive sales practices; (c) a Facebook group called "Powerhome Victims Support Group" had nearly 700 members sharing their problems with Pink Energy.

69.    In an article that appeared on FOX2 Detroit's website on April 13, 2022, a FOX2 undercover reporter recorded a Pink Energy salesperson lying to customers that they would get tens of thousands of dollars in federal tax refunds if they installed solar panels. The FOX2 article identifies numerous Detroit-area residents who were duped by Pink Energy into installing expensive solar panels.  The article mentions lawsuits filed by customers against Pink Energy in California and North Carolina, only to find out that they actually gave up the right to sue Pink Energy in the contract they signed with Pink Energy, and that all disputes were to be arbitrated.

70.    Moreover, from 2021 to 2022, Pink Energy was embroiled in a bitter dispute with a supplier, Generac Power Systems, Inc. ("Generac"), that was having a devastating impact on Pink Energy's financial condition, business operations, and reputation.  In spring 2020, Generac and Pink Energy entered into an agreement for Generac to supply Pink Energy with a necessary electrical component for solar panels called SnapRS. In a lawsuit filed  in the U.S. District Court for the Western District of Virginia on August 1, 2022, Pink Energy alleged:[7]

---

[6] Prior to April 22, 2022, Pink Energy was known as PowerHome Solar.

[7] *Power Home Solar, LLC d/b/a Pink Energy v. Generac Power Systems, Inc*, Case No. 6:22-cv-000043-NKM (W.D. Va.), Dkt. 1.

a.  In the summer of 2021, fires broke out at several homes with Pink Energy solar systems. Pink Energy determined that the fires were caused by overheating of the SnapRS.

b.  Starting in late 2021, Pink Energy started receiving a massive number of service calls, which Pink Energy claimed were due to defects in the SnapRS components.  According to Pink Energy, prior to using SnapRS in its solar panel installations, Pink Energy averaged about 800 service calls per month. Starting from late 2021, the number of service calls to Pink Energy skyrocketed to about 30,000 per month.

c.  Pink Energy started receiving "***an overwhelming number*** of negative reviews and complaints to the Better Business Bureau, social media, and other public platforms" that caused "***significant harm to [Pink Energy]'s reputation***" and resulted in "a ***public relations disaster***" for Pink Energy.

d.  Pink Energy spent more than $39 million responding to service calls associated with defective SnapRSs.

e.  Because of the damage to Pink Energy's brand and reputation caused by the defective SnapRSs, Pink Energy started experiencing a substantial rise in customer cancellations; Pink Energy suffered $155 million in lost revenue because of cancellations.

f.  Pink Energy had to shift labor away from installing new solar panel systems that would have generated revenue for the company to performing repairs on existing customers with defective SnapRS components.

g.  From September 2021 to June 2022, Pink Energy's valuation fell by more than 50%.

71.    These were alarming developments that - if Sunlight's ongoing diligence and monitoring of contractors was as robust as it claimed – should have placed Sunlight on high alert regarding Pink Energy.  Instead, Sunlight designated Pink Energy as a "3" risk level, meaning that it had "excellent to average" reputational risk and "excellent to average" risk assessment.

72.    Yet despite these blatant alarms, Yoder stated on the Q2 2022 earnings call on August 15, 2022 that Sunlight "expect losses in the future to remain very low" with regards to cash advances to contractors.  Indeed, far from carefully monitoring the reputational risk, work quality, financial condition and legal compliance of its contractors such as Pink Energy, Sunlight had no idea that Pink Energy was in the middle of a "public relations disaster" and losing half of its valuation in less than a year.

73.    That Sunlight was blind to Pink Energy's troubles was particularly alarming - and reflective of Sunlight's limited vetting and monitoring of contractors in its network - because Pink Energy was by far the largest recipient of cash advances from Sunlight, with more than three times the amount of advances received compared to Sunlight's next-largest advances recipient as of September 28, 2022.[8]

***Given Sunlight's Inadequate Diligence and Monitoring of Contractors, the Cash Advance Program was not "Low Risk" to Sunlight***

74.    Contrary to Defendant Potere's representation that the cash advance program was "low risk" to Sunlight, the cash advances actually created a high risk to Sunlight.  While giving out generous cash advances to contractors *might have been* low risk if Sunlight actually had a

___

[8] Sunlight does not publicly disclose the identities of contractors in its network, or the identities of contractors that received cash advances from Sunlight.  Therefore, investors did not know that Sunlight partnered with Pink Energy or that Sunlight made cash advances to Pink Energy.

vigorous diligence and monitoring process in place, the lack of such process at Sunlight made the cash advance program very risky.

75.    For example, for fiscal year 2020, Sunlight reported net income of $10 million. Yet, Sunlight had $35 million in cash advances outstanding as of the end of 2020.

