UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

MATTHEW MILLUNCHICK and MIKE
MARGENT, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiffs,

     -against-

SUNLIGHT FINANCIAL HOLDINGS, INC.
f/k/a/ SPARTAN ACQUISITION CORP. II,
MATTHEW POTERE, BARRY EDINBURG,
RODNEY YODER, GEOFFREY STRONG,
JAMES CROSSEN, OLIVIA WASSENAAR,
WILSON HANDLER, CHRISTINE
HOMMES, JOSEPH ROMEO, and SPARTAN
ACQUISITION II SPONSOR, LLC,

                Defendants.

-------------------------------------------------------------- x

22-cv-10658-AKH

## THE SPARTAN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

Christopher E. Duffy
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone:  212-237-0000

Michael C. Holmes (*pro hac vice*)
Jeffrey Crough (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
VINSON & ELKINS LLP
2001 Ross Avenue
Dallas, Texas 75201
Telephone: 214-220-7700

*Attorneys for Defendants Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romeo, and Spartan Acquisition Sponsor II LLC*

Dated: July 21, 2023

**TABLE OF CONTENTS**

**Page(s)**

Preliminary Statement...................................................................................................... 1

Allegations of the Complaint ........................................................................................... 4

    I.   Spartan is formed to acquire an emerging privately-held business. ................................ 4

    II.  Spartan explores potential transactions and agrees to combine with Sunlight. .................. 5

    III. Spartan issues the Proxy with robust disclosures regarding Legacy Sunlight's Cash Advance Program........................................................................................................... 7

    IV. The Business Combination closes with overwhelming stockholder approval.................. 10

    V.  Over a year after the Business Combination, New Sunlight's major contractor becomes insolvent and defaults. ............................................................................................... 10

    VI. Plaintiffs file a Section 10(b) fraud claim following Pink Energy's insolvency, but then tack on a Section 14(a) claim against the Spartan Defendants. ...................................... 11

Legal Standards.............................................................................................................. 12

Argument ....................................................................................................................... 13

    I.   Plaintiffs failed to satisfy Rule 23.1 before bringing their derivative claim..................... 13

    II.  Count III must be dismissed because the Amended Complaint fails to allege the Proxy was false or misleading. ....................................................................................................... 15

        A.  The Amended Complaint is facially deficient under the PSLRA............................... 15

        B.  Plaintiffs failed to allege a false or misleading statement of material fact. ................ 16

            1.  The Proxy's descriptions of Sunlight's contractor diligence as "vigorous" and "robust" are not actionable.................................................................................. 16

            2.  None of the Proxy's other descriptions of Sunlight's contractor diligence are alleged to be false.............................................................................................. 19

                a.  Statement 3: Diligence During Onboarding ................................................... 19

                b.  Statements 4: Ongoing Monitoring............................................................... 19

                c.  Statements 5-6: Risk Tiers ........................................................................... 22

            3.  The Complaint's allegations focusing in 2022 do not plead falsity in the 2021 Proxy. ............................................................................................................... 24

    III. Plaintiffs failed to plead the required mental state............................................................ 27

        A.  Plaintiffs failed to meet the Rule 9(b) standard for pleading scienter. ....................... 27

        B.  Even if Rule 9(b) did not apply, Plaintiffs failed to plead negligence........................ 30

Conclusion ..................................................................................................................... 32

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Africa v. Jianpu Tech Inc.*,
   21-CV-19,
   2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022)...................................................................... 21, 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................................... 13

*Atuahene v. City of Hartford*,
   10 F. App'x 33 (2d Cir. 2001) .......................................................................................... 31

*Bisel v. Acasti Pharma, Inc.*,
   21 Civ. 6051 (KPF),
   2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022)................................................................... 12

*Bocock v. INNOVATE Corp.*,
   2022 WL 15800273 (Del. Ch. Oct. 28, 2022) ................................................................... 14

*Bond Opp. Fund v. Unilab Corp.*,
   87 F. App'x 772 (2d Cir. 2004) ........................................................................................ 12

*Bond Opportunity Fund v. Unilab Corp.*,
   No. 99 CIV. 11074(JSM),
   2003 WL 21058251 (S.D.N.Y. May 9, 2003),
   *aff'd*, 87 F. App'x 772 (2d Cir. 2004)................................................................ 12, 25, 29, 30

*Born v. Quad/Graphics, Inc.*,
   521 F. Supp. 3d 469 (S.D.N.Y. 2021) ............................................................................... 16

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ............................................................................... 30

*Brookfield Asset Mgmt., Inc. v. Rosson*,
   261 A.3d 1251 (Del. 2021) ............................................................................................... 14

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
   587 F. Supp. 3d 56 (S.D.N.Y. 2022) ................................................................................. 17

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ........................................................................................... 21

*ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ............................................................................................ 16

*El Paso Pipeline GP Co. v. Brinckerhoff*,
   152 A.3d 1248 (Del. 2016) ............................................................................................... 14

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
   No. 20-CV-9992 (PAC),
   2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021)..................................................................... 28

*Halebian v. Berv*,
590 F.3d 195 (2d Cir. 2009) ........................................................................................ 14

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
936 F.2d 759 (2d Cir. 1991) .......................................................................................... 4

*In re Aceto Corp. Sec. Litig.*,
No. 2:18-cv-2425-ERK-AYS,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)............................................................... 25

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ......................................................................... 16

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) ......................................................................... 20

*In re Bemis Co. Sec. Litig.*,
512 F. Supp. 3d 518 (S.D.N.Y. 2021) ......................................................................... 12

*In re Citigroup Sec. Litig.*,
20 Civ. 9132 (LAP),
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ........................................................... 17

*In re FedEx Corp. Sec Litig.*,
517 F. Supp. 3d 216 (S.D.N.Y. 2021) ......................................................................... 26

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) ......................................................................... 27

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014),
*aff'd*, 604 F. App'x 62 (2d Cir. 2015)................................................................... 24, 26

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................................... 30

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................................................... 31

*In re Mindbody, Inc. Sec. Litig.*,
489 F. Supp. 3d 188 (S.D.N.Y. 2020) ................................................................... 23, 26

*In re Romeo Power Sec. Litig.*,
21 Civ. 3362 (LGS),
2022 WL 1806303 (S.D.N.Y. June 2, 2022) ...................................................... 2, 13, 15

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964)..................................................................................................... 15

*Karp v. First Conn. Bancorp, Inc.*,
535 F. Supp. 3d 458 (D. Md. 2021).............................................................................. 31

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007),
*aff'd,* 312 F. App'x 400 (2d Cir. 2009)................................................................... 4, 20

*Matusovsky v. Merrill Lynch*,
  186 F. Supp. 2d 397 (S.D.N.Y. 2002) ................................................................. 13

*NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*,
  No. 10 Civ. 440(LAK)(HBP),
  2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012)......................................................... 21

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ........................................................................... 18, 23

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................. 23

*Police & Fire Ret. Sys. of City of Detroit SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009) ............................................................. 29, 30

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ........................................................................... 27, 28

*SEC v. Shanahan*,
  646 F.3d 536 (8th Cir. 2011) ............................................................................... 32

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ................................................................................. 17

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  645 F. App'x 72 (2d Cir. 2016) ........................................................................... 25

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ............................................................................... 18

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004) ................................................................................. 14

*Varjabedian v. Emulex Corp.*,
  No. SACV 15-00554-CJC(JCGx),
  2020 WL 1847708 (C.D. Cal. Feb. 25, 2020) ...................................................... 31

*Welch v. Meaux*,
  No. 19-cv-1260 et al.,
  2022 WL 3273951 (W.D. La. June 15, 2022) ....................................................... 17

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ............................................................................... 22

*Woolgar v. Kingston Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................... 18, 21, 26, 27

**Statutes**

15 U.S.C. § 78u-4 ..................................................................................... 12, 31

**Rules**

Fed. R. Civ. P. 9............................................................................................ passim

Fed. R. Civ. P. 23.1.................................................................................. 2, 13, 15

## PRELIMINARY STATEMENT

Defendants Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romero (collectively, the "Spartan Individual Defendants") and Spartan Acquisition Sponsor II LLC ("Sponsor," and together with the Spartan Individual Defendants, the "Spartan Defendants") file this brief to explain why the Court should dismiss Plaintiffs' Section 14(a) claim against them.  While that claim fails for several reasons, its core allegation – that the Spartan Defendants misrepresented the "robustness" of risk management policies in mid-2021 – is particularly flawed because it is alleged to be false based on an event that occurred *fourteen months later* in September 2022, and well after the Spartan Defendants had ceased being involved with the company.

