## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW MILLUNCHICK and MIKE MARGENT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>-against-<br><br>SUNLIGHT FINANCIAL HOLDINGS, INC. f/k/a/ SPARTAN ACQUISITION CORP. II, MATTHEW POTERE, BARRY EDINBURG, RODNEY YODER, GEOFFREY STRONG, JAMES CROSSEN, OLIVIA WASSENAAR, WILSON HANDLER, CHRISTINE HOMMES, JOSEPH ROMEO, and SPARTAN ACQUISITION SPONSOR II LLC,<br><br>Defendants. | Case No.: 1:22-cv-10658-AKH<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Matthew Millunchick and named plaintiff Mike Margent ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Second Amended Class Action Complaint, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things: (1) a review of the Defendants' public documents, conference calls and announcements, (2) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sunlight Financial Holdings Inc. ("Sunlight" or the "Company") f/k/a Spartan Acquisition Corp. II ("Spartan"), (3) communications with former employees of Sunlight, (4) analyst reports and advisories, and (5) information readily available on the internet. Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>NATURE OF THE ACTION</u>

1.    This is a putative class action brought individually and on behalf of all persons and entities other than Defendants who: (a) purchased the publicly-traded common stock of Sunlight between January 25, 2021 and September 28, 2022, both dates inclusive (the "Class Period"),[1] and/or (b) beneficially owned and/or held Spartan common stock as of June 1, 2021 and were eligible to vote at Spartan's July 8, 2021 special meeting (collectively, the "Class"). Plaintiffs bring this action to recover damages caused by Defendants' violations of the federal securities laws, including Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Sunlight operated a digital home solar panel financing platform that, among other things, offered cash advances to contractors. Sunlight told investors that it had stringent processes in place to vet and monitor the contractors to whom it gave advances. In actuality, starting in 2019, Sunlight substantially loosened its credit standards and removed guardrails that had controlled risks and losses stemming from its cash advance program. Nevertheless, Sunlight kept touting its supposedly rigorous due diligence and monitoring process and claiming that the cash advance program posed minimal risk for Sunlight, even as it was pumping more and more cash into two of the worst solar contractors in the industry - Pink Energy and Vision Solar. All the while, systematic customer complaints and other red flags abound showed that these two industry bottom feeders were extremely high-risk partners whose business could shutter any

_____

[1] Prior to the closing of the Business Combination (defined below) on July 9, 2021, Sunlight was Spartan and its common stock traded under the ticker symbol "SPRQ."

moment.  The risk materialized when Sunlight revealed in September 2022 that it would have to write off more than $30 million in cash advanced to Pink Energy because of the latter's impending bankruptcy.  Sunlight's stock price fell by 57% in the wake of this news, damaging investors.

## II.    JURISDICTION AND VENUE

3.    The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

4.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

5.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and subsequent damages took place in this judicial district.  Additionally, Sunlight common stock traded on the New York Stock Exchange ("NYSE") at all relevant times.

6.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

7.    Lead Plaintiff Matthew Millunchick ("Millunchick"), as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased the publicly-traded common stock of Sunlight at artificially inflated prices during the Class Period.

8.    Named plaintiff Mike Margent ("Margent"), as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased publicly-traded common stock of Sunlight at artificially inflated prices during the Class Period. Mr. Margent also held Spartan common stock as of June 1, 2021 and was eligible to vote in Spartan's special meeting held on July 8, 2021.

### B.    Sunlight Defendants

9.    Defendant Sunlight is organized under the laws of Delaware, with principal executive offices located in Charlotte, North Carolina. Sunlight's common stock trades on the NYSE under the ticker symbol "SUNL." Prior to the Business Combination (defined below), Spartan's common stock traded on the NYSE under the ticker symbol "SPRQ."

10.    Defendant Matthew Potere ("Potere") was the Chief Executive Officer ("CEO") of Legacy Sunlight (defined below) prior to the Business Combination, and the CEO of Sunlight after the Business Combination.

11.    Defendant Barry Edinburg ("Edinburg") was the Chief Financial Officer ("CFO") of Legacy Sunlight prior to the Business Combination, and the CFO of Sunlight after the Business Combination until March 31, 2022.

12.    Defendant Rodney Yoder ("Yoder") was the CFO of Sunlight from April 1, 2022 through the end of the Class Period.

### C.    Spartan Defendants

13.    Defendant Geoffrey Strong ("Strong") was the CEO and Chairman of Spartan from its inception until the Business Combination.

14.    Defendant James Crossen ("Crossen") was the CFO and Chief Accounting Officer of Spartan from its inception until the Business Combination.

15.     Defendant Olivia Wassenaar ("Wassenaar") was a director of Spartan from November 24, 2020 until the Business Combination.

16.     Defendant Wilson Handler ("Handler") was a director of Spartan from November 24, 2020 until the Business Combination.

17.     Defendant Christine Hommes ("Hommes") was a director of Spartan from November 24, 2020 until the Business Combination.

18.     Defendant Joseph Romeo ("Romeo") was a director of Spartan from November 24, 2020 until the Business Combination.

19.     Defendant Spartan Acquisition Sponsor II LLC ("Sponsor") is a Delaware corporation formed in August 2020 to act as the sponsor of Spartan.

20.     All references to the "Spartan Defendants" herein refer to Strong, Crossen, Wassenaar, Handler, Hommes, Romeo, and Sponsor.

21.     All references to the "Spartan Individual Defendants" herein refer to Strong, Crossen, Wassenaar, Handler, Hommes, and Romeo.

## IV.    SECTION 14(a) ALLEGATIONS

### A.    INTRODUCTION

22.     Sunlight came to the U.S. capital markets when Sunlight Financial LLC ("Legacy Sunlight") merged with Spartan, a special purpose acquisition company, commonly known as a SPAC.  Defendants solicited the SPAC shareholders' consent for the merger via a Proxy Statement and Prospectus ("Proxy") dated June 18, 2021, and which was filed with the SEC on June 21, 2021.

23.     Sunlight operates a point-of-sale financing platform that provides residential solar and home improvement contractors the ability to offer financing to customers when purchasing

residential solar systems or other home improvements. The resulting loans are financed by Sunlight's network of capital providers. Sunlight earns a "platform fee" for each loan facilitated through Sunlight's platform.

24.     Sunlight does not advertise directly to homeowners. Instead, Sunlight relies on contractors to tell their customers about the ability to finance their purchase through the Sunlight platform. Hence for Sunlight to make money, it needs to convince as many contractors as possible to use Sunlight's financing platform when signing up customers.

25.     Sunlight, however, does not have any "exclusivity" agreements with contractors. This means that a contractor in Sunlight's network is free to use any one of Sunlight's competitors when offering financing options to customers.

26.     An important way that Sunlight differentiated itself from competitors was by providing generous cash advances to contractors. Customarily, companies financing solar systems and other home improvements do not disburse funds to contractors until the project is completed. This forced contractors to incur substantial up-front costs before they received funding. Sunlight's cash advance program, however, handed out money to contractors before any work was started. Sunlight credited the cash advance program as a major factor in its ability to get contractors to partner with Sunlight.

27.     While the cash advance program consisted of short-term loans, the losses Sunlight could suffer were significant. Sunlight's platform fee amounted to 5% of the total funded loan or less, but it advanced the contractor 90-100% of the contractor's costs. Thus, Sunlight theoretically could incur losses on a project that were more than 20 times greater than it earned in revenues for that project.

28.    Through Defendants' negligence, the Proxy contained false and misleading statements.

29.    In the Proxy, Defendants told investors that before extending a penny in advances, Sunlight "diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation, workmanship warranty offered to its customers [] and sales tools used by the contractor." Defendants also claimed Sunlight repeated this review "at least annually and, if advisable, more frequently."

30.    In late September 2019, however, Sunlight took a fateful decision. It loosened credit checks on contractor advances in order to drum up business. Beginning then, and continuing into 2020, Sunlight removed a series of guardrails that had controlled its losses on contractor advances.

31.    According to a former employee, after these protections' removal, Sunlight's due diligence became "lackadaisical." Both for onboarding and periodic review, Sunlight relied entirely on the contractor's self-supplied financial statements. Sunlight did not even conduct any reputation checks.

32.    By the time of the Proxy, Sunlight had begun making significant advances to two of the worst, most reviled solar contractors in the nation: Pink Energy and Vision Solar. By June 30, 2021 - less than two weeks after the date of the Proxy - these two companies accounted for 26% of Sunlight's outstanding advances.

33.    Pink Energy and Vision Solar were well known as industry bottom-feeders. Their average ratings on the three principal aggregators - SolarReviews, EnergySage, and the Better Business Bureau ("BBB") – were alarmingly bad. Pink Energy had been the subject of a scathing 2020 Business Insider article, in which a current Pink Energy employee stated that the

primary reason for Pink Energy's high-pressure and deceptive sales tactics at aimed getting customers to sign on the spot was: "If a customer is shopping between companies, they're never talking to us again[.]"

34.    Thus, Defendants' statements about Sunlight's due diligence were misleading.

35.    In addition, Defendants negligently failed to disclose Sunlight's 2019 decision to lower credit standards for cash advances. This decision, and its implementation, could reasonably be expected to cause Sunlight's future performance to depart from its prior performance.

36.    Which it did. In late 2021 and 2022, Pink Energy slowly slid into bankruptcy, even as its outstanding cash advance balance (from Sunlight) increased exponentially. On September 28, 2022, Sunlight announced that it would write off $30-33 million in advances to Pink Energy in light of Pink Energy's impending bankruptcy. Sunlight's stock price fell by more than 57% to close at $1.08 per share on September 29, 2022, causing significant losses and damages to Class members.

37.    In its annual report, Sunlight disclosed the final tally for 2022: $41.7 million in advances written off and another $6.7 million in an accounting charge for probable losses, or almost half of Sunlight's *total revenue* for 2022.

## B.    FACTUAL BACKGROUND

### 1.    Spartan's Formation and Purpose

38.    Spartan was a "blank check" company, also known as a SPAC, incorporated in August 2020 for the sole purpose of effecting a merger or similar business combination with a privately-held business to enable the private company to go public. Spartan itself had no business activities; it was formed specifically to acquire an existing operating business.

