UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

MATTHEW MILLUNCHICK and MIKE
MARGENT, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiffs,

     -against-

SUNLIGHT FINANCIAL HOLDINGS, INC.
f/k/a/ SPARTAN ACQUISITION CORP. II,
MATTHEW POTERE, BARRY EDINBURG,
RODNEY YODER, GEOFFREY STRONG,
JAMES CROSSEN, OLIVIA WASSENAAR,
WILSON HANDLER, CHRISTINE
HOMMES, JOSEPH ROMEO, and SPARTAN
ACQUISITION SPONSOR II LLC,

                Defendants.

---------------------------------------------------------------- x

:    22-cv-10658-AKH

**THE SPARTAN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

Christopher E. Duffy
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: 212-237-0000

Michael C. Holmes (*pro hac vice*)
Jeffrey Crough (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
VINSON & ELKINS LLP
2001 Ross Avenue
Dallas, Texas 75201
Telephone: 214-220-7700

*Attorneys for Defendants Geoffrey Strong, James
Crossen, Olivia Wassenaar, Wilson Handler,
Christine Hommes, Joseph Romeo, and Spartan
Acquisition Sponsor II LLC*

Dated: December 20, 2023

## TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................. 1

Allegations of the Complaint ...................................................................................... 3

I.    Spartan is formed to acquire an emerging privately-held business. .................................. 3

II.   Spartan explores potential transactions and, following diligence, agrees to combine with Sunlight. ................................................................................................................. 4

III.  Spartan issues the Proxy with robust disclosures regarding Legacy Sunlight's Cash Advance Program.................................................................................................... 6

IV.   The Business Combination closes with overwhelming stockholder approval.................. 10

V.    Over a year after the Business Combination, New Sunlight terminates the Contractor Advance Program after one contractor becomes insolvent................................................ 10

A.   Vision Solar, an allegedly high-risk contractor, repays tens of millions in debt. ....... 11

B.   Pink Energy, a minor contractor at the time of the Business Combination, becomes insolvent after borrowing millions after the closing. ................................................ 11

VI.   Plaintiffs file a Section 10(b) fraud claim following Pink Energy's insolvency, but then tack on a Section 14(a) claim against the Spartan Defendants. ...................................... 12

Legal Standards.......................................................................................................... 14

Argument ................................................................................................................... 15

I.    Plaintiffs lack standing to bring a Section 14(a) claim.................................................. 16

A.   Plaintiffs failed to satisfy Rule 23.1 before bringing their derivative claim.............. 16

B.   Millunchick lacks standing. ...................................................................................... 17

II.   Count I should be dismissed because the SAC fails to allege the Proxy was false or misleading. .............................................................................................................. 18

A.   The SAC's puzzle pleading is facially deficient under the PSLRA. .......................... 18

B.   Plaintiffs failed to allege a false or misleading statement of material fact. ................ 19

1.   The Proxy's descriptions of Sunlight's contractor advance risk management as "vigorous" and "robust" are not actionable. ....................................................... 19

2.   None of the Proxy's other descriptions of Sunlight's contractor diligence are alleged to be false........................................................................................... 21

a.   Statement 3: Initial Diligence ........................................................ 21

b.   Statement 4: Ongoing Monitoring .................................................. 23

c.   Statements 5-7: Risk Tiers............................................................. 25

d.   Statements 8-9: Historical Loss Statistics...................................... 27

3.   The SAC's allegations focusing in 2022 do not plead falsity in the 2021 Proxy. 29

C.   Plaintiffs failed to allege a material omission........................................................... 31

III. Plaintiffs failed to plead the required mental state.............................................................. 33

    A.  Plaintiffs failed to meet the Rule 9(b) standard for pleading scienter. ........................ 33

    B.  Even if Rule 9(b) did not apply, Plaintiffs failed to plead negligence........................ 36

Conclusion ..................................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Africa v. Jianpu Tech Inc.*,
    2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) ................................................. 24, 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 15

*Atuahene v. City of Hartford*,
    10 F. App'x 33 (2d Cir. 2001) ............................................................................ 36

*Bisel v. Acasti Pharma, Inc.*,
    2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022) ................................................. 14, 15

*Blackmoss Invs. Inc. v. ACA Cap. Hldgs., Inc.*,
    2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ....................................................... 32

*Bocock v. INNOVATE Corp.*,
    2022 WL 15800273 (Del. Ch. Oct. 28, 2022) .................................................... 16

*Bond Opp. Fund v. Unilab Corp.*,
    87 F. App'x 772 (2d Cir. 2004) .......................................................................... 14

*Bond Opportunity Fund v. Unilab Corp.*,
    2003 WL 21058251 (S.D.N.Y. May 9, 2003),
    *aff'd*, 87 F. App'x 772 (2d Cir. 2004) ............................................................ *passim*

*Born v. Quad/Graphics, Inc.*,
    521 F. Supp. 3d 469 (S.D.N.Y. 2021) ................................................................ 18

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012) ............................................................. 17, 36

*Brookfield Asset Mgmt., Inc. v. Rosson*,
    261 A.3d 1251 (Del. 2021) .................................................................................. 16

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ................................................................ 32

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
    587 F. Supp. 3d 56 (S.D.N.Y. 2022) ................................................................. 19

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982) ............................................................................... 23

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) .............................................................................. 24

*ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................................................... 19

*El Paso Pipeline GP Co. v. Brinckerhoff*,
    152 A.3d 1248 (Del. 2016) .................................................................................. 17

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
  2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ................................................ 34

*Garnett v. RLX Tech. Inc.*,
  2022 WL 4632323 (S.D.N.Y. Sept. 30, 2022), *aff'd*,
  2023 WL 8073087 (2d Cir. Nov. 21, 2023) .................................................. 31

*Halebian v. Berv*,
  590 F.3d 195 (2d Cir. 2009) ........................................................................ 16

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) .......................................................................... 4

*In re Aceto Corp. Sec. Litig.*,
  2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ............................................... 31

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) .......................................................... 18

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) .......................................................... 23

*In re Bemis Co. Sec. Litig.*,
  512 F. Supp. 3d 518 (S.D.N.Y. 2021) .......................................................... 14

*In re Citigroup Sec. Litig.*,
  2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .............................................. 19

*In re DraftKings Inc. Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023) .......................................................... 32

*In re FedEx Corp. Sec Litig.*,
  517 F. Supp. 3d 216 (S.D.N.Y. 2021) .......................................................... 29

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) .......................................................... 33

*In re Lehman Bros. Sec. & ERISA Litig.*,
  2013 WL 3989066 (S.D.N.Y. July 31, 2013) ............................................... 22

*In re Liberty Tax, Inc. Sec. Litig.*,
  435 F. Supp. 3d 457 (E.D.N.Y. 2020) ...................................................... 31, 32

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014),
  *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ......................................................... 31

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006) .......................................................... 35

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ....................................................... 36

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020) .......................................................... 13

*In re Romeo Power Sec. Litig.*,
  2022 WL 1806303 (S.D.N.Y. June 2, 2022) .......................................... 2, 16, 17

*J. I. Case Co. v. Borak*,
  377 U.S. 426 (1964) .......................................... 17

*Karp v. First Conn. Bancorp, Inc.*,
  535 F. Supp. 3d 458 (D. Md. 2021) .......................................... 36

*Loc. No. 38 Int'l Bros. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010) .......................................... 22

*Malin v. XL Cap. Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007),
  *aff'd,* 312 F. App'x 400 (2d Cir. 2009) .......................................... 4, 24

*Matusovsky v. Merrill Lynch*,
  186 F. Supp. 2d 397 (S.D.N.Y. 2002) .......................................... 15

*Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014) .......................................... 38

*NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*,
  2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) .......................................... 24

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .......................................... 21

*Paskowitz v. Pac. Cap. Bancorp*,
  2009 WL 4911850 (C.D. Cal. Nov. 6, 2009) .......................................... 37

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) .......................................... 27

*Police & Fire Ret. Sys. of City of Detroit SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009) .......................................... 35

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .......................................... 33, 34

*Rubinstein v. Credit Suisse Group AG*,
  457 F. Supp. 3d 289 (S.D.N.Y. 2020) .......................................... 33

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. Jan 18, 2018) .......................................... 31

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) .......................................... 22

*SEC v. Shanahan*,
  646 F.3d 536 (8th Cir. 2011) .......................................... 37

*Silverman v. 3D Total Sols., Inc.*,
  2020 WL 1285049 (S.D.N.Y. Mar. 18, 2020) .......................................... 38

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) .......................................... 19

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    645 F. App'x 72 (2d Cir. 2016) .............................................................. 30

*Steamfitters Indus. Pension Fund v. Endo Int'l PLC*,
    771 F. App'x 494 (2d Cir. 2019) .............................................................. 32

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .............................................................. 20

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) .............................................................. 16

*Varjabedian v. Emulex Corp.*,
    2020 WL 1847708 (C.D. Cal. Feb. 25, 2020) ....................................... 37

*Welch v. Meaux*,
    2022 WL 3273951 (W.D. La. June 15, 2022) ...................................... 20

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) .............................................................. 26

*Woolgar v. Kingston Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ........................................ 20, 23, 24

**Statutes**

15 U.S.C. § 78u-4 ................................................................................ 14, 36

**Rules**

Fed. R. Civ. P. 9 .......................................................................... *passim*

Fed. R. Civ. P. 23.1 .......................................................................... *passim*

**PRELIMINARY STATEMENT**

Plaintiffs in this securities action allege that Sunlight Financial Holdings, Inc. ("New Sunlight"), an operator of a digital platform that facilitates financing to customers for solar home improvement projects, must have misrepresented its risk management policies because one of its contractors defaulted on a sizeable credit advance in September 2022. But Plaintiffs do not stop at claims against New Sunlight. In an effort to expand the pool of defendants, Plaintiffs also assert Section 14(a) claims against the directors, officers, and sponsor entity of Spartan Acquisition Corp. II ("Spartan"), alleging that they, too, misrepresented the "robustness" of these risk management policies in the proxy statement (the "Proxy") for Spartan's merger with Sunlight Financial Holdings, LLC's ("Legacy Sunlight") in July 2021 (the "Business Combination"). But, as the Spartan Defendants[1] explained in their motion to dismiss the prior Amended Complaint, a default by *one* of New Sunlight's debtors does not support that the Proxy made misrepresentations *fourteen months earlier*. Plaintiffs' reliance on this *post hoc* development fails to plead that the Proxy's descriptions of Legacy Sunlight's credit advance risk management processes were false, misleading, or made with the requisite mental state. The changes in Plaintiffs' Second Amended Complaint (the "SAC") merely highlight the flaws in Plaintiffs' theory, and the SAC should be dismissed with prejudice as to the Spartan Defendants for three principal reasons.

