**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW MILLUNCHICK and MIKE MARGENT, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>     -against-<br><br>SUNLIGHT FINANCIAL HOLDINGS, INC. f/k/a/ SPARTAN ACQUISITION CORP. II, MATTHEW POTERE, BARRY EDINBURG, RODNEY YODER, GEOFFREY STRONG, JAMES CROSSEN, OLIVIA WASSENAAR, WILSON HANDLER, CHRISTINE HOMMES, JOSEPH ROMEO, and SPARTAN ACQUISITION SPONSOR II LLC,<br><br>        Defendants. | Case No.: 1:22-cv-10658-AKH<br><br>**CLASS ACTION** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE SUNLIGHT**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    Sunlight's Formation and Business Model .................................................................... 2

    As Sunlight Grew and Prepared to Go Public, It Loosened Credit Standards for Contractors .. 4

    Entanglement with Pink Energy and Vision Solar ....................................................... 5

        a.   Pink Energy.............................................................................................. 6

        b.   Vision Solar ............................................................................................ 7

    Pink Energy's Alarming, Publicly-Filed Lawsuit Raised Questions About its Survival ........... 8

    Sunlight Forced to Take Loss as Pink Energy Went Out of Business..................................... 10

    Sunlight Jettisoned Cash Advance Program and other Post-Class Period Developments........ 10

STANDARD OF REVIEW ...................................................................................................... 11

ARGUMENT.......................................................................................................................... 11

    I.   The Complaint Adequately Pleads a Section 10(b) Claim ............................................. 11

        A.   The Complaint Adequately Alleges Falsity................................................... 12

            a.   Defendant Yoder's August 15, 2022 Statement was False and Misleading ............. 12

            b.   Defendant Potere's May 16, 2022 Statements were False and Misleading.............. 14

            c.   The S-4 Statements were False and Misleading ....................................... 15

            d.   Defendant Potere's January 25, 2021 Statement was False and Misleading............ 18

        B.   The Complaint Adequately Alleges Scienter............................................... 19

a.    Standard for Pleading Scienter.................................................................... 19

b.    Scienter is Adequately Pled ...................................................................... 20

C.    The Complaint Adequately Alleges Loss Causation ..................................... 24

D.    The Sunlight Defendants' Remaining Arguments Fail................................... 26

a.    The Attacks on the CWs Fail ..................................................................... 26

b.    Sunlight's Generic Risk Disclosures Do Not Immunize Sunlight.......................... 27

c.    Pink Energy's Lawsuit Against Generac is not Immaterial...................................... 29

d.    The Complaint Does Not Constitute Puzzle Pleading ............................................. 30

II.    The Complaint Adequately Pleads a Section 20(a) Claim.................................. 30

III.   The Complaint Adequately Pleads a Section 14(a) Claim................................... 33

A.    Plaintiffs' Section 14(a) Claim is Direct Not Derivative............................. 33

B.    Named Plaintiff Margent Has Standing to Bring Section 14(a) Claim ........................ 35

C.    Rule 8(a)'s Notice Pleading Standard Applies to the Section 14(a) Claim .................. 36

D.    The Proxy Statement was False ................................................................... 37

E.    Plaintiffs are Not Required to Plead Defendants' State of Mind................................. 38

F.    Transaction and Loss Causation are Adequately Pled.................................................. 39

CONCLUSION......................................................................................................... 41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................... 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..................................................................................... 11, 13

*Beck v. Dobrowski,*
559 F.3d 680 (7th Cir. 2009) ................................................................................. 38

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................................ 11

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)....................................................... 16, 19, 38, 39

*Brown v. Enstar Grp., Inc.*,
84 F.3d 393 (11th Cir. 1996) ................................................................................. 31

*Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*,
56 F. Supp. 3d 549 (S.D.N.Y. 2014)....................................................................... 31

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)..................................................................... 26

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)..................................................................... 30

*Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, No. 13 C,
2111, 2014 WL 3610877 (N.D. Ill. July 22, 2014).................................................. 30

*Dekalb Cty. Pension Fund v. Transocean Ltd.,*
817 F.3d 393 (2d Cir. 2016)..................................................................................... 38

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)..................................................................... 32

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir.2009)..................................................................................... 16

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)................................................................................. 20, 27

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F.Supp.2d 395 (S.D.N.Y. 2011) ................................................................. 36

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP,*
    2021 WL 5854075 (S.D.N.Y. Dec. 9, 2021) ..................................................... 34

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP,*
    No. 20-CV-9992 (PAC), 2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ................. 39

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) .......................................................... 33, 36, 38

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......................................................... 11, 12, 13

*G.A. Thompson & Co. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ......................................................................... 31

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ......................................................................... 17

*Grace v. Rosenstock*,
    228 F.3d 40 (2d Cir. 2000) ........................................................................... 40

*Greco v. Qudian Inc.*,
    2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ................................................ 27

*Harrison v. Dean Witter Reynolds, Inc.*,
    974 F.2d 873 (7th Cir. 1992) ......................................................................... 31

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) .......................................................... 20, 26

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ........................................................................... 35

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990) ....................................................................... 31

*In re Am. Realty Cap. Properties, Inc. Litig.*,
    2015 WL 6869337, (S.D.N.Y. Nov. 6, 2015) ................................................. 29, 30

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ................................................. 26

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.,*
757 F. Supp. 2d 260 (S.D.N.Y. 2010)....................................................................... 36, 38, 39

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.,*
763 F. Supp. 2d 423 (S.D.N.Y. 2011)..................................................................... 28

*In re CitiGroup Inc. Bond Litig.,*
723 F. Supp. 2d 568 (S.D.N.Y. 2010)..................................................................... 31

*In re DDAVP Direct Purchaser Antitrust Litig.,*
585 F.3d 677 (2d Cir. 2009)..................................................................... 11

*In re EVCI Colleges Holding Corp. Sec. Litig.,*
469 F. Supp. 2d 88 (S.D.N.Y. 2006)..................................................................... 27, 28

*In re EZCorp., Inc. Sec. Litig.,*
181 F. Supp. 3d 197 (S.D.N.Y. 2016)..................................................................... 24

*In re Glob. Crossing, Ltd. Sec. Litig.,*
313 F. Supp. 2d 189 (S.D.N.Y. 2003)..................................................................... 36

*In re IPO Sec. Litig.,*
241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................................... 32

*In re Jumei Int'l Holding Ltd. Sec. Litig.,*
No. 14-CV-9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ..................................................................... 36

*In re LaBranche Sec. Litig.,*
405 F. Supp. 2d 333 (S.D.N.Y. 2005)..................................................................... 32

*In re Lehman Bros. Sec. & Erisa Litig.,*
799 F. Supp. 2d 258 (S.D.N.Y. 2011)..................................................................... 12

*In re MF Glob. Holdings Ltd. Sec. Litig.,*
982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................... 28

*In re MultiPlan Corp. S'holders Litig.,*
268 A.3d 784 (Del. Ch. 2022)..................................................................... 34

*In re Nielsen Holdings PLC Sec. Litig.,*
510 F. Supp. 3d 217 (S.D.N.Y. 2021)..................................................................... 22

*In re Omnicom Grp., Inc. Sec. Litig.,*
597 F.3d 501 (2d Cir. 2010)..................................................................... 24

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 472 (S.D.N.Y. 2005)...............................................................................31

*In re Parmalat Sec. Litig.*,
594 F. Supp. 2d 444 (S.D.N.Y. 2009)...............................................................................33

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ...................................................................................28

*In re Refco, Inc. Sec. Litig.*,
503 F.Supp.2d 611 (S.D.N.Y. 2007)..................................................................................36

*In re Romeo Power Inc. Sec. Litig.*,
2022 WL 1806303 (S.D.N.Y. June 2, 2022) ...................................................................35

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...........................................................................30

*In re Tronox, Inc. Sec. Litig.*,
No. 09 CIV. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010)........................... 30, 32

*In re Tyson Foods, Inc.*,
919 A.2d 563 (Del. Ch. 2007)...........................................................................................34

*In re Vale Sec. Litig.*
2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..................................................................24

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 .............................................................................................................. 24, 25

*In re Wachovia Equity Sec. Litig.*,
753 F.Supp.2d 326 (S.D.N.Y. 2011)...................................................................................36

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003)...............................................................................32

*Indepen. Energy Hldgs. PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001)...............................................................................32

*Karimi v. Deutsche Bank*,
2022 WL 2114628 (S.D.N.Y. June 13, 2022) ..................................................................17

*Kusnier v. Virgin Galactic Holdings, Inc.*,
639 F. Supp. 3d 350 (E.D.N.Y. 2022) ..............................................................................30

*Lanigan Grp. Inc. v. Li-Cycle Holding Corp.*,
2023 WL 6541884 (E.D.N.Y. Oct. 6, 2023)............................................................ 30

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005).............................................................................. 24, 39

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).............................................................................. 24, 25

*Matrixx Initiatives v. Siracusano*,
563 U.S. 27 (2011).................................................................................................. 11

*Metge v. Baehler*,
762 F.2d 621 (8th Cir. 1985) ................................................................................ 31

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)................................................................................... 12

*Mills v. Electric Auto-Lite Co.*,
396 U.S. 375 (1970)............................................................................................... 40

*Minzer v. Keegan*,
218 F.3d 144 (2d Cir. 2000).................................................................................. 40

*Morrison v. City of Baton Rouge*,
761 F.2d 242 (5th Cir. 1985) ............................................................................... 12

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ............................................................................ 22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)............................................................................ 12, 26

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)...................................................................... 21

*Panthers Partners Inc. v. Ikanos Comms. Inc.*,
681 F.3d 114 (2d Cir. 2012).................................................................................. 37

*Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*,
2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017)....................................................... 37

