**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MATTHEW MILLUNCHICK and MIKE MARGENT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>-against-<br><br>SUNLIGHT FINANCIAL HOLDINGS, INC. f/k/a/ SPARTAN ACQUISITION CORP. II, MATTHEW POTERE, BARRY EDINBURG, RODNEY YODER, GEOFFREY STRONG, JAMES CROSSEN, OLIVIA WASSENAAR, WILSON HANDLER, CHRISTINE HOMMES, JOSEPH ROMEO, and SPARTAN ACQUISITION SPONSOR II LLC,<br><br>Defendants. | Case No.: 1:22-cv-10658-AKH<br><br>**CLASS ACTION** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE SPARTAN
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    Spartan Merged with Legacy Sunlight, Creating Publicly-Traded Sunlight ............................ 2

    Legacy Sunlight's Business Model Relied on Cash Advances to Entice Contractors .............. 3

    As Legacy Sunlight Grew and Prepared to Go Public, It Loosened Credit Standards for
    Contractors ................................................................................................................... 4

    Legacy Sunlight Started Partnering with and Paying Large Advances to Two Notorious
    Contractors ................................................................................................................... 5

        a.    Pink Energy ....................................................................................................... 6

        b.    Vision Solar ...................................................................................................... 7

    Materialization of Risk: Sunlight's Lax Due Diligence and Monitoring of Contractors Caught
    up to Sunlight as Pink Energy Went out of Business, Defaulting on more than $30 Million in
    Cash Advances ............................................................................................................. 7

LEGAL STANDARDS ........................................................................................................ 8

    A.    Rule 9(b) Does Not Apply ............................................................................................ 9

ARGUMENT ................................................................................................................... 10

    I.    Plaintiffs Have Standing to Bring the Section 14(a) Claim ........................................... 10

        A.    Plaintiffs' Section 14(a) Claim is Direct and Not Derivative ..................................... 10
        B.    Named Plaintiff Margent Has Standing ................................................................... 11

    II.    The Complaint Adequately Pleads that the Proxy was Materially False and Misleading 12

        A.    The Complaint Does Not Constitute Puzzle Pleading .................................................. 12

        B.    The Proxy was Materially False and Misleading ........................................................ 13

        C.    The Complaint Adequately Alleges an Item 303 Violation .......................................... 15

    III.    Plaintiffs Are Not Required to Plead the Spartan Defendants' Mental State ................ 17

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baum v. Harman Int'l Indus., Inc.*,
   575 F. Supp. 3d 289 (D. Conn. 2021)................................................................. 17, 18

*Beck v. Dobrowski*,
   559 F.3d 680 (7th Cir. 2009) ....................................................................................... 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................... 8

*Bond Opportunity Fund v. Unilab Corp.*, No. 99 CIV. 11074 (JSM),
   2003 WL 21058251 (S.D.N.Y. May 9, 2003) ............................................................ 18

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................................... 12

*Dekalb Cnty. Pension Fund v. Transocean Ltd.*,
   817 F.3d 393 (2d Cir. 2016).......................................................................................... 9

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
   2021 WL 5854075 (S.D.N.Y. Dec. 9, 2021) ............................................................. 10

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
   No. 20-CV-9992 (PAC), 2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) .................. 17

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................... passim

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004)........................................................................................... 11

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010)......................................................................... 18

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)......................................................................... 16

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006)........................................................................... 16

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................................... 16

*In re Glob. Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................. 12

*In re Heckmann Corp. Sec. Litig.*,
   869 F. Supp. 2d 519 (D. Del. May 25, 2012) ...................................................... 18

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................. 18

*In re MultiPlan Corp. S'holders Litig.*,
   268 A.3d 784 (Del. Ch. 2022) .............................................................................. 10

*In re Romeo Power Inc. Sec. Litig.*,
   2022 WL 1806303 (S.D.N.Y. June 2, 2022) ....................................................... 11

*In re Tyson Foods, Inc.*,
   919 A.2d 563 (Del. Ch. 2007) .............................................................................. 11

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................... 9

*Kusnier v. Virgin Galactic Holdings, Inc.*,
   639 F. Supp. 3d 350 (E.D.N.Y. 2022) ................................................................. 12

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ................................................................................. 15

*SEC v. Fitzgerald*,
   135 F.Supp.2d 992 (N.D. Cal. 2001) ................................................................... 16

*Sec. & Exch. Comm'n v. Hurgin*,
   484 F. Supp. 3d 98 (S.D.N.Y. 2020) ................................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ......................................................................................... 8, 14

