UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

MATTHEW MILLUNCHICK and MIKE
MARGENT, Individually and on Behalf of All
Others Similarly Situated,

              Plaintiffs,

     -against-

SUNLIGHT FINANCIAL HOLDINGS, INC.
f/k/a/ SPARTAN ACQUISITION CORP. II,
MATTHEW POTERE, BARRY EDINBURG,
RODNEY YODER, GEOFFREY STRONG,
JAMES CROSSEN, OLIVIA WASSENAAR,
WILSON HANDLER, CHRISTINE
HOMMES, JOSEPH ROMEO, and SPARTAN
ACQUISITION SPONSOR II LLC,

              Defendants.

---------------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

22-cv-10658-AKH

**THE SPARTAN DEFENDANTS' REPLY IN SUPPORT OF**
**THE MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

Christopher E. Duffy
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone:  212-237-0000

Michael C. Holmes (pro hac vice)
Jeffrey Crough
Eugene Temchenko (pro hac vice)
VINSON & ELKINS LLP
2001 Ross Avenue
Dallas, Texas 75201
Telephone: 214-220-7700

*Attorneys for Defendants Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romeo, and Spartan Acquisition Sponsor II LLC*

Dated: April 12, 2024

**TABLE OF CONTENTS**

**Page**

Preliminary Statement........................................................................................................ 1

Argument ............................................................................................................................ 2

I.    Plaintiffs lack standing to bring their derivative Section 14(a) claim ................... 2

II.    The Opposition confirms Plaintiffs have not alleged that the Proxy was false or misleading ........................................................................................... 5

    A.    The Opposition cannot correct the SAC's puzzle pleading ........................ 5

    B.    The Opposition reinforces Plaintiffs' failure to allege that the Proxy was false or misleading. .................................................... 6

        1.    The Opposition does not address the critical weaknesses of CW1's allegations. ........................................................... 6

        2.    The Opposition confirms the alleged Pink Energy red flags arose post-closing................................................................ 7

        3.    The Opposition cannot avoid the Proxy's disclosures of the risks posed by Sunlight's Cash Advance Program. ........................ 8

    C.    Plaintiffs' novel Item 303 theory fails. ..................................................... 10

III.    Plaintiffs cannot hold the Spartan Defendants strictly liable even if the Proxy were inaccurate............................................................................................ 10

    A.    Plaintiffs cannot state a Section 14(a) claim without pleading at least negligence. ...................................................................................... 10

    B.    Plaintiffs' Section 14(a) claim must be supported by well-pleaded mental state. ......................................................................................... 13

        1.    Plaintiffs triggered an obligation to plead fraud, but failed to meet that standard. .................................................... 13

        2.    Negligence is a state of mind and must be pleaded with particularity. ................................................................ 14

Conclusion ........................................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**

*Baum v. Harman Int'l Indus., Inc.*,
575 F. Supp. 3d 289 (D. Conn. Dec. 14, 2021) ....................................................................... 12

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) ............................................................................................ 14, 15

*Bond Opportunity Fund v. Unilab Corp.*,
2003 WL 21058251 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004) ....... 14, 15

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021) ..................................................................................... 5

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ................................................................................... 15

*Dekalb Cnty. Pension Fund v. Transocean Ltd.*,
817 F.3d 393 (2d Cir. 2016) ................................................................................................. 14

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ......................................................................... 4

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
2021 WL 5854075 (S.D.N.Y. Dec. 9, 2021) ............................................................................ 4

*Fresno Cnty. Empls. Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ....................................................................... 11, 12, 14

*Hilton v. Kijakazi*,
602 F. Supp. 3d 558 (S.D.N.Y. 2022) ................................................................................... 11

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ................................................................................... 10

*In re Heckmann Corp. Sec. Litig.*,
869 F. Supp. 2d 519 (D. Del. 2012) ...................................................................................... 12

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
906 A.2d 766 (Del. 2006) ....................................................................................................... 4

*In re Lehman Bros. Sec. & ERISA Litig.*,
2013 WL 3989066 (S.D.N.Y. July 31, 2013) ........................................................................... 7

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................................... 14

*In re MultiPlan Corp. S'holders Litig.*,
268 A.3d 784 (Del. Ch. 2022) ............................................................................................. 3, 4

*In re Romeo Power, Inc. Sec. Litig.*,
2022 WL 1806303 (S.D.N.Y. June 2, 2022) .................................................................. *passim*