76.    The ratios (and risk) were even worse by 2022.  Per Sunlight's 2Q22 10-Q, the last quarterly report before the Pink Energy default, Sunlight had $91 million in cash advances outstanding.  That was more than the total amount of cash that Sunlight had in hand (*i.e.* $68 million) and *more than three times* Sunlight's revenue for that quarter (*i.e.* $29 million).

77.    Indeed, the amount of advances receivable from Pink Energy alone at the time of Pink Energy's bankruptcy was almost half of Sunlight's total cash at hand at the time, and more than Sunlight's quarterly revenue for the most recent quarter before Pink Energy's bankruptcy.

78.    Because of Sunlight's lackadaisical vetting and monitoring of contractors that it gave advances to, these large advances posed significant risk to Sunlight in the event of default. Following Sunlight's disclosure that it was impairing the advances receivable from Pink Energy due to the latter's imminent bankruptcy, Sunlight's stock price dropped by 57%, wiping out more than half of Sunlight's market capitalization.

79.    Sunlight itself recognized the unacceptable risk that the cash advance program posed. Despite the importance of the cash advance program in differentiating Sunlight from its competitors and the significant role that it played in attracting contractors to work with Sunlight, Sunlight first reduced advances and then suspended the program in the aftermath of the Pink Energy default. During an earnings call to discuss fiscal year 2022 financial results, Defendant Potere admitted that the cash advance program was risky to Sunlight, telling analysts that in the fourth quarter of 2022 Sunlight took steps to "mitigate our risk" in the cash advance program,

and then decided to "suspend the program indefinitely" as of March 2023.  Sunlight would not have taken these actions if cash advances were low risk, especially since these advances were touted as one of the key factors in Sunlight's ability to get contractors to work with Sunlight.

## THE TRUTH WAS REVEALED

80.     On September 28, 2022, after close of trading, Sunlight filed a Form 8-K with the SEC revealing that it was going to take a "non-cash advance receivable impairment charge of $30 to $33 million during the Company's fiscal quarter ending September 30, 2022" because Sunlight "was informed of certain actions taken by one of [Sunlight]'s installer partners to address liquidity issues faced by the installer" which "would likely result in an ability of the Company to collect on advances outstanding to such installer."  In a press release accompanying the 8-K, Defendant Potere disclosed that Sunlight would be "re-underwriting all contractor partners' advances to further mitigate risk going forward."

81.     This adverse disclosure caused the price of Sunlight's common stock to fall by $1.44 per share, or over 57%, to close at $1.08 per share on September 29, 2022, damaging Plaintiffs and other investors in Sunlight's common stock.

82.     Analysts quickly figured out that the installer in question was Pink Energy, which had shut down its business operations on September 21, 2022 (and would file for Chapter 7 bankruptcy on October 7, 2022).  Defendant Potere confirmed during Sunlight's Q3 2022 earnings call that the bankrupt installer was Pink Energy.

## ADDITIONAL ALLEGATIONS SUPPORTING INFERENCE OF SCIENTER

83.     The allegations in this subsection relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

84.     According to CW2, all cash advances to contractors had to go through Defendant Potere for final approval. Therefore, Defendant Potere was aware what kind of diligence was done on each contractor as well as the justification for each contractor's assigned risk tier.

85.     According to CW1, the contractor risk evaluation process was generally effective from 2017 to 2019 when Brian Von Bergen was Head of Operations.  CW1 said that starting late 2019, Sunlight got "too big" and so "were not really looking into" the contractors that it gave advances to, favoring a "less stringent and more lackadaisical approach in the cash advance process."  CW1 believes that Von Bergen left in September 2019 because Von Bergen did not like upper management's laissez-faire approach to handing out cash advances.

86.     That Defendant Potere said Sunlight would "re-underwrite" all cash advances to *all* contractors following Pink Energy's default showed that Defendant Potere believed there was a systemic problem with how Sunlight was performing due diligence and risk evaluation on contractors. If Sunlight's due diligence and risk evaluation process was as vigorous as claimed, then the Pink Energy debacle would have been viewed as an isolated incident, rather than something that would trigger Sunlight to scrutinize every other contractor advance.

## PRESUMPTION OF RELIANCE

87.     At all relevant times, the market for Sunlight common stock was an efficient market for the following reasons, among others:

      a.     Sunlight's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b.     As a regulated issuer, Sunlight filed periodic public reports with the SEC and with the NYSE;

c.  Sunlight regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  Sunlight was followed by several securities analysts employed by major brokerage firms, including Credit Suisse, Roth Capital Partners, and Cowen and Company, and who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

88.    As a result of the foregoing, the market for Sunlight's common stock promptly digested current information regarding Sunlight from all publicly available sources and reflected such information in the price of Sunlight's common stock. Under these circumstances, all purchasers of Sunlight's common stock during the Class Period suffered similar injury through their purchase of Sunlight common stock at artificially inflated prices and the presumption of reliance applies.