To appreciate the flaws in Plaintiffs' claims, it is important to understand the underlying transaction by which defendant Sunlight Financial Holdings, Inc. ("New Sunlight") became a public company, and the Spartan Defendants' involvement in that transaction.  The Individual Spartan Defendants were directors and/or officers of Spartan Acquisition Corp. II ("Spartan"), a special purpose acquisition company ("SPAC").  In July 2021, Spartan completed a business combination with Sunlight Financial Holdings, LLC ("Legacy Sunlight"), an operator of a digital marketplace that home improvement contractors used to offer their customers financing.  As the Amended Complaint admits, the Spartan Defendants' involvement was limited to their roles at Spartan and ceased on the completion of this business combination.  The Spartan Individual Defendants were not directors or officers of New Sunlight.  Nor were they directors or officers of Legacy Sunlight.  Like Legacy Sunlight, New Sunlight has been managed by a separate management team and board.

Over a year after this business combination, in September 2022, New Sunlight announced that it was recognizing losses due to the insolvency of one of its contractors.  Specifically, New

Sunlight was writing off loans extended to that contractor under a cash advance program.  New Sunlight also decided to review other loans extended under the program, and ultimately suspended it.  Despite the fact that the Spartan Defendants were not involved in any of these decisions (and had not been involved in the management of New Sunlight), Plaintiffs claim that the Spartan Defendants are liable under Section 14(a) because the proxy statements issued to Spartan's stockholders in mid-2021 in connection with the business combination misrepresented the "robustness" of controls relating to Legacy Sunlight's cash advance program.  Plaintiffs seize on alleged "red flags" that began in "early 2022" purportedly suggesting the contractor's distress, and have brought this securities action alleging that the New Sunlight's write-off and remedial actions must mean that the quality of its risk monitoring processes was misrepresented.  Plaintiffs do not dispute that those controls existed; rather, their claim is simply about the Spartan Defendants' view that, a year-and-a-half earlier, they believed those controls were robust.

The claim against the Spartan Defendants fails for three principal reasons.

*First*, the Section 14(a) claim is derivative, yet Plaintiffs neither made a demand on the Sunlight Board as required under Federal Rule of Civil Procedure 23.1, nor pleaded demand futility.  As the Southern District of New York recently held for a different SPAC transaction in *In re Romeo Power Securities Litigation*, the claim against the Spartan Defendants is fundamentally one about overpayment—that Plaintiffs were harmed when they approved the merger because Legacy Sunlight was not as valuable as the proxy represented.  21 Civ. 3362 (LGS), 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022).  Under Delaware law, which controls the analysis of whether a claim is direct or derivative, such a damages theory is quintessentially derivative because it harms the corporation directly, and affects the shareholders only indirectly

through the reduced value of their stock. Accordingly, as in *Romeo Power*, the Court should dismiss the Section 14(a) claim for failure to comply with Rule 23.1.

*Second,* Plaintiffs fail to allege that the proxy contained any materially misleading statement. The Amended Complaint quotes a lengthy paragraph from the proxy statement describing Legacy Sunlight's cash advance program, and claims in utterly conclusory fashion that it was misleading. That approach fails at the outset because it does not satisfy the PSLRA's requirement to specify which statements are misleading and why. But even if the Court undertook to do that work for Plaintiffs, none of the quoted statements are materially misleading. Two of the statements describing Legacy Sunlight's risk management policies as "vigorous" and "robust" are, at most, non-actionable puffery and statements of opinion. The remaining statements describe Legacy Sunlight's processes to evaluate, onboard, and monitor contractors under the credit advance program. Crucially, however, the Amended Complaint fails to allege that any of these processes were not actually in place. Indeed, the Amended Complaint cites to New Sunlight SEC filings and to two confidential witnesses that make clear that the process were in fact in place, while characterizing the company's risk management practices as insufficient or imprudent. Instead of identifying how any specific statement is false, Plaintiffs appear to suggest that the proxy statement's description of the credit advance program was misleading because New Sunlight *later* failed to avoid the contractor's default. But it is well-established that Plaintiffs must allege that statements were false *when made*. A description of a risk management policy cannot become a false statement just because a risk later came to fruition. Plaintiffs' suggestion that the proxy statement misleadingly characterized the credit advance program further fails because the same proxy statement, which is incorporated by reference into the Amended Complaint, contained

extensive disclosures regarding the risk posed by the program.  While the Amended Complaint fails to grapple with these disclosures, they are fatal to Plaintiffs' allegations of falsity.

*Third*, even setting aside the absence of any materially misleading disclosure, the Section 14(a) claim fails because Plaintiffs have not pleaded the requisite level of culpability against the Spartan Defendants.  Despite its boilerplate disclaimers of fraud, the Amended Complaint's Section 14(a) allegations sound in fraud because they impute a motive to the Spartan Defendants to complete even a "bad deal."  The claim is therefore subject to the heightened pleading requirements of Rule 9(b), yet the Amended Complaint fails to allege any facts raising a strong inference of scienter.  But even if the claim sounded in negligence, the Amended Complaint contains essentially no allegations against the Spartan Defendants other than their roles at Spartan, which is wholly insufficient to plead that they failed to exercise reasonable care in issuing the proxy statement.

In sum, the Section 14(a) allegations against the Spartan Defendants fail to state a claim as a matter of law and should be dismissed.

## ALLEGATIONS OF THE COMPLAINT

**I.    Spartan is formed to acquire an emerging privately-held business.**

Spartan was incorporated in Delaware in August 2020 for the purpose of "effecting a merger … or similar business combination with a privately-held business to enable the private company to go public."  AC ¶ 35; Ex. A at 18.[1]  Sponsor was likewise incorporated in Delaware

---

[1] Citations in the form "Ex. __" refer to the documents attached to the Declaration in Support of the Motion to Dismiss filed contemporaneously herewith.  In addition to the Amended Complaint, the Court may "examine [the registration and proxy statements cited by Plaintiffs] together with the allegations contained on the face of the [Amended] [C]omplaint" because these documents are "integral to the complaint."  *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991).  Moreover, a court can take judicial notice of "SEC filings even if the plaintiff did not specifically cite them in the complaint," considering them either "for the truth of their contents" (as document filed "under penalty of perjury" with the SEC) or simply to assess the total mix of information available to public stockholders.  *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 132-33 (D. Conn. 2007) (collecting authorities), *aff'd,* 312 F. App'x 400 (2d Cir. 2009).

in August 2020, to serve as Spartan's sponsor.  AC ¶ 32.  Spartan was led by a team of highly qualified officers and directors:  Strong (CEO and Chairman); Crossen (CFO and CAO); directors Wassenaar, Handler, Hommes, Romeo, Jan Wilson and John Stice.  AC ¶¶ 26-31; Ex. A at 227-28.[2]

Spartan completed its initial public offering on November 30, 2020, issuing 34.5 million units for $10 per unit (the "IPO").  Each unit consisted of one share of Spartan Class A Common Stock and one-half of a warrant to later purchase additional Class A shares for $11.50 per share.  AC ¶ 39; Ex. A at 225.  Sponsor, for its services to Spartan and for covering certain of Spartan's expenses, obtained 8,525,000 Class B shares or "founder shares" which would convert to Class A shares upon the completion of a business combination.  Ex. A at 225.  Sponsor also purchased 9.9 million "private placement warrants" for $1 each that entitled Sponsor to buy additional shares at $11.50 per share following a business combination.  *Id.*  None of the Spartan Individual Defendants personally received founder shares.  *See id.* at 267.