39.     SPACs typically raise capital for an acquisition through an initial public offering ("IPO"), and that capital is held in trust for a specific period of time – usually 24 months – until a merger can be completed. If a merger is successfully made within the allocated time frame, founders and managers of the SPAC often reap massive profits from their ownership of the SPAC's securities. However, if a merger is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC.  Accordingly, the founders and management team of a SPAC are highly motivated to complete a merger before the deadline.

40.     The strategy of going public by merging with a SPAC became increasingly popular in the 2019-2021 time frame. For private companies seeking to go public, SPAC transactions are faster than traditional IPOs, and also let them bypass the significant expense and regulatory scrutiny of going public via IPOs.

41.     However, because SPAC mergers allow companies to circumvent traditional underwriting and regulatory scrutiny, SPAC mergers also have the potential to be rife with fraud and other irregularities. For example, in April 2023, the Public Company Accounting Oversight Board ("PCAOB") published a report titled: "Inspection Observations – Audits of Special Purpose Acquisition Companies and De-SPAC Transactions," in which it observed that, for the year 2021, 94% of SPAC audit engagements and 43% of de-SPAC audit engagements contained deficiencies.[2] SEC officials have also expressed concerns over the surge in SPACs in recent years, noting a number of risks to investors.[3]

---

[2] *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/documents/spacs-spotlight.pdf?sfvrsn=b6490773_2

[3] *See* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (John Coates, Acting Director, SEC Division of Corporation Finance: "Concerns include risks

42.    On November 30, 2020, Spartan completed its IPO and became a publicly-traded company.  Spartan's IPO generated $345 million in gross proceeds, which Spartan held in trust for investors while it sought a private company to acquire. In its Form S-1 filed with the SEC prior to the IPO, Spartan stated that, as is common with SPACs, it would be forced to "redeem 100% of our public shares if we have not consummated an initial business combination within 24 months from the closing of [the IPO.]"

### 2.    Sunlight and its Business Model

43.    Founded in 2014, Sunlight [4] describes itself as a "business-to-business-to-consumer, technology-enabled point-of-sale (POS) financing platform" that provides residential solar and home improvement contractors with the ability to offer point-of-sale (POS) financing to their customers when purchasing residential solar systems or other home improvements. The resulting loans are financed by Sunlight's capital providers, which include banks, credit unions, insurance companies, and pension funds.

44.    Sunlight's revenue comes from the "platform fee" that it earns for each loan facilitated through Sunlight's financing platform.

45.    Sunlight does not advertise or conduct outreach to homeowners (*i.e.* the customers who purchase solar systems or home improvements from Sunlight's network of contractors).  For example, a homeowner who decides to install solar panels does not tell the

---

from fees, conflicts, and sponsor compensation, from celebrity sponsorship and the potential for retail participation drawn by baseless hype, and the sheer amount of capital pouring into the SPACs, each of which is designed to hunt for a private target to take public."); https://www.sec.gov/news/testimony/gensler-2021-05-26 (SEC Chair Gary Gensler testifies in front of the U.S. House Appropriations Committee: "The surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected?").

[4] Unless otherwise specified, references to Sunlight in this section apply to both Legacy Sunlight and post-Business Combination Sunlight, as the pre-and-post merger companies had the same purported business model.

contractor that he or she would like financing through Sunlight. Instead, Sunlight relies on contractors to tell their customers about the ability to finance their purchase through the Sunlight platform.

46.     Sunlight does not have any exclusivity agreements with the contractors in its network. This means that a contractor who is in Sunlight's network is free to offer any other financing platform it wishes when signing up a customer interested in financing.

47.     Hence for Sunlight to make money, it must convince contractors to use Sunlight's financing platform when signing up customers.

48.     One way that Sunlight sought to differentiate itself from competitors was by offering generous cash advances to contractors. Generally (and as is standard in the solar panel and home improvement industry), loans facilitated on Sunlight's platform were funded only after the contractor finished each job. This means that before a contractor got paid for their work, they could expect to spend significant money up-front buying supplies, paying subtractors, etc.

49.     Sunlight's cash advance program provided contractors with funds to support those upfront costs and liquidity needs. Sunlight claimed that its cash advance program was "offered on more flexible" terms than its competitors, many of whom did not offer any cash advances at all. Emphasizing the importance of Sunlight's cash advances program, Defendant Potere stated on a conference call discussing Sunlight's fiscal year 2021 financial results that cash advances were a "highly effective" tool in developing relationships with new and existing contracts, and that its decision in 2021 to give even higher cash advances was a "material factor in signing significant contractor commitments for 2022." Defendant Yoder stated on a conference call to discuss Sunlight's Q2 2022 financial results that the cash advance program "is a really good

differentiator for us in terms of attracting new and maintaining deepening relationships with our installers, getting volume commitments and improving margins."

50.     Sunlight made no money from its advances to contractors. It did not receive interest and made the advances at par.

### 3.     The Business Combination

51.     On January 25, 2021, Legacy Sunlight and Spartan issued a joint press release announcing that they have entered into a definitive agreement for a merger ("Business Combination"), through which Legacy Sunlight would merge with Spartan and become a publicly-traded company.

52.     Spartan shareholders approved the Business Combination at a special meeting held on July 8, 2021.  The Business Combination closed the next day on July 9, 2021, and the combined company started trading on the NYSE on July 12, 2021 as Sunlight.

### C.     DETAILED ALLEGATIONS OF MISCONDUCT

### 1.     Sunlight Loosened Credit Restrictions as it Prepared to Go Public

53.     In the period leading up to the Business Combination, Sunlight substantially loosened its credit standards.

54.     Confidential Witness #1 ("CW1") was employed at Sunlight from December 2017 to March 2022.  His terminal position at Sunlight, which he held from September 2020 through March 2022, was Senior Relationship Manager.  As a Senior Relationship Manager, CW1 managed all aspects of Sunlight's relationships with solar system contractors.

55.     From December 2017 to approximately September 2019, CW1 reported to Brian Von Bergen, who served as Sunlight's Head of Operations during that time.  Von Bergen left Sunlight around September 2019.  After Von Bergen departed, CW1 reported to Curtis Lynch

who took over as Sunlight's Head of Operations. At that time, Timothy Parsons fully assumed the position of Chief Operating Officer.

56.     According to CW1, the contractor risk evaluation process was generally effective from 2017 to 2019 when Von Bergen was Head of Operations.  Starting in late 2019, however, Sunlight got "too big" and so "were not really looking into" the contractors to whom it gave advances. Instead, Sunlight adopted a "less stringent and more lackadaisical approach in the cash advance process."  CW1 believes that Von Bergen left because he did not like Sunlight's loosening credit standards.

57.     CW1 reports that Sunlight adopted a series of aggressive credit policies after Von Bergen's departure. During Von Bergen's tenure, Sunlight did not pay any advances until the project had started. That changed in September 2019, the month of Von Bergen's departure. Then, Sunlight started paying advances within three days of the customer's right to rescind the contract, long before any work on the contract.

58.     CW1 described Sunlight's post-Von Bergen due diligence on contractors as "lackadaisical." Sunlight's initial vetting of contractors consisted of looking at the contractor's self-supplied financial statements. After a contractor is accepted into Sunlight's network, there was no "ongoing monitoring" other than an annual review of the contractor's self-supplied financial statements.  There was no additional due diligence for cash advances.

59.     According to CW1, Sunlight accepted any contractor willing to work with it: "[Sunlight] accepted everyone until they got screwed. Once they got screwed, they would cut ties with [the contractor]." CW 1 added "if [anything is] a barrier from getting glass on the roof, then they got rid of the barrier."

60.    CW1 further noted that large contractors like Pink Energy would receive cash advances amounting to almost all, if not all, of the expected price before even beginning the installation.

### 2.    Sunlight Started Paying Large Advances to Two Bottom-Feeding Contractors

61.    With looser credit practices, Sunlight formed key relationships with two contractors who engaged in egregious business practices: Pink Energy and Vision Solar.  The chart below summarizes Sunlight's cash advances outstanding to Pink Energy and Vision Solar, and Sunlight's total cash advances extended to all contractors.[5]

---

[5] Based on Sunlight's disclosure of the amount of advances written off for Pink Energy and the relative size of Pink Energy's advances compared to advances given to other contractors, it is obvious that Pink Energy is Contractor #1 on Sunlight's quarterly report on Form 10-Q for the second quarter of 2022 (and was similarly identified in other periodic SEC filings where Sunlight identified by number the contractors to whom cash advances were outstanding).

For Vision Solar, according to CW2 (defined below), Vision Solar had approximately $20 million in advances as of January 2022. The only contractor identified on Sunlight's SEC filings as having that amount in advances as of Q1 2022 was Contractor #2.

| | Pink Energy | Vision Solar | Combined (Pink Energy and Vision Solar) | Total Advances Outstanding to All Contractors |
|---|---|---|---|---|
| Q4 2020 | $295 thousand | $6.4 million | *$6.7 million* | $35.4 million |
| Q1 2021 | $888 thousand | $6.5 million | *$7.3 million* | $32.6 million |
| Q2 2021 | $5.0 million | $5.6 million | *$10.6 million* | $41.0 million |
| AFTER THE BUSINESS COMBINATION | | | | |
| Q3 2021 | $21.0 million | $13.3 million | *$34.3 million* | $71.3 million |
| Q4 2021 | $12.5 million | $20.9 million | *$33.4 million* | $67.1 million |
| Q1 2022 | $23.0 million | $20.6 million | *$43.6 million* | $86.6 million |
| Q2 2022 | $30.5 million | $10.9 million | *$41.4 million* | $95.3 million |
| Q3 2022 | $32.6 million (as of October 7, 2022) | $6.2 million | *$38.8 million* | $96.7 million[6] |

### i. Pink Energy[7]

62.    On November 8, 2020, Business Insider published a scathing article on Pink Energy's business practices. The article was based on customer complaints, leaked internal Pink Energy documents, and conversations with a dozen current and former Pink Energy employees.