*First*, Plaintiffs lack standing to bring their claims. The Section 14(a) claim is derivative, yet Plaintiffs neither made a demand on the Sunlight Board nor pleaded demand futility, as required under Federal Rule of Civil Procedure 23.1. As the Southern District of New York recently held for a different SPAC transaction in *In re Romeo Power Securities Litigation*, the

---

[1] Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romeo (collectively, the "Spartan Individual Defendants") and Spartan Acquisition Sponsor II LLC ("Sponsor," and together with the Spartan Individual Defendants, the "Spartan Defendants").

claim against the Spartan Defendants is fundamentally one about overpayment—that Plaintiffs were harmed when they approved the merger because Legacy Sunlight was not as valuable as the Proxy represented.  2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022).  Under Delaware law, which controls the analysis of whether a claim is direct or derivative, such a damages theory is quintessentially derivative because it harms the corporation directly, and affects the shareholders only indirectly through the reduced value of their stock.  Accordingly, as in *Romeo Power*, the Court should dismiss the Section 14(a) claim for failure to comply with Rule 23.1.

*Second,* Plaintiffs fail to allege that the Proxy contained any materially misleading statement or omissions.  The SAC block-quotes two paragraphs of the Proxy regarding Legacy Sunlight's incentive program offering home improvement contractors short-term cash advances (the "Cash Advance Program"), and then asserts the description was misleading based on one contractor's subsequent default fourteen months later and the opinion of one confidential call center employee.  That approach fails at the outset because it does not satisfy the PSLRA's requirement to specify which statements are misleading and why.  But even if the Court undertook to do that work for Plaintiffs, none of the quoted statements are materially misleading.  Two of the statements describing Legacy Sunlight's risk management policies as "vigorous" and "robust" are, at most, non-actionable puffery and statements of opinion, and in any event are not guarantees against any default, much less one well later.  The remaining statements describe Legacy Sunlight's processes to evaluate, onboard, and monitor contractors for the Cash Advance Program. Crucially, however, the SAC fails to allege that any of these processes were not actually in place. Indeed, the SAC cites to New Sunlight SEC filings and to one confidential witness that make clear that the processes were in fact in place, while characterizing the company's risk management practices as insufficient or imprudent.

Instead of identifying how any specific statement is false, Plaintiffs appear to suggest that the proxy statement's description of the Cash Advance Program was misleading because New Sunlight *later* failed to avoid the contractor's default.  But it is well-established that Plaintiffs must allege that statements were false *when made*.  A description of a risk management policy cannot become a false statement just because a risk later came to fruition.  Plaintiffs' suggestion that the Proxy misleadingly characterized the Cash Advance Program or omitted any changes thereto further fails because the Proxy contained extensive disclosures regarding the risk posed by the program and Legacy Sunlight's expansion plans.  The SAC fails to grapple with these disclosures, and instead asserts that they can be understood as representing that no defaults would have occurred.  Plaintiffs' interpretation is unreasonable, and their claim should be dismissed.

*Third*, even setting aside the absence of any materially misleading disclosure, the Section 14(a) claim fails because Plaintiffs have not pleaded the requisite level of culpability against the Spartan Defendants.  Despite its boilerplate disclaimers of fraud, the SAC's Section 14(a) allegations sound in fraud because they impute a motive to the Spartan Defendants to "complete a merger" for personal benefit.  The claim is therefore subject to the heightened pleading requirements of Rule 9(b), yet the SAC fails to allege any facts raising a strong inference of scienter.  But even if the claim sounded in negligence, the SAC contains essentially no allegations against the Spartan Defendants other than their roles at Spartan, which is wholly insufficient to plead that they failed to exercise reasonable care in issuing the Proxy.

## ALLEGATIONS OF THE COMPLAINT

### I.     Spartan is formed to acquire an emerging privately-held business.

Spartan was incorporated in Delaware in August 2020 for the purpose of "effecting a merger or similar business combination with a privately-held business to enable the private

-3-

company to go public." SAC ¶ 38; Ex. A at 18.[2] Sponsor was also incorporated in August 2020, to serve as Spartan's sponsor. SAC ¶ 19. Spartan was led by a team of highly qualified officers and directors: Strong (CEO and Chairman); Crossen (CFO and CAO); directors Wassenaar, Handler, Hommes, Romeo, Jan Wilson and John Stice. SAC ¶¶ 13-18; Ex. A at 227-28.[3]

Spartan completed its initial public offering on November 30, 2020, issuing 34.5 million units for $10 per unit (the "IPO"). Each unit consisted of one share of Spartan Class A Common Stock and one-half of a warrant to later purchase an additional Class A share for $11.50. SAC ¶ 39; Ex. A at 225. Sponsor, for its services to Spartan and for covering certain of Spartan's expenses, received 8,525,000 Class B shares (or "founder shares") which would convert to Class A shares upon the completion of a business combination. Ex. A at 225. Sponsor also purchased 9.9 million "private placement warrants" for $1 each that entitled Sponsor to buy additional shares at $11.50 per share following a business combination. *Id.*

## II. Spartan explores potential transactions and, following diligence, agrees to combine with Sunlight.

Following the IPO, Spartan "commenced a robust search for businesses or assets to acquire." Ex. A at 131. Its representatives engaged in discussions with numerous potential acquisition partners across a range of industries, many of which "advanced to … the counterparty … execut[ing] a confidentiality agreement." Ex. A at 122, 131.

---

[2] Citations in the form "Ex. __" refer to the documents attached to the Declaration in Support of the Motion to Dismiss filed contemporaneously herewith. In addition to the SAC, the Court may "examine [the registration and proxy statements cited by Plaintiffs] together with the allegations contained on the face of the [Amended] [C]omplaint" because these documents are "integral to the complaint." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991). Moreover, a court can take judicial notice of "SEC filings even if the plaintiff did not specifically cite them in the complaint," considering them either "for the truth of their contents" (as documents filed "under penalty of perjury" with the SEC) or simply to assess the total mix of information available to public stockholders. *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 132-33 (D. Conn. 2007) (collecting authorities), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

[3] Wilson and Stice are not parties to this case.

Among these potential counterparties was Legacy Sunlight, which operated a "financing platform that provides residential solar and home improvement contractors the ability to offer … financing to their customers when purchasing … solar systems or other home improvements," earning "platform fees … on each … loan [thus] facilitated." Ex. A at 18-19; SAC ¶¶ 2, 23. From its founding in 2014 through the Business Combination, Legacy Sunlight had "facilitated over $4.0 billion of loans." Ex. A at 91. It generated $69.6 million in revenue and $10.6 million in profit in 2020, the year preceding the Business Combination. *Id.* at F-47.

Because Legacy Sunlight did not advertise to consumers, it "relie[d] on contractors to tell their customers [they can] finance their purchase through [its] platform." SAC ¶ 24. Thus, Legacy Sunlight's business model depended on convincing contractors "to use [its] financing platform when signing up customers," *id.*, and it maintained a network of "over 1,200 contractor[s]," Ex. A at x. Legacy Sunlight competed for this market "primarily on process … , pricing and products," by offering contractors "a fast, fully-digital and frictionless" platform to determine if their customers are approved for home improvement loans. *Id.* at 19. Further, Legacy Sunlight sought to attract contractors using Milestone Advances and Prefunding Advances which provided contractors "with short-term capital advances to support upfront costs and liquidity needed to purchase equipment"—the Cash Advance Program. *Id.* at 213; SAC ¶ 26.

On December 14, 2020, Spartan's board of directors (the "Spartan Board") decided to evaluate and pursue Legacy Sunlight as an acquisition target. *See* Ex. A at 132. Evaluation, diligence, and negotiation of a business combination continued through January 23, 2021, with Spartan learning more about Legacy Sunlight by participating in management meetings, receiving presentations from Legacy Sunlight and from Spartan advisors, and reviewing due diligence. *See id.* at 132-35. In connection with this evaluation, Spartan engaged third-party advisors including,

*inter alia*, Vinson & Elkins LLP, PricewaterhouseCoopers LLP, and Credit Suisse Securities (USA) LLC. *Id.* at 133.

On January 21, 2021, the Spartan Board unanimously approved a transaction pursuant to which Legacy Sunlight would merge with and into a subsidiary of Spartan, and Spartan would be renamed Sunlight Financial Holdings, Inc. *Id.* at 19-20, 135. The terms of the Business Combination were finalized on January 23 and the transaction was publicly announced on January 25, 2021. *Id.* at 136.