*SEC v. Fitzgerald*,
135 F.Supp.2d 992 (N.D. Cal. 2001) .................................................................... 28

*Sennett v. Rodman & Renshaw*,
   414 U.S. 926 (1973)......................................................................................... 32

*Setzer v. Omega Healthcare Inv. Inc.*,
   2020 WL 4431902 (2d Cir. 2020)................................................................... 20

*Suez Equity In., L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001).............................................................................. 25

*Tabor v. Bodisen Biotech, Inc.*,
   579 F. Supp. 2d 438 (S.D.N.Y. 2008)............................................................. 30

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008)............................................................................ 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................... 19, 20

*Tooley v. Donaldson, Lufkin & Jenrette*,
   845 A.2d 1031 (Del. 2004) ......................................................................... 33, 34

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991)....................................................................................... 40

*Wilson v. Great Am. Indus., Inc.*,
   855 F.2d 987 (2d Cir. 1988)....................................................................... 38, 39

## Statutes

15 U.S.C. § 78n(a)(1)............................................................................................ 33

15 U.S.C. § 78u-4(b).............................................................................................. 12

## Rules

Fed. R. Civ. P. 15(a)(2).......................................................................................... 41

## Regulations

17 C.F.R. §229.03 ................................................................................................. 37

17 C.F.R. § 240.14a-9(a) ....................................................................................... 33

**<u>Other Authorities</u>**

*Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of O*perations,
Securities Act Release No. 8056, Exchange Act Release No. 45321, FR-61 2002 WL 77153
(Jan. 22, 2002)................................................................................................................... 37

H.R. Conf. Rep. No. 73-1383 (1934)....................................................................................... 32

S. REP. 73-792 (1934) ............................................................................................................. 32

Lead Plaintiff Matthew Millunchick and named plaintiff Mike Margent ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants Sunlight Financial Holdings, Inc. ("Sunlight" or the "Company"), Matthew Potere, Barry Edinburg, and Rodney Yoder (the "Sunlight Individual Defendants," and together with Sunlight, the "Sunlight Defendants")'s Motion to Dismiss the Second Amended Complaint ("Motion," ECF No. 78).

## PRELIMINARY STATEMENT

Sunlight is a fintech company that operated a financing platform that, among other things, offered generous, interest-free cash advances to solar panel and home improvement contractors. Giving cash advances to contractors was risky, so Sunlight told investors that it had stringent processes in place to vet and continually monitor each contractor to whom it gave advances, including checking and monitoring each contractor's reputation, credit bureau data, workmanship quality, legal compliance practices, financial and liquidity condition, etc.  In reality, starting in late 2019, Sunlight adopted an aggressive growth strategy and substantially loosened credit standards for contractors – such that Sunlight's supposedly rigorous vetting and monitoring of contractors consisted of nothing but a perfunctory, once-a-year review of its contractor partners' self-supplied financial statements.  Sunlight never disclosed this important change.

With loosened credit standards, and unbeknownst to investors, Sunlight became increasingly entangled with two of the most disreputable solar panel contractors in the industry: Pink Energy and Vision Solar.  These two reviled contractors, who relied primarily on consumer fraud to generate business, received a disproportionate share of Sunlight's cash advances. Indeed, by the end of 2021, cash advances to these two contractors made up half of Sunlight's total outstanding cash advances.

1

Meanwhile, the Sunlight Defendants continued to tout the supposedly rigorous due diligence and ongoing monitoring that it performed for each contractor, and repeatedly reassured investors that the cash advance program was low risk and that Sunlight would not incur losses from it. Even as Sunlight was advancing $250,000 a week to Vision Solar just to make sure Vision Solar didn't go out of business, Defendant Potere – Sunlight's CEO – told investors that the increased cash advances going out the door was about capitalizing on a business opportunity. And even as Pink Energy, by far the largest recipient of Sunlight's cash advances, was inching closer to collapse – the details of which was laid out in a startling, publicly-filed lawsuit – Defendant Yoder (Sunlight's CFO) reassured investors that Sunlight didn't expect to incur any losses from the cash advance program.

The façade collapsed on September 28, 2022, a mere month after Yoder's reassurance, when Sunlight was forced to record more than $30 million in losses stemming from cash advances that it had outstanding to Pink Energy because Pink Energy – unsurprisingly – went out of business. Sunlight also announced that it would "re-underwrite" all of its contractor cash advances to stem risk. Sunlight's stock price plummeted in response, losing 57% of its value, damaging investors.

This action seeks recovery for investors' losses, pleading two sets of independent claims under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). For the reasons discussed in this brief, Plaintiffs' claims are adequately pled, and the Sunlight Defendants' Motion should be denied in its entirety.

## STATEMENT OF FACTS

**Sunlight's Formation and Business Model**

Sunlight was formed when Sunlight Financial LLC ("Legacy Sunlight") merged with Spartan Acquisition Corp. II ("Spartan"), a publicly-traded special purpose acquisition company, commonly known as a "SPAC." ¶22.[1] SPACs are blank check companies incorporated and taken public for the sole purpose of merging with a privately-held company (*e.g.* Legacy Sunlight) to enable the private company to go public without the regulatory scrutiny of a traditional initial public offering. ¶¶38, 40. The resulting merger between the SPAC and the private company is commonly referred to as a "de-SPAC" merger.[2]

As a financial technology company, Sunlight[3] operates a digital platform connecting homeowners who want to install solar panels or undertake other home improvements with loan providers. ¶43. While Sunlight's customers are homeowners, Sunlight does not market directly to homeowners, instead it relies on contractors to recommend Sunlight to those homeowners who seek financing. ¶45. Sunlight earns a platform fee for each loan facilitated through its platform. ¶44. During and before the Class Period,[4] contractors were incentivized to recommend Sunlight to their customers because Sunlight provided contractors with generous cash up front to finance their work. ¶48. Sunlight's cash advance program was unique in the solar panel and home improvement industry because other financing platforms typically only disburse funds after the completion of a project. *Id.* Sunlight made no money from its cash advances to contractors; it did not charge

---

[1] All citations to "¶_" refer to paragraphs of the Second Amended Class Action Complaint For Violations of the Federal Securities Laws ("Complaint," ECF No. 73). The Complaint was originally filed as ECF No. 70, and re-filed as ECF No. 73 to correct a CM/ECF error caused by the incorrect spelling of a defendant's name on the docket.

[2] The de-SPAC merger between Spartan and Legacy Sunlight is referred to herein as the "Business Combination."

[3] Henceforth and unless otherwise specified, Sunlight refers to both post-merger Sunlight and Legacy Sunlight, as both the pre-and-post merger companies had the same purported business model. ¶43 n. 4.

[4] The Class Period is January 25, 2021 through September 28, 2022. ¶1.

3

interest and made the advances at par. ¶50.  Sunlight handed out cash advances in approximately 90% of the solar contracting projects financed through Sunlight. ¶154.

**As Sunlight Grew and Prepared to Go Public, It Loosened Credit Standards for Contractors**

Giving cash advances to contractors carried risks for Sunlight. At first, during the tenure of Head of Operations Brian Von Bergen, Sunlight's contractor risk evaluation was generally effective. ¶56.  Starting in late 2019, however, the process deteriorated as Sunlight adopted a "less stringent and more lackadaisical approach in the cash advance process." *Id.*  Sunlight's initial vetting of contractors was limited to looking at the contractor's self-supplied financial statements. ¶58.  After accepting a contractor into its network, Sunlight did not perform any "ongoing monitoring" other than an annual review of the contractor's self-supplied financial statements. *Id.* Von Bergen left Sunlight in late 2019 because he did not like the growing laxity with which Sunlight accepted contractors into its network and handed out cash advances. ¶56. Moreover, whereas during Von Bergen's tenure Sunlight only paid advances after a project had started, after Von Bergen's departure Sunlight started paying advances within three days of a customer's right to rescind – long before the commencement of any work on the project. ¶57.  For large contractors, Sunlight's cash advances often amounted to the entire expected cost of a project. ¶60.

Furthermore, Sunlight's review of the financial statements was perfunctory. According to a former Sunlight employee who managed all aspects of Sunlight's relationships with solar panel contractors ("CW1"), Sunlight simply "accepted [every contractor] until [Sunlight] got screwed (*i.e.,* lost money)."  ¶59.  Another former Sunlight employee who was responsible for pitching Sunlight to contractors and growing Sunlight's account with contractors already in its network ("CW2") said that by the time of CW2's tenure of October 2021 through October 2022, Sunlight was essentially "buy[ing] contractors," and that Sunlight's statements concerning its due diligence

4

and ongoing monitoring of contractors was "a bunch of bullshit" – they were just things that "we're going to put on papers to say this is what we're doing…[but] it's never executed." ¶146. Indeed, after 2019, the paramount concern at Sunlight was to rapidly increase its revenue; circumspection was eschewed in favor of a grow-at-all-cost mentality: "if [anything] is a barrier from getting glass on the roof, then [Sunlight] got rid of the barrier." ¶59.

The cash advance program created a perverse system where in many cases Sunlight was forced to continue giving out advances to troubled contractors to ensure that they stayed in business and could finish their projects - so that they could repay Sunlight. ¶147. As to one of those contractors, which was inundated with complaints and government investigations, Sunlight "was in so deep with them, we couldn't just cut them off…if we were to cut them off knowing how bad of a company they are…they wouldn't have any money to go complete the projects we need them to complete." *Id.* Thus, in many cases, the only thing keeping Sunlight's contractors from collapsing – and necessitating painful write-offs - was continuous infusion of cash advances from Sunlight.