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) ................................................................................... 10

*Wilson v. Great Am. Indus., Inc.*,
   855 F.2d 987 (2d Cir. 1988) .............................................................................. 9, 17

**Statutes**

15 U.S.C. §78n(a) ....................................................................................................... 18

15 U.S.C. § 78n(a)(1)..................................................................................................... 8

15 U.S.C. § 78u-4(b)(2) ........................................................................................................ 17

**<u>Rules</u>**

Fed. R. Civ. P. 15(a)(2) .......................................................................................................... 19

**<u>Regulations</u>**

17 C.F.R. § 240.14a-9(a) ..................................................................................................... 8, 9

Lead Plaintiff Matthew Millunchick and named plaintiff Mike Margent ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romeo, and Spartan Acquisition Sponsor II LLC (the "Spartan Defendants")'s Motion to Dismiss the Second Amended Complaint ("Motion," ECF No. 82).

## PRELIMINARY STATEMENT

To defeat a motion to dismiss a Section 14(a) claim, Plaintiffs need only show that: "(1) a proxy statement contained a material misrepresentation or omission ["falsity"], which (2) caused plaintiffs injury ["loss causation"], and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction ["transaction causation"].'" *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017).   As discussed in Plaintiffs' concurrently-filed Memorandum of Law in Opposition to the Sunlight Defendants' Motion to Dismiss ("Plaintiffs' Sunlight Opposition Brief"), the Proxy is false because it, among other things, misrepresented what kind of due diligence and ongoing monitoring Legacy Sunlight performed on its contractor partners.

As to the remaining elements – loss causation and transaction causation – the Spartan Defendants do not contest that the Complaint adequately pleads them.   Instead, the Spartan Defendants misstate the requirements for pleading a Section 14(a) claim and raise a meritless argument on standing.   The Spartan Defendants' Motion should be denied.

1

**STATEMENT OF FACTS**

**Spartan Merged with Legacy Sunlight, Creating Publicly-Traded Sunlight**

As set forth in Plaintiffs' Sunlight Opposition Brief, Sunlight Financial Holdings, Inc. ("Sunlight") emerged as publicly-traded company through a "de-SPAC" business combination in which Legacy Sunlight, a private company, merged with Spartan Acquisition Corp. II ("Spartan"), a publicly-traded special purpose acquisition company, or SPAC.

SPACs, like Spartan here, are "blank check" shell companies with no operations of their own.  ¶38. The sole purpose of a SPAC is to find a private company that is seeking to go public, and effectuate a merger with the private company to allow it to become publicly-traded without the regulatory scrutiny of a traditional initial public offering ("IPO").  ¶¶38, 40.[1] Going public via SPACs reached a frenzied level from 2019 to 2021.  ¶40.  SPAC activity has waned in recent years in part due to the large number of accounting and other irregularities associated with them, which drew the attention of the U.S. Securities and Exchange Commission ("SEC") and the Public Company Accounting Oversight Board ("PCAOB"). ¶41.

Once a SPAC is formed, it typically raise money for an acquisition through an IPO, and those funds are held in trust for a specific period of time – usually 24 months – until a merger can be completed. ¶39.  If a merger is successfully completed during that time frame, founders and mangers of the SPAC often reap massive profits from their ownership of the SPAC's founder shares.  *Id.* On the other hand, if a merger is not effectuated with that time frame, the SPAC is

---

[1] All citations to "¶_" refer to paragraphs of the Second Amended Class Action Complaint For Violations of the Federal Securities Laws ("Complaint," ECF No. 73).  The Complaint was originally filed as ECF No. 70, and re-filed as ECF No. 73 to correct a CM/ECF error caused by the incorrect spelling of a defendant's name on the docket.

dissolved and the money in the trust is returned to investors, with no compensation to the SPAC founders. *Id.*

Spartan was a prototypical SPAC. Spartan Acquisition Sponsor II LLC created Spartan in August 2020. ¶38. Spartan then completed its IPO on November 30, 2020, raising $345 million, which Spartan held in trust while it sought a private company to acquire. ¶42. These funds would have to be returned to investors if Spartan did not consummate a business combination with 24 months. *Id.*

Spartan quickly found Legacy Sunlight. On January 25, 2021, Spartan announced that it and Legacy Sunlight had agreed to a de-SPAC merger. ¶51. Spartan then issued a preliminary proxy statement on March 22, 2021 to solicit shareholder votes to approve the merger, and after two amendments, a final proxy statement was disseminated on June 21, 2021.[2] ¶¶90, 93. Spartan shareholders approved the merger ("Business Combination") at a special meeting on July 8, 2021. ¶52. The combined company started trading as Sunlight on the New York Stock Exchange on July 12, 2021. *Id.*