*In re Treasury Sec. Auction Antitrust Litig.*,
595 F. Supp. 3d 70 (S.D.N.Y. 2022), *aff'd sub nom.*

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ................................................................................................ 15

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ................................................................................................. 10

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964).............................................................................................................. 5

*Loc. No. 38 Int'l Bros. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010) .................................................................................. 7

*McIntosh v. Katapult Hldgs., Inc.*,
2023 WL 5049044 (S.D.N.Y. Aug. 8, 2023)...................................................................... 13

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006)............................................................................................................. 15

**Statutes**

15 U.S.C. § 78aa .................................................................................................................. 4

15 U.S.C. § 78u-4(b)(2) ..................................................................................................... 15

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................................... *passim*

Fed. R. Civ. P. 23.1........................................................................................................... 2

## PRELIMINARY STATEMENT

Plaintiffs' Opposition confirms that Plaintiffs seek to hold the Spartan Defendants liable under a derivative Section 14(a) claim that Plaintiffs lack standing to assert, for statements in the Proxy that are alleged to be false based on events that occurred *after* the Proxy was issued, and without allegations that the Spartan Defendants knew or should have known of the alleged falsities.[1]  Each of these infirmities independently warrants dismissal as to the Spartan Defendants.

*First*, Plaintiffs ask the Court to depart from a straightforward application of *In re Romeo Power*, in which the Southern District of New York recently held that a Section 14(a) claim alleging that a SPAC's board made misrepresentations regarding its acquisition target in a merger proxy was derivative under Delaware law, and dismissed the claims for failure to make a demand or plead demand futility.  2022 WL 1806303 (S.D.N.Y. June 2, 2022).  Plaintiffs' meager attempts to discount *Romeo Power*—that it was undermined by a Delaware Court of Chancery decision issued *before Romeo Power*; or that there is no Delaware state court decision holding that a Section 14(a) claim is derivative, when Section 14(a) claims cannot be brought in state court—are unpersuasive.  The Section 14(a) claim here is on all fours with *Romeo Power*, requiring dismissal.

*Second*, the Opposition confirms that Plaintiffs' allegations of misstatements in the Proxy rest on one paraphrased line from a confidential witness that due diligence "consisted" of reviewing creditors' self-supplied financial statements, even though that confidential witness did not state, and would not have been in a position to state, that Legacy Sunlight conducted no other diligence.  The Opposition further confirms that, at the time of the Proxy, Pink Energy (whose

---

[1] "Opposition" or "Opp." refers to Plaintiffs' Memorandum of Law in Opposition to the Spartan Defendants' Motion to Dismiss, Dkt. 90.  Capitalized terms not defined herein have the meaning ascribed to them in the Spartan Defendants' Memorandum of Law in Support of Their Motion to Dismiss Second Amended Class Action Complaint (the "Spartan Opening Brief" or "Spartan OB"), Dkt. 83.  Citations in the form "Ex. A" refer to the document attached to the Declaration in Support of the Motion to Dismiss, Dkt. 84.

default 14 months after the closing prompted this lawsuit) had received only modest advances from Legacy Sunlight and is not alleged to have been in financial distress.  Thus, Plaintiffs' central theory of liability—that Sunlight advanced Pink Energy increasing and substantial funds even as signs of Pink Energy's troubles mounted—rests on post-closing events that cannot be attributed to the Spartan Defendants and do not render the Proxy false.

*Third,* the Opposition concedes that Plaintiffs have not pleaded that any alleged inaccuracy in the Proxy resulted from a lack of due care or fraud by the Spartan Defendants.  Plaintiffs instead rely entirely on a legal contention that ***nothing*** is needed to plead negligence against a signatory to a proxy other than the presence of a misstatement.  Plaintiffs' contention, which would improperly convert Section 14(a) into a strict liability claim, has been widely rejected by courts dismissing Section 14(a) claims for lacking allegations that defendants failed to exercise reasonable care.  Moreover, Plaintiffs' claims fall further short under the heightened pleading standards of the PSLRA (which applies because negligence is a mental state), and Rule 9(b) (which applies because Plaintiffs' allegations sound in fraud)—standards Plaintiffs do not claim to have satisfied.  Plaintiffs' failure to plead that the Spartan Defendants knew or should have known of the alleged inaccuracies is fatal to Plaintiffs' Section 14(a) claim regardless of the pleading standard.