89.    Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased Sunlight common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are

entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

## **THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE**

90.     The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and materially misleading statements alleged herein.

91.     None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

92.     To the extent that any of the false and materially misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

93.     To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer who actually knew that such statement was false when made.

94.     Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action as a class action under Rule 23 of the Federal Rule of Civil Procedure on behalf of a Class consisting of all person and entities other than Defendants who: (a) purchased the publicly traded common stock of Sunlight between January 25, 2021 and September 28, 2022, both dates inclusive, and/or (b) beneficially owned and/or held Spartan common stock as of June 1, 2021 and were eligible to vote at Spartan's July 8, 2021 special meeting.  Plaintiffs bring this action to recover damages caused by Defendants' violations of the federal securities laws, including Sections 10(b), 14(a), and 20(a) of the Exchange Act. Excluded from the Class are: (a) Defendants and their families, the officers, directors and affiliates of Defendants and Legacy Sunlight at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant or had a controlling interest; and (b) persons and entities who suffered no compensable losses.

96.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sunlight's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sunlight or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

97.     Plaintiffs' claims are claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

98.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  Whether Defendants violated the Exchange Act;

    b.  Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts;

    c.  Whether the Sunlight Defendants acted knowingly or recklessly in issuing false and misleading statements;

    d.  Whether the price of Sunlight's common stock was artificially inflated during the Class Period;

    e.  Whether the market for Sunlight common stock was efficient during the Class Period;

    f.  The extent of damages sustained by Class members, and the appropriate measure of damages.

100.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Sunlight, Potere, and Edinburg, and Yoder

101.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

102.    This Count is asserted against Defendants Sunlight, Potere, Edinburg, and Yoder (the "Sunlight Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.    During the Class Period, the Sunlight Defendants, individually and in concert, at relevant times, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.    The Sunlight Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they, at relevant times: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

105.    The Sunlight Defendants acted with scienter at relevant times in that they knew that the public documents and statements issued or disseminated in the name of the Company

were false and materially misleading; knew that such statements or documents would be issued

or disseminated to the investing public; and knowingly and substantially participated, or

acquiesced in the issuance or dissemination of such statements or documents as primary

violations of the securities laws.  These defendants by virtue of their receipt of information

reflecting the true facts of the Company, their control over, and/or receipt and/or modification of

the Company's allegedly materially misleading statements, and/or their associations with the

Company which made them privy to confidential proprietary information concerning the

Company, participated in the fraudulent scheme alleged herein.

106.    As a result of the foregoing, the market price of the Company's common stock

was artificially inflated during the Class Period. In ignorance of the falsity of the Section 10(b)

Defendants' statements, Plaintiffs and the other members of the Class relied on the statements

described above and/or the integrity of the market price of the Company's common stock during

the Class Period in purchasing the Company's common stock at prices that were artificially

inflated as a result of the Sunlight Defendants' false and misleading statements.

107.    Had Plaintiffs and the other members of the Class been aware that the market

price of the Company's common stock had been artificially and falsely inflated by the Sunlight

Defendants' misleading statements and by the material adverse information which the Sunlight

Defendants did not disclose, they would not have purchased the Company's securities at the

artificially inflated prices that they did, or at all.

108.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members

of the Class have suffered damages in an amount to be established at trial.

109.    By reason of the foregoing, the Sunlight Defendants have violated Section 10(b)

of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the

other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against Potere, Edinburg, and Yoder

110.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

111.     The Defendants named herein (the "Sunlight Individual Defendants") participated in the operation and management of Sunlight, and conducted and participated, directly and indirectly, in the conduct of Sunlight's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

112.     As officers and directors of a publicly owned company, the Sunlight Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sunlight's business operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

113.     Because of their positions of control and authority as senior officers and directors, the Sunlight Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sunlight disseminated in the marketplace during the Class Period. Throughout the Class Period, at relevant times, the Sunlight Individual Defendants exercised their power and authority to cause Sunlight to engage in the wrongful acts complained of herein. The Sunlight Individual Defendants therefore, were controlling persons of Sunlight within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sunlight's common stock.

114.    The Sunlight Individual Defendants, therefore, acted as controlling persons of Sunlight.  By reason of their senior management positions and/or positions as directors of Sunlight, the Sunlight Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sunlight to engage in the unlawful acts and conduct complained of herein. The Sunlight Individual Defendants exercised control over the general operations of Sunlight and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

115.    By reason of the above conduct, the Sunlight Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Arrival.

## CLAIMS UNDER SECTIONS 14(a) OF THE EXCHANGE ACT

116.    The claims in Count III below are brought under Section 14(a) of the Exchange Act (the "Proxy Claim"). The Proxy Claim is brought on behalf of investors who beneficially owned and/or held Spartan common stock as of the Record Date of June 1, 2021 and were eligible to vote at Spartan's July 8, 2021 special meeting. The Proxy Claim is based on negligence. It is not based on any knowing or reckless conduct by or on behalf of the Proxy Claim Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

117.    The basis of the Proxy Claim is that the Proxy Claim Defendants' statements issued to solicit shareholder approval of the Business Combination contained misstatements and/or omissions of material fact.