## II.   Spartan explores potential transactions and agrees to combine with Sunlight.

Following the IPO, Spartan "commenced a robust search for businesses or assets to acquire."  Ex. A at 131.  Its representatives engaged in discussions with numerous potential acquisition partners across a range of industries, many of which "advanced to … the counterparty … execut[ing] a confidentiality agreement."  Ex. A at 122, 131.

Among these potential counterparties was Legacy Sunlight, which "operate[d] a digital platform that lets contractors offer instantaneous financing to customers buying residential solar or home improvement projects," and earned platform fees by connecting contractors with "[Legacy] Sunlight's network of capital providers."  AC ¶¶ 2, 40-41; Ex. A at 18.  Because Legacy

---

[2] Wilson and Stice are not parties to this case.

Sunlight did not advertise to consumers, it "relie[d] on contractors to tell their customers they can finance their purchase through [its] platform." AC ¶ 42. Thus, Legacy Sunlight's business model depended on convincing contractors "to use [its] financing platform when signing up customers." *Id.* ¶ 44. It competed for this market "primarily on process … , pricing and products," by offering contractors "a fast, fully-digital and frictionless" platform to determine if their customers are approved for home improvement loans. Ex. A at 19. Further, Legacy Sunlight sought to attract contractors using "milestone advances" and "contractor prefunding advances" which provided contractors "with short-term capital advances to support upfront costs and liquidity needed to purchase equipment" (the "Cash Advance Program"). *Id.* at 213; AC ¶ 45.

On December 14, 2020, Spartan's board of directors (the "Spartan Board") decided to evaluate and pursue Legacy Sunlight as an acquisition target. *See* Ex. A at 132. Evaluation, diligence, and negotiation of a business combination continued through January 23, 2021, with Spartan learning about Legacy Sunlight by participating in management meetings, receiving presentations from Legacy Sunlight and Spartan advisors, and reviewing due diligence. *See id.* at 132-35. In connection with this evaluation, Spartan engaged third-party advisors including, *inter alia*, Vinson & Elkins LLP, PricewaterhouseCoopers LLP, and Credit Suisse Securities (USA) LLC. *Id.* at 133.

On January 21, 2021, the Spartan Board unanimously approved a transaction pursuant to which Legacy Sunlight would merge with and into a subsidiary of Spartan, and Spartan would be renamed Sunlight Financial Holdings, Inc. (the "Business Combination"). *Id.* at 19-20, 135; AC ¶¶ 47-49. The terms of the Business Combination were finalized on January 23 and the transaction was publicly announced on January 25, 2021. AC ¶ 47; Ex. A at 135.

**III.    Spartan issues the Proxy with robust disclosures regarding Legacy Sunlight's Cash Advance Program.**

On March 22, 2021, Spartan filed with the SEC a Registration Statement and Preliminary Proxy Statement on Form S-4 in connection with the Business Combination.  AC ¶ 57; Ex. B. Amendments to the initial Registration Statement were filed on May 12, 2021 and June 1, 2021, *see* Exs. C-D, and a final form of Proxy Statement and Prospectus was filed on June 21, 2021 (the "Proxy").  AC ¶ 58; Ex. A.[3]  Spanning 530 pages (inclusive of all attachments), the Proxy provided a thorough overview of Legacy Sunlight and the Business Combination, including a background of the transaction, reasons the transaction was deemed attractive for Spartan, and risks that would face the combined business.

The Proxy included a detailed description of the Cash Advance Program, including its utility for Legacy Sunlight's business model, the risks that it posed, and the steps that Legacy Sunlight took to monitor and manage those risks.  The Proxy explained that the Cash Advance Program was implemented to attract contractors in the face of competition.  Ex. A at 213. "[Legacy] Sunlight ha[d] advanced approximately $526 million to contractors in its network," and "only experienced approximately $0.4 million in losses on those advances."  *Id.* at 213.  Given the importance of a growing network to its business, *id.* at 40, 138, Legacy Sunlight was "actively expanding its contractor network" and "[f]orm[ing] strategic partnership … to facilitate rapid expansion of [its] contractor network," *id.* at 19, 173.  Indeed, the Proxy identified such "rapid volume growth profile" as a key reason the Spartan Board favored the Business Combination.  *Id.* at 137-38.

---

[3] Because the relevant disclosures are substantively identical in the March 22, 2021 preliminary proxy and the June 21, 2021 final proxy, for efficiency, the Spartan Defendants herein refer to and cite to only the latter as the "Proxy."

Plaintiffs do not challenge any of the foregoing disclosures or statistics. Instead, Plaintiffs' entire theory of Section 14(a) liability against the Spartan Defendants appears in a single paragraph of the Amended Complaint that contains a lengthy block quote from a section of the Proxy titled "Risk Management" relating to the Cash Advance Program. AC ¶ 57. Plaintiffs' cherry-picked block quote consists of six separate statements:

> **[Stmt. 1]** Sunlight has adopted vigorous contractor diligence and monitoring procedures.
>
> **\*\*\***
>
> **[Stmt. 2]** Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition (to support construction processes and provide post construction warranty support) and legal compliance practices of the contractors in Sunlight's network.
>
> **[Stmt. 3]** Upon the engagement of a contractor into Sunlight's network, Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor.
>
> **[Stmt. 4]** Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently….
>
> **[Stmt. 5]** Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network.
>
> [**Stmt. 6**] Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

*Id.* (emphases omitted); Ex. A at 207-09.

Plaintiffs' cherry-picked set of quotations ignores other key disclosures concerning the Cash Advance Program and the risks attendant thereto.  For one, Plaintiffs omit that they are quoting from a section titled "***Risk*** Management," and they skip over a sentence warning that Legacy and New Sunlight (together, "Sunlight") faced a "commercial credit risk related to the financial condition and liquidity of [its] contractors and their ability to … pay back any advance that may have been made."  Ex. A at 207-09 (emphasis added).  Plaintiffs also omit the Proxy's disclosure that advances were offered "across the [risk] spectrum," *id.* at 213, and that the "risk evaluation and tiering conducted by Sunlight's commercial risk team" was used to determine "[t]he ***aggregate*** amount of advances available"—not to evaluate the soundness of every advance, *id.* at 52 (emphasis added).[4]

Moreover, the Proxy repeatedly warned in bold, italicized text that "Sunlight's risk management processes and procedures may not be effective," *id.* at 47, and that its "short-term capital advance program exposes it to potential losses in the event that a contractor fails to fully perform under its agreement with Sunlight or becomes insolvent prior to completion of the underlying installation or construction, which losses could have an adverse impact on Sunlight's business, results of operations and financial condition," *id.* at 52.  The Proxy also warned that the "ability of contractors to fully perform or maintain their solvency depends on a number of factors, including, but not limited to, changes in economic conditions, adverse trends or events affecting the solar system and home improvement industries, … and management and cash flow levels," and that, "[a]s of March 31, 2021, [Legacy] Sunlight had an aggregate of $32.6 [million] of

---

[4] Nor could an investor reasonable believe that each request for an advance was scrutinized or met with requests for detailed financial data, given that "[p]refunding advances," for example, "are … made by Sunlight to a contractor ***within 24 hours of a request for funding***."  Ex. A at 213 (emphasis added).

outstanding advances to 120 contractors," "[a]pproximately 64%" of which "were made to four of [its] largest contractor relationships." *Id.* at 53.

Thus, investors were notified that Sunlight had tens of millions of dollars in outstanding advances; that those outstanding advances posed material risk to Sunlight; and that Sunlight's risk management policies for onboarding and monitoring its contractors might fail to prevent losses of those advances.

## IV.    The Business Combination closes with overwhelming stockholder approval.

On July 8, 2021, the Spartan shareholders overwhelmingly voted to approve the Business Combination.  AC ¶ 48.  The Combination closed the next day, the Spartan Board resigned, and New Sunlight began trading on the New York Stock Exchange.  *Id.*  Thereafter, the Spartan Defendants ceased to have any involvement in Sunlight's management.  *See* Ex. A at 249.