63.    According to the article, because Pink Energy's prices were about double the industry average, Pink Energy's sales representatives were forced to close the sale quickly before the customer could comparison shop. Business Insider quoted a current employee as saying"[i]f a

---

[6] Includes amounts owed by Pink Energy that were written off on Pink Energy's Q3 2020 financial statements.

[7] Prior to April 2022, Pink Energy was known as PowerHome Solar.

customer is shopping between companies, ***they're never talking to us again***, because once they see another company's prices, they're going to know we're overpriced."

64.     To ensure that customers signed up right away without taking the time to consider other options, Pink Energy's salespeople systematically engaged in consumer fraud.

65.     Business Insider highlighted two particular practices: telling customers they could make money selling power back to the grid in jurisdictions where such sales were not permitted, and overstating the amount of power the customer's solar panels would generate.

66.     Business Insider's November 8, 2020 article reported that the leading source for customers seeking information about solar providers, EnergySage (backed by the Department of Energy), had kicked Pink Energy off the platform for employing misleading sales practices.

67.     A later November 24, 2020 Business Insider article reported on widespread sloppy installation that damaged customers' homes, broken solar panels, installers who drank on the job, and panels that did not produce any energy.

68.     Former Sunlight employees confirmed that Pink Energy engaged in widespread misconduct. At some time after September 2019, CW1 spent two months working as Sunlight's Pink Energy relationship manager. According to CW1, Sunlight was aware that Pink Energy employees were committing fraud but chose to amend its procedures so that it could turn a blind eye.

69.     CW1 reports that fewer than 50% of Pink Energy's applications for consumer credit were accurate. Pink Energy "would fake information on income." Sunlight initially asked customers to verify income, which led to many application rejections. As a result, Pink Energy and others complained that it was "hard to get deals through because [Sunlight was] asking for income or verification of things, ***so Sunlight began to do away with those processes***." According

to CW1, the removal of the income verification process for big players like Pink Energy took place between 2019 and into 2020. Thereafter, "[i]t took a lot to make the system say 'Hey, we need to check this.'"

70.    Customer reviews left no doubt that engaged in misleading sales practices.

71.    On SolarReviews, a solar company review aggregator,[8] Pink Energy's average rating collapsed to less than two stars in 2020:





72.    From January 1, 2020, through June 27, 2021, Pink Energy had 104 one-star reviews on SolarReviews, and only 42 reviews that gave it more than one star.

---

[8] SolarReviews is regularly cited as a go-to aggregator in advice columns. *See*, *e.g.,* https://www.nytimes.com/2022/05/24/business/energy-environment/solar-panel-advice.html

73.    Other customers complained that Pink Energy took months, or even up to a year, to properly install solar panels.  Many reviews said that when Pink Energy's panels did work, the reduction in customers' energy bills was de minimis, and far less than they had been promised by the salespeople. Customers also complained that Pink Energy representatives had lied about tax incentives. Other customers complained that Pink Energy had damaged their homes, in one case by using a flamethrower to melt snow. By June 21, 2021, Pink Energy had accumulated more than 230 BBB complaints in less than a year.

### ii.    Vision Solar

74.    Vision Solar was formed by former executives of Code Green Solar LLC.

75.    Code Green collapsed shortly before its CEO was indicted for, and later pled guilty to, wire fraud. Specifically, Code Green submitted false documents to the U.S. Treasury that falsely certified that it had completed certain solar projects, thereby obtaining federally funded rebates totaling more than $3 million.

76.    At the time of its collapse, Code Green also owed customers and counterparties more than $18 million. Customers accused Code Green of unauthorized sales calls and tampering with contracts.

77.    Code Green's longtime Chief Operating Officer was Jonathan Seibert. Seibert was an executive while much of the misconduct occurred.

78.    Seibert left in July 2018 to found Vision Solar. He has been its Chief Executive Officer since the company's inception.

79.    A series of class actions were filed against Vision Solar in 2020 alleging that it was recruiting customers through a telemarketing scam.[9] In particular, they alleged that Vision Solar had employed a telemarketing company, Solar Exchange, to repeatedly cold call potential customers, including those who had placed their names on the National Do Not Call Registry. Solar Exchange representatives would falsely assert it was affiliated with the customer's utility company while concealing that they were calling on behalf of Vision Solar. Solar Exchange would arrange for Vision Solar to visit the potential customer's home. The customer would get the misleading impression that Vision Solar was recommended by an objective third party - the customer's utility company.

80.    A class action filed in Massachusetts state court on July 8, 2021, made similar allegations.[10]

81.    In July 2023, the United States and the State of Arizona filed a civil action against Vision Solar and its various telemarketing partners.[11]  The plaintiffs alleged that the same pattern of activity alleged in the earlier actions had been ongoing since 2019.

82.    The plaintiffs also alleged that during the visits, Vision Solar's representatives would make false representations to customers, including that they would save an average of 20-40% from their energy bill after factoring in the cost of servicing the loan to pay for the installation, and that the customers would realize these savings immediately. Vision Solar representatives also made false and unsubstantiated representations about the installation

---

[9] *E.g. Zelma v. Seibert*, 20-cv-20595-KM-ESK (D.N.J.).

[10] The action was removed to federal court, where it received the caption *Doane v. Vision Solar LLC*, 21-cv-11285-IT (D. Mass.).

[11] *U.S. v. Vision Solar LLC*, 23-cv-1387-DGC (D. Ariz.)

process, available tax credits, rebates, and other terms and conditions relating to the sale and use of solar panels.

83.    Like Pink Energy, Vision Solar's average rating on SolarReviews collapsed in 2020:



84.    From January 1, 2020 through June 27, 2021, Vision Solar received 37 one-star reviews on SolarReviews, and only 8 reviews of more than one star.

85.    Similarly, from January 1, 2020 through June 21, 2021, Vision Solar had received 13 reviews on EnergySage, only one of which was above one star.

86.     Vision Solar was not accredited on the BBB's website and had a grade of F. From January 1, 2020 through June 27, 2021, it received 20 one-star reviews on the BBB, and only 3 reviews over one star.

87.     Customer reviews and complaints reported on Vision Solar's rampant misconduct. In a January 26, 2021 review on SolarReviews, a customer confirmed that Solar Exchange had set up a visit under false pretenses that did not mention Vision Solar's name. The customer agreed to an information visit, was repeatedly lied to, and was told by the representative's supervisor that the representative could not leave until the customer purchased a product. On BBB's website, an elderly potential customer reported in an October 5, 2020 complaint that a Vision Solar representative falsely told him the company worked with the customer's utility company.  The representative refused to leave until the customer's son forced him out.  In a January 4, 2021 complaint, a customer reported that Vision Solar had forged a contract with him, which was confirmed by the financing company. In a March 5, 2021 complaint, a customer complained that his solar panels had been installed in October 2019 but failed an inspection due to shoddy workmanship, and the customer had been waiting for Vision Solar to fix the installation since then.

88.     A former employee also left a review on the BBB's website dated February 12, 2021 stating that Vision Solar "run[s] a[n] illegal call center [called] solar exchange."

89.     Spartan shareholders who were solicited to vote on the Business Combination did not know that Sunlight was partnering with and giving cash advances to Pink Energy and Vision Solar, because Sunlight did not disclose the identities of the contractors in its network or the contractors to whom it gave cash advances.

### D.    FALSE STATEMENTS IN THE PROXY STATEMENT

90.    On March 22, 2021, Spartan filed with the SEC a Registration Statement and preliminary proxy statement and prospectus on Form S-4 in connection with the Business Combination.  The S-4 was signed by each of the Spartan Defendants.  The S-4 stated that "Sunlight has adopted vigorous contractor diligence and monitoring procedures" and that:[12]

> Upon the engagement of a contractor into Sunlight's network, Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

> […]

> Sunlight has established a ***robust commercial underwriting and ongoing monitoring process*** to assure that the quality of the work product, solar system construction, ***financial condition*** (to support construction processes and provide post construction warranty support) and ***legal compliance practices*** of the contractors in Sunlight's network.

91.    The S-4 also stated:

> Sunlight's milestone advance program provides qualifying solar contractors with short-term capital advances to support upfront costs and liquidity needed to purchase equipment and pay third party contractors in the due course of its installation business. Milestone advances are generally required to be repaid in 90 days or less from the advance date and are typically repaid by Sunlight deducting the related amounts from the loan funding to the contractor upon completion of a given project. Sunlight's milestone advance program is generally offered to contractors in Sunlight's top risk tiers which have the strongest commercial risk assessment results. While Sunlight has advanced

---

[12] All emphases in the Complaint are added unless otherwise noted.

approximately $526 million to contractors in its network since inception, Sunlight has only experienced approximately $0.4 million in losses on those advances.

92.     Finally, the S-4 stated:

Sunlight maintains a short-term capital advance program with certain contractors that provides such contractors with up-front working capital to pay for certain expenses for installation or the construction of solar systems and home improvements. Such short-term capital advances may be paid to contractors prior to the commencement of such installation or construction, or at specified periods during the installation or construction process. ***The aggregate amount of advances available to a given contractor is based on a risk evaluation and tiering conducted by Sunlight's commercial risk team that performs contractor underwriting generally, as well as additional oversight and periodic monitoring requirements.***

93.     Sunlight made the identical misrepresentation in each of the following subsequent proxy statements:

    a.  May 12, 2021: Amendment No. 1 to the March 22, 2021 S-4 and updated preliminary proxy statement, signed by each of the Spartan Defendants.

    b.  June 1, 2021: Amendment No. 2 to the March 22, 2021 S-4 and updated preliminary proxy statement, signed by each of the Spartan Defendants.

    c.  June 21, 2021: Proxy Statement and Prospectus, signed by Defendant Strong.

94.     These statements were false because: (1) since 2020, Sunlight did not perform any due diligence at all except reviewing contractors' self-supplied financial statements, and therefore: (a) Sunlight did not obtain independent credit assessments, and (b) Sunlight performed neither initial nor ongoing reputational review; (2) Sunlight's cash advances went

disproportionately to bottom-feeding companies that duped customers and would have difficulty repaying all advances.