**III.    Spartan issues the Proxy with robust disclosures regarding Legacy Sunlight's Cash Advance Program.**

On March 22, 2021, Spartan filed with the SEC a Registration Statement and Preliminary Proxy Statement on Form S-4 in connection with the Business Combination. SAC ¶ 90. Amendments to the initial Registration Statement were filed on May 12, 2021 and June 1, 2021, and a final form of Proxy was filed on June 21, 2021. SAC ¶ 93; Ex. A.[4] Spanning 530 pages (inclusive of all attachments), the Proxy provided a thorough overview of Legacy Sunlight and the Business Combination, including a background of the transaction, reasons the transaction was deemed attractive for Spartan, and risks that would face the combined business. This information included a detailed description of the Cash Advance Program, including its utility for Legacy Sunlight's business model, the risks that it posed, and Legacy's Sunlight's historic losses from the program.

The Proxy explained that the Cash Advance Program "provide[d] qualifying solar contractors with short-term capital advances to support upfront costs," and was implemented as "[a]n important part of Sunlight's value proposition to residential solar contractors." Ex. A at 213;

---

[4] Because the relevant disclosures are substantively identical in the March 22, 2021 preliminary proxy and the June 21, 2021 final proxy, for efficiency, the Spartan Defendants herein refer to and cite to only the latter as the "Proxy."

*see also* SAC ¶ 91.  While Plaintiffs disregard the distinction, "Sunlight's advance program ha[d] two components: (1) [M]ilestone [A]dvances and (2) contractor [P]refunding [A]dvances."  Ex. A at 213.  The Milestone Advance Program was offered only to "contractors in [its] top risk tiers … [with] the strongest commercial risk,"[5] and "generally required [advances] to be repaid in 90 days … from the advance date."[6]  *Id.*  Pursuant to "contractual arrangements with [Sunlight's lenders]," the lender would "remit[] to Sunlight the cash related to loans," thereby both repaying the advance and paying Sunlight's fee.  *Id.* at F-55; *see also id.* at 213; SAC ¶ 91.  The Prefunding Program, by contrast, was offered "***across the [risk] spectrum***" but "[t]ypically" consisted of short-term loans and was offered only to "bridge the time that it takes for the relevant capital provider to review relevant documents and execute on its funding commitment."  Ex. A at 213 (emphasis added).  Unlike Milestone Advances, Prefunding Advances could be "paid … prior to the commencement of … installation or construction."[7]  Ex. A at 52-53, 213; SAC ¶¶ 60, 91.

The Proxy emphasized Legacy Sunlight's decision to rapidly grow its network through increased cash advances, which nearly doubled from roughly $600 million in 2019 to roughly $1.1 billion in 2020.  Ex. A at 191.  Consistent with the foregoing, the Proxy disclosed as "[h]ighlights" for "2020" the fact that Sunlight "increased the number of nationwide contractors in its network to over 1,000," and that it formed "strategic partnerships" involving "advances to the contractors" for said contractors to "obtain[] … equipment to install solar systems" and repay Sunlight when the "loan is funded," in a bid "to facilitate ***rapid expansion*** of [its] contractor network."  *Id.* at 19, 173 (emphasis added).  Legacy Sunlight was on pace to again double such lending between 2020 to 2021—advancing $0.2 billion in the first quarter of 2020 but $0.4 billion in the first quarter of

---

[5] **Statement 7.**  *See* SAC ¶ 91.  For ease of reference, the Spartan Defendants numbered each discrete statement using footnotes herein by category.

[6] **Statement 10.**  *See* SAC ¶ 91.

[7] **Statement 11**.  *See* SAC ¶ 92.

2021.  *Id.*  The Proxy identified such "rapid volume growth profile" as a reason the Spartan Board favored the Business Combination.  *Id.* at 137-38.  And, the Proxy informed stockholders about both the scope of the program and its concentration among only a few contractors:  "As of March 31, 2021, [Legacy] Sunlight had an aggregate of $32.6 million of outstanding advances to 120 contractors," and "[a]pproximately 64% of those advances were made to four of Sunlight's largest contractor relationships in terms of funded loan volume."  *Id.* at 53.

In the sections Plaintiffs primarily challenge—captioned "***Risk*** Management"—the Proxy stated that "Sunlight ha[d] adopted vigorous contractor diligence and monitoring procedures" for its Cash Advance Program.[8]  *Id.* at 207, 209 ("Sunlight … established a robust commercial underwriting and ongoing monitoring process"[9]); SAC ¶ 90.  Indeed, Legacy Sunlight had "advanced approximately $526 million to contractors" since the inception of the Milestone Advance Program but "only experienced approximately $0.4 million in losses,"[10] and, in "2020, Sunlight made $1.1 billion in … advances under [the Milestone Advance Program and the Prefunding Program] and did not incur any losses."[11]  Ex. A at 188, 213.  The Proxy nevertheless warned of a "commercial credit risk related to the financial condition and liquidity of [its] contractors and their ability to … pay back any advance that may have been made," before explaining that its risk management processes consisted of diligence before a contractor was added to its network and monitoring thereafter:

> Upon the engagement of a contractor into Sunlight's network, Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's

---

[8] **Statement 1**.  *See* SAC ¶ 90.
[9] **Statement 2**.  *See* SAC ¶ 90.
[10] **Statement 8**.  *See* SAC ¶ 91.
[11] **Statement 9**.  *See* SAC ¶ 95.

reputation, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor.[12]

Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently….[13]

Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network.[14]

Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.[15]

Ex. A at 208-09; SAC ¶ 90.  The Proxy further explained that the monitoring, due diligence, and "tiering" was not performed prior to each individual advance, but to determine "[t]he aggregate amount of advances available" to a contractor.[16]  Ex. A at 52.

Given Legacy Sunlight's substantial advances, the Proxy repeatedly cautioned in bold, italicized text that "Sunlight's risk management processes and procedures may not be effective," *id.* at 47, and that its "short-term capital advance program exposes it to potential losses in the event that a contractor fails to fully perform under its agreements with Sunlight or becomes insolvent prior to completion of the underlying installation or construction, which losses could have an adverse impact on Sunlight's business, results of operations and financial condition," *id.* at 52. "[I]f the contractor funded by Sunlight declares bankruptcy prior to Sunlight being reimbursed, the capital provider is not likely to fund the loan," and "Sunlight may need to write-off such advances." *Id.* at 53.  The Proxy also warned that the "ability of contractors to fully perform or

---

[12] **Statement 3**. *See* SAC ¶ 90.
[13] **Statement 4**. *See* SAC ¶ 90.
[14] **Statement 5**. *See* SAC ¶ 90.
[15] **Statement 6**. *See* SAC ¶ 90.
[16] **Statement 12**. *See* SAC ¶ 91.

maintain their solvency depend[ed] on a number of factors, including, but not limited to, changes in economic conditions, adverse trends or events affecting the solar system and home improvement industries, … and management and cash flow levels." *Id.* at 53. Moreover, the Proxy contained an independent auditor's review of Sunlight's financials, which included a pre-Business Combination assessment of the risk tiers for the contractors with outstanding advances (with most contractors falling in the "low-to-medium" risk), an assessment of payment delinquency for such advances (with less than 9% delinquent at the time), and a chart listing the amounts advanced to Legacy Sunlight's then-top-ten contractors. *See id.* at F-88- to 90.

Thus, investors were informed that Sunlight had tens of millions of dollars in outstanding advances; that those outstanding advances posed material risk to Sunlight; and that Sunlight's risk management policies for onboarding and monitoring its contractors might fail to prevent losses of those advances.

## IV.    The Business Combination closes with overwhelming stockholder approval.

On July 8, 2021, the Spartan shareholders overwhelmingly voted to approve the Business Combination. AC ¶ 48. The Combination closed the next day, the Spartan Board resigned, and New Sunlight began trading on the New York Stock Exchange. *Id.* Thereafter, the Spartan Defendants ceased to have any role in Sunlight's management. *See* Ex. A at 249.

## V.    Over a year after the Business Combination, New Sunlight terminates the Contractor Advance Program after one contractor becomes insolvent.

As the Proxy disclosed, in the year preceding the Business Combination, Legacy Sunlight had $35.4 million in outstanding advances to 131 contractors, with two contractors holding nearly 50% of such debt. *Id.* at F-62. In the quarter preceding the Business Combination, Legacy Sunlight had $32.529 million in outstanding advances to a growing list of contractors. *Id.* at 94.

Plaintiffs focus on Legacy Sunlight's decision to accept *two* solar contractors into its network—Vision Solar and Pink Energy.  SAC ¶ 61.

### A. Vision Solar, an allegedly high-risk contractor, repays tens of millions in debt.

In their second amendment, Plaintiffs added many allegations concerning Vision Solar, an allegedly "high-risk partner[]."  *Id.* ¶ 2.  Plaintiffs allege at length that Vision Solar faced customer complaints, litigation, regulatory proceedings, and financial distress—suggesting this shows the Proxy mischaracterized Legacy Sunlight's Cash Advance Program.  *See id.* ¶¶ 32-33, 74-88, 134-36.  But the SAC acknowledges that Vision Solar repaid tens of millions of dollars to New Sunlight after the Business Combination, *id.* ¶ 61, and nothing in the SAC suggests that New Sunlight lost even a dollar from its lending to Vision Solar.  Indeed, the prior iterations of the Complaint ***did not even reference*** Vision Solar, and for good reason—Plaintiffs have not alleged any corrective disclosure, any stock price drop, or any loss from Sunlight's advances to this contractor.

### B. Pink Energy, a minor contractor at the time of the Business Combination, becomes insolvent after borrowing millions after the closing.

In the two quarters preceding the Proxy (Fourth Quarter 2020 and First Quarter 2021), Pink Energy had borrowed from Legacy Sunlight only $295,000 and $888,000 respectively.  *Id.* ¶ 61.  Pink Energy's debt thus represented between 0.8-2.7% of Legacy Sunlight's $32.6-35.4 million in then-outstanding advances at the time of the Proxy.  Ex. A at F-90.  The SAC also alleges that, around the time of the Business Combination (end of second quarter 2021), Pink Energy had been advanced $5 million—only 12% of the $41.0 in then-outstanding advances.  SAC ¶ 61.