**Entanglement with Pink Energy and Vision Solar**

With credit standards relaxed, and unbeknownst to investors, Sunlight formed key relationships with two of the most reviled solar panel contractors in the industry: Pink Energy and Vision Solar. As the below chart illustrates, Sunlight's entanglement with Pink Energy and Vision Solar ran so deep that by the end of the third quarter of 2021, the two companies accounted for nearly half of Sunlight's cash advances outstanding to contractors:

| | Pink Energy Cash Advances | Vision Solar Cash Advances | Combined (Pink Energy and Vision Solar) | Total Advances Outstanding (to all contractors) |
|---|---|---|---|---|
| Q3 2022 | $32.6 million (as of October 7, 2022) | $6.2 million | $38.8 million | $96.7 million |
| Q2 2022 | $30.5 million | $10.9 million | $41.4 million | $95.3 million |
| Q1 2022 | $23.0 million | $20.6 million | $43.6 million | $86.6 million |
| Q4 2021 | $12.5 million | $20.9 million | $33.4 million | $67.1 million |
| Q3 2021 | $21.0 million | $13.3 million | $34.3 million | $71.3 million |
| Q2 2021 | $5.0 million | $5.6 million | $10.6 million | $41.0 million |
| Q1 2021 | $888 thousand | $6.5 million | $7.3 million | $32.6 million |
| Q4 2020 | $295 thousand | $6.4 million | $6.7 million | $35.4 million |

¶156.

### a. *Pink Energy*

Pink Energy relied on consumer fraud to induce unwitting homeowners to hire them to install solar panels. ¶64. Starting in 2020, Pink Energy's fraudulent practices and nosediving reputation became increasingly public. ¶¶62, 67, 71. Not only was Pink Energy practicing fraud on its customers, it was also committing fraud on Sunlight's platform, to which Sunlight turned a blind eye. According to CW1, who worked as Sunlight's relationship manager for Pink Energy, more than half of the loan applications that Pink Energy submitted on Sunlight's platform on behalf of Pink Energy customers contained falsified income information. ¶¶68-69. Sunlight initially asked Pink Energy's customers for income verification, but after that resulted in many rejections and complaints from Pink Energy, Sunlight stopped conducting income verifications. ¶69. By November 2020, EnergySage - a leading provider of information about solar installers and backed by the Department of Energy - kicked Pink Energy off its platform for employing deceptive sales practices. ¶66.

6

By the spring of 2022, reports about Pink Energy's deceptive marketing practices and shoddy workmanship had become regular fare on local and national news. ¶¶157-167. The Better Business Bureau (BBB) removed Pink Energy's rating and issued a warning to consumers about the company. ¶164. During the period from June 2021 to June 2022, the review aggregator SolarReviews recorded that Pink Energy received more than 200 one-star reviews, compared to only 16 reviews that were two stars or higher. ¶166.

**b.** *Vision Solar*

Vision Solar was founded by the former Chief Operating Officer of Code Green Solar LLC, a now-defunct company that filed false claims with the federal government to illegally obtain millions of dollars in rebates and whose CEO pled guilty to wire fraud. ¶¶74-78. Vision Solar derived much of its business from consumer fraud; it used telemarketers to pretend that they were calling from the customer's utility company or the government, and those telemarketers would arrange for Vision Solar to visit the customer's homes, giving customers the misleading impression that Vision Solar was recommended by the utility company or the government. ¶79. A series of class actions were filed starting in 2020 alleging that Vision Solar engaged in consumer fraud and violated telecommunications laws. ¶¶79, 185. According to the Attorney General of Connecticut, "Vision Solar's predatory practices are far and away the worst we have seen. Vision Solar preyed on low-income, elderly, and disabled homeowners, pressuring them into unaffordable loans for solar panels that in some cases were never activated. Their egregious misconduct appears to have violated multiple law[s]." ¶189. Vision Solar was not accredited by the BBB and had a grade of F; its average rating on SolarReviews was the second-worst of any solar contractor with at least 100 reviews. ¶¶182, 187.

7

Vision Solar was one of the contractors that became dependent on cash advances from Sunlight for its survival.  ¶147. According to CW2, in 2021 Sunlight began to advance Vision Solar $250,000 per week just so that it could buy materials to keep operating; this was in addition to any project-related cash advances.  ¶148.  If Sunlight were to discontinue the cash advances to Vision Solar, then Vision Solar would go out of business and Sunlight would lose all the money that it had advanced to Vision Solar. ¶147.  Another former Sunlight relationship manager who worked at Sunlight from August 2020 to November 2022 ("CW3") confirmed this, stating that because Vision Solar owed Sunlight so much money, "Sunlight kept giving them more and more money."  ¶152.

**Pink Energy's Alarming, Publicly-Filed Lawsuit Raised Questions About its Survival**

Beginning in 2021 and escalating through 2022, Pink Energy was embroiled in a bitter dispute with one of its suppliers, Generac Power Systems, Inc. ("Generac").  ¶168.  Pink Energy eventually filed suit against Generac on August 1, 2022. ¶169. In the lawsuit, Pink Energy revealed the alarming extent to which its dispute with Generac was devastating its business, finances, and reputation – seriously raising questions about Pink Energy's ability to stay in business. ¶¶168-181.

According to Pink Energy's complaint, in 2020 Pink Energy entered into an agreement for Generac to supply Pink Energy with an electrical component for solar panel installations known as SnapRS. ¶169.  In the summer of 2021, fires broke out at several homes with Pink Energy-installed solar panels. ¶170. Pink Energy concluded that the fires were due to a design defect in SnapRS, causing it to overheat. *Id.* While not all defective SnapRS caused fires, they cut off the supply of electricity to the solar panels, rendering the solar panels useless. *Id.*[5]

---

[5] Generac denied supplying defective SnapRSs to Pink Energy, claiming instead that Pink Energy's faulty installation was to blame. ¶178 n. 20.

Starting in late 2021, Pink Energy became inundated with service calls caused by defective SnapRSs. ¶171. Prior to using SnapRS, Pink Energy averaged about 800 service calls a month; this number skyrocketed to approximately 30,000 per month as of late 2021. *Id.* The service requests overwhelmed Pink Energy's existing workforce, so Pink Energy was forced to hire and train additional customer service representatives and field technicians to respond to those calls. ¶¶172-73.  Instead of doing new installations, Pink Energy was spending most of its time and resources on repairs. *Id.*

The financial impact on Pink Energy was devastating. Pink Energy spent $39 million responding to service calls associated with defective SnapRSs, and suffered another $155 million in customer cancellations. ¶¶175-76. Its revenue fell by 50% from 2021 to 2022. ¶178.

Describing the entire ordeal a "public relations disaster," Pink Energy stated that it received "an overwhelming number of negative reviews and complaints to the BBB, social media, and other public platforms,"  causing "significant harm to [its] reputation." ¶174.

The industry was quick to take notice. A leading solar panel industry publication reported on the lawsuit on August 11, 2022, noting Pink Energy's lost revenue, awful ratings on SolarReviews, and complaints to the BBB. ¶179. Pink Energy's other creditors also took notice, making Pink Energy add the claims in the Generac lawsuit as collateral on its loan facility on August 5, 2022.  ¶180.

Nevertheless, Sunlight's internal risk classification for Pink Energy remained a 3, meaning that it had "excellent to average" reputational risk and "excellent to average" risk assessment. ¶181.

Indeed, and not surprisingly, Pink Energy did not survive the SnapRS debacle, shuttering its business the following month on September 21, 2022.  ¶215.

**Sunlight Forced to Take Loss as Pink Energy Went Out of Business**

On September 28, 2022, less than two months after Pink Energy's lawsuit against Generac, Sunlight announced that it was taking a loss of $30-$33 million because one of its contractors was unlikely to pay back the cash advances it received from Sunlight. ¶213.  Sunlight's stock tumbled by over 57% in reaction to this news, from $2.52 per share to $1.08 per share, wiping out more than half of Sunlight's market capitalization and damaging investors.  ¶214.

Analysts quickly figured out – and Defendant Potere would later confirm - that the defaulting contractor was Pink Energy, which had shut down its business on September 21, 2022. ¶215.

As a result of the Pink Energy default, Sunlight announced that it would "re-underwrite" all contractor cash advances to "further mitigate risk going forward." ¶213.

**Sunlight Jettisoned Cash Advance Program and other Post-Class Period Developments**

No longer willing to tolerate the high risk of giving out cash advances to contractors, Sunlight first curtailed its cash advance program and then jettisoned it for good in March 2023. ¶196.

On October 30, 2023, Sunlight filed for Chapter 11 bankruptcy. *See In re Sunlight Financial Holdings Inc., et al.,* Case No. 23-11794 (MFW) (Bankr. D. Del.).  As part of its plan of reorganization, Sunlight initially sought to discharge  - and permanently enjoin Plaintiffs from pursuing – Plaintiffs' claims against Sunlight. *See In re Sunlight,* Case No. 23-11794 (MFW) (Bankr. D. Del.) (ECF No. 57).  Plaintiffs objected to the proposed discharge. *Id.* at ECF No. 137. The Bankruptcy Court approved Sunlight's reorganization, but ordered Sunlight to remain a

10

defendant in this action so that Plaintiffs may attempt to establish its liability for the purposes of recovering available insurance proceeds and seeking discovery. *Id.,* ECF No. 201 at ¶27.[6]

## STANDARD OF REVIEW

In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept all well-pleaded allegations in a complaint as true, and draw all inferences in favor of the plaintiffs. *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 692 (2d Cir. 2009). Although the factual allegations "must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), once a complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), it may proceed even if "actual proof of those facts is improbable." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) (quoting *Twombly,* 550 U.S. at 556).