**Legacy Sunlight's Business Model Relied on Cash Advances to Entice Contractors**

Legacy Sunlight was founded in 2014 and operated a digital financing platform that provided solar panel and home improvement contractors the ability to offer point-of-sale financing to homeowners. ¶43. The resulting loans were financed by Legacy Sunlight's capital providers, which included banks, credit unions, insurance companies, and pension funds. *Id.* Legacy Sunlight earned a "platform fee" for each loan facilitated on its platform. ¶44.

---

[2] Because each version of the proxy contained the same false and misleading statements, the preliminary proxy, the two amendments, and the final proxy are collectively referred to as the "Proxy." ¶93.

Legacy Sunlight did not market directly to homeowners; instead, it depended on contractors to tell their customers that they could finance their purchase through Legacy Sunlight. ¶45. Because Legacy Sunlight did not have exclusivity agreements with contractors – meaning a contractor was free to offer any other financing platform it wished when signing up a customer – Legacy Sunlight relied on generous cash advances to entice contractors to partner with it.  ¶48. The industry norm was for contractors to be paid only upon the completion of a project; Sunlight's cash advance program, however, provided contractors with significant cash up front – before the contractor had even started work. ¶¶48, 60.  Legacy Sunlight executives highlighted the cash advance program as Legacy Sunlight's key competitive advantage and a major factor in Legacy Sunlight's ability to recruit contractor partners. ¶49.

Legacy Sunlight made no money from the cash advances themselves; it did not charge interest and made the advances at par. ¶50.

**As Legacy Sunlight Grew and Prepared to Go Public, It Loosened Credit Standards for Contractors**

Naturally, giving interest-free cash advances to contractors carried risks for Legacy Sunlight.  At first, during the tenure of Head of Operations Brian Von Bergen, Legacy Sunlight had a contractor vetting process in place – consisting of initial onboarding due diligence and ongoing monitoring - that was generally effective. ¶56.  Starting in late 2019, however, the process changed as Legacy Sunlight adopted a "less stringent and more lackadaisical approach" to evaluating contractors. *Id.*  Legacy Sunlight's initial due diligence of contractors was limited to looking at the contractor's self-supplied financial statements. ¶58.  After accepting a contractor into its network, Legacy Sunlight did not perform any "ongoing monitoring" other than an annual review of the contractor's self-supplied financial statements. *Id.*  Von Bergen left Legacy Sunlight in late 2019 because he did not like the growing laxity with which Legacy Sunlight accepted

4

contractors into its network and handed out cash advances. ¶56. Moreover, whereas during Von Bergen's tenure Legacy Sunlight only paid advances after a project had started, after Von Bergen's departure Legacy Sunlight started paying advances within three days of the customer's right to rescind – long before the commencement of any work on the project. ¶57. For large contractors, Legacy Sunlight's cash advances often amounted to the entire expected cost of a project. ¶60.

Moreover, even Legacy's Sunlight's review of the financial statements was perfunctory. According to a former Legacy Sunlight employee who managed all aspects of Sunlight's relationships with solar panel contractors ("CW1"), Legacy Sunlight simply "accepted [every contractor] until [it] got screwed (*i.e.,* lost money)." ¶59. Indeed, after 2019, the paramount concern at Legacy Sunlight was to rapidly increase its revenue; circumspection was eschewed in favor of a grow-at-all-cost mentality: "if [anything] is a barrier from getting glass on the roof, then [Legacy Sunlight] got rid of the barrier." ¶59.

**Legacy Sunlight Started Partnering with and Paying Large Advances to Two Notorious Contractors**

With credit standards relaxed, and unbeknownst to investors, Legacy Sunlight formed key relationships with two of the most reviled solar panel contractors in the industry: Pink Energy and Vision Solar. The chart below shows Legacy Sunlight's cash advances outstanding to Pink Energy and Vision Solar, and Legacy Sunlight's total cash advances extended to all contractors:

|  | **Pink Energy** | **Vision Solar** | **Combined (Pink Energy and Vision Solar)** | **Total Advances Outstanding to All Contractors** |
|---|---|---|---|---|
| Q4 2020 | $295 thousand | $6.4 million | *$6.7 million* | $35.4 million |
| Q1 2021 | $888 thousand | $6.5 million | *$7.3 million* | $32.6 million |
| Q2 2021 | $5.0 million | $5.6 million | *$10.6 million* | $41.0 million |
| **AFTER THE BUSINESS COMBINATION** | | | | |
| Q3 2021 | $21.0 million | $13.3 million | *$34.3 million* | $71.3 million |
| Q4 2021 | $12.5 million | $20.9 million | *$33.4 million* | $67.1 million |
| Q1 2022 | $23.0 million | $20.6 million | *$43.6 million* | $86.6 million |
| Q2 2022 | $30.5 million | $10.9 million | *$41.4 million* | $95.3 million |
| Q3 2022 | $32.6 million (as of October 7, 2022) | $6.2 million | *$38.8 million* | $96.7 million |

¶61.

### a. *Pink Energy*

Pink Energy relied on consumer fraud to induce unwitting homeowners to hire them to install solar panels. ¶64. Starting in 2020, Pink Energy's fraudulent practices and nosediving reputation became increasingly public, and were the subject of multiple scathing Business Insider reports. ¶¶62, 67, 71. Not only was Pink Energy practicing fraud on its customers, it was also committing fraud on Sunlight's platform, to which Sunlight turned a blind eye. According to CW1, who worked as Sunlight's relationship manager for Pink Energy, more than half of the loan applications that Pink Energy submitted on Sunlight's platform on behalf of Pink Energy customers contained falsified income information. ¶¶68-69. Sunlight initially asked Pink Energy's customers for income verification, but after that resulted in many of Pink Energy's customers getting rejected, Sunlight stopped conducting income verifications. ¶69. By November 2020, EnergySage - a leading provider of information about solar installers and backed by the

Department of Energy - kicked Pink Energy off its platform for employing deceptive sales practices. ¶66. Pink Energy's plummeting rating on SolarReviews, a reviews aggregator for solar panel installers, and BBB complaints left no doubt that Pink Energy was engaging in deception. ¶¶71-73.

### b. Vision Solar

Vision Solar was founded by the former Chief Operating Officer of Code Green Solar LLC, a now-defunct company that filed false claims with the federal government to illegally obtain millions of dollars in rebates and whose CEO pled guilty to wire fraud. ¶¶74-78. Vision Solar derived much of its business from consumer fraud; it used telemarketers to pretend that they were calling from the customer's utility company or the government, and those telemarketers would arrange for Vision Solar to visit the customer's homes, giving customers the misleading impression that Vision Solar was recommended by the utility company or the government. ¶79. A series of class actions were filed starting in 2020 alleging that Vision Solar engaged in consumer fraud and violated telecommunications laws. ¶¶79. Vision Solar was not accredited by the BBB and had a grade of F, with one former Vision Solar employee leaving a review on BBB stating that Vision Solar ran an illegal call center. ¶¶86, 88. Like Pink Energy, Vision Solar's ratings on SolarReviews also plummeted in 2020. ¶83.

**Materialization of Risk: Sunlight's Lax Due Diligence and Monitoring of Contractors Caught up to Sunlight as Pink Energy Went Out of Business, Defaulting on More than $30 Million in Cash Advances**

On September 28, 2022, Sunlight announced that it was taking a loss of $30-$33 million because one of its contractor partners was unlikely to pay back the cash advances it received from Sunlight. ¶102. Sunlight's stock tumbled by over 57% in reaction to this news, from $2.52 per share to $1.08 per share, wiping out more than half of Sunlight's market capitalization and damaging investors. ¶103.

7

Analysts quickly figured out – and Sunlight's CEO would later confirm - that the defaulting contractor was Pink Energy, which had shut down its business on September 21, 2022.  ¶104.

As a result of the Pink Energy default, Sunlight announced that it would "re-underwrite" all contractor cash advances to reduce risk. ¶105.

## LEGAL STANDARDS

On a motion to dismiss, the Court accepts all facts the plaintiff alleges as true, considers the complaint in its entirety, and draws all reasonable inferences in the plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The complaint survives if its allegations support a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Complaint brings claims under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 promulgated thereunder against the Spartan Defendants. These provisions impose liability on those who "solicit or [] permit the use of [their] name to solicit any proxy or consent or authorization," 15 U.S.C. § 78n(a)(1), if the proxy "is false or misleading with respect to any material fact, or [] omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

 "To state a claim under Section 14(a) and Rule 14a–9, a plaintiff must allege that: '(1) a proxy statement contained a material misrepresentation or omission ["falsity"], which (2) caused plaintiffs injury ["loss causation"], and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction ["transaction causation"].'" *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017).