## ARGUMENT

### I.  Plaintiffs lack standing to bring their derivative Section 14(a) claim

Less than two years ago, this Court in *Romeo Power* held that a Section 14(a) claim alleging that a SPAC's board made misrepresentations regarding its acquisition target in a merger proxy was derivative under Delaware law, and it dismissed the claim under Rule 23.1 for failure to plead demand futility or make a pre-suit demand.  *See* 2022 WL 1806303, at *5.  The Opening Brief

explained that *Romeo Power* was on all fours with Plaintiffs' Section 14(a) claim here, and that the same result should follow. *See* Spartan OB at 16-17.

In response, Plaintiffs scarcely even attempt to distinguish the facts of *Romeo Power*—nor could they. There, as here, "the essence of [the] claim is that the proxy statements overstated the value of [the target] and as a result, [the SPAC's] shareholders received less in value from the merger than they expected when they approved it." 2022 WL 1806303 at *5. Plaintiffs argue only that *Romeo Power* "did not concern any rights of redemption" (Opp. at 11), but they are mistaken. The plaintiff in *Romeo Power* brought claims on behalf of a class of SPAC stockholders that had redemption rights, and alleged that stockholders would have redeemed but for the alleged Section 14(a) violations,[2] yet the claims were still dismissed as derivative.

Rather than squarely address *Romeo Power*, Plaintiffs unavailingly attempt to discount it. Plaintiffs first assert that *Romeo Power* "is now contradicted by a ruling of the Delaware Chancery Court"—*In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784 (Del. Ch. 2022). But *MultiPlan* was decided six months **before** *Romeo Power* and therefore does not represent a subsequent change in Delaware law. Nor are the holdings of *MultiPlan* and *Romeo Power* in conflict. *MultiPlan* held that allegations that a SPAC's directors breached fiduciary duties to the SPAC's stockholders by impairing their redemption decisions presented direct claims, because only the stockholders (and not the SPAC) held redemption rights, meaning that any harm from the impairment was suffered directly by stockholders.[3] *Id.* at 802-03. The *MultiPlan* Court took pains to clarify that, there, the plaintiff's breach of fiduciary duty claims did not depend on allegations that the SPAC overpaid

---

[2] Am. Compl. ¶¶ 191-93, *In re Romeo Power Sec. Inc. Sec. Litig.*, C.A. No. 1:21-cv-03362-LGS (S.D.N.Y. Sept. 15, 2021), ECF No. 82.

[3] Indeed, such a breach of fiduciary duty claim has been asserted against the Spartan directors in the Delaware Court of Chancery, and the Spartan directors have not contended that those claims are derivative. *See McCants v. Strong et al.*, C.A. No. 2023-0694-PAF (Del. Ch.), ECF No. 99 (Opening Br. of Spartan Defs.), No. 114 (Reply Br.).

for the target.  *Id.* at 803-05.  Here, by contrast, the Section 14(a) claims are based on the drop in stock value due to alleged inadequate disclosures.  *See* Opp. at 7-8 ("Materialization of Risk…Sunlight's stock tumbled by over 57% in reaction to…news…, wiping out more than half of Sunlight's market capitalization and damaging investors.").  A theory that the company's stock price declined because it emerged that the acquired company was not as described presents a textbook overpayment claim, which is exclusively derivative.  *See* Spartan OB at 16-17.

Plaintiffs next fault the Spartan Defendants for not citing "a single decision in Delaware where courts have held that Section 14(a) claims stemming from a de-SPAC transaction are derivative rather than direct."  Opp. at 11.  But that is hardly surprising, given that Section 14(a) claims can only be brought in federal court—i.e., not in Delaware.  *See* 15 U.S.C. § 78aa.  Thus, Plaintiffs do not cite a Delaware decision where a Section 14(a) claim regarding a de-SPAC transaction was held to be direct.  Indeed, Defendants' citation to *Romeo Power* is the ***only citation in either side's briefs*** from any court addressing whether a Section 14(a) claim regarding a de-SPAC transaction proxy is direct or derivative.[4]  And while Plaintiffs seek to downplay *Romeo Power* as a "single decision" (Opp. at 11), they fail to grapple with the fact that *Romeo Power* is recent, directly on-point precedent from this Court.