118.    The Proxy Claim Defendants' proxy solicitations included all statements which served to color the market's view of the Business Combination and encourage Spartan common

stockholders to vote in favor of the Business Combination.  These statements included the following (collectively referred to as the "Proxy Solicitations") as set forth above in ¶58:

      a.   The Form S-4 Registration Statement filed on March 22, 2021, which included a Preliminary Proxy Statement Subject to Completion.

      b.   Amendment No. 1 to the Form S-4 Registration Statement, filed on May 12, 2021, which included a Preliminary Proxy Statement Subject to Completion.

      c.   Amendment No. 2 to the Form S-4 Registration Statement, filed on June 1, 2021, which included a Preliminary Proxy Statement Subject to Completion.

      d.   The Proxy Statement Form 424(b)(3) filed on June 21, 2021.

119.    All the Proxy Solicitations were materially false and misleading as discussed above.

## COUNT III

**Violation of Section 14(a) of the Exchange Act Against All Defendants EXCEPT Yoder**

120.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except the allegations in ¶¶83-86 that relate solely to Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act.

121.    This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim and allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is solely based on negligence.

122.    This claim is brought against all Defendants except Yoder (the "Proxy Claim Defendants") pursuant to Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, on behalf of all person and entities who held Spartan common stock as of June 1, 2021 and were eligible to vote at Spartan's special meeting held on July 8, 2021 with respect to the Business Combination.

123.    The Proxy Claim Defendants statements issued to solicit shareholder approval of the Business Combination contained statements that, at the time and in light of the circumstances under which they were made were false and misleading with respect to material facts and/or omitted to state material facts necessary to make the statements therein not false or misleading.

124.    The Proxy Claim Defendants jointly and severally solicited and/or permitted the use of their names in solicitations contained in the Proxy Solicitations.

125.    By means of the Proxy Solicitations and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, the Proxy Claim Defendants sought to secure Plaintiff Margent and other Class members' approval of the Business Combination and solicited proxies from Plaintiff Margent and other members of the Class.

126.    The Proxy Claim Defendants acted negligently in making inaccurate statements of material facts, and/or omitting material facts required in order to make those statements not misleading. The Proxy Claim Defendants were required to ensure that the Proxy Solicitations and all other proxy solicitation material fully and accurately disclosed all material facts to allow an investor to make an informed investment decision.

127.    The Proxy Solicitations were essential links in the accomplishment of the Business Combination.

128.    Plaintiff Margent and other members of the Class eligible to vote on the Business Combination were misled by the Proxy Claim Defendants' false and misleading statements and/or omissions, were denied the opportunity to make a fully informed decision in voting on the Business Combination, and were damaged as a direct and proximate result of the untrue statements and/or omissions set forth herein.

129.    The false and misleading statements and/or omissions in the Proxy Solicitations and other proxy solicitation materials are material in that a reasonable shareholder would consider them important in deciding how to vote on the Business Combination and/or whether to exercise their conversion right to receive $10.00 in cash per share of Spartan common stock.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Solicitations and in other information reasonably available to stockholders.

130.    The untrue statements and omission set forth above proximately caused foreseeable losses to Plaintiff Margent and other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives;

b.    Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 22, 2023                          Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             */s/ Laurence M. Rosen*
                                             Laurence M. Rosen
                                             Phillip Kim
                                             Yu Shi
                                             275 Madison Ave, 40th Floor
                                             New York, NY 10016
                                             Tel: (212) 686-1060
                                             Fax: (212) 202-3827
                                             lrosen@rosenlegal.com
                                             pkim@rosenlegal.com
                                             yshi@rosenlegal.com

                                             *Lead Counsel for Plaintiffs*

                                             **GLANCY PRONGAY & MURRAY LLP**
                                             Gregory B. Linkh
                                             230 Park Ave, Suite 358
                                             New York, NY 10169
                                             Tel: (212) 682-5340
                                             Fax: (212) 884-0988
                                             glinkh@glancylaw.com

                                             **LAW OFFICES OF HOWARD G. SMITH**
                                             Howard G. Smith
                                             3070 Bristol Pike, Suite 112
                                             Bensalem, PA 19020
                                             Tel: (215) 638-4847
                                             Fax: (215) 638-4867

                                             *Additional Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 22, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*<u>/s/ Yu Shi</u>*