## V.    Over a year after the Business Combination, New Sunlight's major contractor becomes insolvent and defaults.

On September 28, 2022—more than thirteen months after the Business Combination closed—New Sunlight announced that it would take a "non-cash advance receivable impairment charge of $30 to $33 million" because one of its contractors was taking "certain actions" that were "likely [to] result in an [in]ability of [New Sunlight] to collect on advances outstanding to such installer."  AC ¶ 80.  In an accompanying press release, New Sunlight disclosed that it would be "re-underwriting all contractor partners' advances to further mitigate risk going forward."  *Id.*  The price of New Sunlight's common stock fell from $2.52 to $1.08 the following day.  *Id.* ¶ 81.  The contractor at issue was revealed to be Power Home Solar, LLC d/b/a Pink Energy ("Pink Energy"), which filed for bankruptcy on October 7, 2022.  *Id.* ¶ 82.  New Sunlight later announced that, "in the fourth quarter of 2022[,] [it] took steps to 'mitigate … risk' in the cash advance program," but ultimately "decided to 'suspend the program indefinitely' as of March 2023."  *Id.* ¶ 79.

**VI.     Plaintiffs file a Section 10(b) fraud claim following Pink Energy's insolvency, but then tack on a Section 14(a) claim against the Spartan Defendants.**

On December 16, 2022, a few months after the Pink Energy write-off, then-plaintiff Kathie Fung filed a Section 10(b) and Section 20 securities fraud complaint against Sunlight and certain of its executives.  Compl. ¶¶ 14-18.[5]  The Original Complaint's fraud theory was that, in light of the Pink Energy default, Legacy Sunlight's management team must have known but concealed that Legacy Sunlight "lacked effective underwriting and risk evaluation" policies, "oversight and periodic monitoring systems," and "effective internal controls" all of which rendered "positive statements about [Legacy Sunlight's] business, operations, and prospects … materially misleading and/or lack[ing] a reasonable basis."  *Id.* ¶¶ 7, 19.

The Amended Complaint filed on May 22, 2023 abandoned this fraud-by-omission theory. Instead, Plaintiffs reasserted Section 10(b) and Section 20 claims against Sunlight and certain of its executives by alleging that statements by Sunlight executives assessing the Cash Advance Program to be low risk were false in light of supposed warning signs regarding Pink Energy that emerged by "early 2022."  *See* AC ¶¶ 66-73.  The Amended Complaint sought to bolster its allegations through snippets and paraphrasing of two former Sunlight employees as confidential witnesses, through whom Plaintiffs seek to portray the Cash Advance Program as too permissive and the monitoring as "lackadaisical."  *Id.* ¶¶ 60-65.  The Amended Complaint also added Count III for claims under Section 14(a) against all defendants, except Sunlight CFO Rodney Yoder, but including against the Spartan Defendants.  The essence of Plaintiffs' Section 14(a) theory against the Spartan Defendants is that a block-quoted paragraph of the Proxy's description of Legacy

---

[5] The individual defendants were New Sunlight executives Potere, Edinburg, and Yoder, and pre-Business Combination Spartan executives Strong and Crossen.  Compl. ¶¶ 14-18.

Sunlight's monitoring procedures for the Cash Advance Program in March to June 2021 was allegedly misleading in light of Pink Energy's default over fourteen months later.

**LEGAL STANDARDS**

The sole claim against the Spartan Defendants is Count III for violation of Section 14(a), which requires pleading that "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury, and [that] (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Bond Opp. Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004).

Whether a Section 14(a) claim sounds in negligence or fraud, "Plaintiff[s] face[] a high pleading standard" under the Private Securities Litigation Reform Act ("PSLRA"). *Bisel v. Acasti Pharma, Inc.*, 21 Civ. 6051 (KPF), 2022 WL 4538173, at *6 (S.D.N.Y. Sept. 28, 2022). Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, … stat[ing] with particularity all facts on which that belief is formed." *Id.*; *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 529 (S.D.N.Y. 2021) ("[P]laintiffs must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so."). The PSLRA also requires pleading "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The 'strong inference' requirement … mean[s] that plaintiffs are entitled to only the most plausible of competing inferences." *Bond Opportunity Fund v. Unilab Corp.*, No. 99 CIV. 11074(JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003) (citation omitted), *aff'd*, 87 F. App'x 772 (2d Cir. 2004).

Additionally, where "plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct," those allegations are "subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for allegations of fraud." *Bisel*, 2022 WL 4538173, at *7. Rule 9(b) requires

that Plaintiffs "'[i] specify the statements that [they] contend[] were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'" *Id.* (alterations in original) (collecting authorities).  This heightened standard applies to "Section 14(a) claims grounded in alleged fraudulent conduct … even if," as here (AC ¶ 116), Plaintiffs "disclaim reliance on a fraud theory." *Id.*; *see infra*, pp. 27-28.

Even setting aside these heightened pleading standards, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" and mere "labels," "conclusions," and "naked assertion[s]" are insufficient to state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Allegations "contradicted" by documents "integral to, or explicitly referenced in," the complaint, are likewise insufficient.  *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

## ARGUMENT

As explained below, Count III should be dismissed as to the Spartan Defendants for at least three independent reasons.  *First*, the Section 14(a) claim is derivative in nature, but Plaintiffs have neither presented it to New Sunlight's board nor pleaded demand futility in violation of Rule 23.1. *Second*, the allegations are insufficient to plead that any statement was materially false or misleading when considered in isolation or combination.  *Third*, Plaintiffs have not pleaded the requisite level of culpability by the Spartan Defendants.

## I.      Plaintiffs failed to satisfy Rule 23.1 before bringing their derivative claim.

As a threshold matter, Count III should be dismissed because it is a derivative claim that Plaintiffs seek to assert directly, but Plaintiffs did not "satisfy the requirements of Rule 23.1 of the Federal Rules of Civil Procedure" by making a demand on the New Sunlight board or pleading demand futility.  *Romeo Power*, 2022 WL 1806303, at *5 (citations omitted).

-13-

Whether a claim is direct or derivative is determined per "the law of the state of incorporation," *Halebian v. Berv*, 590 F.3d 195, 206 (2d Cir. 2009), which is Delaware, *see* Ex. A at x.  Under Delaware law, to state a "direct" claim a plaintiff must "demonstrate[] that he or she can prevail without showing an injury to the corporation," because harms that flow indirectly to stockholders through harm to the corporation are derivative.  *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263, 1268 (Del. 2021) (citation omitted).  "The manner in which a plaintiff labels its claim and the form of words used in the complaint are not dispositive."  *Bocock v. INNOVATE Corp.*, 2022 WL 15800273, at *16 (Del. Ch. Oct. 28, 2022).  Rather, "a court should look to the nature of the wrong and to whom the relief should go."  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).

Here, the essence of Plaintiffs' Section 14(a) claim is that Spartan overpaid for Legacy Sunlight because Legacy Sunlight was not as described in the Proxy, causing a decline in Plaintiffs' stock.  Specifically, Plaintiffs allege that deficiencies in the Proxy deprived them of the "opportunity to make a fully informed decision in voting on the Business Combination" whereby Spartan acquired Legacy Sunlight, and that they were harmed by a "precipitous decline in the market value of [New] Sunlight's common stock" when it supposedly emerged that New Sunlight's credit risk processes were not as robust as described.  AC ¶¶ 11-13, 80-81, 88, 128.  This is a textbook "overpayment" claim that is "exclusively derivative" under Delaware law.  *Brookfield*, 261 A.3d at 1265.  That is because claims that fiduciaries caused the company to overpay for an asset allege conduct that "harm[s] the corporation directly, [but] harms the stockholders only derivatively so far as their stock loses value."  *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1261 (Del. 2016).