95.     The S-4 also stated:

In 2020, Sunlight made $1.1 billion in short term advances under its contractor advance funding program and in prefunding payments under its prefunding program and did not incur any losses associated with these advances or prefunding payments.

96.     This statement was misleading because Sunlight had adopted business practices that could cause its historical performance not to be representative of future performance.

### E.      MISLEADING OMISSIONS: ITEM 303

97.     Item 303 of SEC Regulation S-K sets forth the information issuers are required to disclose in their registration statements filed with the SEC, including the Form S-4 that Sunlight filed.

98.     Item 303 requires issuers to:

[1] Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.

[2] Describe any known material trends, favorable or unfavorable, in the registrant's capital resources. Indicate any reasonably likely material changes in the mix and relative cost of such resources. The discussion must consider changes among equity, debt, and any off-balance sheet financing arrangements.

[3] Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.

[4] Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

99.    Since late 2019 through 2020, Sunlight had: (a) expanded its contractor advance program, and (b) removed measures designed to ensure conservative underwriting practices as to these advances. Since the end of 2020, Sunlight had (c) began to steer a large portion of the advances to two companies - Pink Energy and Vision Solar - with poor reputations and prospects. These new developments were reasonably likely to cause Sunlight to have to recognize increased losses, reducing the liquidity it could receive from repayment of contractor advances.

100.    In addition, Sunlight faced new material demands on its liquidity: (a) it had to spend more and more cash to ensure its contractors could stay in business, and (b) it risked having to write off contractor advances.

101.    In addition, the developments set out in the preceding paragraph were "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations[.]"  Writing off cash advances reduces Sunlight's net income.  Because Sunlight's cash advances were so disproportionate to revenues it earned on the projects, write offs could, and did, overwhelm Sunlight.

## F.    THE RISKS CONCEALED BY DEFENDANTS' FALSE STATEMENTS MATERIALIZES

102.    On September 28, 2022, after close of trading, Sunlight filed a Form 8-K with the SEC revealing that it was going to take a "non-cash advance receivable impairment charge of $30 to $33 million during the Company's fiscal quarter ending September 30, 2022" because

Sunlight "was informed of certain actions taken by one of [Sunlight]'s installer partners to address liquidity issues faced by the installer" that "would likely result in an ability of the Company to collect on advances outstanding to such installer." In a press release accompanying the 8-K, Defendant Potere disclosed that Sunlight would be "re-underwriting all contractor partners' advances to further mitigate risk going forward."

103.    This adverse disclosure caused the price of Sunlight's common stock to fall by $1.44 per share, or over 57%, to close at $1.08 per share on September 29, 2022, damaging Plaintiffs and other investors in Sunlight's common stock.

104.    Analysts quickly figured out that the installer in question was Pink Energy, which had shut down its business operations on September 21, 2022 (and would file for Chapter 7 bankruptcy on October 7, 2022). Defendant Potere confirmed during Sunlight's Q3 2022 earnings call that the bankrupt installer was Pink Energy.

105.    In its 2022 10-K, Sunlight would report that in 2022, it had written off of $41.5 million of contractor advances, with another $6.7 million in an accounting charge - or almost half of its 2022 *revenues*.

### G.    CLASS ACTION ALLEGATIONS

106.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rule of Civil Procedure on behalf of a Class consisting of all person and entities other than Defendants who: (a) purchased the publicly traded common stock of Sunlight between January 25, 2021 and September 28, 2022, both dates inclusive, and/or (b) beneficially owned and/or held Spartan common stock as of June 1, 2021 and were eligible to vote at Spartan's July 8, 2021 special meeting. Plaintiffs bring this action to recover damages caused by Defendants' violations of the federal securities laws, including Sections 10(b), 14(a), and 20(a) of the Exchange Act.

Excluded from the Class are: (a) Defendants and their families, the officers, directors and affiliates of Defendants and Legacy Sunlight at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant or had a controlling interest; and (b) persons and entities who suffered no compensable losses.

107.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sunlight's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sunlight or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

108.    Plaintiffs' claims are claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

109.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.        Whether Defendants violated the Exchange Act;

b.      Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts;

c.      Whether Defendants knowingly or recklessly or negligently in issuing false and misleading statements;

d.      Whether the price of Sunlight's common stock was artificially inflated during the Class Period;

e.      Whether the market for Sunlight common stock was efficient during the Class Period;

f.      The extent of damages sustained by Class members, and the appropriate measure of damages.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**H.    CLAIMS UNDER SECTIONS 14(a) OF THE EXCHANGE ACT**

112.    The claims in Count I below are brought under Section 14(a) of the Exchange Act (the "Proxy Claim"). The Proxy Claim is brought on behalf of investors who beneficially owned and/or held Spartan common stock as of the Record Date of June 1, 2021 and were eligible to vote at Spartan's July 8, 2021 special meeting. The Proxy Claim is based on negligence. It is not based on any knowing or reckless conduct by or on behalf of the Proxy Claim Defendants

(defined below), and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

113. The basis of the Proxy Claim is that the Proxy Claim Defendants' statements issued to solicit shareholder approval of the Business Combination contained misstatements and/or omissions of material fact.

114. The Proxy Claim Defendants' proxy solicitations included all statements which served to color the market's view of the Business Combination and encourage Spartan common stockholders to vote in favor of the Business Combination. These statements included the following (collectively referred to as the "Proxy Solicitations") as set forth above in ¶93:

      a. The Form S-4 Registration Statement filed on March 22, 2021, which included a Preliminary Proxy Statement Subject to Completion.

      b. Amendment No. 1 to the Form S-4 Registration Statement, filed on May 12, 2021, which included a Preliminary Proxy Statement Subject to Completion.

      c. Amendment No. 2 to the Form S-4 Registration Statement, filed on June 1, 2021, which included a Preliminary Proxy Statement Subject to Completion.

      d. The Proxy Statement Form 424(b)(3) filed on June 21, 2021.

115. All the Proxy Solicitations were materially false and misleading as discussed above.

## COUNT I

**Violation of Section 14(a) of the Exchange Act Against All Defendants EXCEPT Yoder**

116.    Plaintiffs repeat and reallege each and every allegation in Section IV (SECTION 14(a) ALLEGATIONS) as if fully set forth herein.

117.    This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim and allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is solely based on negligence.

118.    This claim is brought against all Defendants except Yoder (the "Proxy Claim Defendants") pursuant to Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, on behalf of all person and entities who held Spartan common stock as of June 1, 2021 and were eligible to vote at Spartan's special meeting held on July 8, 2021 with respect to the Business Combination.

119.    Proxy Claim Defendants' statements issued to solicit shareholder approval of the Business Combination contained statements that, at the time and in light of the circumstances under which they were made were false and misleading with respect to material facts and/or omitted to state material facts necessary to make the statements therein not false or misleading.

120.    The Proxy Claim Defendants jointly and severally solicited and/or permitted the use of their names in solicitations contained in the Proxy Solicitations.

121.    By means of the Proxy Solicitations and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, the Proxy Claim Defendants sought to secure Plaintiff Margent and other Class members' approval of the Business Combination and solicited proxies from Plaintiff Margent and other members of the Class.

122.    The Proxy Claim Defendants acted negligently in making inaccurate statements of material facts, and/or omitting material facts required in order to make those statements not misleading. The Proxy Claim Defendants were required to ensure that the Proxy Solicitations and all other proxy solicitation material fully and accurately disclosed all material facts to allow an investor to make an informed investment decision.

123.    The Proxy Solicitations were essential links in the accomplishment of the Business Combination.

124.    Plaintiff Margent and other members of the Class eligible to vote on the Business Combination were misled by the Proxy Claim Defendants' false and misleading statements and/or omissions, were denied the opportunity to make a fully informed decision in voting on the Business Combination, and were damaged as a direct and proximate result of the untrue statements and/or omissions set forth herein.

125.    The false and misleading statements and/or omissions in the Proxy Solicitations and other proxy solicitation materials are material in that a reasonable shareholder would consider them important in deciding how to vote on the Business Combination and/or whether to exercise their conversion right to receive $10.00 in cash per share of Spartan common stock.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Solicitations and in other information reasonably available to stockholders.

126.    The untrue statements and omissions set forth above proximately caused foreseeable losses to Plaintiff Margent and other members of the Class.

## V.    **SECTION 10(b) and 20(a) ALLEGATIONS**

### I.    **INTRODUCTION**

127.    When Defendant Potere introduced Sunlight to Spartan shareholders, he made sure to highlight Sunlight's contractor advance program. In doing so, Potere told investors the program was "low risk".

128.    Throughout the Class Period, Sunlight would continue to emphasize the thoroughness of the procedures it followed before allowing any contractor into its advance programs, and the care it took to monitor developments to ensure that advances did not increase too quickly or to conduct periodic reviews.

129.    Yet the truth was quite different. In reality, Sunlight had embarked on a risky strategy wherein it abandoned nearly all credit standards, including those meant to prevent its solar contractors from committing fraud. In doing so, it became entangled with two of the worst industry participants, Pink Energy and Vision Solar.

130.    By September 30, 2021, Pink Energy and Vision Solar accounted for almost half of Sunlight's outstanding advances.

131.    By June 30, 2022, the two companies owed Sunlight $41.4 million.

132.    Pink Energy and Vision Solar came to depend on Sunlight's advances for a large part of their capital, such that if Sunlight turned off the cash spigot, the companies might quickly go out of business, imperiling Sunlight's existing advances.

133.    The two companies' reputations and prospects collapsed even as they grew more indebted to Sunlight.

134.    Vision Solar's business model was built on consumer fraud. Through the deceptive use of a third-party lead generator, Vision Solar would give customers the impression it was recommended by their utility company or local government.

135.    By the end of 2021, Vision Solar's ploy was wearing thin. Its reputation, as shown by customer reviews, was the second-worst among large U.S. contractors. Customer discontent was putting a strain on its finances.  Sunlight was advancing $250,000 net of new money a week so that it could complete its current job to earn revenues that might allow it to pay back Sunlight in the future.