It was not until after the Business Combination (Q3 2021) that New Sunlight decided to advance Pink Energy up to $21 million, and, even then, Pink Energy reduced that balance by $8.5 million the following quarter.  *Id.* (alleging that Pink Energy's debt of $21 million fell to $12.5

million by Q4 2021).  It was another year—and more than thirteen months after the Business Combination—before New Sunlight announced that it would take a "non-cash advance receivable impairment charge of $30 to $33 million" because one of its contractors, later identified as Pink Energy, was taking "certain actions" that were "likely [to] result in an [in]ability of [New Sunlight] to collect on advances outstanding to such installer."  *Id.* ¶ 102.  In an accompanying press release, New Sunlight disclosed that it would be "re-underwriting all contractor partners' advances to further mitigate risk going forward."  *Id.*  The price of New Sunlight's common stock fell from $2.52 to $1.08 the following day.  *Id.* ¶ 103.  Pink Energy filed for bankruptcy on October 7, 2022. *Id.* ¶ 104.  New Sunlight announced "in the fourth quarter of 2022[,]" that it "took steps to 'mitigate … risk' in the cash advance program," but ultimately "decided to 'suspend the program indefinitely' as of March 2023."  *Id.* ¶ 196.

## VI.    Plaintiffs file a Section 10(b) fraud claim following Pink Energy's insolvency, but then tack on a Section 14(a) claim against the Spartan Defendants.

On December 16, 2022, a few months after the Pink Energy write-off, then-Plaintiff Kathie Fung filed a Section 10(b) and Section 20 securities fraud complaint against Sunlight and certain of its executives.  Compl. ¶¶ 14-18.[17]  The Original Complaint's fraud theory was that, in light of the Pink Energy default, Sunlight's management team must have known but concealed that Sunlight "lacked effective underwriting and risk evaluation" policies, "oversight and periodic monitoring systems," and "effective internal controls" all of which rendered "positive statements about [Sunlight's] business, operations, and prospects … materially misleading and/or lack[ing] a reasonable basis."  *Id.* ¶¶ 7, 19.

---

[17] The individual defendants were New Sunlight executives Matthew Potere, Barry Edinburg, and Rodney Yoder, and pre-Business Combination Spartan executives Strong and Crossen.  Compl. ¶¶ 14-18.

The Amended Complaint filed on May 22, 2023 abandoned this fraud-by-omission theory. Instead, it reasserted Section 10(b) and Section 20 claims against Sunlight and certain Sunlight executives by alleging their statements assessing the Cash Advance Program to be low risk were false in light of supposed warning signs regarding Pink Energy that emerged by "early 2022." *See* AC ¶¶ 66-73. The Amended Complaint also tacked on a Section 14(a) claim against the Spartan Defendants, on the theory that a block-quoted paragraph of the Proxy's description of Legacy Sunlight's monitoring procedures for the Cash Advance Program in March to June 2021 was allegedly misleading in light of Pink Energy's default over fourteen months later.

Rather than oppose the Spartan Defendants' and the Sunlight Defendants' motions to dismiss, Plaintiffs filed the SAC on October 20, 2023. Count I of the SAC is asserted under Section 14(a), against the Spartan Defendants and most of the Sunlight Defendants,[18] for alleged misrepresentations and omissions in the Proxy. In addition to repeating the theory that the Proxy contained misstatements about the Cash Advance Program, the SAC partially resurrects the fraud-by-omission theory by adding that the Proxy did not disclose expansion of the Contractor Advance Program, alleged loosening of risk management strategies, and increased lending to Vision Solar and Pink Energy. *See* SAC ¶¶ 97-99. The SAC attempts to bolster its allegations through snippets and paraphrasing of four former Sunlight employees as confidential witnesses (three of whom joined New Sunlight after the Business Combination), through whom Plaintiffs seek to portray the Cash Advance Program as too permissive and the monitoring as "lackadaisical."[19] *Id.* ¶¶ 53-60,

---

[18] The "Sunlight Defendants" are New Sunlight, Potere, Edinburg, and Yoder. Count I is asserted against all except Yoder.

[19] Allegations attributed to CW2, CW3, and CW4 are not part of the Section 14(a) allegations and appear to relate exclusively to the Section 10(b) and 20(a) allegations that are not asserted against the Spartan Defendants. *See* SAC ¶¶144-55. Nor could Plaintiffs have supported their Section 14(a) claim by citing to these confidential witnesses, because CW2-4's employment at New Sunlight post-date the closing of the Business Combination; thus, their purported observations cannot establish pre-closing contemporaneous falsity for the Spartan Defendants. *In re Mindbody, Inc. Sec. Litig.,* 489 F. Supp. 3d 188, 204-05 (S.D.N.Y. 2020) (holding that allegation of confidential

144-55.  But as explained below, the SAC cures none of the fatal deficiencies of the Amended Complaint that were identified in the Spartan Defendants' prior motion to dismiss.

## LEGAL STANDARDS

The sole claim against the Spartan Defendants is Count I for violation of Section 14(a), which requires pleading that "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury, and [that] (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Bond Opp. Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004).

Whether a Section 14(a) claim sounds in negligence or fraud, "Plaintiff[s] face[] a high pleading standard" under the Private Securities Litigation Reform Act ("PSLRA").  *Bisel v. Acasti Pharma, Inc.*, 2022 WL 4538173, at *6 (S.D.N.Y. Sept. 28, 2022).  Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, … stat[ing] with particularity all facts on which that belief is formed."  *Id.*; *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 529 (S.D.N.Y. 2021) ("[P]laintiffs must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so.").  The PSLRA also requires pleading "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "The 'strong inference' requirement … mean[s] that plaintiffs are entitled to only the most plausible of competing inferences."  *Bond Opp. Fund v. Unilab Corp.*, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003) (citation omitted), *aff'd*, 87 F. App'x 772 (2d Cir. 2004).

---

witness who did not work at the company at the time the statement was made was insufficient to show contemporaneous falsity).

Additionally, where "plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct," those allegations are "subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for allegations of fraud." *Bisel*, 2022 WL 4538173, at *7.  Rule 9(b) requires that Plaintiffs "'[i] specify the statements that [they] contend[] were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'"  *Id.* (alterations in original) (collecting authorities).  This heightened standard applies to "Section 14(a) claims grounded in alleged fraudulent conduct … even if," as here (AC ¶ 116), Plaintiffs "disclaim reliance on a fraud theory."  *Id.*; *see infra* pp. 33-35.

Even setting aside these heightened pleading standards, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" and mere "labels," "conclusions," and "naked assertion[s]" are insufficient to state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Allegations "contradicted" by documents "integral to, or explicitly referenced in," the complaint, are likewise insufficient.  *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

## **ARGUMENT**

As explained below, Count I should be dismissed as to the Spartan Defendants for at least three independent reasons.  *First*, the Section 14(a) claim is derivative in nature, but Plaintiffs have neither presented it to New Sunlight's board nor pleaded demand futility as required by Fed. R. Civ. P. 23.1.  *Second*, the SAC's allegations are insufficient to plead that any statement was materially false or misleading when considered in isolation or combination.  *Third*, Plaintiffs have not pleaded the requisite level of culpability by the Spartan Defendants.

## I.    Plaintiffs lack standing to bring a Section 14(a) claim.

### A.    Plaintiffs failed to satisfy Rule 23.1 before bringing their derivative claim.

As a threshold matter, Count I should be dismissed because it is a derivative claim that Plaintiffs seek to assert directly, and Plaintiffs did not "satisfy the requirements of Rule 23.1" by making a demand on the New Sunlight board or pleading demand futility. *Romeo Power*, 2022 WL 1806303, at *5 (citations omitted).

Whether a claim is direct or derivative is determined per "the law of the state of incorporation," *Halebian v. Berv*, 590 F.3d 195, 206 (2d Cir. 2009), which is Delaware, *see* Ex. A at x.  Under Delaware law, to state a "direct" claim a plaintiff must "demonstrate[] that he or she can prevail without showing an injury to the corporation," because harms that flow indirectly to stockholders through harm to the corporation are derivative.  *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263, 1268 (Del. 2021) (citation omitted).  "The manner in which a plaintiff labels its claim and the form of words used in the complaint are not dispositive." *Bocock v. INNOVATE Corp.*, 2022 WL 15800273, at *16 (Del. Ch. Oct. 28, 2022).  Rather, "a court should look to the nature of the wrong and to whom the relief should go." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).

Here, the essence of Plaintiffs' Section 14(a) claim is that Spartan overpaid for Legacy Sunlight because Legacy Sunlight was not as described in the Proxy, causing a decline in Plaintiffs' stock.  Specifically, Plaintiffs allege that they (and the putative class) purchased Spartan / Sunlight common stock "at artificially inflated prices" that declined when the alleged inaccuracy of the Proxy supposedly emerged.  SAC ¶¶ 7-8, 103, 110(d).  This is a textbook "overpayment" claim that is "exclusively derivative" under Delaware law. *Brookfield*, 261 A.3d at 1265.  That is because claims that fiduciaries caused the company to overpay for an asset allege conduct that "harm[s]

the corporation directly, [but] harms the stockholders only derivatively so far as their stock loses value." *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1261 (Del. 2016).