## ARGUMENT

### I.    The Complaint Adequately Pleads a Section 10(b) Claim

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must plead (1) a material misrepresentation or omission ("falsity"), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. *Matrixx Initiatives v. Siracusano,* 563 U.S. 27, 37-38 (2011).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that a §10(b) claim must "'specify'" each false statement, explain "'the reason or reasons why the statement [was] misleading,'" and "'state with particularity facts giving rise to a strong inference'"

---

[6] The Bankruptcy Court also ordered that if Sunlight's directors and officers are dismissed from this action, then Plaintiffs shall be required to dismiss this action against Sunlight as well. *Id.,* ECF No. 201 at ¶28.

of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)).

The Sunlight Defendants contest falsity, scienter, and loss causation. The Complaint adequately pleads each of these elements.

### A. The Complaint Adequately Alleges Falsity

"The federal securities laws impose an obligation on speakers to be both accurate and complete." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Morrison v. City of Baton Rouge*, 761 F.2d 242, 250 (5th Cir. 1985). A statement to investors "is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg*, 712 F. Supp. 2d at 180. Moreover, the Court must consider a complaint holistically, reviewing the defendants' statements and omissions in context and taken together. *Meyer v. Jinkosolar Holdings Co., Ltd.,* 761 F.3d 245, 250-51 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.").

### a. Defendant Yoder's August 15, 2022 Statement was False and Misleading

On August 15, 2022, Defendant Yoder - Sunlight's Chief Financial Officer - told analysts that Sunlight recorded a $3.6 million potential loss associated with cash advanced to a solar panel contractor, a loss that he described as a "very, very small" amount that "doesn't even show up on the calculator." ¶¶208, 209.  Yoder reassured and emphasized to analysts that it was an isolated incident, stating that he and Sunlight "don't expect to take any further one-time charges." ¶209. This reassurance was false, as a mere month later on September 28, 2022, Sunlight announced that

it was recording a massive $30-33 million impairment charge due to Pink Energy's collapse, or more than Sunlight's revenue for the entire second quarter of 2022. ¶¶213, 193.

Forward-looking statements are actionable if the "statements were made with actual knowledge of falsity." *Freudenberg*, 712 F. Supp. 2d at 193. Here, there were numerous indicia that Yoder knew Sunlight would likely incur additional losses from the cash advance program. Two weeks earlier, Pink Energy had publicly filed its hair-raising lawsuit against Generac, laying bare its dire financial condition and seriously calling into question Pink Energy's ability to survive. Pink Energy was one of Sunlight's biggest contractor partners. As of the second quarter of 2022, cash advances extended to Pink Energy accounted for *nearly one-third* of Sunlight's total cash advances outstanding, such that Pink Energy owed Sunlight *three times* as much as the next largest contractor. ¶220. Moreover, the amount of cash advances that Sunlight had outstanding to Pink Energy went up six-folds from the second quarter of 2021 to 2022 – from $5 million to $30.6 million. *Id.* Accordingly, Sunlight had much riding on Pink Energy's success. That Pink Energy was very publicly embroiled in an existential crisis could not have been unknown to Yoder when he made his August 15, 2022 statements.

Moreover, Pink Energy's lawsuit against Generac was reported on by PV Magazine, a leading publication for the solar industry. ¶179. PV Magazine noted, among other things, that Pink Energy lost $155 million in revenue from the SnapRS defect, and identified the name of the lawsuit, the case number, and the court in which it was filed. *Id.* And Pink Energy's other creditors took notice, requiring Pink Energy to add the claims against Generac as collateral on its loans. ¶18. It strains credulity that as the CFO of Sunlight, Yoder was oblivious to this development regarding Sunlight's largest contractor partner. *Iqbal,* 556 U.S. at 663-64 ("determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on…common

13

sense."). Indeed, in explaining why he did not expect Sunlight to have any more losses from the cash advance program, Yoder said that "*we monitor* each installer and reevaluate on a variety of factors, including *financial stability*." ¶209.

In addition, by August 15, 2022, it was abundantly clear that Pink Energy and Vision Solar – the two biggest recipients of Sunlight's cash advances – were two of the most reviled solar contractors in the industry that relied on fraud and deceit to make sales. Both had terrible and rapidly plummeting reviews on BBB, SolarReviews, and EnergySage. The national media was replete with reports of fraudulent marketing practices and poor workmanship by Pink Energy, and Vision Solar was named in multiple class action lawsuits alleging consumer fraud. Their business models built on consumer fraud and other deceptive practices were hardly sustainable – likely leading to their defaulting on cash advances.

Thus, Yoder's August 15, 2022 statement that Sunlight was not expected to take any more losses from the cash advance program was not only objectively false (because Sunlight would take additional losses a month later), but also subjectively false because he knew that more losses were likely given Sunlight's deep entanglement with Pink Energy and Vision Solar.

### b. Defendant Potere's May 16, 2022 Statements were False and Misleading

During an earnings call with analysts on May 16, 2022, Defendant Potere – Sunlight's Chief Executive Officer – offered the following description of the cash advance program: "our contractor advances program supports our contractor partners in their efforts to secure sufficient inventory to meet demand." ¶204. This statement creates the misleading impression that Sunlight was providing cash advances so that their contractor partners, such as Pink Energy and Vision Solar, could meet customer demand. In actuality, by this time, half of Sunlight's outstanding advances were to just two contractors – Vision Solar and Pink Energy (¶156), and the reason for

14

the cash advances was because Sunlight had boxed itself into a corner such that without these continuous injections of cash, Vision Solar and Pink Energy would go out of business and Sunlight would lose all of their money owed by these two contractors. ¶147 (CW2 stating that Sunlight "was in so deep with [Vision Solar], we couldn't just cut them off…if we were to just cut them off knowing how bad of a company they are…they wouldn't have any money to go complete the projects we need them to complete."). Moreover, CW2 said that by then, Sunlight was advancing Vision Solar $250,000 a week *independent of* project-related advances so that Vision Solar could stay in business. ¶148.

Potere's later statement on the same earnings call - "[i]n the first quarter [of 2022], we invested an additional $19 million in advances and we'll continue to allocate capital to this program opportunistically to drive profitable volume" (¶206) – was misleading for the same reason. Half of that increase went to Pink Energy, who by then was already in the middle of the SnapRS debacle and desperately needed cash to, among other things, hire new employees to repair inoperable solar panels and make up for its drastic decline in revenue. ¶¶156, 207, 168-178. Accordingly, Potere statement misleading created the impression that Sunlight was capitalizing on a business opportunity rather than gambling more and more capital in an attempt to keep the likes of Pink Energy in business.

### c. The S-4 Statements were False and Misleading

Sunlight's S-4 stated that all contractors it partnered with had to undergo Sunlight's "vigorous contractor diligence and monitoring procedures." ¶199. It went on to detail the specific procedures that Sunlight supposedly performed for each contractor during onboarding and as part

15

of ongoing monitoring, including: reviewing the contractor's reputation, workmanship/quality of work product, legal compliance practices, credit bureau data, etc.  *Id.*[7]

The S-4 Statements were false because Sunlight wasn't doing those things during the Class Period. According to CW1, starting in 2019, Sunlight loosened credit standards and removed guardrails that had allowed it to keep losses associated with its cash advance program to a minimum. ¶57. Thereafter, Sunlight's due diligence of contractors consisted entirely of looking at the contractor's self-supplied financial statements. ¶58. There was no "ongoing monitoring" other than an annual review of the contractor's self-supplied financial statements. *Id.*  Contrary to the S-4 Statements, there was no initial review or ongoing monitoring of a contractor's reputation, workmanship, legal compliance practices, or credit bureau data. This is corroborated by CW2, who said that Sunlight's representations about a vigorous due diligence and ongoing monitoring process was "a bunch of bullshit" and nothing more than "what we're [putting on paper] to say what we're doing" but "it's never executed." ¶146.

The Sunlight Defendants appear to argue that the S-4 Statements were puffery because they included the trigger word "robust" (*i.e.* that Sunlight's underwriting and ongoing monitoring process for contractors was "robust"). Puffery is defined as "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243–44 (S.D.N.Y. 2012) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 206 (2d Cir.2009)). A statement is immaterial as a matter of law ***only when*** it is "so obviously unimportant to a

---

[7] The same statements were repeated in numerous SEC filings and disclosures throughout the Class Period. ¶202.  For the sake of brevity, any references to "S-4 Statements" also refers to the same statements in those filings.

16

reasonable investor that reasonable minds could not differ on the question of [its] importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Indeed, **statements** are puffery, not individual words, and a single word does not render an entire statement puffery. Here, the S-4 Statements were false because Sunlight listed specific procedures (*e.g.* doing a reputation check, reviewing the contractor's legal compliance practices, etc.) that Sunlight was supposedly doing as part of its due diligence and ongoing monitoring process, but which Sunlight after 2019 was not doing.

Moreover, statements that "may be mere puffery" in isolation may still be actionable when viewed in context, such as where statements "were made repeatedly in an effort to reassure the investing public" or where they are "at odds" with "what was actually going on" at the company. *Karimi v. Deutsche Bank*, 2022 WL 2114628, at \*6 (S.D.N.Y. June 13, 2022). Here, the Sunlight Defendants told investors that Sunlight's advances were a pillar of its efforts to attract contractors. But loans to contractors, even for short terms, exposed Sunlight to credit risk. Investors would want to know that, like a well-functioning bank, Sunlight appropriately limited credit risks and ensured that its cash advances would be repaid. Sunlight assured investors that it did, saying "repeatedly in an effort to reassure the investing public" that the credit risks were minimal *because* it had established robust commercial underwriting and ongoing monitoring process that among other things, reviewed the "contractor's financial and liquidity position," "reputation," and "legal compliance practices." ¶199. These representations were not "so vague, broad, and non-specific that a reasonable investor would not rely on [them]" and they were certainly not "so obviously unimportant" as to make them immaterial as a matter of law.