The Spartan Defendants do not contest, and therefore concede, loss causation and transaction causation.

**A. Rule 9(b) Does Not Apply**

"Under Rule 14a–9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the [] defendants with an intent to deceive." *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988). Section 14(a) does not "involve[] a claim of fraud, deceit, manipulation, or contrivance." *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 408 (2d Cir. 2016) (finding Section 14(a) claim untimely because statute of limitations for claims of fraud did not apply).

Here, the Complaint segregates Plaintiffs' Section 14(a) claim from Plaintiffs' fraud-based Section 10(b) claim. *See* ¶¶22-126 ("SECTION 14(a) ALLEGATIONS") and ¶¶127-250 ("SECTION 10(b) and 20(a) ALLEGATIONS"). This method of segregation is approved by numerous courts in this circuit. *See, e.g., Fresno,* 268 F. Supp. 3d at 558 (citing cases).

Furthermore, the Complaint does not allege that any of the Spartan Defendants engaged in fraud - none of the Spartan Defendants are named as Section 10(b) defendants. The Spartan Defendants' baseless contention that *general descriptions about the characteristic* of SPACs (*e.g.* that they allow private companies to go public without the regulatory scrutiny of IPOs, or that SPAC founders profit if a de-SPAC merger if consummated but lose money if a merger could not be effectuated in 24 months, etc.) necessarily impute fraudulent intent to them should be rejected. Those allegations provide background information on the nature and purpose of SPACs, nothing more. Nor does the allegation that the Proxy was "false" and "misleading" mean that it sounds in fraud. Indeed, Section 14(a) and Rule 14a-9 ***require*** a plaintiff to plead that a proxy was "false or misleading with respect to any material fact[.]" 17 C.F.R. § 240.14a-9(a). It is axiomatic that the "mere use of the statutory language is itself insufficient to render a complaint that 'sounds in fraud'." *In re Wachovia Equity Sec. Litig.,* 753 F. Supp. 2d 326, 374-75 (S.D.N.Y. 2011).

## ARGUMENT

### I.    Plaintiffs Have Standing to Bring the Section 14(a) Claim

#### A.    Plaintiffs' Section 14(a) Claim is Direct and Not Derivative

There is no dispute that Delaware law governs whether Plaintiffs' Section 14(a) claim is direct or derivative.  Under the test established by the Delaware Supreme Court in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), it is a direct claim.  "[A] court should look to the nature of the wrong and to whom the relief should go" determining whether a proxy claim is direct or derivative. *Id.* at 1039.  Here, the rights of Plaintiff Margent (and other members of the Class eligible to vote on the Business Combination) to a fully informed vote and an exercise of a redemption right for $10.00 were materially impaired because shareholders were denied access to complete material information on which to make their decision. ¶¶124-25. These injuries were exclusive to shareholders. In this way, the relief requested is recovery of the economic loss stemming from the uniformed shareholder vote and associated loss of the right of redemption. It is not about whether Spartan overpaid for Legacy Sunlight.

In connection with a similar claim arising from a materially false and misleading proxy in connection with a de-SPAC merger, Delaware's Chancery Court recently held that shareholders had a direct claim and suffered unique injury "through the impairment of their redemption rights" and personal loss of "the opportunity to recover $10.04 before the merger closed an any reduction in enterprise value occurred[,] which could have been avoided if shareholders were fully informed. *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 804 (Del. Ch. 2022) (citing *Tooley*). In short, the "distinct purported injury [to the shareholder] can be assessed without considering any overpayment (or lack thereof) by" Spartan. *Id. See also, Enzo Biochem, Inc. v. Harbert Discovery Fund, LP,* 2021 WL 5854075, at *11 (S.D.N.Y. Dec. 9, 2021) ("the harm stemming from a

corporation defying its duty to allow each individual shareholder to exercise [the] right [of a fully informed vote] 'is almost always an individual, not corporate harm." (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 601 (Del. Ch. 2007)).

Here, the underlying facts tip even further in favor of the Section 14(a) claim being direct because the claim does not concern only the vote on the merger, but also the forgoing of a $10.00 right of redemption on the part of Plaintiff Margent and other affected Class members, which is an injury wholly independent of any harm to the company. ¶125.