---

[4] Plaintiffs' citation to *Enzo Biochem*, a case between a company and an activist investor about the alleged delay of a shareholder meeting, is inapposite, and if anything supports the Spartan Defendants.  *See* Opp. at 10-11; *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 5854075, at *9-11 (S.D.N.Y. Dec. 9, 2021).  The section Plaintiffs cite in *Enzo Biochem* concerns "***Fiduciary Duty*** Counterclaims" under New York ***state law***. *Id.* (emphasis added) (citing *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) for the proposition that "[w]here it is claimed that ***a duty of disclosure violation*** impaired the stockholders' right to cast an informed vote, that claim is direct.") (emphasis added).  The case's separate Section 14(a) section does not address the direct / derivative issue. *Id.* at *4.  And because the case did not concern a merger, "overpayment" being a direct harm was not at issue.  Moreover, in the underlying Section 14(a) claim, the court noted that "[i]n fact, an issuer, as opposed to individual shareholders, would typically be better situated in terms of resources and corporate influence to pursue litigation under Section 14(a) and as a result, enforce the 'fair corporate suffrage' policies undergirding the statute." *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *6 (S.D.N.Y. Sept. 27, 2021).

Moreover, contrary to Plaintiffs' suggestion, *Romeo Power* is not an outlier; it follows well-established principles, cited in Spartan's Opening Brief to which Plaintiffs do not respond, that the "injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder." *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964).

## II.   The Opposition confirms Plaintiffs have not alleged that the Proxy was false or misleading

### A.  The Opposition cannot correct the SAC's puzzle pleading

The Opposition contends that the SAC is not puzzle pleading because it identifies allegedly false statements "with added emphasis where challenged statements are embedded in longer passages and summarizes why each statement was false." Opp. at 13 (citing SAC ¶¶ 90-92, 94-96). But the Opposition confirms that the "added emphasis" within the page and a half of block quoting does little to alert Defendants or the Court of what exactly they allege to be false. Indeed, while the SAC's block quote emphasizes the statements "Sunlight has adopted vigorous contractor diligence and monitoring procedures," and "[o]nce onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently," SAC ¶ 90, the Opposition instead focuses elsewhere, Opp. at 13 (citing the same paragraph by alleging a false statement based on unemphasized sections of the block quote).[5] This is precisely the kind of failure to "describe what portion of [the] quotation constitutes a false representation" that is fatal to a complaint under the PSLRA. *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477 (S.D.N.Y. 2021).[6]

---

[5] This whole paragraph is copy-and-pasted with additional emphases in ¶ 199, but Plaintiffs strategically represent that "¶¶ 127-250" do not apply to their Section 14(a) claims further mixing their puzzle pieces. Opp. at 9.

[6] Rather than confront the Defendants' authorities showing that "relying primarily on bolded text in half-page block quotations to identify the allegedly misleading statements" is insufficient, they instead distinguish a case (*Bahash*) not even cited by Defendants. *Compare* Spartan OB at 18, *with* Opp. at 12.

**B. The Opposition reinforces Plaintiffs' failure to allege that the Proxy was false or misleading.**

Setting aside its puzzle pleading defects, the SAC still fails to allege facts indicating that the Proxy misrepresented Legacy Sunlight's Cash Advance Program. Plaintiffs' allegations that Legacy Sunlight did not take the monitoring and diligence steps described in the Proxy at the time it was issued rests primarily on a paraphrasing of a single confidential witness who was not in a position to speak to such issues. Plaintiffs also cannot avoid that the sizeable advances extended to Pink Energy, and the alleged signs of its financial duress, did not occur until *after* the Proxy and thus cannot support a Section 14(a) claim. Lastly, the Opposition's attempts to avoid the Proxy's extensive cautionary disclosures regarding the advance program are unavailing.

**1. *The Opposition does not address the critical weaknesses of CW1's allegations.***

The Opposition confirms that Plaintiffs' claims that the Proxy misrepresented Legacy Sunlight's processes rest on a one-line paraphrase from CW1—i.e., that "Legacy Sunlight's initial due diligence and ongoing monitoring of contractors consisted of looking at the contractor's self-supplied financial statements." Opp. at 14 (citing SAC ¶ 58). Plaintiffs argue that this statement (although not directly so stating) supports an inference that Legacy Sunlight undertook no other diligence, but such loose interpretation is inconsistent with Plaintiffs' own allegations showing robust diligence, including that Legacy Sunlight held "Weekly Operations Meetings…to discuss contractors and the cash advance program," Opp. at 26, "received and logged customer complaints…that were made about the various contractors," SAC ¶ 150, and had a process for review of contractors and advances by the Chief Operating Officer and the Chief Executive Officer, *id.* ¶¶ 151, 217. Moreover, Plaintiffs provide no meaningful response to the Spartan Defendants' observation that CW1 was a "Relationship Manager" who is not alleged to have any insight into the "Commercial Risk" team's practices and therefore could not speak to the full extent

-6-

of Legacy Sunlight's diligence.  Spartan OB at 22; *see also* Sunlight OB at 32-34, 37.[7]  Such allegations about company-wide practices from one alleged customer service employee are inadequate to survive a motion to dismiss.  *See, e.g.*, *Loc. No. 38 Int'l Bros. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).