The recent decision in *Romeo Power* is directly on point. *See* 2022 WL 1806303. There, plaintiffs brought a Section 14(a) claim against a SPAC's directors based on allegations that plaintiffs' stock lost value after a battery company acquired by the SPAC encountered revenue and supply chain issues, despite the merger proxy touting the strength of the supply chain. The Court held the Section 14(a) claim was derivative under Delaware law because "the essence of [the] claim is that the proxy statements overstated the value of [the target] and as a result, [the SPAC's] shareholders received less in value from the merger than they expected when they approved it." *Id*. at *5. The *Romeo Power* holding accords with the Supreme Court's longstanding recognition that the "injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder"; and that the "[t]he damage suffered results not from the deceit practiced on him alone but rather from the deceit practiced on the stockholders as a group." *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964). Accordingly, Count III should be dismissed on procedural grounds, without reaching the merits, for non-compliance with Rule 23.1.

**II.    Count III must be dismissed because the Amended Complaint fails to allege the Proxy was false or misleading.**

Even if Count III stated a direct rather than derivative claim, which it does not, the claim should be dismissed for failure to plead facts demonstrating that the Proxy was false or misleading.

**A.    The Amended Complaint is facially deficient under the PSLRA.**

Plaintiffs wholly disregarded their obligation of pleading falsity with particularity. Only one paragraph of the Amended Complaint identifies an alleged misstatement in the Proxy. *See* AC ¶ 57. That paragraph simply contains a lengthy block quote from the Proxy about Sunlight's Cash Advance Program, with sentences and phrases bolded; Plaintiffs assert that the entire quote is a misrepresentation. *Id*. Other portions of the Amended Complaint contain detail on post hoc

-15-

developments and former employees' views about why Sunlight's monitoring was inadequate, but "Plaintiffs neglect[ed] to make it clear … which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005). The PSLRA does not allow Plaintiffs to bring claims based on "lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false." *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477 (S.D.N.Y. 2021). Thus, the Court can dismiss the Section 14(a) claim based on Plaintiffs' failure to "describe what portion of [the] quotation constitutes a false representation" alone. *Id.*

### B. Plaintiffs failed to allege a false or misleading statement of material fact.

Even if the Court elected to parse the Amended Complaint to determine the specific portions of the block quote from the Proxy that Plaintiffs allege to be false, the Amended Complaint still fails to plead that the Proxy contained a material misrepresentation.

#### 1. The Proxy's descriptions of Sunlight's contractor diligence as "vigorous" and "robust" are not actionable.

Among the Proxy's statements block-quoted in the Amended Complaint are: (1) "[Legacy] Sunlight ha[d] adopted vigorous contractor diligence and monitoring procedures" (Statement 1); and (2) "[Legacy] Sunlight has established a robust commercial underwriting and ongoing monitoring process" (Statement 2). AC ¶ 57. Both of these statements are, at most, inactionable puffery because they are "too general to cause a reasonable investor to rely upon them." *ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Indeed, courts in this district have routinely reached that conclusion for very similar statements. *See id.* (statement that defendant "set the standard for best practices in risk management techniques" not actionable); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser*

*Grp. PLC*, 587 F. Supp. 3d 56, 93 (S.D.N.Y. 2022) ("[T]he claim of a 'robust' compliance program … [was a] generic statement[] that would not be considered material by a reasonable investor and [is] nothing more than puffery."); *In re Citigroup Sec. Litig.*, 20 Civ. 9132 (LAP), 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) ("statements about how [defendant] 'manages its risks,' that it has systems 'designed to protect Citi' and 'policies, procedures, and processes' to control risk" are puffery).

The conclusion that such statements are inactionable is all the more evident where, as here, a proxy statement contains specific disclosures of risk, such that optimistic assessments do not "significantly alter[] the 'total mix' of information available." *Singh v. Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) (citation omitted) (statements that defendant "allocate[d] significant resources[] to compliance" or "established [compliance] policies" were generic and immaterial given that the statements  were "framed by acknowledgments of the complexity and numerosity of applicable regulations," which "reflect[ed] [defendant's] uncertainty as to the very possibility of maintaining adequate compliance mechanism"); *Welch v. Meaux*, No. 19-cv-1260 et al., 2022 WL 3273951, at *10 (W.D. La. June 15, 2022) (statement in SPAC proxy that target business had "huge potential" with "proven … ability to grow and expand[]" immaterial because it was "based on accurate historical trends[] and corollary risks … were identified in the proxy").  The Proxy disclosed that Sunlight faced "risk related to the financial condition … of [its] contractors and their ability to … pay back advances"; the advances were "offered … across the spectrum of Sunlight's assigned contractor risk tiers"; Legacy Sunlight historically "advanced approximately $526 million" and "experienced approximately $0.4 million in losses"; and, "Sunlight [was] at risk for defaults" with "an aggregate of $32.6 million of outstanding advances."  Ex. A at 52-53, 208, 213 & F-53.  In light of these express warnings, generic descriptions of the Cash Advance Program as

"robust" or "vigorous" are inactionable because they do not significantly alter the total mix of the information available.

Lastly, Statements 1 and 2 are inactionable statements of opinion under well-established Second Circuit law. *See Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) (treating as opinions statements that pharmaceutical "demonstrated a 'strong and robust treatment effect'" and "that 'the data are nothing short of stunning'"). "[S]tatements of opinions are not actionable unless subjectively false - the speaker does not believe what [he or she] says - or objectively false - the speaker misrepresents or omits existing material facts in support of [his] belief." *Woolgar v. Kingston Cos.*, 477 F. Supp. 3d 193, 224 (S.D.N.Y. 2020). Neither circumstance applies here. Plaintiffs do not and cannot claim subjective falsity by the Spartan Defendants; indeed, Plaintiffs expressly disclaimed "any knowing or reckless conduct" in their sole claim against the Spartan Defendants. AC ¶ 116. Similarly, Plaintiffs have not alleged that the Proxy "misrepresent[ed] or omit[ted] material facts" that "support[ed]" the opinions that Sunlight's processes were vigorous or robust. *Woolgar*, 477 F. Supp. 3d at 224. Plaintiffs neither identified the data the Proxy cited in support of these optimistic assessments, nor alleged any reason to believe that such data was "inaccurate at the time reported." *Id.* at 225. Nor could they, since the Proxy disclosed (and Plaintiffs do not challenge) that, historically, the Cash Advance Program caused Legacy Sunlight to lose only "$0.4 million" of "$526 million" advanced. Ex. A at 213. A 0.08% historic loss statistic plainly supports a belief that Legacy Sunlight's processes were robust and vigorous. "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

### 2.    *None of the Proxy's other descriptions of Sunlight's contractor diligence are alleged to be false.*

The remaining statements in the Proxy block-quote likewise cannot give rise to Section 14(a) liability because Plaintiffs fail to allege facts indicating they were false when made between March and June 2021.

#### a.    Statement 3: Diligence During Onboarding

Plaintiffs fail to plead falsity of Statement 3: "Upon the engagement of a contractor into Sunlight's network, Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor." AC ¶ 57.  Plaintiffs have pleaded no non-conclusory facts indicating that Legacy Sunlight did not actually review contractors' financial and reputational information during onboarding at the time the Proxy was issued (March to June 2021).  Rather, Plaintiffs' allegations support the accuracy of these statement, by citing CW1 as stating that "initial vetting of contractors consisted of looking at the contractor's self-supplied financial statements."  *Id.* ¶ 61.

#### b.    Statements 4: Ongoing Monitoring

Any challenge Plaintiffs raise to Statement 4 ("Once onboarded, Sunlight continues to monitor the contractors … against the[] same standards at least annually and, if advisable, more frequently….") fails for similar reasons—there are no allegations that Legacy Sunlight did not so continue to monitor its contractors.  *Id.* ¶ 57.  Again, CW1 confirmed that Legacy Sunlight conducted "an annual review of the contractor's self-supplied financial statements."  *Id.* ¶ 61. Plaintiffs' conclusory allegation that "there was no 'ongoing monitoring'" apart from that review is insufficient to show falsity because it does not "allege[] that management did not, in fact,

conduct the evaluations described in those statements." *In re Banco Bradesco S.A. Sec. Litig*., 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017).[6]

Apparently cognizant that they cannot plead facts demonstrating an absence of ongoing monitoring , Plaintiffs attempt to show falsity by: (1) mischaracterizing the statement about Legacy Sunlight's "ongoing monitor[ing] [of] contractors" as a representation that additional diligence was performed before each individual contractor advance, *see* AC ¶¶ 63-65; and (2) claiming that descriptions of Legacy Sunlight's ongoing monitoring must be inaccurate given that New Sunlight was allegedly "blind" to Pink Energy's impending insolvency, *see id.* ¶¶ 66-73, 80-82.  Neither theory suffices to plead falsity.