136.    Though Vision Solar survived, Pink Energy did not. Pink Energy's troubles reaches a crescendo in summer 2022. Beginning in March 2022, a series of local television stations began reporting on Pink Energy's deceptive marketing techniques. These programs, featuring customers from all over the country, all told the same story: Pink Energy salespeople lied to customers, telling them they could expect to eliminate (or nearly so) their electricity bills, but when the panels were installed, the customers found that they made little or no difference. The complaints customers left with the Better Business Bureau - which had grown to more than a thousand by the end of summer - also spoke to Pink Energy's deceptive business tactics and shoddy workmanship.

137.    On May 31, 2022 and August 18, 2022 - even as Pink Energy was collapsing - Sunlight amended its advance agreement to increase the funds available to Pink Energy.  As a result, advances outstanding to Pink Energy almost tripled from $12.5 million as of December 31, 2020, to $30.5 million as of June 30, 2022.

138.    On August 1, 2022, Pink Energy filed a hair-raising federal complaint against one of its suppliers, Generac. The complaint detailed how Generac's alleged malfeasance had cost

Pink Energy $40 million, ruined its relationship with customers, and caused sales to plummet. The complaint explained that there was no end in sight to Pink Energy's troubles.  The complaint made very clear that it was only a matter of time before Pink Energy became insolvent, if it was not already so.

139.    On August 11, 2022, PV Magazine, a leading solar energy publication, published an article summarizing Pink Energy's lawsuit's allegations.

140.    On August 15, 2022, Defendant Yoder told investors that not only were Sunlight's losses on the advances program "very, very small," Sunlight "[doesn't] expect to take any further one-time charges."

141.    Before and during the Class Period, Sunlight did not disclose the identities of the contractors that it worked with, or the contractors to whom it gave cash advances. Therefore, investors did not know that Sunlight was giving cash advances to Pink Energy and Vision Solar.

142.    On September 28, 2022, Sunlight announced that it expected to write off $30-33 million in advances because of a single contractor, later revealed to be Pink Energy.  Sunlight's stock price fell by $1.44 per share, or over 57%, to close at $1.08 per share.

143.    In its 2022 10-K, Sunlight would report that in 2022, it had written off of $41.5 million of contractor advances, with another $6.7 million in an accounting charge - or almost half of its revenue for the entire year of 2022.

### J.  DETAILED ALLEGATIONS OF MISCONDUCT

#### 1.    Former Employees Reveal a Haphazard and Perverse System

144.    Confidential Witness #2 ("CW2") worked as a Regional Sales Manager - Home Improvement from October 2021 to October 2022.  CW2 reported to Kevin Jurczyk, Sunlight's Head of Home Improvement.  As a Regional Sales Manager - Home Improvement, CW2 was

responsible for finding contractors to work with Sunlight and growing the accounts (*i.e.* getting the contractors to do more business with Sunlight). According to CW2, Home Improvement and Solar work as one division because, among other things, the contractors typically had to replace the roof (which fell under home improvement) before installing any solar panels.

145. According to CW2, Sunlight was throwing around money in the form of cash advances to get "first look" agreements with contractors. Because Sunlight did not have any exclusivity agreement with contractors (*i.e.* a contractor in Sunlight's network can suggest that a customer use any of Sunlight's competitors for financing), Sunlight tried to use the lure of cash advances to get what Sunlight felt was the next best thing. A "first look" agreement is when a contractor agrees to tell a customer about Sunlight's financing platform before showing them other financing platforms. Indeed, rather than being judicious about which contractors to work with, Sunlight was practically begging and "buy[ing]" contractors.

146. According to CW2, once Sunlight began working with a contractor and giving out cash advances, the money just kept going out: "there was never: this account's high risk…you need to call and find out what's going on[.]" CW2 further stated that Sunlight's representations about a vigorous due diligence and ongoing monitoring process for contractors was "a bunch of bullshit" and that it was just "hey, this is what we're going to put on papers to say this is what we're doing…it's never executed."

147. CW2 stated that the cash advances created a perverse system where Sunlight was forced to continuing giving out cash advances to troubled contractors because that's the best way to ensure that those contractors stayed in business and could finish their projects. In other words, sometimes the more risky a contractor was, the more cash advances they got from Sunlight. CW2 mentioned that during her time at Sunlight, Vision Solar that was getting inundated with

complaints and government investigations, but Sunlight "was in so deep with them, we couldn't just cut them off...if we were to cut them off knowing how bad of a company they are…they wouldn't have any money to go complete the projects we need them to complete."

148.    According to CW2, Sunlight began to advance Vision Solar net $250,000/week to go out and buy materials to keep operating, in addition to any project-related cash advances. Sunlight's own SEC filings confirm CW2's story. In its 2021 10-K, Sunlight disclosed that it was owed $9.0 million by a contractor for advances not associated with specific projects. At the time, there were only two contractors who owed enough to be plausible candidates: Pink Energy, which owed $12.5 million, and Vision Solar, which owed $20.9 million.

149.    Confidential Witness #3 ("CW3") served as the Sunlight Financial Relationship Manager: Team Lead from August 2021 until November 2022. He had previously served as a relationship manager from August 2020 through August 2021. In his earlier position, he managed the relationship with a number of different solar partners/contractors. In his latter position, he led the team which performed such functions.

150.    According to CW3, Sunlight received and logged customer complaints. CW3's team then served as the middleman between the customer and the contractor. In this way, Sunlight kept close track of the complaints that were made about the various contractors.

151.    According to CW3, CW3's team tried to raise concerns about several installers, including Pink Energy and Vision Solar, without avail. CW3's team escalated his concerns about particular contractors directly to Chief Operating Officer Timothy Parsons, emailing between five and twenty occasions, but was never informed of a resolution.

152.    According to CW3, Vision Solar just ran out of money. Because it owed Sunlight so much money, "Sunlight kept giving them more and more money." CW3 "raised a million

concerns with Vision [including] that they were a terrible installer and that they were going to put us in a bad position." Indeed, CW3 raised concerns regarding Vision Solar from June 2021 through his departure in November 2022. CW3 was told that his complaints were sent to Sunlight's Commercial Risk team. But Sunlight's higher ups ignored CW3's concerns and "kept giving Vision more money."

153.    Confidential Witness #4 ("CW4") was a Sunlight Financial Account Manager - Small and Medium Business Development: Home Improvement Division from April 2022 through January 2023. CW4 also managed relationships with solar installers. CW4 reported to Chris Kastler, Sunlight's Financial Managing Director/Director of SMB Business Development.

154.    According to CW4, contractors received advances in about 90% of solar contracting projects.

155.    According to CW4, Sunlight would make advance payments to contractors before customers were approved for loans. CW4 estimates that in "at least" 20% of contractor advances, the customer was ultimately not approved. CW4 noted that Pink Energy was a prime culprit.  In those cases, Sunlight would have to struggle to obtain repayment from the contractor. This was not always possible. According to CW 4, "Some [contractors] didn't pay [Sunlight] back. Some would disappear because they have already gotten their money."

### 2. Pink Energy and Vision Solar Came to Account For Half of Sunlight's Outstanding Advances

156.    After the Business Combination, Sunlight continued to expand business with Pink Energy and Vision Solar. By the end of Q3 2021, the two companies combined accounted for nearly half of all Sunlight's cash advances:[13]

| | Pink Energy | Vision Solar | Combined (Pink Energy and Vision Solar) | Total Advances Outstanding (to all contractors) |
|---|---|---|---|---|
| Q3 2022 | $32.6 million (as of October 7, 2022)[14] | $6.2 million | $38.8 million | $96.7 million[15] |
| Q2 2022 | $30.5 million | $10.9 million | $41.4 million | $95.3 million |
| Q1 2022 | $23.0 million | $20.6 million | $43.6 million | $86.6 million |
| Q4 2021 | $12.5 million | $20.9 million | $33.4 million | $67.1 million |
| Q3 2021 | $21.0 million | $13.3 million | $34.3 million | $71.3 million |
| Q2 2021 | $5.0 million | $5.6 million | $10.6 million | $41.0 million |
| Q1 2021 | $888 thousand | $6.5 million | $7.3 million | $32.6 million |
| Q4 2020 | $295 thousand | $6.4 million | $6.7 million | $35.4 million |

---

[13] Based on Sunlight's disclosure of the amount of advances written off for Pink Energy and the relative size of Pink Energy's advances compared to advances given to other contractors, it is obvious that Pink Energy is Contractor #1 on Sunlight's quarterly report on Form 10-Q for the second quarter of 2022 (and was similarly identified in other periodic SEC filings where Sunlight identified by number the contractors to whom cash advances were outstanding).

For Vision Solar, according to CW2, Vision Solar had approximately $20 million in advances as of January 2022. The only contractor identified on Sunlight's SEC filings as having that amount in advances as of Q1 2022 is Contractor #2.

[14] According to Sunlight's proof of claim filed in Pink Energy's bankruptcy, *In re Power Home Solar, LLC*, 22-50228, Claim # 5736 (Bankr. W.D. N. C.).

[15] Includes amounts owed by PowerHome Solar.

### 3.    Pink Energy Publicly Unravels

157.    By spring 2022, there were widespread media reports of Pink Energy salespeople engaging in deceptive marketing practices and widespread complaints of Pink Energy's shoddy workmanship.

158.    For example, on March 15, 2022, an article and TV segment appeared on CBS4 Indianapolis reporting on customer complaints about Pink Energy. The TV segment reported that the FTC was investigating at least 131 complaints submitted by Pink Energy customers. [16] According to the reporter, "the stories we have heard have been similar if not the same." Salespersons promised customers that the solar panels would cut almost all, or even all, of their power bills.  Indeed, in one case, the salesperson had asked to see a year's worth of a customer's power bills to ensure Pink Energy would install enough solar panels to eliminate the bill. But when installed, the solar panels produced barely any power at all. The customers were left having to pay off the loan they had taken out to pay for the solar project and paying utility bills that were substantially the same.

159.    Stories about Pink Energy falsely telling customers their solar panels would eliminate their electricity bills became regular fare on local news.