The recent decision in *Romeo Power* is directly on point. *See* 2022 WL 1806303. There, plaintiffs brought a Section 14(a) claim against a SPAC's directors based on allegations that plaintiffs' stock lost value after a battery company acquired by the SPAC encountered revenue and supply chain issues, despite the merger proxy touting the strength of the supply chain. The Court held that the Section 14(a) claim was derivative under Delaware law because "the essence of [the] claim is that the proxy statements overstated the value of [the target] and as a result, [the SPAC's] shareholders received less in value from the merger than they expected when they approved it." *Id.* at *5. The *Romeo Power* holding accords with the Supreme Court's longstanding recognition that the "injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder"; and that the "[t]he damage suffered results not from the deceit practiced on him alone but rather from the deceit practiced on the stockholders as a group." *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964). Accordingly, Count I should be dismissed on procedural grounds, without reaching the merits, for non-compliance with Rule 23.1.

### B.    Millunchick lacks standing.

Moreover, Lead Plaintiff Millunchick lacks standing to bring a Section 14(a) claim, because "only shareholders who were entitled to vote on a transaction have standing under section 14(a) to challenge the proxy materials issued by a corporation regarding that transaction." *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 236-37 (S.D.N.Y. 2012) (citation omitted). Millunchick's PSLRA certification confirms that he first purchased shares after the record date for eligibility to vote on the Business Combination.

*See* Dkt. 13-2 (attesting that he first purchased shares on July 2, 2021); Ex. A at 11 (defining the record date at June 1, 2021).

**II.     Count I should be dismissed because the SAC fails to allege the Proxy was false or misleading.**

Even if Count I stated a direct rather than derivative claim, which it does not, the claim should be dismissed for failure to plead facts demonstrating that the Proxy was false or misleading.

**A.     The SAC's puzzle pleading is facially deficient under the PSLRA.**

Plaintiffs wholly disregarded their obligation of pleading falsity with particularity.  Only one paragraph of the SAC identifies an alleged misstatement in the Proxy.  *See* SAC ¶ 94.  That paragraph merely references a page of block quotes from the Proxy about Sunlight's Cash Advance Program, with sentences and phrases bolded, and summarily claims that Legacy Sunlight did not have the risk management policies that the Proxy described.  *Id.*  Other portions of the SAC contain detail on post hoc developments and former employees' views about why Sunlight's monitoring was inadequate, but "Plaintiffs neglect[ed] to make it clear … which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005).  The PSLRA does not allow Plaintiffs to bring claims based on "lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false." *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477 (S.D.N.Y. 2021).  Thus, the Court can dismiss the Section 14(a) claim based on Plaintiffs' failure to "describe what portion of [the] quotation constitutes a false representation" alone. *Id.* at 479.

**B. Plaintiffs failed to allege a false or misleading statement of material fact.**

Even if the Court elected to parse the SAC to determine the specific portions of the block quote from the Proxy that Plaintiffs allege to be false, the SAC still fails to plead that the Proxy contained a material misrepresentation.

*1.    The Proxy's descriptions of Sunlight's contractor advance risk management as "vigorous" and "robust" are not actionable.*

Among the Proxy's statements block-quoted in the SAC are: (1) "[Legacy] Sunlight ha[d] adopted vigorous contractor diligence and monitoring procedures" (Statement 1); and (2) "[Legacy] Sunlight … established a robust commercial underwriting and ongoing monitoring process" (Statement 2).  SAC ¶ 90 (emphasis omitted).  Both of these statements are inactionable puffery because they are "too general to cause a reasonable investor to rely upon them."  *ECA, Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  Indeed, courts routinely so conclude for very similar statements.  *See id.* (statement that defendant "set the standard for best practices in risk management techniques" not actionable); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 93 (S.D.N.Y. 2022) (same for "claim of a 'robust' compliance program" ); *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (same for "statements about how [defendant] 'manages its risks,' [and] that it has systems 'designed to protect Citi' and 'policies, procedures, and processes' to control risk").

That such statements are inactionable is all the more evident because the Proxy quantified the size, historical losses, and exposure of the Cash Advance Program and contained specific disclosures about the risks the program posed.  *Supra* pp. 6-10.  In these circumstances, such optimistic assessments do not "significantly alter[] the 'total mix' of information available."  *Singh v. Cigna Corp.*, 918 F.3d 57, 61, 63-64 (2d Cir. 2019) (citation omitted) (statements that defendant

"allocate[d] significant resources[] to compliance" or "established [compliance] policies" were generic and immaterial given that the statements were "framed by acknowledgments of the complexity and numerosity of applicable regulations," which "reflect[ed] [defendant's] uncertainty as to the very possibility of maintaining adequate compliance mechanism"); *Welch v. Meaux*, 2022 WL 3273951, at \*10 (W.D. La. June 15, 2022) (statement in SPAC proxy that target business had "huge potential" with "proven … ability to grow and expand[]" immaterial because it was "based on accurate historical trends[] and corollary risks … were identified in the proxy").

Lastly, Statements 1 and 2 are inactionable statements of opinion under well-established Second Circuit law. *See Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) (treating as opinions statements that pharmaceutical "demonstrated a 'strong and robust treatment effect'" and "that 'the data are nothing short of stunning'"). "[S]tatements of opinions are not actionable unless subjectively false - the speaker does not believe what [he or she] says - or objectively false - the speaker misrepresents or omits existing material facts in support of [his] belief." *Woolgar v. Kingston Cos.*, 477 F. Supp. 3d 193, 224 (S.D.N.Y. 2020). Neither circumstance applies here. Plaintiffs do not and cannot claim subjective falsity by the Spartan Defendants; indeed, Plaintiffs expressly disclaimed "fraud or intentional or reckless misconduct" in their sole claim against the Spartan Defendants. SAC ¶ 117. Similarly, Plaintiffs have not alleged that the Proxy "misrepresent[ed] or omit[ted] material facts" that "support[ed]" the opinions that Sunlight's processes were vigorous or robust. *Woolgar*, 477 F. Supp. 3d at 224. Plaintiffs neither identified the data the Proxy cited in support of these optimistic assessments, nor alleged any reason to believe that such data was "inaccurate at the time reported." *Id.* at 225. Nor could they, since the Proxy disclosed (and Plaintiffs do not challenge) that, historically, the Cash Advance Program caused Legacy Sunlight to lose only "$0.4 million" of "$526 million" advanced. Ex. A at 213. A

0.08% historic loss statistic plainly supports a belief that Legacy Sunlight's processes were robust and vigorous. "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

### 2. None of the Proxy's other descriptions of Sunlight's contractor diligence are alleged to be false.

The remaining statements in the Proxy block-quote likewise cannot give rise to Section 14(a) liability because Plaintiffs fail to allege facts indicating they were false when made between March and June 2021.

#### a.    Statement 3: Initial Diligence

Plaintiffs fail to plead falsity of Statement 3: "Upon the engagement of a contractor into Sunlight's network, Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor." SAC ¶ 90. Plaintiffs have pleaded no non-conclusory facts indicating that Legacy Sunlight did not actually review contractors' financial and reputational information during onboarding at the time the Proxy was issued. Plaintiffs challenge the description of the initial diligence using one paraphrased statement from *a single* Senior Relationship Manager (CW1)—that "initial vetting of contractors consisted of looking at contractor's self-supplied financial statements," (*id.* ¶¶ 58, 94). But that allegation *supports* the accuracy of Statement 3. Regardless, CW1's allegation is insufficient to plead falsity for three additional and independent reasons:

*First*, CW1 is allegedly a Senior Relationship Manager; nothing suggests that she had any personal role in underwriting risk, performing due diligence, or determining whether to onboard a contractor. *E.g.*, *Loc. No. 38 Int'l Bros. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F.

Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting allegations from "low-level employees" who were not alleged to have "had … access to aggregated data").  Indeed, the SAC acknowledges that Sunlight had a separate "Commercial Risk team" that reviewed complaints about creditworthiness from a different "[r]elationship manager."  *See* SAC ¶¶ 150-53.  It was that "commercial risk team that perform[ed] contractor underwriting generally," not "Relationship Managers" who had two functions: (1) operate a "call center" to "address customer complaints and facilitate resolution of differences between the contractor and [its] customer," and (2) "support" contractors in using Sunlight's digital marketplace.  Ex. A at 52, 188-89, 209.  Tellingly, CW1 does not aver to have any insight into the Commercial Risk team's processes or policies.[20]  Nor does the SAC suggest that CW1 had sufficient seniority to be able to speak "to the company's practices broadly."  *E.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at \*4 (S.D.N.Y. July 31, 2013) ("loan level underwriters" could not speak about company-wide practices).  This alone is enough to disregard Plaintiffs' inferences that are based on CW1's assertions.

*Second*, the SAC simply paraphrases CW1's characterization of Sunlight's diligence practices—that monitoring "consisted of looking at the contractor's self-supplied financial statements," SAC ¶ 58—but then makes the unsupported inference that ***no other diligence occurred***, *id.* ¶ 94.  Plaintiffs are not entitled to such an unreasonable "leap of logic."  *E.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 304-05 (S.D.N.Y. 2019) (disregarding confidential witnesses who claimed to have accompanied defendant "to a town hall at which the bribe" was paid for lack of allegation that the witness actually "witnessed money changing hands").

*Third*, the alleged presence of some flaws in a monitoring program, or a negative characterization of that program by one employee, is not enough to render the Proxy's statement

---

[20] Plaintiffs vaguely describe CW1 as "manag[ing] all aspects of Sunlight's relationships with solar system contractors."  SAC ¶ 54.

that certain processes are in place misleading.  *Woolgar*, 477 F. Supp. 3d at 221, 230-32 (statements regarding underwriting and risk management policies were not pleaded false despite allegations by confidential witnesses that the "underwriting department suffered from missing paperwork" and "underwriting guidelines changed every few months"); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 115-16 (2d Cir. 1982) (not enough to quote defendants as "stat[ing] that it has adopted advanced technology to solve distribution problems" and then assert "that the company does not operate at the level of technological sophistication implied").  Plaintiffs needed to plead particularized facts demonstrating that the policies described in the Proxy were not in place.  CW1 provided none, and the SAC is devoid of any other particularized allegations.