The S-4 Statements also include the misrepresentation that "Sunlight's milestone advance program is generally offered to contractors in Sunlight's top risk tiers which have the strongest

17

commercial risk assessment results." ¶200.  This statement is false and misleading because in many instances, Sunlight gave more and more cash advances to troubled contractors to ensure that they didn't go out of business, including advancing Vision Solar $250,000 a week to keep it afloat. ¶¶147-48.[8]  Furthermore, Sunlight's cash advances went disproportionately to Vision Solar and Pink Energy, two notorious, reviled contractors that relied on consumer fraud to acquire customers. ¶156.

### d.  Defendant Potere's January 25, 2021 Statement was False and Misleading

On January 5, 2021, Defendant Potere participated in a conference call to introduce Sunlight to Spartan shareholders who would be voting on whether to approve the Business Combination. ¶¶127, 197. On this call, Potere touted the cash advance program and said that the cash advances were "low risk to Sunlight." *Id.*

This was false. While giving out cash advances *might have been* low risk if Sunlight actually had a vigorous diligence and monitoring process in place, by 2021 Sunlight had abandoned nearly all credit standards for contractor advances, making the cash advance program highly risky.  Essentially, Sunlight had become a bank that financed its contractors, relying on nothing more than the contractor's self-supplied financial statements for risk evaluation.

The risk was evident in the numbers. The platform fee that Sunlight earned for each loan amounted to 5% or less of the total loan amount, but Sunlight advanced contractors 90-100% of the contractor's costs for each project.  ¶27. Thus, Sunlight theoretically could incur losses per

---

[8] While Sunlight also had another type of cash advance program called "prefunding advances" that was offered to all contractors regardless of risk level, that is clearly not the cash advances at issue here, as prefunding advances are generally reimbursed within 24-72 hours by the loan provider, and "***the contractors are not specifically responsible for the repayment obligations***." (emphasis added).  *See* Sunlight S-4, attached as Exhibit A to the Declaration of Jeffrey J. Chapman filed with the Sunlight Defendants' Motion (ECF No. 80-1 at ECF Page 225 of 550).

project that were more than 20 times what it earned for that project. Moreover, in 2020 (the year right before Potere's "low risk" statement), Sunlight reported total revenues of $69 million, but handed out more than half of that amount - $35 million – in cash advances.  ¶192.  While this might not have been risky if Sunlight *did* indeed conduct vigorous due diligence and ongoing monitoring of contractors, Sunlight's "lackadaisical" and perfunctory vetting of contractors made the risk to Sunlight in the event of default was very high.[9]

Nor was this puffery. "In deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution…The only circumstance in which a Court may deem a statement immaterial as a matter of law is when it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."" *Transocean,* 866 F. Supp. 2d at 243-44.  Potere's representation that the cash advance program was "low risk" was not "so obviously unimportant" to investors.  The cash advance program was Sunlight's unique value proposition to contractors, differentiating Sunlight from its competitors. Whether this program was risky or not was certainly important to investors evaluating Sunlight.

**B.  The Complaint Adequately Alleges Scienter**

**a.  Standard for Pleading Scienter**

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In assessing scienter, "courts must consider the complaint in its entirety[,] whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

---

[9] Indeed, the Pink Energy default and the resulting wipe out of more than 50% of Sunlight's market capitalization, and the fact that Sunlight eventually chose to do away with the cash advance program despite the program being Sunlight's single most significant competitive advantage, all spoke to the high risk of the cash advance program.

standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). Scienter is alleged if a "reasonable person would deem the inference of scienter…at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324-26. The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences;" rather, the inference of scienter need only be ***equally plausible*** as any non-culpable inference. *Id*. at 324. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331

"In this Circuit, plaintiffs can satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Inv. Inc.*, 2020 WL 4431902, at *6 (2d Cir. 2020). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). Where a plaintiff alleges defendants "had knowledge of facts … that explicitly contradicted their public statements…[t]hese allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008).

### b.  Scienter is Adequately Pled

The scienter and falsity analyses overlap for Yoder's August 15, 2022 statement that Sunlight did not expect to take any further losses from its cash advance program. Because a forward-looking statement is false only if the speaker had actual knowledge of its falsity, if the Court finds that Plaintiffs adequately alleged the falsity of Yoder's August 15, 2022 statement, then scienter is also satisfied. Accordingly, for the reasons discussed in Section I(A)(a) *supra* in

20

support of the falsity of Yoder's August 15, 2022 statement, the August 15, 2022 statement was made with scienter.

As to the rest of the challenged statements, the allegations support the inference that the Sunlight Defendants knew or were reckless in not knowing that they were false and misleading. The statements all concerned Sunlight's cash advance program. The cash advance program was of vital importance to Sunlight. Both Potere and Yoder identified the cash advanced program as the key differentiator between Sunlight and its competitors, as well as the primary reason behind Sunlight's ability to get contractors to partner with Sunlight, which was how Sunlight earned its revenue. ¶¶47,49. It is not plausible that Sunlight's strategy in 2019 to substantially loosen credit standards and jettison virtually all due diligence and monitoring of contractors to drive growth was done without the knowledge of Defendants Potere and Edinburg, Sunlight's CEO and CFO at the time. "[A] court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019). Therefore, it is implausible that when Potere and Edinburg signed the SEC filings containing the S-4 Statements in 2021, they did not know that by then Sunlight's contractor diligence and monitoring program was nothing like the vigorous process described by the S-4 Statements; there was no reputation check, no inquiry into/monitoring of contractor's legal compliance practices, no monitoring of contractor's workmanship, etc. Moreover, that Potere knew Sunlight was handing out millions in cash advances relying on nothing but a once-a-year review of a contractor's *self-supplied* financial statements supports the scienter of his January 25, 2021 statement (*i.e.* that the cash advance program was low risk). It is common sense that under those circumstances, it was not low risk.

Additionally, Defendant Potere personally issued final approval for every cash advance given to contractors. ¶217.  It is unlikely that he did so without looking at the diligence file for each contractor receiving advances (and therefore knew what was and wasn't done as part of Sunlight's due diligence and ongoing monitoring of contractors).  And he would have known that: (1) by Q1 2022, cash advances to Pink Energy and Vision Solar grew so exponentially that these two troubled contractors accounted for half of Sunlight's cash advances outstanding to all contractors, and that (2) in 2021, Sunlight was advancing Vision Solar $250,000 each week in non-project-related funding to keep it from going out of business (and defaulting on its cash advances owed to Sunlight).  Knowledge of these facts render his May 16, 2022 characterization of the cash advance program – as a means to capitalize on a business opportunity and to allow contractors to buy sufficient supplies to meet demand - knowingly misleading.[10]  Indeed, Potere clearly held himself out as someone intimately knowledgeable about the state of Sunlight's cash advance program, repeatedly speaking about it during conference calls with investors and analysts. ¶¶49, 127, 204, 206. "In order to speak so knowledgeably regarding the state of "Sunlight's cash advances, Potere "must have educated themselves" on this topic. *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 237 (S.D.N.Y. 2021). These facts support scienter. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (fact that inventory levels "was a subject about which investors and analysts often inquired" "reinforce[d] the inference of scienter" by "explain[ing] why [defendants] would have been alert to information concerning" that subject).

The alternative inference – that Sunlight's due diligence and ongoing monitoring process was as robust as claimed, but other, unrelated factors led to Pink Energy's default – is less

---

[10] And also renders knowingly false the S-4 Statement that advances were generally only given to contractors in Sunlight's top risk tiers with the lowest commercial risk.

compelling.[11]  For example, after the Pink Energy default, Defendant Potere announced that Sunlight would "re-underwrite" all cash advances to contractors. ¶213.  If Sunlight's due diligence and risk evaluation process was as vigorous as it claimed, then the Pink Energy default would have been viewed as an isolated incident, rather than something that required Sunlight to re-assess every single contractor cash advance. That Sunlight felt the need to "re-underwrite" every contractor cash advance indicated a systemic problem with Sunlight's credit standard.  Additionally, despite Pink Energy's reviews plummeting starting in 2020, and its fraudulent practices becoming regular fare on national and local news media, Sunlight *never changed* its "tier 3" risk rating for Pink Energy. ¶3. A risk level of 3 meant that it had "excellent to average" reputational risk and "excellent to average" risk assessment  – neither of which was true for Pink Energy. *Id.*[12]  A more compelling inference is that: in 2019 and 2020 - as it sought to become a publicly-traded company - Sunlight embarked on an aggressive strategy that emphasized growth. To drive growth, it needed

---

[11] The Sunlight Defendants assert that rising interest rates was to blame for Pink Energy's demise. This extraneous factual contention is improper on a motion to dismiss and need not be entertained by the Court.  In any event, rising interest rates do not explain Pink Energy's fraudulent practices that became regular fare on national media, its industry-worst reputation, or the SnapRS debacle that became the last straw for Pink Energy's ability to stay in business.