The Sunlight Defendants do not, and cannot, cite to a single decision in Delaware where courts have held that Section 14(a) claims stemming from a de-SPAC merger are derivative rather than direct. The Sunlight Defendants' only citation in this regard is to *In re Romeo Power Inc. Sec. Litig.,* 2022 WL 1806303 (S.D.N.Y. June 2, 2022).  But *Romeo* is inapposite for two reasons. First, *Romeo* is now contradicted by a ruling of the Delaware Chancery Court. Second, the case did not concern any rights of redemption. Furthermore, the plaintiffs in *Romeo* cited "a variety of cases finding direct claims but d[id] nothing to explain how this case…matches the circumstances of those cases." *Id.* at *6.

### B.    Named Plaintiff Margent Has Standing

The Spartan Defendants make the unremarkable observation that Lead Plaintiff Millunchick does not have standing to bring the Section 14(a) claim.  This has no bearing on the sufficiency of the Complaint because in securities class actions, a lead plaintiff is not required to have standing to sue on every cause of action. *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82–83 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action).

11

In situations such as this, the lead plaintiff may bring in a named plaintiff who does have standing. This is exactly what Millunchick has done here, and the Spartan Defendants do not dispute that named plaintiff Margent *does have* standing to bring the Section 14(a) claim. The practice of a lead plaintiff adding a named plaintiff with standing to bring a particular cause of action is commonplace in securities class actions:

> Nor does anything in the PSLRA prevent the Lead Plaintiffs from constructing a consolidated complaint that brings claims on behalf of a number of named parties besides the Lead Plaintiffs themselves. That is all that has been done here. In conducting the lawsuit on behalf of all class members and all those who have brought complaints that have been consolidated under their leadership, Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims. By naming additional plaintiffs who, as purchasers of different categories of securities, have standing to bring claims on behalf of the various potential subclasses of securities purchasers, the Lead Plaintiffs in this case have simply exercised that responsibility.

*In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003)

## II.    The Complaint Adequately Pleads that the Proxy was Materially False and Misleading

### A.    The Complaint Does Not Constitute Puzzle Pleading

The Complaint is not puzzle pleading because it "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). The Complaint is "far from the 280-page complaint in *Bahash* where the lengthy quotations and canned allegations made any analysis a Sisyphean task." *Id.* Here, Plaintiffs "have identified specific statements (and added emphasis where challenged assertions are embedded in longer passages)[.]" *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022).

12

Here, after providing the background and describing predicate events, the Complaint identifies the false statements (¶¶90-92, 95) with "added emphasis where challenged statements are embedded in longer passages," and summarizes why each statement was false (¶¶94 explains why the statements in ¶¶90-92 were false; ¶96 explains why ¶95 was false.).

### B.   The Proxy was Materially False and Misleading

Plaintiffs incorporate by reference their arguments set forth in Plaintiffs' Sunlight Opposition Brief demonstrating why the Proxy was false and misleading.  Below, Plaintiffs respond to additional arguments raised by the Spartan Defendants.

First, like the Sunlight Defendants, the Spartan Defendants isolate individual words from the Proxy and argue that those individual words render the entire statements puffery and statements of opinion. Plaintiffs' Sunlight Opposition Brief explains why they are not puffery.  The individual words also do not turn the entire statement into opinions. For example, the word "robust" appears in this sentence: "Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition (to support construction processes and provide post construction warranty support) and legal compliance practices of the contractors in Sunlight's network." ¶90. But the Complaint alleges that Legacy Sunlight did not do those things; it did not diligence or monitor a contractor's quality of work, legal compliance practices, etc.  *See, e.g.* ¶¶58, 94. Likewise, the statement that "Sunlight has adopted vigorous contractor diligence and monitoring procedures" was made in the context of the *factual* representation that it, among other things, conducted due diligence and monitored on an ongoing basis the contractors' reputation, credit bureau data, sales tools, etc.  *Id.*  The Complaint alleges that Legacy Sunlight did none of those things. *See, e.g.* ¶¶58, 94.

Second, the Spartan Defendants' attempt to distort CW1's statements is unavailing. CW1 stated that Legacy Sunlight's initial due diligence and ongoing monitoring of contractors consisted of looking at the contractor's self-supplied financial statements. ¶58. This unambiguous statement does not allow for the Spartan Defendants' suggested inference that more was actually done. *Tellabs,* 551 U.S. at 322 (on a motion to dismiss, all reasonable inferences are to be drawn in plaintiffs' favor).