### 2. *The Opposition confirms the alleged Pink Energy red flags arose post-closing.*

The Opposition further confirms that Plaintiffs' central theory of liability—that Sunlight advanced Pink Energy increasing and substantial funds even as signs of Pink Energy's troubles mounted—rests on post-closing events that cannot be attributed to the Spartan Defendants.

The SAC alleges that Pink Energy deteriorated "slowly…[i]n late 2021 and 2022," and, in a section titled "Pink Energy Publicly Unravels," that "[b]y spring 2022, there were widespread media reports of Pink Energy salespeople engaging in deceptive marketing practices and widespread complaints of Pink Energy's shoddy workmanship."  SAC ¶¶ 36, 157; *see also* ¶¶ 158-81 (detailing incidents post-dating the Proxy).  The Spartan Opening Brief demonstrated that falsity cannot be alleged by "red flags" post-dating the Proxy.  Spartan OB at 30-31.  In response, Plaintiffs note only that, pre-closing, Pink Energy had been removed from one platform and criticized in a *Business Insider* article and in certain customer reviews.  Opp. at 6-7.  But the Proxy did not represent that Legacy Sunlight partnered only with contractors with immaculate reputations, and none of the SAC's allegations suggest that Pink Energy was in financial distress

---

[7] The Opposition does not attempt to support claims against the Spartan Defendants through any allegations made by CWs 2-4, correctly so because none of them could have insight into pre-close processes.  *See* Spartan OB at 13 n.19.

at the time of the Proxy.  Thus, Plaintiffs cannot allege that advances to a distressed contractor at the time of the Proxy rendered misleading its statements regarding the Cash Advance Program.[8]

Moreover, the sizeable advances to Pink Energy that allegedly led to the complained-of loss accumulated only post-closing.  In the two quarters preceding the Proxy (Q4 2020 and Q1 2021), the advances to Pink Energy were only $295,000 and $888,000 respectively (0.8-2.7% of the total advances outstanding), and in the quarter of the Business Combination (Q2 2022) they were $5 million (12% of the total advances outstanding).  Spartan OB at 11; Opp. at 6.  In the quarter after the closing (Q3 2021), this amount more than quadrupled to $21 million, or roughly 29% of the total outstanding, before eventually increasing to $32.6 million in Q3 2022.  *Id*. Plaintiffs' fraud-by-hindsight theory, which should be rejected in any case (*see* Spartan OB at 24-25), is particularly untenable here because, at the time of the Proxy, Pink Energy was not even a large creditor posing a special risk to Sunlight, as Plaintiffs claim to be the case post-closing.

The Court should reject Plaintiffs' attempt to hold the Spartan Defendants liable for a loss that occurred more than 14 months after the closing, based on loans that had not been advanced and supposed red flags that had not emerged at the time of the Proxy.

### 3. The Opposition cannot avoid the Proxy's disclosures of the risks posed by Sunlight's Cash Advance Program.

As explained in the Spartan Opening Brief, the Proxy contained robust disclosures regarding the risks posed by Sunlight's Cash Advance Program, including that one of its two components, the Prefunding Advances, were offered "across the [risk] spectrum" and not only to low-risk contractors.  Spartan OB at 6-10, 27.  The Opposition seeks to discount these disclosures on the notion that "investors would not have cared" about "diligence" for "[P]refunding

---

[8] The Opposition does not respond to the Spartan Defendants' observation that Vision Solar is not alleged to have defaulted on any advances from Sunlight and therefore cannot support Plaintiffs' claims.  Spartan OB at 11, 27 n.21.

[A]dvances," because those advances were typically repaid by loan providers. Opp. at 14. But the Proxy explained that Prefunding Advances, which made up the vast majority of total advances,[9] exposed Legacy Sunlight to "risk for defaults if a contractor…fails to fully perform under its agreement[]…or becomes insolvent prior to the completion of installation or construction"—i.e., if Legacy Sunlight advanced funds, the contractor failed to install the system, and the loan provider therefore never funded the loan. Ex. A at 52-53. Moreover, the section of the Proxy Plaintiffs cite for "Advances [Then-]Outstanding" (Opp. at 6) showed Legacy Sunlight lending to "[l]ow risk," "[m]edium risk," and "[h]igher risk" contractors, Ex. A at F-89. Thus, Plaintiffs cannot escape the Proxy's repeated warnings that the Cash Advance Program was extended across the risk spectrum and thus presented exposure.