*First*, Plaintiffs suggest "ongoing monitoring" was misrepresented because "[t]here was no additional due diligence for individual cash advances."  *Id.* ¶ 61.  But Statement 4 concerned "monitor[ing] [of] ***contractors***," not individual advances.  *Id.* ¶ 57 (emphasis added).  The Proxy never states that each individual cash advance was subject to additional due diligence.  To the contrary, the Proxy stated "[t]he ***aggregate amount*** of advances available to a given contractor [was] based on a risk evaluation and tiering conducted by [Legacy] Sunlight's commercial risk team."  Ex. A at 52 (emphasis added).  Thus, the Proxy's description of monitoring of contractors as a whole and tracking advances in the aggregate would not be rendered false by Plaintiffs' allegation that "[t]here was no additional due diligence for individual cash advances."  AC ¶ 61; *see Malin*, 499 F. Supp. 2d at 146-47 (finding no falsity where plaintiffs argued that "Defendants had [not] conducted claims audits at ceding companies, as represented to investors" because SEC

---

[6] The closest the Amended Complaint comes is the allegation of CW2 that the diligence and monitoring process was only "on papers" and was "never executed."  AC ¶ 64.  But as explained below, this allegation is irrelevant to the Spartan Defendants because CW2 did not start with Sunlight until October 2021—three months after the last Proxy Filing was made.  *Infra*, p. 26 (collecting authorities).

filings stated that "claims audits are conducted for *specific* claims and claims procedures at the offices of *selected* ceding companies" (emphasis in original)).

*Second*, a statement about risk management policies cannot become false merely by pleading that a risk later came to fruition and caused harm despite those policies. This is "the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain." *Woolgar*, 477 F. Supp. 3d at 225-26 (statement that loss reserves were adequate not rendered false by subsequent need to significantly increase reserves). Especially where statements concern estimating risk or the ability to repay debt, an allegation that such estimates were later proved wrong is insufficient. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990) (estimates of credit losses were not rendered false just because additional debt was later determined to be uncollectible); *NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, No. 10 Civ. 440(LAK)(HBP), 2012 WL 3191860, at *13 (S.D.N.Y. Feb. 9, 2012) ("[T]he simple fact [that a bank needed to] write-down [loan portfolios] does not stand for the proposition that values stated before the write-down were inaccurate….").

This Court's opinion in *Africa v. Jianpu Tech. Inc.* is particularly instructive. *See* 21-CV-19, 2022 WL 4537973, at *6 (S.D.N.Y. Sept. 28, 2022). There, a company in the business of recommending credit cards to consumers informed its shareholders that it "'beefed up [its] quality control process,' 'removed the noncompliant financial product,' and implemented 'a very stringent and strict onboarding process'" for credit card providers. *Id.* Plaintiffs alleged these assertions were false because "there were [still] noncompliant providers on" defendant's network and, after being subject to media scrutiny, defendant "suspended its mobile application, engaged a consultant to review its internal processes, and adopted stricter policies for financial services." *Id.* This Court rejected such allegations as insufficient to show that the prior statements were false when made

because the allegations proved "[a]t best … that a few loan providers" remained non-compliant, not that defendant "was generally noncompliant." *Id.* The same is true here—the mere fact that Pink Energy defaulted in 2022 while owing Sunlight significant sums for advances does not indicate that Sunlight generally did not monitor its contractors at least annually.

c.     Statements 5-6: Risk Tiers

The two remaining statements are likewise not alleged to be false: "[b]ased on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network" (Statement 5); and "[c]ontractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring" and "the availability of advances" (Statement 6).  AC ¶ 57.

Regarding Statement 5, Plaintiffs do not dispute that Legacy Sunlight undertook an onboarding diligence process, based on which a contractor would be either accepted or rejected. At most, the Amended Complaint quotes CW1 as stating that the "contractor risk evaluation process was generally effective from 2017 to 2019," but that starting in late 2019 Sunlight took a "less stringent and more lackadaisical approach" and "accepted everyone until they got screwed." *Id.* ¶¶ 62, 85.  But a confidential witness's assessment that the onboarding diligence process became "less stringent" and "accepted everyone" does not allege falsity as to statements that there was a diligence process for deciding whether to accept or reject new creditors—particularly given the Proxy's disclosures that Sunlight was "growing its … network rapidly" and that its "prefunding advance program is offered to contractors in Sunlight's network across the spectrum of Sunlight's assigned contractor risk tiers."  Ex. A at 206, 213; *see Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 132-33 (2d Cir. 2011) (holding that defendant's disclosure that it "is permitted, but not obligated," to submit bids in auctions for its own securities and that it "routinely" does so was not

rendered by false by allegations that defendant placed such bids "in every single auction" except where defendant "decided to let certain auctions fail").[7]

Similarly, for Statement 6, Plaintiffs do not dispute that Legacy Sunlight categorized its contractors into risk tiers that affected aspects of their relationships. Indeed, the Amended Complaint supports the accuracy of Statement 6 by citing to New Sunlight's 2022 SEC filings detailing its "1-5 risk tier." AC ¶ 66. Rather, Plaintiffs assert that Legacy Sunlight's monitoring process must have been deficient because in 2022 New Sunlight assigned Pink Energy a rating of "3" for "medium commercial credit risk," despite signs that Pink Energy was a "troubled company" at that time. *Id.* ¶¶ 66-67. But such "disagreements [about] business judgments … are not actionable" as violation of securities laws. *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) (dismissing securities claim that defendant "should have recorded much larger write-downs" "on mortgage-backed securities" "than it did" in light of the economic downturn). And in any case, taking issue with New Sunlight's rating of Pink Energy in mid-2022 in light of warning signs that allegedly emerged in early 2022 certainly does not plead that the Proxy misrepresented Legacy Sunlight's categorizing of contractors into risk tiers in March to June 2021. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309.

---

[7] Even if the Court concluded that a reasonable investor could read Statement 5 as implying that Sunlight historically rejected contractors, a single, unnamed employee's vague and conclusory claim that Sunlight "accepted everyone" is insufficient under the PSLRA to allege Statement 5 as false. AC ¶ 62. CW1 was, at best, a middling manager ("Senior Relationship Manager") and not in a position to have personal knowledge of every contractor Sunlight ever considered, or the outcome of those considerations. *See In re Mindbody, Inc. Sec. Litig.,* 489 F. Supp. 3d 188, 204-05 (S.D.N.Y. 2020) (holding that confidential witness testimony was insufficient to allege statement to be false because witness was not alleged to have sufficient personal knowledge ).

### 3.   The Complaint's allegations focusing in 2022 do not plead falsity in the 2021 Proxy.

Rather than identifying a specific statement and explaining how it was false when made, Plaintiffs appear to primarily contend that the Proxy conveyed an impression of a stringent credit monitoring process that was misleading in light of Pink Energy's subsequent default and the confidential witnesses' assessments of the monitoring process.  Plaintiffs' contention fails for several reasons.