160.    On March 30, 2022,[17] an article appeared on WECT News, a media company serving eastern North Carolina, reporting that residents in North Carolina were getting duped by Pink Energy.  Salespersons told customers that the panels would eliminate their electric bills, but the panels hardly made a dent. WECT reported that they had heard the same story from

---

[16] https://cbs4indy.com/cbs4-investigates/dozens-of-customers-heated-after-installing-solar-panels/

[17] https://www.wect.com/2022/03/30/customers-say-theyre-being-burned-by-some-solar-companies/

customers "from Michigan to Texas." WECT reported that (a) one man even started a website (www.PowerHomeLawsuit.com), [18] with the hope of filing a class action lawsuit against Pink Energy, and the website "took off" with more than 500 people signing up shortly after the site was launched; (b) in Ohio alone, the Attorney General received 57 complaints against Pink Energy in 2021 and 2022 alleging deceptive sales practices; (c) a Facebook group called "Powerhome Victims Support Group" had nearly 700 members sharing their problems with Pink Energy.

161.    On April 1, 2022, FOX4 Kansas City reported, once again, that Pink Energy salespeople had promised Missouri homeowners that their power bills would be eliminated, but the solar panels were producing little power. The FOX4 story included a comment by the Missouri Attorney General that it had "issued a civil investigative demand to [Pink Energy] for information regarding its practices for sales and installation of solar panels."

162.    On April 13, 2022, a FOX2 Detroit undercover reporter recorded a Pink Energy salesperson falsely telling customers that they would get tens of thousands of dollars in federal tax refunds if they installed solar panels. The FOX2 article details numerous Detroit-area residents who were duped by Pink Energy into installing expensive solar panels. The article cites lawsuits filed by customers against Pink Energy in California and North Carolina.

163.    In an undercover investigation reported in a May 16, 2022 article, a FOX5 Atlanta reporter posing as a prospective customer recorded a senior account manager as saying that the panels would "eliminate" the customer's electricity bill, and guaranteeing that "[w]orst case scenario you'll have 23% of your bill left. But that really will probably be in the winter when

---

[18] Prior to April 22, 2022, Pink Energy was known as PowerHome Solar.

we're not producing as much." The senior account manager also promised the customer could sell unused power into the grid, although the customer's utility does not offer that service.

164.    On June 9, 2022, CBS4 Indianapolis reported that BBB had removed Pink Energy's rating and issued a consumer alert about the company. A June 20, 2022 FOX5 Atlanta article repeated the news.

165.    Meanwhile, the stories recounting the same story about Pink Energy - that salespeople promised to eliminate or nearly eliminate electric bills, but that the solar panels produced barely any energy - kept accumulating, including:

> a.    A June 26, 2022 WSMV Nashville article and segment
>
> b.    A July 15, 2022 CBS21 Harrisburg article and segment
>
> c.    A July 28, 2022 ABC5 [WEMS] Cleveland article and segment

166.    Sunlight could also have turned to customer reviews. The review aggregator SolarReviews records that between June 27, 2021 and June 30, 2022, Pink Energy received 16 written reviews that were two stars or higher. In that same period, it received more than 200 one-star written reviews.

167.    Customer reviews revealed outrageous misconduct on Pink Energy's part. One customer complained that Pink Energy "wired my system incorrectly" such that it could have caught fire but for an alert Generac Power Systems, Inc. (one of Pink Energy's suppliers) customer support representative who advised the customer not to turn the power on. Another complained in a January 31, 2022 review that Pink Energy's panels had caused a house fire, leaving significant damages. Another complained that "Salesman lied about how the federal tax break works. They showed up with no ladder or extension cords. Left a hole under my breaker

box. Did not complete the install. City inspector even told them things needed to be done and they were not. Power company told them the same and they did not."

### 4. Pink Energy Lays Out Its Profound Business Challenges In a Publicly-Filed Complaint

168.    Beginning in 2021 and escalating through 2022, Pink Energy was embroiled in a bitter dispute with a supplier, Generac Power Systems, Inc. ("Generac"), that was having a devastating impact on Pink Energy's financial condition, business operations, and reputation.

169.    According to Pink Energy's complaint, filed August 1, 2022,[19] in spring 2020, Generac and Pink Energy entered into an agreement for Generac to supply Pink Energy with a necessary electrical component for solar panels called SnapRS. A substantial majority of Pink Energy's installations included a Generac SnapRS.

170.    In the summer of 2021, fires broke out at several homes with Pink Energy solar panels. Pink Energy determined that the fires were caused by overheating of the SnapRS. A design defect caused the SnapRS components to overheat, then melt or explode. While not all defective SnapRS devices caused fires, they cut the solar panels' connection to the customer's electric system, depriving them of the benefits for which they had paid.

171.    Starting in late 2021, Pink Energy started receiving a massive number of service calls, which Pink Energy claimed were due to defects in the SnapRS components.  According to Pink Energy, prior to using SnapRS in its solar panel installations, Pink Energy averaged about 800 service calls per month. Starting from late 2021, the number of service calls to Pink Energy skyrocketed to about 30,000 per month.

---

[19] *Power Home Solar, LLC d/b/a Pink Energy v. Generac Power Systems, Inc*, Case No. 6:22-cv-000043-NKM (W.D. Va.), Dkt. No. 1.

172.    This had substantial consequences for Pink Energy's business. Pink Energy was required to hire and train additional customer service representatives, field service technicians, and other employees to handle customer service, maintenance, and other issues for SnapRS-related problems.

173.    Pink Energy also had to shift its existing employees from starting new projects to repairing existing defective panels, expending "extraordinary amounts of time" on these repair projects.

174.    Pink Energy started receiving "***an overwhelming number*** of negative reviews and complaints to the BBB, social media, and other public platforms" that caused "***significant harm to [Pink Energy]'s reputation***" and which resulted in "a ***public relations disaster***" for Pink Energy.

175.    Pink Energy spent more than $39 million responding to service calls associated with defective SnapRSs.

176.    Because of the damage to Pink Energy's brand and reputation caused by the defective SnapRSs, Pink Energy started experiencing a substantial rise in customer cancellations; Pink Energy suffered $155 million in lost revenue because of cancellations.

177.    Pink Energy alleged that Generac had acknowledged the defect rate for SnapRSs was higher than 50%.

178.    According to the financial statements it filed in its bankruptcy, Pink Energy earned $600.0 million in gross receipts in 2021, but only $291.6 million from January 1, 2022 through October 7, 2022. [20]

---

[20] Generac has denied that it supplied defective components to Pink Energy, contending that Pink Energy's faulty installation was to blame.

179.    Pink Energy's publicly-filed complaint drew attention from the media and analysts before August 15, 2022, including in an August 11, 2022, article in PV Magazine, a leading publication for the solar industry. The article was titled *Pink Energy files Lawsuit Against Generac* and noted that Pink Energy alleged it had lost $155 million in revenues from the Generac defect. The article stated that the case was brought in the Western District of Virginia and identified the lawsuit as "Case 6:22-cv-00043-NKM." The article also noted that Pink Energy had an average rating of 2.02 on SolarReviews and that 1,057 complaints had been lodged against it on the BBB's website.

180.    Pink Energy's other creditors took notice. On August 5, 2022, Pink Energy executed an agreement adding the claims alleged in its lawsuit against Generac to the collateral on its loan facility.[21]

181.    These were alarming developments that - if Sunlight's ongoing diligence and monitoring of contractors was as robust as it claimed - should have placed Sunlight on heightened alert regarding Pink Energy.  Instead, Sunlight designated Pink Energy as a "3" risk level, meaning that it had "excellent to average" reputational risk and "excellent to average" risk assessment.

### 5.    Vision Solar

182.    Vision Solar's reputation in the solar industry was awful. It was not accredited by the BBB and received a grade of F.

183.    As set out in a series of class action lawsuits filed in 2020 and into 2021, and an action by the United States and the State of Arizona filed in July 2023, and as more fully alleged above, Vision Solar derived much of its business from consumer fraud.

---

[21] *Summerlin v. JPMorgan Chase Bank, N.A.*, 23-03013, Dkt. Nos. 1-4 (W.D. N.C.)

184.    Vision Solar hired telemarketing companies to harass potential customers. These telemarketers would often falsely tell customers that they were calling from the customer's utility or from the government. It was a condition of Vision Solar's hiring that the telemarketers *not mention* Vision Solar's name. The telemarketers would arrange a visit from a representative, which Vision Solar would conduct.

185.    Several other class actions alleging violations of telecommunications laws and consumer fraud were filed in late 2021 and 2022. *Calta v. Vision Solar FL, LLC*, 22-cv-897-CEH-CPT (M.D. Fl.) (filed in state court March 28, 2022); *Sego v. Vision Solar LLC*, 22-cv-11181-RGS (D. Mass.) (filed July 21, 2022), *Landy v. Vision Solar, LLC*, 21-cv-20241 (D.N.J.) (filed November 29, 2021).

186.    According to SolarReviews, Vision Solar's average rating in 2021 and 2022 was lower than two stars. Vision Solar received 59 reviews between June 28, 2021 and July 1, 2022. All but three of them were one-star reviews. On EnergySage, in that same time period, Vision Solar received 20 one-star reviews, and only one review of more than one star. on the BBB, Vision Solar received 85 one-star reviews, and only 7 reviews of more than one star.

187.    On SolarReviews Vision Solar's average rating is the second-worst of any company with 100 reviews or more.

188.    On the BBB, customers complained that Vision Solar had installed panels, and then failed to arrange an inspection to connect them to the grid, or failed to give them documents necessary to pass an inspection, so that solar panels could not be used for months or years, and ignored customer calls seeking to have Vision Solar help. Other customers stated that Vision Solar had installed solar panels without permits. Some customers complained that Vision Solar had falsified their signatures on contracts.  Homeowners complained that they'd received dozens

or even hundreds of unsolicited calls on behalf of Vision Solar. In many cases, Vision Solar had to agree to spend thousands of dollars paying off customers' loans.