> b.      Statement 4: Ongoing Monitoring

Any challenge Plaintiffs raise to Statement 4 ("Once onboarded, Sunlight continues to monitor the contractors … against the[] same standards at least annually and, if advisable, more frequently….") fails for similar reasons—there are no allegations that Legacy Sunlight did not so continue to monitor its contractors.  SAC ¶ 90.  Again, CW1 confirmed that Legacy Sunlight conducted "an annual review of the contractor's self-supplied financial statements."  *Id.* ¶ 58.  Plaintiffs' conclusory allegation that "there was no 'ongoing monitoring'" apart from that review is insufficient to show falsity because it does not "allege[] that management did not, in fact, conduct the evaluations described in those statements."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017).

Apparently cognizant that they cannot plead facts demonstrating an absence of ongoing monitoring, Plaintiffs instead suggest "ongoing monitoring" was misrepresented because "[t]here was no additional due diligence for individual cash advances."   SAC ¶ 58.  But Statement 4 concerned "monitor[ing] [of] ***contractors***," not individual advances.  *Id.* ¶ 90 (emphasis added).  The Proxy never stated that each individual cash advance was subject to additional due diligence.

To the contrary, the Proxy stated "[t]he ***aggregate amount*** of advances available to a given contractor [was] based on a risk evaluation and tiering conducted by [Legacy] Sunlight's commercial risk team." Ex. A at 52 (emphasis added). Thus, the Proxy's description of monitoring of contractors as a whole and tracking advances in the aggregate would not be rendered false by Plaintiffs' allegation that "[t]here was no additional due diligence for individual cash advances." SAC ¶ 58; *see Malin*, 499 F. Supp. 2d at 146-47 (finding no falsity where plaintiffs argued that "Defendants had [not] conducted claims audits at ceding companies, as represented to investors" because SEC filings stated that "claims audits are conducted for *specific* claims and claims procedures at the offices of *selected* ceding companies").

Plaintiffs also claim that descriptions of Legacy Sunlight's ongoing monitoring must be inaccurate given that New Sunlight was allegedly "blind" to Pink Energy's impending insolvency, SAC ¶¶ 36, 61, 68, 80-82. This is "the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain." *Woolgar*, 477 F. Supp. 3d at 225-26 (statement that loss reserves were adequate not rendered false by subsequent need to significantly increase reserves). Especially where statements concern estimating risk or the ability to repay debt, an allegation that such estimates were later proved wrong is insufficient. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990) (estimates of credit losses were not rendered false just because additional debt was later determined to be uncollectible); *NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, 2012 WL 3191860, at *13 (S.D.N.Y. Feb. 9, 2012) ("[T]he simple fact [that a bank needed to] write-down [loan portfolios] does not stand for the proposition that values stated before the write-down were inaccurate….").

This Court's opinion in *Africa v. Jianpu Tech. Inc.* is particularly instructive. 2022 WL 4537973, at *6 (S.D.N.Y. Sept. 28, 2022). There, a company in the business of recommending

-24-

credit cards to consumers informed its shareholders that it "'beefed up [its] quality control process,' 'removed the noncompliant financial products,' and implemented 'a very stringent and strict onboarding process'" for credit card providers. *Id.* Plaintiffs alleged these assertions were false because "there were [still] noncompliant providers on" defendant's network and, after being subject to media scrutiny, defendant "suspended its mobile application, engaged a consultant to review its internal processes, and adopted stricter policies for financial services." *Id.* This Court rejected such allegations as insufficient to show that the prior statements were false when made because the allegations proved "[a]t best … that a few loan providers" remained non-compliant, not that defendant "was generally noncompliant." *Id.* The same is true here—the mere fact that Pink Energy defaulted in 2022 while owing Sunlight significant sums for advances does not indicate that Sunlight generally did not monitor its contractors at least annually.

c.    Statements 5-7: Risk Tiers

Plaintiffs likewise fail to demonstrate the falsity of the statements concerning Sunlight's risk tiers: "[b]ased on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network" (Statement 5); "[c]ontractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring" and "the availability of advances" (Statement 6); and "Sunlight's [M]ilestone [A]dvance [P]rogram is generally offered to contractors in Sunlight's top risk tiers which have the strongest commercial risk assessment results" (Statement 7). SAC ¶¶ 90-91.

Regarding Statements 5 and 6, Plaintiffs do not dispute that Legacy Sunlight undertook an onboarding diligence process, based on which a contractor would be either accepted or rejected, or that Legacy Sunlight categorized its contractors into risk tiers. At most, the SAC quotes CW1 as stating that the "contractor risk evaluation process was generally effective from 2017 to 2019," but that starting in late 2019 Sunlight took a "less stringent and more lackadaisical approach" and

-25-

"accepted everyone until they got screwed." *Id.* ¶¶ 56, 59. But a confidential witness's assessment that the onboarding diligence process became "less stringent" and "accepted everyone" does not allege falsity as to statements that there was a diligence process for deciding whether to accept or reject new creditors—particularly given the Proxy's disclosures that Sunlight was "growing its … network rapidly" and that its "[P]refunding [A]dvance [P]rogram is offered to contractors in Sunlight's network across the spectrum of Sunlight's assigned contractor risk tiers." Ex. A at 206, 213; *see Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 132-33 (2d Cir. 2011) (holding that defendant's disclosure that it "is permitted, but not obligated," to submit bids in auctions for its own securities and that it "routinely" does so was not rendered false by allegations that defendant placed such bids "in every single auction" except where defendant "decided to let certain auctions fail"); *see also supra* pp. 22-23.

Similarly, the fact that Legacy/New Sunlight continued to make individual advances to Pink Energy does not speak at all to either (1) the initial diligence that was used to determine whether to admit Pink Energy into the network, *see* Ex. A at 52, 209 (admitting that initial diligence was used to "accept[] or decline[] to include a contractor in its network") or (2) the ongoing diligence that was used solely to determine the "[t]he aggregate amount of advances available to a given contractor," *id.* at 52. To the contrary, the Proxy warned that the "[P]refunding [A]dvance [P]rogram [was] offered to contractors … ***across the [risk] spectrum***." *Id.* at 213 (emphasis added).

Nor do Plaintiffs dispute that Legacy Sunlight categorized its contractors into risk tiers. Rather, their challenge to Statement 6 is premised on a disagreement with a business judgment about the risk that Vision Solar and Pink Energy posed, and such disagreements "are not actionable" as violation of securities laws. *Plumbers & Steamfitters Loc. 773 Pension Fund v.*

*Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301, 303 (S.D.N.Y. 2010) (dismissing securities claim that defendant "should have recorded much larger write-downs" "on mortgage-backed securities" "than it did" in light of the economic downturn).  This is particularly true here, where Legacy Sunlight's business judgment was supported by a 0.1% loss statistic on Milestone Advances (of $526 million advanced), Ex. A at 213, and a 0% loss statistic in 2020 on all advances (of $1.1 billion advanced), *id.* at 188.[21]  Plaintiffs' apparent belief that Legacy Sunlight should have presciently run its business differently despite historically excellent loss statistics is not a basis for securities violation claims.

As for Statement 7, Plaintiffs appear to dispute that Milestone Advances were offered only to contractors in the top risk tiers, contending that the "cash advances went disproportionately to bottom-feeding companies that duped customers and would have difficulty repaying all advances." SAC ¶ 94.  This argument is based on a misreading of the Proxy:  "Sunlight's advance program ha[d] ***two components***: (1) [M]ilestone [A]dvances and (2) contractor [P]refunding advances"; only "[M]ilestone [A]dvance[s]" were "offered to contractors in [the] top risk tiers."  Ex. A at 213 (emphasis added).  "[P]refunding [A]dvances" were offered "across the [risk] spectrum." *Id.*  The SAC does not contend that Milestone Advances were made to higher-risk contractors, and the fact that some Prefunding Advances were made to higher-risk contractors is fully consistent with the Proxy.

### d.      Statements 8-9: Historical Loss Statistics

Plaintiffs failed to allege facts showing that the Proxy misrepresented that, historically, Legacy Sunlight "advanced [under the Milestone Advance Program] approximately $526 million" while "experienc[ing] approximately $0.4 million in losses," (Statement 8), or that, "[i]n 2020,

---

[21] Even Plaintiffs concede Vision Solar repaid ***$14.4 million*** in advances following the Business Combination, *see* SAC ¶ 61, and never caused Sunlight to lose a dime, despite the myriad issues Vision Solar allegedly faced.

[Legacy] Sunlight made $1.1 billion in short term advances under [both cash advance programs] and did not incur any losses" (Statement 9). SAC ¶¶ 91, 95. Plaintiffs do not allege these statistics were inaccurate; instead, they contend the statistics were misleading because Legacy "Sunlight had adopted [(but not disclosed)] business practices that ***could*** cause its historical performance not to be representative of future performance." *Id.* ¶ 96 (emphasis added). But this theory is contradicted by the SAC itself, which alleges that the "less stringent" policies were adopted in "***late 2019***." *Id.* ¶ 56 (emphasis added). Thus, the statistics the Proxy quoted, which ran through the end of 2020, were based on Legacy Sunlight's track record under the supposedly new "business practices."

Furthermore, Plaintiffs have not identified what material ***fact*** was omitted. The plans to rapidly grow the contractor network were disclosed: The Proxy explained that Legacy Sunlight was focused on a "rapid expansion of [its] contractor network," that the Board favored the transaction because of Legacy Sunlight's "rapid volume growth profile," and that contractor advances have nearly quadrupled in just two years. *See* Ex. A at 137-38, 173, 190-91; *see also supra* p. 7-8. And Plaintiffs have not alleged any specific changes departing from the risk management processes as described in the Proxy.