[12] Contrary to the Sunlight Defendants' contention, there is no "contradiction" between this allegation and ¶66 of the Amended Complaint (ECF No. 34).  Paragraph 66 of the Amended Complaint reads as follows:

> Based on cash advance amounts disclosed in Sunlight's quarterly report for the second quarter of 2022 on Form 10-Q (the "2Q22 10-Q"), and confirmed by Credit Suisse's analyst report on Sunlight dated September 28, 2022, Sunlight assigned Pink Energy a risk rating of "3" in its 1-5 risk tier (with 1 being the least risky and 5 the most risky).  According to the 2022 10-Q, a risk rating of 3 means that the contractor has "medium commercial credit risk, *excellent to average reputational risk* (e.g., online ratings, average complaint levels), and/or an *excellent to average risk assessment*."

to get as many contractors as it could to partner with Sunlight. It then deliberately loosened credit standards and gave out increasingly generous cash advances to attract and retain contractors.[13]

### C.  The Complaint Adequately Alleges Loss Causation

Pleading loss causation requires only a short plain statement. *In re EZCorp., Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 211-12 (S.D.N.Y. 2016). The theory of loss causation need only be "plausible." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 n.65 (2d Cir. 2020). Unlike falsity and scienter which are subject to Rule 9(b), "the vast majority of courts in this [Circuit] have required that [pleading] loss causation only meet the notice requirements of Rule 8." *In re Vale Sec. Litig.*, 19 CV 526 (RJD) (SJB), 2020 WL 2610979, at *17 (E.D.N.Y. May 20, 2020) (*quoting Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 183 (2d Cir. 2015)).

The Complaint adequately pleads loss causation under the materialization of the risk theory. Under a risk materialization theory, a misstatement or omission is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)). "'[M]aterialization of risk' [is] reflective of the principle that 'to establish loss causation, [plaintiffs must plead that a] ... misstatement or omission concealed *something* from the market that, *when disclosed*, negatively affected the value of the security.' *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62, (quoting *Lentell,* 396 F. 3d at 173) (emphases added). "Whether the truth

---

[13] Corporate scienter for Sunlight is alleged through the scienter of the individual Sunlight Defendants (*i.e.* Defendants Potere, Edinburg, Yoder) whose scienter could be imputed to Sunlight. *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190 (2d Cir. 2008).

comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Id*. at 262.

Here, each of the false statements served to conceal the very real risk that Sunlight was going to incur substantial losses because of a contractor defaulting on its cash advances:  Potere said the cash advance program was "low risk." The S-4 Statements described the supposed great length to which Sunlight vetted and monitored each contractor.  Yoder assured analysts that after taking a loss so small that it "doesn't even show up on the calculator," Sunlight did not expect to take any further losses from the cash advance program.  Potere characterized increasing cash advances as Sunlight capitalizing on a business opportunity.  The risk eventually materialized when Pink Energy defaulted on the more than $30 million in advances that it owed Sunlight.

*Vivendi* supports a finding that the Complaint adequately pleads loss causation through a materialization of the risk theory. Vivendi acquired large amounts of debt in a rapid expansion. During the class period, Vivendi acknowledged liquidity issues internally but assured the market that it faced no such issues and had sufficient cash to meet its obligations. *Vivendi*, 838 F.3d at 233-237. Affirming that plaintiffs proved loss causation, the Second Circuit ruled that a series of events (including a ratings downgrade) corrected Vivendi's misstatements concealing the extent of its liquidity problems. *Id*. at 261-62 (citation and internal quotations omitted). Vivendi's "liquidity risk" is analogous to the risk of contractors defaulting on Sunlight's cash advances. *See also Suez Equity In., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95-99 (2d Cir. 2001) (reversing dismissal, finding that omitting principal executive's past failures in other ventures proximately caused loss when investment collapsed due to principal executive's management failures); *Loreley*, 797 F.3d at 188-89) (reversing dismissal, finding that investment marketed as well-

25

managed when it was designed to fail proximately caused loss when investment became worthless); *Goldin*, 590 F. Supp. 2d at 624 (denying motion to dismiss, finding that concealed risk of undercapitalization materialized when fund's high-risk investment caused losses).

### D.  The Sunlight Defendants' Remaining Arguments Fail

#### a.  The Attacks on the CWs Fail

On a motion to dismiss, courts must credit confidential witness ("CW") statements so long as the confidential witnesses are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Avon Sec. Litig.,* 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) (citing *Novak*, 216 F.3d at 314). There is no requirement that a CW have direct contact with an individual defendant. *Id.* ("The notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law."). Further, courts may credit CW allegations that are based on indirect knowledge. *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123 (S.D.N.Y. 2020) ("[T]he heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible.").

As to CW1, the complaint states his position and job duties at Sunlight, his dates of employment, and to whom he reported. ¶54. He was knowledgeable about Sunlight's due diligence and monitoring of contractors because he managed all aspects of Sunlight's relationship with solar system contractors. *Id.* He also participated in Weekly Operations Meetings where all relationship managers, the Chief Operating Officer, and heads of the Credit and Commercial Underwriting departments met to discuss contractors and the cash advance program. ¶218.  He would know about Sunlight's loosening of credit standards in late 2019 because he was employed at Sunlight from December 2017 to March 2022.  ¶54.  That he left Sunlight before the end of the Class Period

does not diminish his statements. *Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period."); *see also, Greco v. Qudian Inc.,* 2022 WL 4226022, at *13 (S.D.N.Y. Sept. 13, 2022) ("Although CW 4 left [the company] at least a few months prior to the Class Period, the fact that banks were not conducting independent credit assessments in the summer of 2018 supports the inference that the banks continued that practice into the Class Period."). The Sunlight Defendants' suggested inference that Sunlight might have reimposed strict credit standards between March 2022 (CW1's departure) and the announcement of its loss from Pink Energy's default (September 2022) is not credible.

Likewise, the Complaint describes CW2's position and duties, dates of employment, and to whom CW2 reported. ¶144. CW2 is knowledgeable about the cash advance program and Sunlight's due diligence and monitoring of contractors because CW2's job at Sunlight was to recruit contractors to work with Sunlight and growing each contractor's account (*i.e.* getting the contractors to do more business with Sunlight). *Id.* Moreover, CW2's account of Sunlight giving Vision Solar cash advances to keep it afloat is corroborated by Sunlight's SEC filings and also by CW3. ¶¶148, 152. CW3 is similarly described with particularity in the Complaint, including his position and duties and dates of employment. ¶149. Additionally, as a Relationship Manager, CW3 – like CW1 - also attended the Weekly Operations Meetings. ¶218.[14]

### b. Sunlight's Generic Risk Disclosures Do Not Immunize Sunlight

"To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged," *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006), and "must discredit the alleged misrepresentations to

---

[14] As to CW4, the Complaint likewise states his job title, dates of employment, and to whom he reported. ¶153.

such an extent that the 'risk of real deception drops to nil.'" *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011).  Sunlight's generic warning that it may be harmed if a contractor goes bankrupt did not do so.  Given Sunlight's business model of advancing cash to contractors, it is **obvious** that Sunlight would lose money in the event of a contractor's insolvency.  Investors, however, view this risk disclosure in the context of Sunlight's other statements – *e.g.,* that it had a stringent due diligence and ongoing monitoring process in place to minimize such risks.  This risk disclosure merely indicates the possibility that a contractor might go bankrupt *despite* Sunlight's vigorous diligence and monitoring; it does not warn investors of the high likelihood that a contractor might go out of business *because* Sunlight was willing to accept any contractor into its network and did virtually no due diligence.  *SEC v. Fitzgerald*, 135 F.Supp.2d 992, 1028 (N.D. Cal. 2001) ("defendant's statements must be viewed as part of a mosaic to see if those statements, in the aggregate, created a misleading impression.").

Sunlight's other risk disclosure -  that Sunlight could suffer losses "[i]f Sunlight's risk management framework does not effectively identify and control its risks" – is misleading because by then Sunlight had already loosened credit standards for contractors and abandoned the safeguards that had previously kept losses associated with its advance program to a minimum.  It therefore presents as a hypothetical something that was already transpiring. By superficially warning of possible risks while failing to disclose critical facts," Sunlight's risk disclosures were "akin 'to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) (quoting *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)). *See EVCI*, 469 F. Supp. 2d at 102-03 (disclosures are misleading if they "failed to warn investors that the risk

28

factors were not hypothetical - which, of course, dramatically increased the possibility of adverse consequences").

Indeed, for Sunlight's risk disclosures to be such that the "risk of real deception drops to nil," Sunlight would have had to disclose the risk that it could suffer losses because it was giving advances to contractors relying only on a once-a-year review of the contractor's self-supplied financial statements, and that it was also giving large advances to contractors who were dependent on Sunlight's continued cash infusion simply to stay in business.

### c.  Pink Energy's Lawsuit Against Generac is not Immaterial

Pink Energy's startling admissions in its lawsuit against Generac are not immaterial. The Sunlight Defendants argue that the Court should disregard the Pink Energy lawsuit because there is no final adjudication on the merits in that matter.[15] But unlike in the cases that the Sunlight Defendants cite, final merits adjudication is irrelevant because what matters is Pink Energy's *admissions* in the lawsuit *concerning its own* financial condition.  Whether the defective SnapRS was due to Generac's faulty manufacturing or Pink Energy's faulty installation – which is the crux of the Pink Energy lawsuit and the key liability issue to be decided – is irrelevant for the purposes of Plaintiffs' Complaint. Indeed, the Complaint's references to the Pink Energy lawsuit is more analogous to *In re Am. Realty Cap. Properties, Inc. Litig.,* 2015 WL 6869337, (S.D.N.Y. Nov. 6, 2015) (AKH), where this Court found that:

> David Kay, an individual defendant, joined by several others, moved to dismiss the complaint, based on the fact that it relied heavily on a state court complaint filed by defendant Lisa McAlister in New York Supreme Court, and later withdrawn before any final adjudication of the facts alleged therein took place. The motions to dismiss on this ground are denied. Plaintiffs integrated what they learned from the verified complaint with the information gleaned from ARCP's disclosures and restatements.

---

[15] Indeed, there is likely never going to be a final adjudication on the merits in the Pink Energy lawsuit against Generac in light of Pink Energy's filing for liquidation.