Third, the Spartan Defendants' reference to another type of cash advance that Sunlight provided (*i.e.* prefunding advance) is an unnecessary obfuscation. Prefunding advances are clearly not the type at issue here because they were reimbursed within 24-72 hours ***by the loan provider***, and "***the contractors are not specifically responsible for the repayment obligations***." *See* Final Proxy, attached as Exhibit A to the Declaration of Jeffrey Crough in Support of the Spartan Defendants' Motion to Dismiss ("Crough Decl.") (ECF No. 84-1 at ECF Page 238 of 531). Thus, investors would not have cared whether and to what extent Legacy Sunlight diligence and monitored contractors for prefunding advances – and it mattered little to investors that prefunding advances were extended to contractors regardless of risk level - because the contractors were not the ones responsible for repayment. This distinction, if anything, further amplifies the importance of Legacy Sunlight actually doing due diligence and ongoing motoring of contractors for the milestone advances, and only providing those advances to contractors in its top risk tier.[3]

Fourth, the historical loss data (¶91, 95) - while they may have been objectively accurate - were misleading in light of Legacy Sunlight's late-2019 decision to dramatically relax its diligence

---

[3] The Spartan Defendants' argument that the assignment of contractors into a given risk tier is business judgment is another non-sequitur. The issue here is that because Legacy Sunlight's due diligence and ongoing monitoring of contractors consisted of nothing but a once-a-year review of the contractor's self-supplied financial statements, Legacy Sunlight did not have any reasonable basis to place a contractor in any risk tier.

14

and monitoring of contractors.  These historical loss data provided a false reassurance of the risk characteristic of the cash advance program, based on underlying practices that were no longer in place by the time of the Proxy, and was not going to be representative of future performance.

Lastly, just because Sunlight didn't immediately incur substantial losses after loosening its diligence practices does not mean Sunlight did not loosen its contractor diligence procedures. While Sunlight may have had the good fortune of avoiding losses until 2022, its luck did eventually run out – in dramatic fashion.[4]

### C.    The Complaint Adequately Alleges an Item 303 Violation

Plaintiffs incorporate by reference their arguments in the Sunlight Defendants' Opposition in support of why the Complaint adequately pleads an Item 303 violation.

Item 303 imposes a duty to disclose "where a trend, demand, commitment, event or uncertainty is both [1] presently known to ***management*** and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (emphasis added).  Therefore, Plaintiffs need not plead that the ***Spartan Defendants*** had actual knowledge of any trend, demand, commitment, event or uncertainty for them to be liable under Item 303, the knowledge requirement is satisfied if a member of Legacy Sunlight's ***management*** had such knowledge. Analogous scenarios are commonly seen in cases alleging violation of Section 11 of the Securities Act of 1933 based on false registration statements, where the underwriters (who are subject to a negligence standard) may also be held liable for Item 303 violations based on the company management's

---

[4] Indeed, one reason Sunlight was able to avoid losses until 2022 was because it gave troubled contractors like Vision Solar more and more cash advances, including advances not associated with specific projects, to make sure those contractors didn't go out of business. ¶¶147-48.

knowledge of the trend/event/uncertainty.  *See, e.g.,  In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 506-514 (S.D.N.Y. 2013).[5]

The Proxy's generic risk warnings do not immunize it.  "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged," *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006), and "must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011).  The Proxy's generic warning that Sunlight may be harmed if a contractor went bankrupt did not do so.  Given Sunlight's business model of advancing cash to contractors, it is **obvious** that Sunlight would lose money in the event of a contractor's insolvency.  Investors, however, view this risk disclosure in the context of the Proxy's other, reassuring statements – *e.g.,* that Sunlight had a stringent due diligence and ongoing monitoring process in place to minimize such risks.  This risk disclosure merely indicates the possibility that a contractor might go bankrupt *despite* Sunlight's vigorous diligence and monitoring; it does not warn investors of the high likelihood that a contractor might go out of business *because* Sunlight was willing to accept any contractor into its network and did virtually no due diligence.  *SEC v. Fitzgerald*, 135 F.Supp.2d 992, 1028 (N.D. Cal. 2001) ("defendant's statements must be viewed as part of a mosaic to see if those statements, in the aggregate, created a misleading impression.").

---

[5] To be clear, the disclaimer in ¶112 ("The Proxy Claim is based on negligence.  It is not based on any knowing or reckless conduct by or on behalf of the Proxy Claim Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims") disclaims **intentional or reckless** violation of Section 14(a).    The reference to "knowing…conduct" refers to purposeful conduct to violate Section 14(a), not that all of the Proxy Claim Defendants were ignorant of the underlying facts.