Plaintiffs also do not dispute the accuracy of the Proxy's disclosure that historically the Cash Advance Program caused Legacy Sunlight to lose only "$0.4 million" of "$526 million" advanced. Ex. A at 213. Plaintiffs concede these figures "may have been objectively accurate," but contend they "were misleading in light of Legacy Sunlight's late-2019 decision to dramatically relax its diligence and monitoring of contractors." Opp. at 14-15. But that suggestion is implausible because (in addition to Plaintiffs' failure to allege facts indicating such standards were relaxed) these figures ran through the end of 2020—a full year after this supposed relaxing. *See* Spartan OB at 28.

In sum, Plaintiffs have failed to allege that the Proxy misrepresented either the process or the results of the Cash Advance Program.

---

[9] *Compare* Ex. A at 188 (reporting $1.1 billion advanced under the Prefunding Program in a ***single year***), *with id.* at 213 (reporting $526 million advanced under the Milestone Program ***over its entire lifetime***).

### C. Plaintiffs' novel Item 303 theory fails.

Plaintiffs seek to salvage their Section 14(a) claim by arguing that the Spartan Defendants had a duty to disclose the supposedly known trend of Legacy Sunlight's loosening risk management practices under Item 303. Plaintiffs disavow any allegation that the Spartan Defendants knew of this supposed trend; instead, they argue that, "under Item 303, the knowledge requirement is satisfied if a member of Legacy Sunlight's management had such knowledge." Opp. at 15. But the law is clear "that Item 303 requires the *registrant* to disclose only those trends, events, or uncertainties that *it* actually knows of when *it* files the relevant report with the SEC." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (emphasis added). Tellingly, Plaintiffs cite to no Section 14(a) cases supporting their proposition that the alleged knowledge of a merger counterparty triggers Item 303. Instead, Plaintiffs cite only an inapposite Section 11 case regarding underwriters in an IPO, not counterparties to a merger.[10] Opp. at 15-16. Because Plaintiffs do not allege that the Spartan Defendants had knowledge of the alleged trend, their novel Item 303 theory fails.

### III. Plaintiffs cannot hold the Spartan Defendants strictly liable even if the Proxy were inaccurate.

#### A. Plaintiffs cannot state a Section 14(a) claim without pleading at least negligence.

Plaintiffs argue that their Section 14(a) claim is not subject to a heightened pleading requirement, contending that the SAC's allegations do not sound in fraud and thus do not trigger Rule 9(b), and that negligence is conduct and thus does not trigger the PSLRA's requirements for

---

[10] Moreover, the underwriters in that case *did* know of the alleged trend. *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 502, 513-14 (S.D.N.Y. 2013). The underwriters and issuer submitted a joint brief in which knowledge of the trend was uncontested. *See In re Facebook*, C.A. No. 11:12-cv-07587-RWS (S.D.N.Y.), ECF Nos. 27-39. Still, the Court only stated that the *registrant* "omitted material information in violation of Item 303…." *In re Facebook*, 986 F. Supp. 2d at 514.

pleading a mental state.  *See* Opp. at 9, 17-18.  As explained herein, Plaintiffs are mistaken on both points, and Rule 9(b) and the PSLRA apply.  *Infra* III.B.

But the Court need not reach these issues because the Section 14(a) claim should be dismissed for failure to plead negligence even under a Rule 8 standard.  The Spartan Opening Brief explained that, even assuming the Proxy contained a false statement, the SAC contains no allegations that the Spartan Defendants failed to exercise reasonable care in preparing the Proxy.  *See* Spartan OB at 36-37.  Indeed, the SAC's only allegations as to the Spartan Individual Defendants are that they signed the Proxy.  *See* SAC ¶¶ 90-93.  The Opposition does not dispute that the SAC contains no such allegations, and thereby concedes the point.[11]  Rather, Plaintiffs remarkably contend that because "each of the Spartan Individual Defendants signed the Proxy,…[n]othing more is required to plead their negligence." Opp. at 18.  Plaintiffs' unsupported argument would collapse Section 14(a)'s falsity and negligence elements, thereby improperly converting it into a strict-liability claim.