The Amended Complaint alleges that by "early 2022" or "Spring 2022" warning signs should have alerted New Sunlight to the possibility of the default that occurred in September 2022. *See* AC ¶¶ 66-73.  But the Proxy pre-dated these alleged warning signs by many months, and the default by more than one year.  For example, Plaintiffs allege "widespread media reports … of Pink Energy … engaging in deceptive marketing practices" "***by spring 2022***," and allegations of Pink Energy's financial woes are based on "a lawsuit [Pink Energy] filed … ***on August 1, 2022***." *Id.* ¶¶ 68-70 (emphases added).  Plaintiffs therefore cannot plead that any of these alleged warning signs existed at the time of the Proxy and rendered the Proxy false when issued.[8]  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (dismissing claims under PSLRA where there were no "well-pleaded allegations of contemporaneous falsity"—i.e., that the "statements were false or misleading *at the time they were made*").  Falsity cannot be alleged by referencing "red flags" post-dating the statements at issue. *E.g.*, *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x

---

[8] To the contrary, the complaint filed by Pink Energy cited in Plaintiffs' Amended Complaint indicates Pink Energy was "ranked number 7 among the top 228 residential solar contractors nationwide" "[f]or the year 2021." Ex. E ¶ 8. For 2021, "consumer sentiment for [Pink Energy] was so strong that its reviews across Facebook, Google and the Better Business Bureau were above 4.0 on a 5.0 scale." *Id.* ¶ 9.  A widespread electric component defect that partially precipitated Pink Energy's insolvency according to Plaintiffs, *see* AC ¶ 70, was not discovered by Pink Energy until "summer of 2021," Ex. E ¶¶ 35-48 (first defect identified in April 2021, but defects became apparent "in August 2021"); *see also* AC ¶ 70(a).  And, Pink Energy did not experience significant increase in customer service calls until "***late*** 2021 and into early 2022." Ex. E ¶¶ 74-76; *see also* AC ¶ 70(c).

72, 75 (2d Cir. 2016) (dismissing Section 10(b) claim for failure to plead falsity where underlying facts could "be characterized as red flags" only "with the benefit of hindsight"); *In re Aceto Corp. Sec. Litig.*, No. 2:18-cv-2425-ERK-AYS, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (dismissing as insufficient allegation that defendants misrepresented adequacy of internal controls since "a problem was disclosed" three months later and thus "defendants must have known of the problem" when the disclosures were made).

Thus, Plaintiffs are left to contend that the Proxy's descriptions of the credit monitoring system must have been misleading because that system *later* failed to prevent a sizeable credit default. But falsity cannot be stated based on "the benefit of hindsight." *Special Situations*, 645 F. App'x at 75. For example, in *Bond* the court held that the "mere fact that [a company's shares] increased in value over the eighteen months subsequent to the merger does not, in itself, constitute any evidence" supporting plaintiffs' allegations that the merger proxy understated the value of the shares. 2003 WL 21058251, at *10 ("[L]iability cannot be imposed on the basis of subsequent events" (citation omitted)). And, as detailed above, caselaw is clear that a statement detailing risk management policies, including credit risks, cannot be alleged as false merely by pleading that a risk later manifested despite those policies. *See supra*, p. 21 (collecting authorities).

Moreover, the Proxy cannot reasonably be read, as Plaintiffs contend, to assure investors that Sunlight's risk management processes ensured that Sunlight "would … know[]" in advance if a contractor was "troubled" and at risk of default. AC ¶ 12. Indeed, the very section from which Plaintiffs cherry-picked some quotes disclosed that the Cash Advance Program created "commercial credit risk related to the financial condition and liquidity of such contractors and their ability to complete the projects and to pay back any advances that may have been made by Sunlight." Ex. A at 208-09. The Proxy further disclosed that Sunlight was "at risk for defaults if

a contractor … becomes insolvent." *Id.* at 53.  It even quantified the amount of this exposure as "an aggregate of $32.6 million of outstanding advances to 120 contractors," noting that 64% of that amount was to its four largest contractors, and that if a contactor became insolvent "Sunlight may lose a portion or all of the funds advanced to such contractor, which may have an adverse impact on Sunlight's business." *Id.* at 53.  In light of these disclosures, no reasonable investor would interpret the description of Sunlight's "rigorous" underwriting processes as implying an ability to predict contractor insolvency and avoid any corresponding losses.  *E.g.*, *In re FedEx Corp. Sec Litig.*, 517 F. Supp. 3d 216, 229-30 (S.D.N.Y. 2021) (holding that statements about ability to recover data from a virus were not false "because those statements were accompanied by numerous disclosures about the difficulties faced … in that process").

Lastly, the Amended Complaint's attribution of statements to two confidential witnesses does not support Plaintiffs' Section 14(a) claim.  The statements of "CW2" should be disregarded altogether, because she is alleged to have joined New Sunlight in October 2021 (AC ¶ 63)—months after the Proxy was issued—and CW2 makes no assertions regarding conduct prior to her hiring.  *See Mindbody*, 489 F. Supp. 3d at 204-05 (holding that allegation of confidential witness who did not work at the company at the time the statement was made was insufficient to show contemporaneous falsity); *Woolgar*, 477 F. Supp. 3d at 221 ("Without approximate dates as to when the CWs had—or raised—certain concerns, their allegations do not plead contemporaneous falsity"); *Lululemon*, 14 F. Supp. 3d at 579 (same).  The statements of "CW1" are primarily that "contractor risk evaluation process was generally effective from 2017 to 2019," but that starting in late 2019 Sunlight took a "less stringent and more lackadaisical approach" and an aggressive approach to lending in order to generate business.  AC ¶¶ 61-62, 85.  But the alleged presence of some flaws in a monitoring program, or a negative characterization of that program by one

employee, is not enough to render the Proxy's descriptions misleading. *Woolgar*, 477 F. Supp. 3d at 221, 230-32 (statements regarding underwriting and risk management policies were not pleaded false despite allegations by confidential witnesses that the "underwriting department suffered from missing paperwork" and "underwriting guidelines changed every few months").

*    *    *

Thus, the Amended Complaint fails to meet the PSLRA's heightened standard for pleading material falsity as to the six statements at issue, whether they are viewed in combination or isolation. Accordingly, Count III must be dismissed as to the Spartan Defendants.

## III.    Plaintiffs failed to plead the required mental state.

Even setting aside the absence of a material misstatement, Count III fails because Plaintiffs wholly fail to plead the requisite level of culpability as to the Spartan Defendants.

### A.    Plaintiffs failed to meet the Rule 9(b) standard for pleading scienter.

Plaintiffs purport to disclaim reliance on allegations of fraud (AC ¶ 121), but their allegations say otherwise: Plaintiffs broadly allege that the Spartan Defendants authorized false or misleading statements to profit from an unfavorable deal while circumventing regulatory scrutiny. These conclusory allegations sound in fraud but lack particularity required under Rule 9(b), requiring dismissal of Plaintiffs' claim.

Plaintiffs cannot plead around Rule 9(b) through boilerplate disclaimers of an intent to bring a fraud claim. *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005). Rather, Rule 9(b) applies regardless of labels and disclaimers where "wording and imputations" of their allegations "are classically associated with fraud." *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004). For example, in *Rombach*, the Second Circuit required plaintiffs to satisfy Rule 9(b) because plaintiffs alleged "the [r]egistration statement was 'inaccurate *and*

-27-

misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued." *Id.*

The rationale for applying Rule 9(b) is far stronger here than in *Rombach*. In addition to alleging that the Spartan Defendants issued "false" and "misleading" statements, AC ¶¶ 58-59, 123, 128-29, Plaintiffs assert that the Spartan Defendants' receipt of founder shares incentivized "the founders/sponsors and management team of a SPAC" to approve "even … a bad deal for SPAC investors" because shares would "convert[] to common public shares, earning sponsors tens of millions of dollars," whereas in the absence of a merger the "founder shares are cancelled." *Id.* ¶ 36. The Amended Complaint goes so far as to accuse the Spartan Defendants of "circumvent[ing] traditional underwriting and regulatory scrutiny" through their use of a SPAC structure, and alleging such a structure carried "a higher risk that fraud and other irregularities will not be detected." *Id.* ¶ 38. Such allegations and imputations of bad motives plainly sound in fraud. *E.g.*, *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-CV-9992 (PAC), 2021 WL 4443258, at *9 (S.D.N.Y. Sept. 27, 2021) (applying Rule 9(b) because "[t]he gravamen of [plaintiff's] Section 14(a) claim is that" defendant "concocted a plan," "engaged in secret backchannel discussions," and "promulgated false proxy solicitations … to … force a fire sale," and all such language is "classically associated with fraud").