189.    Indeed, Connecticut Attorney General William Tong would later comment that "Vision Solar's predatory practices are far and away the worst we have seen. Vision Solar preyed on low-income, elderly, and disabled homeowners, pressuring them into unaffordable loans for solar panels that in some cases were never activated. Their egregious misconduct appears to have violated multiple laws[.]"

190.    Sunlight did not publicly disclose the identities of contractors in its network, or the identities of contractors that received cash advances from Sunlight.  Therefore, investors during the Class Period did not know that Sunlight partnered with Pink Energy and Vision Solar, or that Sunlight gave cash advances to Pink Energy and Vision Solar.

### 6.    Given Sunlight's Inadequate Diligence and Monitoring of Contractors, the Cash Advance Program was not "Low Risk" to Sunlight

191.    Contrary to Defendant Potere's representation that the cash advance program was "low risk" to Sunlight, the cash advances actually posed a high risk to Sunlight.  While giving out generous cash advances to contractors *might have been* low risk if Sunlight actually had a vigorous diligence and monitoring process in place, the lack of such process at Sunlight made the cash advance program very risky.

192.    For example, for fiscal year 2020, Sunlight reported total revenue of $69 million. Yet, Sunlight handed out $35 million in cash advances that year. In other words, Sunlight gave out cash advances equal to *more than half* of its annual revenue.

193.    The ratio (and risk) was even worse by 2022.  Per Sunlight's 2Q22 10-Q, the last quarterly report before the Pink Energy default, Sunlight had $91 million in cash advances

outstanding. That was more than the total amount of cash that Sunlight had in hand (*i.e.* $68 million) and *more than three times* Sunlight's revenue for that quarter (*i.e.* $29 million).

194.    Indeed, the amount of advances receivable from Pink Energy alone at the time of Pink Energy's bankruptcy was almost half of Sunlight's total cash at hand at the time, and more than Sunlight's quarterly revenue for the most recent quarter before Pink Energy's bankruptcy.

195.    Coupled with Sunlight's lackadaisical vetting and monitoring of contractors that it gave advances to, these large advances posed significant risk to Sunlight in the event of default. Following Sunlight's disclosure that it was impairing the advances receivable from Pink Energy due to the latter's imminent bankruptcy, Sunlight's stock price dropped by 57%, wiping out more than half of Sunlight's market capitalization.

196.    Sunlight itself recognized the unacceptable risk that the cash advance program posed. Despite the importance of the cash advance program in differentiating Sunlight from its competitors and the significant role that it played in attracting contractors to work with Sunlight, Sunlight first reduced advances and then suspended the program in the aftermath of the Pink Energy default. During an earnings call to discuss fiscal year 2022 financial results, Defendant Potere admitted that the cash advance program was risky to Sunlight, telling analysts that in the fourth quarter of 2022 Sunlight took steps to "mitigate our risk" in the cash advance program, and then decided to "suspend the program indefinitely" as of March 2023. Sunlight would not have taken these actions if cash advances were low risk, especially since these advances were touted as one of the key factors in Sunlight's ability to get contractors to work with Sunlight.

**K. DEFENDANTS' FALSE STATEMENTS**

197.    On January 25, 2021, Defendants Strong, Potere, and Edinburg held a conference call with investors about the proposed Business Combination. During the call, Potere touted the

cash advance program, and falsely stated the advances were low risk to Sunlight: "We structure these advances such that *they're low risk to Sunlight*, but provide significant benefit to our contractors. This is another example of how at Sunlight we use credit experience and access to capital to differentiate our value proposition."

198.    As explained above in paragraphs 191 to 196, this statement was false and made with scienter because the cash advances were not "low risk" to Sunlight, especially in light of Sunlight's 2019 decision to abandon nearly all credit standards for contractor advances.

199.    Sunlight also made false statements concerning its contractor diligence and monitoring. The first of these misstatements occurred on March 22, 2021, when Spartan filed with the SEC a Registration Statement and preliminary proxy statement and prospectus on Form S-4 in connection with the Business Combination. The S-4 stated that "Sunlight has adopted vigorous contractor diligence and monitoring procedures" and that:

> *Upon the engagement of a contractor into Sunlight's network, Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently* . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

> […]

> Sunlight has established a *robust commercial underwriting and ongoing monitoring process* to assure that the quality of the work product, solar system construction, *financial condition* (to support construction processes and provide post construction warranty support) and *legal compliance practices* of the contractors in Sunlight's network.

200.    The S-4 also stated that: "***Sunlight's milestone advance program is generally offered to contractors in Sunlight's top risk tiers which have the strongest commercial risk assessment results***."

201.    Even though the S-4 was filed by Spartan, the S-4 stated that "all…information relating to Sunlight has been supplied by Sunlight."

202.    Sunlight made the identical misrepresentation in each of the following subsequent SEC filings and disclosures during the Class Period:

>    a.    May 12, 2021: Amendment No. 1 to the March 22, 2021 S-4 and updated preliminary proxy statement.
>
>    b.    June 1, 2021: Amendment No. 2 to the March 22, 2021 S-4 and updated preliminary proxy statement
>
>    c.    June 21, 2021: Proxy Statement and Prospectus, signed by Defendant Strong.
>
>    d.    July 30, 2021: Registration Statement on Form S-1, signed by Defendants Potere and Edinburg.
>
>    e.    September 2, 2021: Amendment No. 1 to the July 30, 2021 S-1, signed by Defendants Potere and Edinburg.
>
>    f.    September 7, 2021: Prospectus (which forms part of the July 30, 2021 Registration Statement).
>
>    g.    April 22, 2022: Prospectus (which forms part of the July 30, 2021 Registration Statement).

203.    The statements were false and made with scienter because: (1) Sunlight had enacted a risky strategy in 2019 of extending riskier advances to contractors and removing

measures designed to address potential fraud; (2) thereafter, Sunlight had avoided recognizing losses by doubling down on risky advances to contractors, in particular Pink Energy and Vision Solar; (3) Sunlight was able to avoid significant losses until mid-2022 only because it extended more and more cash advances to companies that would otherwise go under.

204.    On May 16, 2022, Sunlight held a call to discuss its Q1 2022 earnings. On the call, Defendant Potere stated that "our contractor advances program supports our contractor partners in their efforts to secure sufficient inventory to meet demand."

205.    Defendant Potere's statement was false and misleading because by this time, half of Sunlight's outstanding advances went to Pink Energy and Vision Solar. These advances were not meant to allow Pink Energy and Vision Solar to meet demand, but to attempt to stay in business so they would have a chance of paying Sunlight back. The statements thus gave a misleading impression that Sunlight was capitalizing on a business opportunity rather than gambling more and more capital in an attempt to avert a catastrophic outcome.

206.    Defendant Potere also stated that "[i]n the first quarter, we invested an additional $19 million in advances and we'll continue to allocate capital to this program opportunistically to drive profitable volume."

207.    Defendant Potere's statements were false and misleading because the net amount owed by Pink Energy in Q1 2022 increased by $10.5 million, or over half the overall increase. The advances to Pink Energy were not Sunlight's allocating capital "opportunistically to drive profitable volume." Rather, they were Sunlight's desperate attempt to keep Pink Energy in business just a little longer so that it might have a chance to recover and pay back the tens of millions of dollars it already owed Sunlight. The statements thus gave a misleading impression

that Sunlight was capitalizing on a business opportunity rather than gambling more and more capital in an attempt to avert a catastrophic outcome.

208.    On August 15, 2022, two weeks after Pink Energy filed its alarming lawsuit against Generac revealing its increasingly dire financial woes, Sunlight held a call to discuss its Q2 2022 earnings. In an earnings release Defendants issued before the call, Sunlight announced that it had taken a provision for losses of $4.0 million.

209.    On the call, in response to an analyst question, Defendant Yoder stated that he and Sunlight "don't expect to take any further one-time charges":

**Q:**
Okay. And one last one from me. Thank you for taking all the questions. For the $3.5 million loan loss provision. That was on I think working capital advances, right, with contractors. And I think you mentioned to a single contractor [sic]. So I was wondering philosophically if you still think this is the best way to go and what can you share what happened with that contractor how unique of the situation. Is it or do you think it might be a pattern for us to expect ahead? Thanks.

**DEFENDANT YODER:**
Yeah. Thanks, Phil, for the question. Yeah so, yes, we did take a reserve for $3.6 million incremental potential losses for a single installer as part of our installer advance program. We like this program and we don't expect to take any further one-time charges. That said we monitor each installer and reevaluate on a variety of factors including financial stability. And so this is a one instance, but again we've advanced over $1 billion program to date with minimal actual losses.

So this is a really good differentiator for us in terms of attracting new and maintaining deepening relationships with our installers getting volume commitments and improving margins. So we like it.

**Q:**
Great. Yeah, so it seems like it's a -- the 1 billion with minimal losses, are we talking about like sub 1% or like low single digits?

**DEFENDANT YODER:**
Yeah, it doesn't even show up on the calculator. It's very, very small.

210.    Defendant Yoder's statements were misleading and made with scienter because, among other things, by then: (I) Pink Energy was likely to default on some of its outstanding

loans, because (a) it had filed a public complaint setting out its increasingly dire financial problems and casting doubt on its ability to stay in business, (b) a leading solar industry journal had reported on Pink Energy's complaint, and (c) Pink Energy had one of the worst reputations in the solar installation business, with numerous reports of systematic deceptive practices and duped customers in the national media; and (2) Vision Solar was likely to default on some of its outstanding loans, in that: (a) multiple class action lawsuits had been filed against it, starting in 2020, (b) its ratings on BBB, SolarReviews, and EnergySage showed that it (along with Pink Energy) was two of the worst and most reviled solar contractors in the industry, often relying on consumer fraud to get business – a risky and unsustainable business model.

## L. DEFENDANTS' PRE-MERGER STATEMENTS WERE ABOUT POST-MERGER SUNLIGHT

211.    Defendant Potere's statement at the January 25, 2021 conference call, made in the context of a proposed merger, was related to and about Spartan and the post-Business Combination Sunlight. Indeed, Defendant Strong, CEO of Spartan, was at this conference call and began the conference call saying: "we are excited to announce this morning that Spartan is *combining with* Sunlight Financial…and *bringing it to the public markets*." Spartan had no business operations of its own; its business post-Business Combination is that of Legacy Sunlight's.  Therefore, Defendant Potere's statements on this conference call were also about post-Business Combination Sunlight. Indeed, the conference call was intended to introduce Legacy Sunlight to Spartan investors. The targeted audience of this conference call was not Legacy Sunlight investors, but rather, Spartan investors and those interested in the post-Business Combination Sunlight.