Moreover, as explained above, the SAC attributes its entire theory of relaxed diligence standards to CW1, who is not alleged to have had any involvement in such diligence, which is plainly insufficient under the PSLRA, *see supra* pp. 21-22.[22]

---

[22] The SAC block-quoted other statements that Plaintiffs do not appear to challenge as false, including that Legacy Sunlight "required [Milestone Advances] to be repaid in 90 days" (Statement 10), that advances under the Prefunding Program "may be paid [to contractors] prior to the commencement of … installation or construction" (Statement 11), and that the ongoing diligence and risk tiers were used to determine the "aggregate amount of advances available" (Statement 12). SAC ¶¶ 91-92. The SAC does not contain any factual allegations that contradict any of the foregoing statements.

> ### 3.    *The SAC's allegations focusing in 2022 do not plead falsity in the 2021 Proxy.*

The gravamen of the SAC's Section 14(a) claim follows the same flawed formula as its predecessor:  Because Pink Energy defaulted on a large advance in *September 2022*, the Proxy's *mid-2021* description of a "robust" credit monitoring process must have been false and somehow "concealed" the risk that a contractor could become insolvent without having repaid Sunlight all of its advances.   SAC ¶¶ 90-05.  This theory fails at every step.

The Proxy Did Not Conceal the Risk of Loss:  The Proxy cannot reasonably be read, as Plaintiffs contend, to "conceal[]" the risk that a contractor could become insolvent, causing New Sunlight to suffer loss.  *See id.* ¶¶ 102-05.  The very section from which Plaintiffs cherry-picked some quotes disclosed that the Cash Advance Program created "commercial credit risk related to the financial condition and liquidity of such contractors and their ability to complete the projects and to pay back any advances that may have been made by Sunlight." Ex. A at 208-09.  The Proxy also disclosed that Sunlight was "at risk for defaults if a contractor … becomes insolvent."  *Id.* at 53.  It even quantified the amount of this exposure as "an aggregate of $32.6 million of outstanding advances to 120 contractors," noting that 64% of that amount was to its four largest contractors, and that if a contractor became insolvent "Sunlight may lose a portion or all of the funds advanced to such contractor, which may have an adverse impact on Sunlight's business."  *Id.* at 53.  In light of these disclosures, no reasonable investor would interpret the description of Sunlight's "robust" underwriting processes as implying an ability to avoid all losses from contractor insolvency.  *E.g.*, *In re FedEx Corp. Sec Litig.*, 517 F. Supp. 3d 216, 229-30 (S.D.N.Y. 2021) (holding statements about ability to recover data from a virus were not false they "were accompanied by numerous disclosures about the difficulties faced … in that process").

Post Hoc Developments Cannot Render Prior Disclosures False: Plaintiffs' fundamental theory of liability also fails because falsity cannot be stated based on "the benefit of hindsight." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72, 75 (2d Cir. 2016). For example, in *Bond* the court held that the "mere fact that [a company's shares] increased in value over the eighteen months subsequent to the merger does not, in itself, constitute any evidence" supporting plaintiffs' allegations that the merger proxy understated the value of the shares. 2003 WL 21058251, at *10 ("[L]iability cannot be imposed on the basis of subsequent events" (citation omitted)). And, as detailed above, caselaw is clear that a statement detailing risk management policies, including credit risks, cannot be alleged as false merely by pleading that a risk later manifested despite those policies. *See supra* pp. 24-25 (collecting authorities).

In an attempt to bridge this temporal gap, Plaintiffs cite CW1's characterization of Pink Energy's business practices, an allegedly "scathing" news article about the same, and Pink Energy's low consumer reviews in late 2020—all in an attempt to suggest Pink Energy was troubled before the Business Combination. *See* SAC ¶¶ 62-73. But even assuming all such allegations were true, Plaintiffs miss the mark because the Proxy never assured investors that Legacy Sunlight only advanced funds to flawless contractors. According to Plaintiffs, New Sunlight suffered losses due to Pink Energy's insolvency, which Pink Energy "***slowly*** slid into … [i]n ***late 2021 and 2022***"—after the Business Combination closed. *Id.* ¶ 36 (emphasis added).[23]

Accordingly, Plaintiffs did not and cannot plead that any warning signs of Pink Energy's financial distress existed at the time of the Proxy and rendered the Proxy false when issued. *See*

---

[23] Notably, the SAC removed prior allegations that explained the reason for Pink Energy's insolvency. The prior version, the Amended Complaint, explained that, "[s]tarting from late 2021," a defect was discovered in a component of Pink Energy's solar panels, causing property damage and an "overwhelming number of negative reviews," which flooded Pink Energy. AC ¶ 70. Whereas Plaintiffs previously acknowledged that Pink Energy's insolvency was precipitated by the events that started to occur after the Business Combination, Plaintiffs partially removed them to concoct a claim against the Spartan Defendants. Still, Plaintiffs admit that Pink Energy did not embark on the path to bankruptcy until after the Business Combination closed, which defeats Plaintiffs' theory.

*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (dismissing claims under PSLRA where there were no "well-pleaded allegations of contemporaneous falsity"—i.e., that the "statements were false or misleading *at the time they were made*"). Falsity cannot be alleged by referencing "red flags" post-dating the statements at issue. *E.g.*, *Special Situations*, 645 F. App'x at 75 (dismissing Section 10(b) claim for failure to plead falsity where underlying facts could "be characterized as red flags" only "with the benefit of hindsight"); *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (dismissing as insufficient allegation that defendants misrepresented adequacy of internal controls since "a problem was disclosed" three months later and thus "defendants must have known of the problem" when the disclosures were made).

### C. Plaintiffs failed to allege a material omission.

Plaintiffs' theory of an Item 303 omission is based entirely on rebranding their failed claims regarding the allegedly undisclosed expansion of the Contractor Advance Program and relaxation of underwriting policies as a failure to disclose likely losses under Item 303. *See* SAC ¶¶ 97-101. But courts routinely reject such attempts to cure deficient claims by repackaging them as "Item 303 omissions." *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *14 (S.D.N.Y. Jan 18, 2018) (dismissing "largely redundant" claims of violation of Items 303); *Garnett v. RLX Tech. Inc.*, 2022 WL 4632323, at *26 (S.D.N.Y. Sept. 30, 2022) (same), *aff'd*, 2023 WL 8073087 (2d Cir. Nov. 21, 2023).

Moreover, Plaintiffs did not and cannot allege a violation of Item 303. "[T]he Second Circuit has only recognized a failure to comply with Item 303 when a company has failed to disclose a trend that was about to directly harm their operational results." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 469 (E.D.N.Y. 2020). Plaintiffs do not allege that Legacy Sunlight faced any such trend; rather, their allegations are based on a disagreement with Sunlight's alleged

decision to relax its underwriting processes based on harm that materialized more than a year after the Business Combination closed. *See* SAC ¶¶ 97-101. Such attenuated impact is not a "trend that was about to directly harm … operation results," *Liberty*, 435 F. Supp. 3d at 469, and the alleged changes amount to "business strategy decision[s]" that are inactionable under Item 303, *Steamfitters Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 496, 498 (2d Cir. 2019) (allegations that defendants had a "secret plan to transform [their] business" not subject to disclosure under Item 303); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 426-27 (S.D.N.Y. 2020) (failure to disclose alleged plan to replace experienced personnel with inexperienced personnel not a violation of Item 303). This alone is fatal to Plaintiffs' claim.

Additionally, Plaintiffs' allegations fail to state a violation of Item 303 because such a claim requires allegations of actual knowledge. *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 180 (S.D.N.Y. 2023) (collecting cases). This is true even if a plaintiff attempts to state a claim under a section of the Exchange Act that does not require proof of scienter. *Blackmoss Invs. Inc. v. ACA Cap. Hldgs., Inc.*, 2010 WL 148617, at *9-10 (S.D.N.Y. Jan. 14, 2010) (dismissing Section 11 negligence claim based on Item 303 violation for failure to plead actual knowledge). This is not a standard Plaintiffs can meet as to the Spartan Defendants because Plaintiffs affirmatively disclaimed any attempt to plead actual knowledge, *see* SAC ¶112, and wholly failed to plead scienter, *see infra* pp. 33-35.

Finally, the Item 303 allegation fails because the Proxy disclosed the potential negative outcomes of which Plaintiffs complain. The Proxy disclosed Legacy Sunlight's continued plan to rapidly grow its network of contractors, quantified the size and rapid increase in Legacy Sunlight's outstanding cash advances, and explained the risk posed by the program. *See supra* pp. 7-8; Ex. A

at 19, 52-53, 137-38, 173, 190-91.  The Proxy disclosed the risk that Sunlight could lose up to $32.6 million advanced to contractors.  Ex. A at 53.  These disclosures more than satisfied Item 303.  *Rubinstein v. Credit Suisse Group AG*, 457 F. Supp. 3d 289, 298 (S.D.N.Y. 2020) ("Because Defendants' disclosures adequately warned investors about the liquidity risks about which Plaintiffs claim to have been misled, Plaintiffs fail to allege an actionable misstatement or omission.") (cleaned up).

*    *    *

The SAC fails to meet the PSLRA's heightened standard for pleading material falsity as to the statements at issue, whether they are viewed in combination or isolation.  Accordingly, Count I must be dismissed as to the Spartan Defendants.

**III.    Plaintiffs failed to plead the required mental state.**

Even setting aside the absence of a material misstatement or omission, Count I fails because Plaintiffs fail to plead the requisite level of culpability as to the Spartan Defendants.