2015 WL 6869337, at *4.

### d.  The Complaint Does Not Constitute Puzzle Pleading

The Sunlight Defendants argue that Plaintiffs §10(b) allegations based on the S-4 Statements (identified in ¶¶199-200) constitute puzzle pleading. Not so. With regards to the S-4 Statements, the Complaint "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). [16] The Complaint is "far from the 280-page complaint in *Bahash* where the lengthy quotations and canned allegations made any analysis a Sisyphean task." *Id.*  Here, Plaintiffs "have identified specific statements (and added emphasis where challenged assertions are embedded in longer passages)[.]" *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022).

### II.    The Complaint Adequately Pleads a Section 20(a) Claim

To state a *prima facie* case of control person liability, a plaintiff must allege a primary violation and control of the primary violator by the defendant. *In re Tronox, Inc. Sec. Litig.*, No. 09 CIV. 6220 (SAS), 2010 WL 2835545, at *14–15 (S.D.N.Y. June 28, 2010). The control person inquiry "is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."

---

[16] The Complaint is nothing like the cases the Sunlight Defendants cite. For example, *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452 (S.D.N.Y. 2008) is not even about puzzle pleading, instead, the plaintiffs' allegations were insufficient to establish the defendants' statements were false.  In the remaining cases, the plaintiffs (a) set out long block quotes, (b) did not identify particular portions of the block quotes as misleading, and (c) following each allegedly false statements, included the a "laundry list of reasons" "not linked to any specific statement but rather are alleged to be generally applicable to all allegedly misleading statements."  *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, No. 13 C 2111, 2014 WL 3610877, at *6 (N.D. Ill. July 22, 2014); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001); *Lanigan Grp. Inc. v. Li-Cycle Holding Corp.,* 2023 WL 6541884 (E.D.N.Y. Oct. 6, 2023) (similar).

*In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010). Allegations of control are subject only to Rule 8. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 516 (S.D.N.Y. 2005).

The Sunlight Defendants' first argument against Section 20(a) liability is that a primary violation of Section 10(b) has not been pled.  This argument can be disposed of if the Court finds that the Complaint adequately pleads a Section 10(b) violation.

The Sunlight Defendants' second argument is that that Potere, Edinburg, and Yoder were not control person of Sunlight who "culpably participated" in the fraud.  As an initial matter, as CEO and CFO, the Sunlight Individual Defendants were the senior-most executives of Sunlight. They signed SEC filings containing false statements, and appeared on earnings and investor conference calls on behalf of Sunlight where false statements were made. At the pleading stage, this is sufficient to allege their control person status.

Moreover, while there is a split of authority as to whether plaintiffs must also plead culpable participation, the better-reasoned view is that culpable participation under Section 20(a) is an affirmative defense that triggers no pleading obligations on the plaintiffs' part. Although the Second Circuit has yet to rule on the issue, a clear majority of those circuits that *have* (including the Fifth, Seventh, Eighth, Ninth (en banc), Tenth, and Eleventh Circuits) have held that plaintiffs need not plead culpable participation to allege a Section 20(a) claim, and that Section 20(a) instead provides an affirmative defense of "good faith" for a defendant to assert. *See Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*, 56 F. Supp. 3d 549 (S.D.N.Y. 2014) n.75.[17] In sum, the clear weight of circuit-level authority holds that "a

---

[17] *Citing G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc); and *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996).

plaintiff need not plead culpable participation by the control person in order to state a legally sufficient claim." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 256 (S.D.N.Y. 2012); *accord In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 363–64 (S.D.N.Y. 2005) (burden of proving good faith is on defendant); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003) ("[I]t does not appear that there is any requirement that the plaintiff plead or prove a culpable state of mind to allege or establish culpable participation").

Indeed, Judge Scheindlin - who also initially took the contrary view (*see Indepen. Energy Hldgs. PLC Sec. Litig.*, 154 F. Supp. 2d 741, 771 (S.D.N.Y. 2001)) - later reconsidered her position in *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 392-97 (S.D.N.Y. 2003) (adopting majority view that plaintiff need ***not*** plead culpable participation). In so holding, Judge Scheindlin found the statute's legislative history persuasive. *See IPO*, 241 F. Supp. 2d at 395 (citing S. REP. 73-792 (1934) at 22 & H.R. Conf. Rep. No. 73-1383 (1934) at 26). As Judge Scheindlin also noted:

> Section 20(a) provides that anyone who "controls" a person liable under the 1934 Act is equally liable, ***subject only to the defense of "good faith."*** The section is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable. . . The [Act's] purpose is to expand, not restrict, the public's remedies.

*Id.* at 395-96 (quoting *Sennett v. Rodman & Renshaw*, 414 U.S. 926, 929 (1973) (Douglas, J., dissenting from denial of certiorari)). Accordingly, the Sunlight Defendants' view that Plaintiffs need to plead culpable participation for their Section 20(a) control person liability claim should be rejected.

Even assuming *arguendo* that Plaintiffs must allege "culpable participation" under Section 20(a), Plaintiffs' allegations plainly suffice, as it is governed by the liberal pleading standard of Rule 8(a). *See, e.g.*, *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010) ("[A]lthough the meaning of 'culpable participation' is unclear, there is strong reason to

32

believe that it is not the same as scienter, and thus is governed by Rule 8's pleading standard."); *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2009) (to apply heightened pleading standard "would be inconsistent also with this Court's oft-stated view that a plaintiff relying on Section 20(a) is not obliged to allege or prove a controlling person's culpable participation in the violation"). Here, Potere and Edinburg signed SEC filings containing the false S-4 Statements. Potere and Yoder spoke on behalf of Sunlight on earnings and investor conference calls where false statements were made. Accordingly, even if Plaintiffs must plead culpable participation on the part of the Sunlight Individual Defendants, they have done so.

### III.    The Complaint Adequately Pleads a Section 14(a) Claim

Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder impose liability on those who "solicit or [] permit the use of [their] name to solicit any proxy or consent or authorization," 15 U.S.C. § 78n(a)(1), if the proxy "is false or misleading with respect to any material fact, or [] omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

"To state a claim under Section 14(a) and Rule 14a–9, a plaintiff must allege that: '(1) a proxy statement contained a material misrepresentation or omission ["falsity"], which (2) caused plaintiffs injury ["loss causation"], and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction ["transaction causation"].'" *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017).

#### A.  Plaintiffs' Section 14(a) Claim is Direct Not Derivative

There is no dispute that Delaware law governs whether Plaintiffs' Section 14(a) claim is direct or derivative. Under the test established by the Delaware Supreme Court in *Tooley v.*

33

*Donaldson, Lufkin & Jenrette,* 845 A.2d 1031 (Del. 2004), it is a direct claim. "[A] court should look to the nature of the wrong and to whom the relief should go" determining whether a proxy claim is direct or derivative. *Id.* at 1039. Here, the rights of Plaintiff Margent (and other members of the Class eligible to vote on the Business Combination) to a fully informed vote and an exercise of a redemption right for $10.00 were materially impaired because shareholders were denied access to complete material information on which to make their decision. ¶¶124-25. These injuries were exclusive to shareholders. In this way, the relief requested is recovery of the economic loss stemming from the uniformed shareholder vote and associated loss of the right of redemption.

In connection with a similar claim arising from a materially false and misleading proxy in connection with a de-SPAC merger, Delaware's Chancery Court recently held that shareholders had a direct claim and suffered unique injury "through the impairment of their redemption rights" and personal loss of "the opportunity to recover $10.04 before the merger closed an any reduction in enterprise value occurred[,] which could have been avoided if shareholders were fully informed. *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 804 (Del. Ch. 2022) (citing *Tooley*). In short, the "distinct purported injury [to the shareholder] can be assessed without considering any overpayment (or lack thereof) by" the Company. *Id. See also, Enzo Biochem, Inc. v. Harbert Discovery Fund, LP,* 2021 WL 5854075, at *11 (S.D.N.Y. Dec. 9, 2021) ("the harm stemming from a corporation defying its duty to allow each individual shareholder to exercise [the] right [of a fully informed vote] 'is almost always an individual, not corporate harm." (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 601 (Del. Ch. 2007)).

Here, the underlying facts tip even further in favor of the Section 14(a) claim being direct because the claim does not concern only the vote on the merger, but also the forgoing of a $10.00

34

right of redemption on the part of Plaintiff Margent and other affected Class members, which is an injury wholly independent of any harm to the Company. ¶125.

The Sunlight Defendants do not, and cannot, cite to a single decision in Delaware where courts have held that Section 14(a) claims stemming from a de-SPAC merger are derivative rather than direct. The Sunlight Defendants' only citation in this regard is to *In re Romeo Power Inc. Sec. Litig.,* 2022 WL 1806303 (S.D.N.Y. June 2, 2022).  But *Romeo* is inapposite for two reasons. First, *Romeo* is now contradicted by a ruling of the Delaware Chancery Court. Second, the case did not concern any rights of redemption. Furthermore, the plaintiffs in *Romeo* cited "a variety of cases finding direct claims but d[id] nothing to explain how this case…matches the circumstances of those cases." *Id.* at *6.

### B.  Named Plaintiff Margent Has Standing to Bring Section 14(a) Claim

In a footnote, the Sunlight Defendants argue that Lead Plaintiff Millunchick does not have standing to bring the Section 14(a) claim.  This is unremarkable and has no bearing on the sufficiency of the Complaint because in securities class actions, a lead plaintiff is not required to have standing to sue on every cause of action. *Hevesi v. Citigroup Inc.,* 366 F.3d 70, 82-83 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action.").