16

Indeed, for the Proxy's risk disclosures to be such that the "risk of real deception drops to nil," the Proxy would have to disclose the risk that Sunlight could suffer losses because it was giving advances to contractors relying only on a once-a-year review of the contractor's self-supplied financial statements, and that it was also giving large advances to disreputable contractors like Pink Energy and Vision Solar whose business model depended on consumer fraud.

**III.    Plaintiffs Are Not Required to Plead the Spartan Defendants' Mental State**

Negligence allegations face a "low bar." *Fresno,* 268 F. Supp. 3d at 560. "***As a matter of law***, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [] negligence standard." *Id.* at 561 (*quoting Wilson*, 855 F.2d at 995); *see also Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 301 (D. Conn. 2021) (similar, and holding that plaintiffs pleaded claim against independent directors by showing they signed a proxy containing false statements).

The Spartan Defendants argue that Plaintiffs need to plead "a strong inference of negligence" against them, and that this requirement is grounded in the PSLRA. This is incorrect. The source of the PSLRA's "strong inference" requirement is a provision requiring plaintiffs to plead a strong inference ***if*** they "may recover money damages ***only on proof that the defendant acted with a particular state of mind.***" 15 U.S.C. § 78u-4(b)(2) ("**(b)(2)**"). In an influential 2007 opinion, Judge Posner explained that "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable [] to come up to the specified standard of care." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). *See also* Black's Law Dictionary, NEGLIGENCE (11th ed. 2019) (negligence is "[t]he failure to exercise the standard of care[]"). Because negligence is not a "state of mind," **(b)(2)** does not apply. *E.g. Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-CV-9992 (PAC), 2021 WL 4443258, at *8 (S.D.N.Y. Sept. 27, 2021)(**(b)(2)** "does not

17

apply to suits brought under Section 14(a)."); *Fresno*, 268 F. Supp. 3d 526, 559 (similar, and citing cases).[6] Accordingly, the Complaint need not plead a "strong inference of negligence."

To establish that a defendant had a duty to speak truthfully, a complaint need only allege a "substantial connection" between the defendant and the proxy. *Sec. & Exch. Comm'n v. Hurgin*, 484 F. Supp. 3d 98, 117 (S.D.N.Y. 2020). "[W]hen individuals listed in a proxy statement 'hav[e] put their reputations in issue, [they] cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names.'" *Id.* (quoting *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 294 (S.D.N.Y. 2010)).

Here, each of the Spartan Individual Defendants signed the Proxy. ¶¶90-93. By signing the Proxy, they consented to the use of their names in the Proxy. The Proxy also states that "The Spartan Board is soliciting your proxy to vote [at the special meeting.]"[7] *See* Ex. A to Crough Decl. (ECF No. 84-1 at ECF Page 42 of 531). Nothing more is required to plead their negligence. *Baum,* 575 F. Supp. 3d at 301 (D. Conn. 2021) (Section 14(a) claim stated against outside directors against whom plaintiffs made no specific allegations); *see also, In re Heckmann Corp. Sec. Litig.,* 869 F. Supp. 2d 519, 537 (D. Del. May 25, 2012) (rejecting argument that the complaint's Section 14(a) claim relied on group pleading, holding that the "plain text of the statute applies to 'any person' that 'permit[s] the use of his name to solicit any proxy.'") (citing 15 U.S.C. §78n(a)).[8]

---

[6] *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) is inapposite because there, the plaintiff erroneously **conceded** that negligence is a "state of mind", triggering **(b)(2)**. *Bond Opportunity Fund v. Unilab Corp.*, No. 99 CIV. 11074 (JSM), 2003 WL 21058251, at *2 (S.D.N.Y. May 9, 2003), *aff'd,* 87 F. App'x 772 (2d Cir. 2004) pre-dates *Beck* and assumes without analysis that negligence is a state of mind.

[7] Defendants Strong, Wassenaar, Handler, Hommes, and Romeo were all member of the Spartan Board. ¶¶13, 15-18.

[8] Spartan Acquisition Sponsor II LLC, which created Spartan, acted through its CEO (Defendant Strong), and as Spartan's sponsor, *certainly* put its reputation at issue in the proxy solicitation.

18

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied in its entirety. In the event the Court grants all or part of the Motion, Plaintiffs respectfully request an opportunity to re-plead. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

Dated: March 5, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
*/s/ Yu Shi*_____
Laurence M. Rosen
Yu Shi
275 Madison Ave, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh
230 Park Ave, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
glinkh@glancylaw.com

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Yu Shi*

20