As demonstrated in the Spartan Opening Brief, courts around the country resoundingly reject Plaintiffs' proposition, and dismiss Section 14(a) claims where a complaint fails to allege that directors knew or should have known about the alleged inaccuracies.  *See* Spartan OB at 36-37 (collecting authorities).  The Opposition does not attempt to distinguish these many authorities.

Neither of the two cases cited by the Opposition support rendering Section 14(a)'s negligence element entirely redundant of its falsity element.  Plaintiffs cherry-pick a snippet from *Fresno County*, but ignore that the court there held that negligence required allegations showing a defendant's failure "to come up to the specified standard of care" and found that "[t]he allegations [were] sufficient to" plead negligence where plaintiff alleged, *inter alia*, that company

---

[11] *Hilton v. Kijakazi*, 602 F. Supp. 3d 558, 570 (S.D.N.Y. 2022) ("As Hilton failed to develop her argument, it could be rejected for that reason alone.").

management had for months faced publicly scrutiny of their accounting practices and an independent accounting firm raised "red flags" about those practices that were omitted from the solicitation statement. *Fresno Cnty. Empls. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 536-44, 559-60 (S.D.N.Y. 2017). Similarly, in citing *Baum*, Plaintiffs omit that the Section 14(a) negligence claim was sustained after the court found subjective (i.e., knowing) falsity and actual fraud regarding the statements at issue: The solicitation statement claimed that senior management viewed projections as reflecting more downside risk than upside potential, whereas the CEO and President had elsewhere expressed a contrary view. *Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 294 (D. Conn. Dec. 14, 2021).[12] Thus, in both of these cases, the courts' discussion of Section 14(a)'s negligence element was in the context of having already found that company insiders knew or should have known about alleged misstatements or omissions regarding their own company. Here, by contrast, the challenged statements concern a ***counterparty's*** risk management practices, and the SAC does not even attempt to plead that ***anyone*** at Spartan knew or should have known of the alleged falsity or otherwise failed to exercise reasonable care in preparing the Proxy.

Plaintiffs' Section 14(a) claim fails because it hinges on the rejected argument that directors are *per se* liable for any inaccuracy in a proxy's description of a merger counterparty.

---

[12] Plaintiffs' only other case, *In re Heckmann*, also required a showing that a Section 14(a) defendant "knew or should have known that the statements were false or misleading." *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 538 (D. Del. 2012). There the Complaint alleged that, in a parallel litigation, the defendants had, among other things, "admitted that [their auditors] informed the Company" that the merger target's CEO was reporting different sets of financial numbers to Chinese officials and the SEC. *Id.* at 538-39. Because the amended complaint alleged the defendants "were aware, and chose not to disclose," material facts which occurred prior to the merger, the Section 14(a) claim survived. *Id.*

### B. Plaintiffs' Section 14(a) claim must be supported by well-pleaded mental state.

The SAC also fails to state a Section 14(a) claim because Plaintiffs must plead "cogent and compelling" facts demonstrating the Spartan Defendants' fraudulent or negligent state of mind, and Plaintiffs do not even argue that they have met this standard.

### 1. *Plaintiffs triggered an obligation to plead fraud, but failed to meet that standard.*

As explained in the Spartan Opening Brief, Plaintiffs' Section 14(a) claims must satisfy the heightened pleading standards of Rule 9(b) because their allegations sound in fraud. *See* Spartan OB at 33-35. Specifically, the SAC alleges that SPAC directors and sponsors like the Spartan Defendants are "highly motivated to complete a merger" because "massive profits from [founder shares]" would be lost "if a merger is not effectuated within" 24 months, and that such mergers "have the potential to be rife with fraud and other irregularities" and allow SPAC targets to "bypass…regulatory scrutiny of…[an] IPO[]." SAC ¶¶ 39-41.

The Opposition, while doubling down on those allegations, untenably contends that they do not sound in fraud but are rather merely "background information on the nature and purpose of SPACs." Opp. at 2-3, 9. But those allegations are plainly not some aside; they are included to set the stage for claims against the Spartan Defendants and to attribute a motive to issue a fraudulent proxy. Indeed, this Court recently held that Rule 9(b) was triggered for a Section 14(a) claim against SPAC defendants where—just as here—"Plaintiffs devote[d] several paragraphs of the [complaint] to the idea that 'SPACs like FinServ have become magnets for fraud,' noting that 'the SEC has criticized SPACs because of their apparent tendency to encourage fraud.'" *McIntosh v. Katapult Hldgs., Inc.*, 2023 WL 5049044, at *5 (S.D.N.Y. Aug. 8, 2023).