Plaintiffs' general allegation that the receipt of founder shares provide a motive does not raise a strong inference of scienter. Indeed, the Amended Complaint notes that the founder shares "are converted to common public shares" following the merger (AC ¶ 36), which would give recipients of founder shares all the more reason to enter a transaction favorable for the SPAC and its other stockholders. That the recipients do not acquire the founder shares on the open market, or that the founder shares would be cancelled absent a deal, does not change this incentive—

particularly absent any allegations that the SPAC faced dissolution absent a combination with Legacy Sunlight. In *Bond*, for instance, in dismissing allegations that director defendants knew that a proxy statement undervalued the stock being sold, the court found it "extremely significant that all of the defendant directors sold all or most of their shares for the same … buyout price that was paid to the public shareholders," because it would be in the directors' "informed economic self-interest" to get the best deal available. 2003 WL 21058251 at *11. The Court rejected the "[p]laintiffs' attempt to overcome this presumption by arguing that because the outside directors were allowed to purchase their shares cheaply, they could make a profit even at a low price," because that "does not negate these directors' self-interest in achieving a higher price for their shares." *Id.* Moreover, crediting the plaintiffs' theory "would raise suspicion about directors' and officers' 'conflicts'" in each of the "very common" scenarios where they had been "given the opportunity to purchase shares at below market prices." *Id.* So too here. Plaintiffs' theory would raise an inference of fraud in every Section 14(a) case against SPAC defendants receiving founder shares—even though those shares convert to the same common stock as that of other stockholders, incentivizing them to enter a value-maximizing transaction for the SPAC.

The only other allegations as to the Spartan Defendants likewise do nothing to raise an inference of fraud. Plaintiffs allege only that the Spartan Defendants are all parties to this litigation, *see* AC ¶¶ 26-32; Strong attended an investor conference call, *see id.* ¶¶ 50-51; Sponsor had its founder shares converted, *see id.* ¶ 49; and the Spartan Individual Defendants signed the Proxy, *see id.* ¶¶ 57-58. Such allegations fall far short of Rule 9(b) under which, even for Section 14(a) claims, Plaintiffs must allege "with more specificity" as to "each defendant" "their knowledge of the allegedly fraudulent [conduct]." *Police & Fire Ret. Sys. of City of Detroit SafeNet, Inc.*, 645 F. Supp. 2d 210, 239 (S.D.N.Y. 2009). Mere "allegations regarding the

magnitude of the fraud or the organizational role of a defendant" (which is all the Amended Complaint contains here) "are insufficient." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006). Thus, even a complaint that "include[s] specific allegations regarding misconduct" fails where it does not "connect the misconduct or knowledge of the misconduct to … the individually named defendants." *Id.* at 484. No factual allegations in the Amended Complaint indicate that the Spartan Defendants knew or should have known that the Proxy's description of the Cash Advance Program was false. Accordingly, Plaintiffs cannot meet the pleading standard "by simply alleging that [certain] [d]efendants had the requisite state of mind because they signed certain documents or because of their positions." *SafeNet*, 645 F. Supp. 2d at 239 (holding the mere fact directors signed proxy insufficient to satisfy Rule 9(b) for Section 14(a) claim).

### B.       Even if Rule 9(b) did not apply, Plaintiffs failed to plead negligence.

Plaintiffs cannot avoid dismissal of Count III even if the Court found Rule 9(b) does not apply, because Plaintiffs failed to plead facts indicating the requisite culpability for claims sounding in negligence.

"The Second Circuit has not opined on the [pleading standard for negligence], and what authority exists is divergent," with some courts concluding that "negligence is conduct, and not a state of mind," rendering the PSLRA's heightened pleading standard inapplicable to the negligence prong, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 240 (S.D.N.Y. 2012), while other courts treat negligence as a mental state, requiring a plaintiff "plead with particularity facts that give rise to a strong inference of negligence" as to "each particular defendant," *Bond*, 2003 WL 21058251, at \*4, \*10. Treating negligence as a mental state for securities claims is most consistent with the language of the PSLRA, which imposes a heightened pleading standard for any "required state of mind"—i.e., not just for scienter.

15 U.S.C. § 78u-4(b)(2); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000).

The Amended Complaint entirely fails to plead a strong inference of negligence as to each Spartan Defendant, as there are no particular allegations against any Spartan Defendant. *See Bond*, 2003 WL 21058251, at *4, *10. But even if the Court concluded that negligence was conduct, rather than a state of mind, the Amended Complaint's lack of detailed allegations is still fatal to the Section 14(a) claim. Regardless of the pleading standard, Plaintiffs still had to plead negligence—i.e., "allege[] what the applicable standard of care in this case would be" and plead facts demonstrating that defendants "failed to exercise reasonable care" when authorizing a proxy containing false statements. *Karp v. First Conn. Bancorp, Inc.*, 535 F. Supp. 3d 458, 484 (D. Md. 2021). Since Plaintiffs simply "lump[ed] all the defendants together in [the Section 14(a)] claim and provid[ed] no factual basis to distinguish their conduct," the Amended Complaint "fail[s] to satisfy even the minimum [pleading] standard" of Rule 8. *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001). Indeed, even setting aside the group pleading issue, the Amended Complaint makes no allegations indicating that the Spartan Board collectively acted unreasonably. Absent such allegations, the Court cannot simply presume that any inaccuracy in the Proxy was the result of culpable conduct. *E.g.*, *Bond*, 2003 WL 21058251, at *10 (dismissing Section 14(a) claim where plaintiffs failed to allege "that the directors knew or should have known of the alleged flaws"); *Varjabedian v. Emulex Corp.*, No. SACV 15-00554-CJC(JCGx), 2020 WL 1847708, at *11 (C.D. Cal. Feb. 25, 2020) (dismissing Section 14(a) claim because, *inter alia*, plaintiff failed to allege facts showing the board did not exercise reasonable prudence in deciding which detail from an advisor's fairness opinion to disclose); *SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir.

2011) (affirming judgment as a matter of law on Section 14(a) claim absent evidence a director had "any reason to be concerned that" a proxy statement was inaccurate).

Plaintiffs have not plausibly alleged that any of the Spartan Defendants were negligent. Indeed, for Sponsor, Plaintiffs alleged no involvement whatsoever vis-à-vis the Proxy.[9]   The allegations as to the Spartan Individual Defendants are scarcely better—Plaintiffs merely alleged that the Spartan Individual Defendants signed the Proxy.  *See* AC ¶¶ 57-58(a)-(c).  Plaintiffs have identified no oversight in the preparation of the Proxy, and no facts contradicting the description of the Cash Advance Program that the Spartan Defendants should have known at the time the Proxy were being issued.  Instead, Plaintiffs proceed entirely on the theory that the Spartan Defendants described Legacy Sunlight's diligence and monitoring processes optimistically between March and June 2021, *see id.* ¶¶ 57-58, but that New Sunlight did not enforce its policy as described after the Business Combination, allegedly failing to detect red flags regarding a major contractor that became insolvent in 2022, *see id.* ¶¶ 63-73, 80-82.  The mere fact that some harm subsequently occurred is insufficient to show a breach of duty and plead negligence.  Because Plaintiffs have not pleaded facts suggesting Spartan Defendant could have avoided some alleged falsity in the Proxy through the exercise of reasonable care, their claim is not plausible on its face and must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Count III as to the Spartan Defendants.

---

[9] The sole allegations as to Sponsor are that its CEO was Strong, AC ¶ 26, it was formed "to act as the sponsor of Spartan," *id.* ¶ 32, and it received founder shares that were converted into publicly-traded shares, *id.* ¶ 49.

Dated: July 21, 2023

Respectfully submitted,

VINSON & ELKINS LLP

s/ *Christopher E. Duffy*
Christopher E. Duffy
1114 Avenue of the Americas
New York, New York 10036
Telephone:  212-237-0000

Michael C. Holmes (*pro hac vice*)
Jeffrey Crough (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
2001 Ross Avenue
Dallas, Texas 75201
Telephone: 214-220-7700

*Attorneys for Defendants Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romeo, and Spartan Acquisition Sponsor II LLC*