212.    Similarly, Defendants' other pre-Business Combination statements were about post-Business Combination Sunlight and Spartan, in that:

a. They appeared on prospectuses that related to Spartan investors' decisions to make the investment decisions of (1) approving the Business Combination and (2) not redeeming their shares;

b. They were made in order to convince Spartan investors to make the investment decisions of (1) approving the Business Combination and (2) not redeeming their shares.

## M. THE RISKS CONCEALED BY DEFENDANTS' FALSE STATEMENTS MATERIALIZES, CAUSING INVESTOR LOSSES

213.    On September 28, 2022, after close of trading, Sunlight filed a Form 8-K with the SEC revealing that it was going to take a "non-cash advance receivable impairment charge of $30 to $33 million during the Company's fiscal quarter ending September 30, 2022" because Sunlight "was informed of certain actions taken by one of [Sunlight]'s installer partners to address liquidity issues faced by the installer" which "would likely result in an ability of the Company to collect on advances outstanding to such installer."  In a press release accompanying the 8-K, Defendant Potere disclosed that Sunlight would be "re-underwriting all contractor partners' advances to further mitigate risk going forward."

214.    This adverse disclosure caused the price of Sunlight's common stock to fall by $1.44 per share, or over 57%, to close at $1.08 per share on September 29, 2022, damaging Plaintiffs and other investors in Sunlight's common stock.

215.    Analysts quickly figured out that the installer in question was Pink Energy, which had shut down its business operations on September 21, 2022 (and would file for Chapter 7 bankruptcy on October 7, 2022).  Defendant Potere confirmed during Sunlight's Q3 2022 earnings call that the bankrupt installer was Pink Energy.

216.    In its 2022 10-K, Sunlight would report that in 2022, it had written off of $41.5 million of contractor advances, with another $6.7 million in an accounting charge—or almost half of its 2022 *revenues*.

**N.  ADDITIONAL ALLEGATIONS FURTHER SUPPORTING THE INFERENCE OF SCIENTER**

217.    According to CW2, all cash advances to contractors had to go through Defendant Potere for final approval. Therefore, Defendant Potere was aware what kind of diligence was done on each contractor as well as the justification for each contractor's assigned risk tier.

218.    According to CW1, Sunlight held Weekly Operations Meetings to discuss, among other things, problems with the cash advance process. All Relationship Managers and every department connected to Operations, including the Chief Operating Officer, Head of Credit, and Head of Commercial Underwriting, attended the meetings.

219.    That Defendant Potere said Sunlight would "re-underwrite" all cash advances to *all* contractors following Pink Energy's default showed that Potere believed there was a systemic problem with how Sunlight was performing due diligence and risk evaluation on contractors. If Sunlight's due diligence and risk evaluation process was as vigorous as claimed, then the Pink Energy debacle would have been viewed as an isolated incident, rather than something that would trigger Sunlight to scrutinize every other contractor advance.

220.    The rate of increase in cash advances doled out to Pink Energy, particularly relative to advances outstanding to other contractors, should have caught the attention of Sunlight executives. Outstanding cash advances to Pink Energy increased by a multiple of six in just one year, from $5.0 million in Q2 2021 to $30.6 million in Q2 2022, such that (1) Pink Energy owed *three times* as much as the next largest contractor by Q2 2022, and (2) cash advances extended to Pink Energy accounted for *nearly one-third* of total cash advances

outstanding. Indeed, according to a claim Sunlight filed in Pink Energy's bankruptcy, Sunlight's financing agreement with Pink Energy was amended three times in 2022: on January 5, May 31, and again on August 18 (*i.e.,* more than two weeks after Pink Energy's lawsuit against Generac, revealing its dire financial situation, was publicly filed). The last two were amendments to Pink Energy and Sunlight's Volume Commitment and Advance Payments Amendment to Financing Program Agreement, suggesting that they were increases to the maximum credit that could be extended to Pink Energy.[22]

221.    According to CW4, a good rating by the BBB was nominally a requirement for approval. Vision Solar was not accredited with the BBB and had a grade of F. Sunlight would have had to grant a high-level exception to Vision Solar.

### O.    PRESUMPTION OF RELIANCE

222.    At all relevant times, the market for Sunlight common stock was an efficient market for the following reasons, among others:

    a.    Sunlight's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b.    As a regulated issuer, Sunlight filed periodic public reports with the SEC and with the NYSE;

    c.    Sunlight regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as

---

[22] According to Sunlight's proof of claim filed in PowerHome's bankruptcy, *In re Power Home Solar, LLC*, 22-50228, Claim # 5736-1, ¶5 (Bankr. W.D. N. C.).

communications with the financial press and other similar reporting services; and

d.      Sunlight was followed by several securities analysts employed by major brokerage firms, including Credit Suisse, Roth Capital Partners, and Cowen and Company, and who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

223.    As a result of the foregoing, the market for Sunlight's common stock promptly digested current information regarding Sunlight from all publicly available sources and reflected such information in the price of Sunlight's common stock. Under these circumstances, all purchasers of Sunlight's common stock during the Class Period suffered similar injury through their purchase of Sunlight common stock at artificially inflated prices and the presumption of reliance applies.

224.    Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased Sunlight common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

### P. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

225.     The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and materially misleading statements alleged herein.

226.     None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

227.     To the extent that any of the false and materially misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

228.     To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer who actually knew that such statement was false when made.

229.     Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

### Q.    CLASS ACTION ALLEGATIONS

230.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rule of Civil Procedure on behalf of a Class consisting of all person and entities other than Defendants who: (a) purchased the publicly traded common stock of Sunlight between January 25, 2021 and September 28, 2022, both dates inclusive, and/or (b) beneficially owned and/or held Spartan common stock as of June 1, 2021 and were eligible to vote at Spartan's July 8, 2021 special meeting.  Plaintiffs bring this action to recover damages caused by Defendants' violations of the federal securities laws, including Sections 10(b), 14(a), and 20(a) of the Exchange Act. Excluded from the Class are: (a) Defendants and their families, the officers, directors and affiliates of Defendants and Legacy Sunlight at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant or had a controlling interest; and (b) persons and entities who suffered no compensable losses.

231.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sunlight's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sunlight or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

232. Plaintiffs' claims are claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

233. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

234. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. Whether Defendants violated the Exchange Act;

    b. Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts;

    c. Whether the Sunlight Defendants acted knowingly or recklessly in issuing false and misleading statements;

    d. Whether the price of Sunlight's common stock was artificially inflated during the Class Period;

    e. Whether the market for Sunlight common stock was efficient during the Class Period;

    f. The extent of damages sustained by Class members, and the appropriate measure of damages.

235. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT II

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Sunlight, Potere, Edinburg, and Yoder**

236.    Plaintiffs repeat and reallege each and every allegation contained above in Section V (SECTION 10(b) and 20(a) ALLEGATIONS) as if fully set forth herein.

237.    This Count is asserted against Defendants Sunlight, Potere, Edinburg, and Yoder (the "Sunlight Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

238.    During the Class Period, the Sunlight Defendants, individually and in concert, at relevant times, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

239.    The Sunlight Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they, at relevant times: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

240.    The Sunlight Defendants acted with scienter at relevant times in that they knew that the public documents and statements issued or disseminated in the name of the Company

were false and materially misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

241.    As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of the Section 10(b) Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of the Sunlight Defendants' false and misleading statements.

242.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's common stock had been artificially and falsely inflated by the Sunlight Defendants' misleading statements and by the material adverse information which the Sunlight Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

243.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

244.    By reason of the foregoing, the Sunlight Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the

other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

**COUNT III**

**Violation of Section 20(a) of the Exchange Act Against Potere, Edinburg, and Yoder**

245.    Plaintiffs repeat and reallege each and every allegation contained above in Section V (SECTION 10(b) and 20(a) ALLEGATIONS) as if fully set forth herein.

246.    The Defendants named herein (the "Sunlight Individual Defendants") participated in the operation and management of Sunlight, and conducted and participated, directly and indirectly, in the conduct of Sunlight's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

247.    As officers and directors of a publicly owned company, the Sunlight Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sunlight's business operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

248.    Because of their positions of control and authority as senior officers and directors, the Sunlight Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sunlight disseminated in the marketplace during the Class Period. Throughout the Class Period, at relevant times, the Sunlight Individual Defendants exercised their power and authority to cause Sunlight to engage in the wrongful acts complained of herein. The Sunlight Individual Defendants therefore, were controlling persons of Sunlight within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sunlight's common stock.

249.    The Sunlight Individual Defendants, therefore, acted as controlling persons of Sunlight.  By reason of their senior management positions and/or positions as directors of Sunlight, the Sunlight Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sunlight to engage in the unlawful acts and conduct complained of herein. The Sunlight Individual Defendants exercised control over the general operations of Sunlight and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

250.    By reason of the above conduct, the Sunlight Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sunlight.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives;

b.      Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 20, 2023                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**
                                           */s/ Laurence M. Rosen*
                                           Laurence M. Rosen
                                           Phillip Kim
                                           Yu Shi
                                           275 Madison Ave, 40th Floor
                                           New York, NY 10016
                                           Tel: (212) 686-1060
                                           Fax: (212) 202-3827
                                           lrosen@rosenlegal.com
                                           pkim@rosenlegal.com
                                           yshi@rosenlegal.com

                                           *Lead Counsel for Plaintiffs*

                                           **GLANCY PRONGAY & MURRAY LLP**
                                           Gregory B. Linkh
                                           230 Park Ave, Suite 358
                                           New York, NY 10169
                                           Tel: (212) 682-5340
                                           Fax: (212) 884-0988
                                           glinkh@glancylaw.com

                                           *Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*/s/ Laurence M. Rosen*</u>