**A.    Plaintiffs failed to meet the Rule 9(b) standard for pleading scienter.**

Plaintiffs purport to disclaim reliance on allegations of fraud for Count I (SAC ¶ 112), but their allegations say otherwise: Plaintiffs broadly allege that the Spartan Defendants authorized false or misleading statements to profit from an unfavorable deal while circumventing regulatory scrutiny.  These conclusory allegations sound in fraud but lack the particularity required under Rule 9(b), requiring dismissal of Plaintiffs' claim.

Plaintiffs cannot plead around Rule 9(b) through boilerplate disclaimers of an intent to bring a fraud claim.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).  Rather, Rule 9(b) applies regardless of labels and disclaimers where "wording and imputations" of their allegations "are classically associated with fraud."  *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  For example, in *Rombach*, the Second Circuit required plaintiffs to

-33-

satisfy Rule 9(b) because plaintiffs alleged "the [r]egistration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued." *Id.*

The rationale for applying Rule 9(b) is far stronger here than in *Rombach*.  In addition to alleging that the Spartan Defendants issued "false" and "misleading" statements,  SAC ¶¶ 94, 96, 115, Plaintiffs assert that the Spartan Defendants' "[were] highly motivated to complete a merger" because of "massive profits from [founder shares]," which would be lost "if a merger is not effectuated within" 24 months, *id.* ¶ 39.  The SAC goes so far as to say that the SPAC-model allowed Defendants to "bypass … regulatory scrutiny of … [an] IPO[]," and that "SPAC mergers … have the potential to be *rife with fraud* and other irregularities." *Id.* ¶¶ 40-41 (emphasis added). Such allegations and imputations of bad motives plainly sound in fraud.  *E.g.*, *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *9 (S.D.N.Y. Sept. 27, 2021) (applying Rule 9(b) because "[t]he gravamen of [plaintiff's] Section 14(a) claim is that" defendant "concocted a plan," "engaged in secret backchannel discussions," and "promulgated materially false proxy solicitations … to … force a fire sale," and all such language is "classically associated with fraud").

Plaintiffs' theory that the receipt of founder shares provides a motive for fraud does not raise a strong inference of scienter.  Indeed, the Proxy explained that the founder shares are converted to common public shares following the merger (Ex. A at 6), which would give recipients of founder shares all the more reason to enter a transaction favorable for the SPAC and its other stockholders.  In *Bond*, for instance, in dismissing allegations that director defendants knew that a proxy statement undervalued the stock being sold, the court found it "extremely significant that all of the defendant directors sold all or most of their … shares for the same … buyout price that was

paid to the public shareholders," because it would be in the directors' "informed economic self-interest" to get the best deal available. 2003 WL 21058251 at *11. That the recipients do not acquire the founder shares on the open market, or that the founder shares would be cancelled absent a deal, does not change this incentive—particularly absent any allegations that the SPAC faced dissolution absent a combination with Legacy Sunlight.

The only other allegations as to the Spartan Defendants likewise do nothing to raise an inference of fraud. Plaintiffs allege only that the Spartan Defendants are all parties to this litigation, *see* SAC ¶¶ 13-21; Strong attended an investor conference call, *see id.* ¶¶ 197, 211; and the Spartan Individual Defendants signed the Proxy, *see id.* ¶¶ 90, 93, 202(c). Such allegations fall far short of Rule 9(b) under which, for Section 14(a) claims sounding in fraud, Plaintiffs must allege "with more specificity" as to "each defendant" "their knowledge of the allegedly fraudulent [conduct]." *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 239 (S.D.N.Y. 2009). Mere "allegations regarding the magnitude of the fraud or the organizational role of a defendant"—which is all the SAC contains here—"are insufficient." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006). Thus, even a complaint that "include[s] specific allegations regarding misconduct" fails where it does not "connect the misconduct or knowledge of the misconduct to … the individual named defendants." *Id.* at 484. No factual allegations in the SAC indicate that the Spartan Defendants knew that the Proxy's description of the Cash Advance Program was false. Accordingly, Plaintiffs cannot meet that standard "by simply alleging that [certain] [d]efendants … signed certain documents or because of their positions." *SafeNet*, 645 F. Supp. 2d at 239 (holding the mere fact directors signed proxy insufficient to satisfy Rule 9(b) for a Section 14(a) claim).

### B. Even if Rule 9(b) did not apply, Plaintiffs failed to plead negligence.

Even if the Court found Rule 9(b) inapplicable, Count I should be dismissed because Plaintiffs failed to plead facts indicating the requisite culpability for claims sounding in negligence.

"The Second Circuit has not opined on the [pleading standard for negligence], and what authority exists is divergent," with some courts concluding that "negligence is conduct, and not a state of mind," rendering the PSLRA's heightened pleading standard inapplicable to the negligence prong, *Bricklayers*, 866 F. Supp. at 240, while other courts treat negligence as a mental state, requiring a plaintiff "plead with particularity facts that give rise to a strong inference of negligence" as to "each particular defendant," *Bond*, 2003 WL 21058251, at \*4, \*10. Treating negligence as a mental state for securities claims is most consistent with the language of the PSLRA, which imposes a heightened pleading standard for any "required state of mind"—i.e., not just for scienter. 15 U.S.C. § 78u-4(b)(2); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000).

The SAC entirely fails to plead a strong inference of negligence as to each Spartan Defendant, as there are no particular allegations against any Spartan Defendant. *See Bond*, 2003 WL 21058251, at \*4, \*10. But even if the Court concluded that negligence was conduct, rather than a state of mind, the SAC's lack of allegations specific to the Spartan Defendants is still fatal to the Section 14(a) claim. Regardless of the pleading standard, Plaintiffs still must plead negligence—i.e., that Defendants "failed to exercise reasonable care" when authorizing a proxy containing false statements. *Karp v. First Conn. Bancorp, Inc.*, 535 F. Supp. 3d 458, 474 (D. Md. 2021) (dismissing Section 14(a) claim on summary judgment). Since Plaintiffs simply "lump[ed] all the defendants together in [the Section 14(a)] claim and provid[ed] no factual basis to distinguish their conduct," the SAC "fail[s] to satisfy this minimum [pleading] standard" of Rule 8. *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001). Indeed, even setting aside the

group pleading issue, the SAC makes no allegations indicating that the Spartan Board collectively acted unreasonably.  Absent such allegations, Plaintiffs cannot simply presume that any inaccuracy in the Proxy was the result of culpable conduct.  *E.g.*, *Bond*, 2003 WL 21058251, at \*10 (dismissing Section 14(a) claim where plaintiffs failed to allege "that the directors knew or should have known of the alleged flaws"); *Varjabedian v. Emulex Corp.*, 2020 WL 1847708, at \*11 (C.D. Cal. Feb. 25, 2020) (dismissing Section 14(a) claim because, *inter alia*, plaintiff failed to allege facts showing the board did not exercise reasonable prudence in deciding which detail from an advisor's fairness opinion to disclose); *SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011) (affirming judgment as a matter of law on Section 14(a) claim absent evidence a director had "any reason to be concerned that" a proxy statement was inaccurate).

Plaintiffs have not plausibly alleged that any of the Spartan Defendants were negligent. *Paskowitz v. Pac. Cap. Bancorp*, 2009 WL 4911850, at \*6 (C.D. Cal. Nov. 6, 2009) (dismissing Section 14(a) claim for failure to disclose risk that reverse stock split would decrease company value because plaintiff relied on published studies to claim that such a risk was publicized but failed "to allege that these studies were commonly known by [d]efendants and negligently omitted").  Indeed, for Sponsor, Plaintiffs alleged no involvement whatsoever vis-à-vis the Proxy.[24]  The allegations as to the Spartan Individual Defendants are scarcely better—Plaintiffs merely alleged that the Spartan Individual Defendants signed the Proxy.  *See* SAC ¶¶ 90-93. Plaintiffs have identified no oversight in the preparation of the Proxy, and no facts contradicting the description of the Cash Advance Program that the Spartan Defendants should have known at the time the Proxy was being issued.  Instead, Plaintiffs proceed entirely on the theory that the Spartan Defendants described Legacy Sunlight's diligence and monitoring processes

---

[24] The sole allegations as to Sponsor are that its CEO was Strong, SAC ¶ 13, and it was formed "to act as the sponsor of Spartan," *id.* ¶ 19.

optimistically between March and June 2021, *see id.* ¶¶ 90-93, but that New Sunlight incurred losses after failing to detect red flags regarding a major contractor that became insolvent in 2022, *see id.* ¶¶ 102-05. The mere fact that New Sunlight suffered losses is not indicative of unreasonable diligence. To the contrary, Plaintiffs admit that Pink Energy's path to insolvency did not begin until after the Business Combination closed. *Id.* ¶ 36. Accordingly, the negligence claim fails.

## CONCLUSION

Plaintiffs have now twice amended their Complaint, and the SAC already attempted to cure "the defects" the Spartan Defendants identified "in the original complaint." *Silverman v. 3D Total Sols., Inc.*, 2020 WL 1285049, at *10 (S.D.N.Y. Mar. 18, 2020). Thus, "leave to amend should be denied." *Id.* This is particularly true because Plaintiffs' "failure to identify any actionable[] misrepresentation or omission" and failure to satisfy Rule 23.1 "[are] not curable through amendment," which "would be futile." *Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 351, 358-59 (S.D.N.Y. 2014). For the foregoing reasons, the Court should dismiss Count I as to the Spartan Defendants with prejudice.

Dated: December 20, 2023

Respectfully submitted,

VINSON & ELKINS LLP

Michael C. Holmes

Christopher E. Duffy
1114 Avenue of the Americas
New York, New York 10036
Telephone: 212-237-0000

Michael C. Holmes (*pro hac vice*)
Jeffrey Crough (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
2001 Ross Avenue
Dallas, Texas 75201
Telephone: 214-220-7700

*Attorneys for Defendants Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romeo, and Spartan Acquisition Sponsor II LLC*