In situations such as this, the lead plaintiff may bring in a named plaintiff who does have standing. This is exactly what Millunchick has done here, and the Sunlight Defendants do not dispute that named plaintiff Margent *does have* standing to bring the Section 14(a) claim. The practice of a lead plaintiff adding a named plaintiff with standing to bring a particular cause of action is commonplace in securities class actions:

> Nor does anything in the PSLRA prevent the Lead Plaintiffs from constructing a
> consolidated complaint that brings claims on behalf of a number of named parties besides

the Lead Plaintiffs themselves. That is all that has been done here. In conducting the lawsuit on behalf of all class members and all those who have brought complaints that have been consolidated under their leadership, Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims. By naming additional plaintiffs who, as purchasers of different categories of securities, have standing to bring claims on behalf of the various potential subclasses of securities purchasers, the Lead Plaintiffs in this case have simply exercised that responsibility.

*In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003)

### C. Rule 8(a)'s Notice Pleading Standard Applies to the Section 14(a) Claim

The Complaint is structured such that Plaintiffs' Section 14(a) claim, which is based on negligence, is segregated from the fraud-based Section 10(b) claim. *See* ¶¶22-126 ("SECTION 14(a) ALLEGATIONS") and ¶¶127-250 ("SECTION 10(b) and 20(a) ALLEGATIONS"). Plaintiffs are permitted to plead fraud and negligence-based claims in the alternative, and this method of segregation is approved by numerous courts in this circuit. *See, e.g., Fresno,* 268 F. Supp. 3d at 558:

> However, ***the [second amended complaint] is segregated into two parts, the first for the allegations supporting Counts I and II, which sound in fraud, and the second for the allegations supporting Counts III, IV, and V, which plead at most negligence.*** Counts III, IV, and V are only pleaded by plaintiff Huff. Plaintiff Huff is allowed to "plead claims in the alternative" and the careful structure of the SAC "draw[s] a clear distinction between [the at most] negligence and fraud claims." *In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 632 (S.D.N.Y. 2007); *accord In re Wachovia Equity Sec. Litig.,* 753 F.Supp.2d 326, 374 (S.D.N.Y. 2011****). In similar circumstances, courts have consistently held that Section 11 and Section 14(a) are subject to notice pleading where, as here, the division between the claims is clear.*** *E.g., In re Jumei Int'l Holding Ltd. Sec. Litig.,* No. 14-CV-9826, 2017 WL 95176, at *3 (S.D.N.Y. Jan. 10, 2017) (Section 11); *EnergySolutions*, 814 F.Supp.2d at 424 (Section 11); *Bank of Am. Corp.,* 757 F.Supp.2d at 321–22 (Section 14(a)).

(emphases added).

### D.  The Proxy Statement was False

The Sunlight Defendants are correct that the Section 14(a) claim is based primarily on the S-4 Statements, which are false for the reasons discussed in section I(A)(c) *supra.*

The Proxy was false and misleading for the additional reason that it violated Item 303 of SEC Regulation S-K. Item 303 imposes a duty to disclose "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panthers Partners Inc. v. Ikanos Comms. Inc.,* 681 F.3d 114, 120 (2d Cir. 2012). The instructions to Item 303 further provides that management is required to disclose and discuss "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. *Id. (*citing 17 C.F.R. §229.03).

Accordingly, unless management can "determine that [the known trend or uncertainty] is not reasonably likely to occur," disclosure is required. According to the SEC, the disclosure threshold "is lower than 'more likely than not.'" ' *Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at \*17 (S.D.N.Y. Sept. 30, 2017), *aff'd sub nom. Pipefitters Union Loc. 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630 (2d Cir. 2019) (citing *Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 8056, Exchange Act Release No. 45321, FR-61, 2002 WL 77153 at \*4 (Jan. 22, 2002)).

Here, in light of Sunlight's decision in 2019-2020 to: (a) substantially expand its contractor advance program, (b) loosen credit standards used to determine which contractors to partner with and give advance to, (c) steer a large portion of cash advances to two companies – Pink Energy and Vision Solar – with atrocious reputations and precarious prospects, Sunlight was likely to incur

37

losses and/or have to spend more and more cash to ensure that its contractors stayed in business. ¶¶98-100. These developments also caused the historical default and loss rates under Sunlight's cash advance program (¶91, 95) to be not representative of future performance.[18]

### E. Plaintiffs are Not Required to Plead Defendants' State of Mind

As discussed above, Plaintiffs' Section 14(a) claim is based on negligence and is segregated from the Complaint's fraud-based Section 10(b) allegations. While there is currently disagreement among courts as to whether negligence is a "state of mind," the "better reasoned cases have followed the decision of the Court of Appeals for the Seventh Circuit in *Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) (Posner, J.), which held that the elevated pleading standard does not apply to Section 14(a) claims that sound in negligence because " 'negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care.'" *Fresno,* 268 F. Supp. 3d at 559 (S.D.N.Y. 2017); *accord Transocean,* 866 F.Supp.2d at 240*; In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.,* 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010).

The Second Circuit in *Dekalb Cty. Pension Fund v. Transocean Ltd.,* 817 F.3d 393 (2d Cir. 2016) has cited with approval *Beck*'s articulation of the standard for pleading negligence. *Id,* 817 F.3d at 408 n. 90. This articulation is consistent with the Second Circuit's earlier holding that "Under Rule 14a–9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive. Liability can be imposed for negligently drafting a proxy statement." *Wilson v. Great Am. Indus.,*

---

[18] Item 303 requires that the material events and/or uncertainties be known to management. For the reasons discussed in section I.B *supra* concerning scienter, Yoder and Edinburg (Sunlight's CEO and CFO, respectively, at the time of the Proxy) were aware of these developments.

38

*Inc.*, 855 F.2d 987, 995 (2d Cir. 1988).  Under the negligence standards, all that is required is "the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact[.]" *Id.*

### F.  Transaction and Loss Causation are Adequately Pled

To allege loss causation under Section 14(a), all that is needed is "some indication of the loss and the causal connection the plaintiff has in mind." *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-CV-9992 (PAC), 2021 WL 4443258, at *9 (S.D.N.Y. Sept. 27, 2021) (citing *Transocean,* 866 F. Supp. 2d at 245).  An allegation that the company's stock price fell after a corrective disclosure or materialization of the risk suffices to allege loss causation under Section 14(a). *In re Bank of Am.,* 757 F. Supp. 2d at 291 (S.D.N.Y. 2010) (loss causation adequately alleged because proxy statements concealed risks that caused company's stock price to decline when the risk materialized or they were revealed to be false).  This Complaint alleges  this. ¶¶102-105. Here, instead of redeeming their shares for $10 per share or voting against the Business Combination, shareholders suffered losses when Sunlight's share price dropped to $1.08 per share on September 29, 2022 upon the revelation that Sunlight was recording more than $30 million in loss due to Pink Energy's default. ¶103. In other words, shareholders' shares that were originally worth $10 per share prior to the Business Combination became $1.08 after the materialization of the risk that Defendants' misrepresentations concealed. These allegations are sufficient to plead loss causation. *Transocean,* 866 F. Supp. 2d at 245.  "Contrary to Defendants' contention, a plaintiff is not 'required to allege the precise loss attributable to [the fraud or misrepresentation/omission." *Id.,* quoting *Lentell*, 396 F.3d at 177.

Transaction causation is adequately alleged if the Complaints shows that the proxy was an "essential link" to the accomplishment of the Business Combination. It was. The proxy was the

39

means via which shareholder votes were solicited for the Business Combination. ¶121. The Business Combination could not have happened without those votes. ¶123.

The Sunlight Defendants appear to argue that transaction causation requires Plaintiffs to show: (1) how many class members' votes were necessary to approve the Business Combination, and (2) how many of those class members would have changed their vote had they known the truth.  This exacting level of detail is untenable even at trial - Plaintiffs would need to track down each class member and ask them how his/her vote would have changed if the proxy was truthful – and could not be what is required at the pleading stage.  And it is not: "Where there has been a finding of materiality, a shareholder has made a sufficient showing of casual relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970); *see also, Minzer v. Keegan*, 218 F.3d 144, 149 n.2 (2d Cir. 2000) *(Mills* "reliev[ed] plaintiffs of the difficult burden of proving that, properly informed, shareholders would have defeated the transaction in question.").

Moreover, this case is distinguishable from cases such as *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083 (1991) or *Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000) where proxy claims under Section 14(a) were brought by minority shareholders against majority shareholders. In those cases, the majority shareholder *is* the defendant. As such, it was clear *on the face of the complaint* that the minority shareholders' vote would not have made a difference regardless of the veracity of the proxy.  This is not the case here, as the Complaint alleges that class members' votes were necessary to achieving the Business Combination (¶¶121, 123), and nothing in the Complaint

indicates that Defendants constituted majority shareholders who could have consummated the Business Combination without any non-Defendant votes.[19]

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, the Motion to Dismiss should be denied in its entirety. In the event the Court grants all or part of the Motion, Plaintiffs respectfully request the opportunity to re-plead. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

Dated: March 5, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
*/s/ Yu Shi_____*
Laurence M. Rosen
Yu Shi
275 Madison Ave, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh
230 Park Ave, Suite 358
New York, NY 10169
Tel: (212) 682-5340
glinkh@glancylaw.com

*Additional Counsel for Plaintiffs*

---

[19] Indeed, the final proxy states: "***In addition to the vote of our Sponsor and other holders of our Founder Shares,*** we would need 12,937,501, or 37.5% (assuming all outstanding shares are voted) or 2,156,251, or 6.25% (assuming only the minimum number of shares representing a quorum are voted), of the 34,500,000 public shares sold in the IPO to be voted in favor of Business Combination in order for it to be approved." Ex A to the Declaration of Jeffrey Crough in Support of the Spartan Defendant' Motion to Dismiss (ECF No. 84-1 at ECF Page 94 of 531) (emphasis added).

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Yu Shi*

42