Plaintiffs plainly attempt to have their cake and eat it too by insinuating that the Spartan Defendants were motivated to make knowingly false statements, but at the same time denying they

are making such an insinuation in order to avoid their obligation to support those serious claims with particularized allegations. This is precisely the scenario that requires allegations of fraud be made with particularly. *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 492 (S.D.N.Y. 2006) (dismissing Section 11 strict liability claim sounding in fraud for failure to plead scienter due to "Rule 9(b)'s mandate to safeguard a defendant's reputation from improvident charges of wrongdoing") (citation omitted).[13]

The Spartan Opening Brief detailed how the barebones allegations against the Spartan Defendants come nowhere near satisfying Rule 9(b). *See* Spartan OB at 33-35. The Opposition does not contend otherwise, and therefore concedes the point. Thus, because Rule 9(b) applies, the Section 14(a) claims should be dismissed.

### 2. Negligence is a state of mind and must be pleaded with particularity.

The SAC also fails to state a Section 14(a) claim because the Court should follow *Bond* and hold that Plaintiffs must "plead with particularity facts that give rise to a strong inference of negligence" as to "each particular defendant." *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *4, *10 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004); *see also* Spartan OB at 36. Plaintiffs' primary response is to invoke *Beck v. Dobrowski*, which held that "negligence is not a state of mind." 559 F.3d 680, 682 (7th Cir. 2009); Opp. at 17. But *Bond*, which was affirmed by the Second Circuit without reaching "the state of mind issue," 87 F. App'x 772, 774 (2d Cir. 2004), is no less persuasive authority than the Seventh Circuit's *Beck*, which was merely a "*see also*" cite in the Second Circuit's *Dekalb* opinion, *see Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 408 n.90 (2d Cir. 2016). Because "[t]he Second Circuit has not

---

[13] Plaintiffs again rely on *Fresno County*, but that case is distinguishable because the plaintiff there made no "allegations that could lead to an inference that the [] defendants were complicit in the fraud." 268 F. Supp. 3d at 558.

-14-

opined on the [pleading standard for negligence], and what authority exists is divergent," *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 240 (S.D.N.Y. 2012), the Court would need to determine whether to follow *Bond* or *Beck* unless it dismissed on one of the several other bases herein.

Plaintiffs offer no justification for following *Beck* other than the decision itself. Indeed, the Opposition does not respond to the Spartan Defendants' argument that applying heightened requirements to negligence claims is most consistent with the PSLRA's purpose of subjecting securities law cases to more exacting standards at the pleading stage. Spartan OB at 36; *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 80-81 (2006). The PSLRA imposes heightened requirements for any "required state of mind," not just for scienter. 15 U.S.C. § 78u-4(b)(2). By using the term "state of mind," Congress must have meant to capture scienter and lesser mental states, such as negligence. Plaintiffs' argument would impermissibly rewrite the statute's use of "mental state" into scienter. Here again, Plaintiffs do not argue that they have met the PSLRA's heightened requirements, thereby requiring dismissal.

## CONCLUSION

For the foregoing reasons, and those stated in their Opening Brief and the Sunlight Defendants' briefing, the Spartan Defendants respectfully request that the Court grant their motion to dismiss and dismiss Plaintiffs' claims against them with prejudice.[14]

---

[14] *In re Treasury Sec. Auction Antitrust Litig.,* 595 F. Supp. 3d 22, 70 (S.D.N.Y. 2022), *aff'd sub nom. City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381 (2d Cir. 2024) (denying leave to file second amended complaint because "Plaintiffs have had ample notice of the deficiencies in their pleadings, and have not been able to cure those deficiencies. There is no reason to believe that further amendment would be productive.").

Dated:  April 12, 2024

Respectfully submitted,

VINSON & ELKINS LLP


 /s/ *Michael C. Holmes*

Michael C. Holmes

Christopher E. Duffy
1114 Avenue of the Americas
New York, New York 10036
Telephone:  212-237-0000

Michael C. Holmes (*pro hac vice*)
Jeffrey Crough
Eugene Temchenko (*pro hac vice*)
2001 Ross Avenue
Dallas, Texas 75201
Telephone: 214-220-7700

*Attorneys for Defendants Geoffrey Strong, James Crossen, Olivia Wassenaar, Wilson Handler, Christine Hommes, Joseph Romeo, and Spartan Acquisition Sponsor II LLC*

-16-