OCA1MILC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

MATTHEW MILLUNCHICK and MIKE
MARGENT, individually and on
behalf of all others similarly
situated,

                    Plaintiffs,

          v.                              22 Civ. 10658 (AKH)

SUNLIGHT FINANCIAL HOLDINGS,
et al.,

                    Defendants.           Fairness Hearing
-------------------------------x
                                          New York, N.Y.
                                          December 10, 2024
                                          10:18 a.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                          District Judge

                         APPEARANCES

THE ROSEN LAW FIRM
     Attorneys for Plaintiff Class
BY:  YU SHI, ESQ.

McGUIRE WOODS LLP
     Attorneys for Sunlight Defendants
BY:  JEFFREY J. CHAPMAN, ESQ.
     AARON F. JAROFF, ESQ.

VINSON & ELKINS LLP
     Attorneys for Spartan Defendants
BY:  JEFFREY CROUGH, ESQ.

ROSCA SCARLATO LLC
     Attorneys for Objector Mitchell Wax
BY:  PAUL J. SCARLATO, ESQ.

OCA1MILC

(Case called)

THE DEPUTY CLERK:  Counsel, please state your appearance for the record.

MR. SHI:  Good morning, your Honor.  Yu Shi from the Rosen Law Firm for the plaintiffs.

THE COURT:  Good morning.

MR. CHAPMAN:  Good morning, your Honor.  Jeff Chapman and Aaron Jaroff from McGuireWoods for the Sunlight defendants.

MR. CROUGH:  Good morning, your Honor.  Jeff Crough from the law firm of Vinson & Elkins on behalf of the Spartan defendants.

THE COURT:  Good morning.

And we have our objector?

MR. SCARLATO:  Yes.  Good morning, your Honor.  Paul Scarlato for objector Mitchell Wax.

THE COURT:  Yes.  Why don't you take a seat in the front bench, over to the left.

Mr. Shi, tell me about the settlement, the notice, and the reasons that you want me to approve it.

MR. SHI:  Yes, your Honor.  Would you like me to use the podium or——

THE COURT:  I would, yes.

MR. SHI:  Your Honor, we're here for final approval of a class-action settlement that will completely resolve this action as to all defendants.  This is a $3.5 million cash

settlement that recovers approximately 10.4 percent of what plaintiffs' expert calculates to be the maximum classwide damages here.  This 10.4 percent recovery is a very strong recovery that is approximately double the median recovery in securities class actions alleging a similar amount of damages over the last ten years.

THE COURT:  I don't think that's an important figure.

MR. SHI:  And——

THE COURT:  There are too many weak cases.

MR. SHI:  The claims administrator has mailed out over 45,000 notices.  The summary notice was also published on the national news wire.  So far, over 12,000 claims have been received, and there was one objection to the settlement.  There were no objections to the plan of allocation or to the attorney's fee motion, and there were no optouts.

And so here, this case, at the time that the settlement was reached, the motion to dismiss was fully briefed and pending, and the settlement here avoids the risk that this case might be dismissed.  And frankly, it's a case that, even if it were to go into discovery, the problem is that because of Sunlight's financial situation, it's uncertain whether the company would even exist if the litigation were to continue.  As your Honor is aware, during the pendency of this action, about a week after the second amended complaint was filed, Sunlight filed for Chapter 11 bankruptcy.  And Sunlight's

OCA1MILC

financial situation was such that, again, initially, they needed a longer payment term, and then your Honor asked them to pay us sooner, and I know that Mr. Chapman had to do quite a bit of arm twisting for the payment to come in.  And so this recovery, it avoids the risk that the action could be dismissed or that it could be truncated if some of the alleged false statements would not get dismissed.  And it also gives the class members an immediate recovery rather than further delay, and we believe that this is a strong settlement that should be approved.

THE COURT:  And you've corrected the deficiency that I noted when we had the preliminary hearing.

MR. SHI:  Yes, your Honor.

THE COURT:  Now, Mr. Scarlato, your objection is not as to the settlement, it's to the scope of the release; is that right?

MR. SCARLATO:  Correct, your Honor.

THE COURT:  You're not here to oppose anything that Mr. Shi has said.

MR. SCARLATO:  That is correct, your Honor.

THE COURT:  Okay.  So in effect we have no optouts and we have no opposition and no objectors to the settlement, only to the settlement language.

MR. SHI:  That's right, your Honor.

THE COURT:  Do the defendants have anything to add?

OCA1MILC

MR. CHAPMAN:  Nothing, your Honor.  If your Honor wants to hear argument on the objection, we'd like to address that, but nothing for now.

MR. CROUGH:  Nothing for the Spartan defendants at this time, your Honor.

THE COURT:  You may sit down, Mr. Shi.

With great reluctance, I approve the settlement.  The factors that a judge has to satisfy are stated in *City of Detroit* v. *Grinnell Corp.*, 495 F.2d 448, 463 (1974), and there are nine factors.

First is the complexity, expense, and likely duration of the litigation.  This is not too complex.  The issue was whether there was a misstatement in the amount of examination defendant would do before extending credits in the field of solar energy.  The business scheme was to extend credits and finance the sellers of this equipment for a premium, and it was stated in its offering documents that there were rigid controls that made sure that the loans were good loans.  The alleged misstatement was that these protective measures were withdrawn without stating such.  Not a terribly complex issue.  There would be substantial additional expense in going through discovery, and the case would have taken considerably longer, so on balance, that factor supports the settlement.

The second factor is the reaction of the class to the settlement.  There has been a silent reaction, which we take as

OCA1MILC

approval.

The third factor is the stage of the proceedings and the amount of discovery completed. The stage of the proceedings is very short. We were at the stage, coming into these class actions, of a motion to dismiss, and the settlement occurred before the motion could be resolved. So there really was no testing of the legal sufficiency of the complaint.

The merits were not discovered. The settlement was made on the strength of the allegations alone. And the fact that it was a low percentage—10 percent is a low percentage—indicates that plaintiff did not have very good confidence in its case or that a judgment would not have been available. Since the judgment is paid by insurance, as I understand it, and insurance does not disappear in a bankruptcy, the condition of the company was not a factor, and the insurance of the individual directors I don't think was touched. I think this is not a very good settlement. I will approve it because the alternative doesn't seem to exist of anything better.

The risks of establishing liability, I think there was substantial risks of establishing liability. I think the question of how adequate a set of checks for the giving of a loan is a very difficult set of questions to say they were or were not sufficient has a lot of judgment involved in it, and it was not at all clear that plaintiff would win.

The risks of establishing damages, I think damages

OCA1MILC

would have been pretty definitely known.  We know the prices of stocks, before and after.  There's always a question how much of this is due to natural action of the stock markets and how much due to the uncovering of the fraud, and that would have to be proved, but presumably damages could have been proved.  Whether they could have been collected in any better way, I mentioned before.

The risks of maintaining the class action through the trial, I don't think there was much risk.

The ability of the defendants to withstand a greater judgment, that has already been remarked on, and probably they wouldn't have been capable of withstanding much more judgment.

The eighth factor is the range of reasonableness of the settlement fund in light of the best possible recovery. That range was much in excess of what is resolved.

The next one, the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  I think it's a good reflection of the difficulty of the case and difficulty of collecting on it.

So given all these factors together, I approve the settlement.  Not enthusiastically, but I approve it.  There is not much of an alternative that was available to the plaintiff, but the plaintiff did choose to file the lawsuit.

Now the class is defined as all persons or entities

who purchased the publicly traded common stock of Sunlight between January 25, 2021, and September 28, 2022——and it says "and/or," but it's "and," it's not "and/or"——and all persons or entities who beneficially owned and/or held the common stock of Spartan Acquisition Corp. II as of June 1, 2021, and were eligible to vote at Spartan's July 18, 2021, special meeting. It's a conjunctive, not a disjunctive, but we avoid double recoveries.  That class has been certified previously by me. It was the subject of a notice.  There have been no complaints about it.  I approve the class as defined.

The exclusions are the usual exclusions.  People affiliated with a company, those who suffered losses, those who didn't submit valid requests for recovery, they're excluded.

It said that the potential maximum recovery, based on expert consultation, is $33.6 million.  There was the help of a mediator, Robert A. Meyer, Esq.  And the proposed recovery is $3,500,000, and I said before that I would approve it.  It's fair, reasonable, and adequate.

Now I need more explanation——Mr. Shi, I'll ask you to resume the podium——with regard to the allocation.

MR. SHI:  Yes, your Honor.

So the plan of allocation, it's in the long, long notice, notice of pendency, and for the pending claims, so class members will only have damages if they purchased the shares during the class period and then held them through the

OCA1MILC

end of the class period, because if they sold their shares prior to the alleged corrective disclosure, that means that the stock was also artificially inflated at the time that they sold their shares, so therefore, there wouldn't be any damages.  So which is why subsection A for the plan of allocation says that for shares that were purchased during the class period and also sold during the class period, the recognized loss will be zero, because there would be no compensable damages.

THE COURT:  I agree.

MR. SHI:  And therefore, sub point B, so this says that if the shares were purchased during the class period and then sold during the 90 days from the end of the class period to——so the 90 days from the end of the class period goes to December 27, 2022.

THE COURT:  What's the significance of the 90-day——

MR. SHI:  So the PSLRA has a 90-day look-back provision that says the amount of recovery of damages cannot exceed the purchase price by the closing price, the average closing price during the 90 days subsequent to the close of the class period.  So therefore, for people who sold their shares during those 90 days, then they get the lesser of $1.40 per share, which was the amount of the stock drop, or the average closing price, up to the day, during the 90-day look-back period that they sold their stock.

THE COURT:  In other words, it's their cost, the

OCA1MILC

purchase price of the stock——

MR. SHI:  Yes.

THE COURT:  ——at a certain amount less the average closing price on the date they sold.

MR. SHI:  That's right.

THE COURT:  So they have it in their proof, so the date of their sale, and we have averages in a table attached.

MR. SHI:  Yes.  That's right.

THE COURT:  And that will be administered by the——

MR. SHI:  By the claims administrator.

THE COURT:  By the claims administrator.  Okay.  That seems sensible.

Now the next one is (c), for each share of Sunlight——go ahead.

MR. SHI:  So for subsection (c), this is for people who held their shares through the end of the 90-day look-back period, and then here, the recovery would be the lesser of $1.40 per share, which is the stock drop on the date of the corrective disclosure, or $1.38 per share.

THE COURT:  Instead of taking the average of the day the person sold, what you're doing is taking the average of the entire 90 days.

MR. SHI:  Right, the entire 90-day look-back period.

THE COURT:  Okay.  I approve that as well.

So that approves the allocation.

OCA1MILC

Now we have loss for claimants with Section 14(a) claims. And how does that work?

MR. SHI: So the 14(a) allegation is that because of the alleged false statements in the proxy documents, shareholders were deprived of the chance to redeem their shares for $10 per share.

THE COURT: This has to do with the Spartan people?

MR. SHI: Right, right. So people who held the shares, the pre—

THE COURT: The Spartan people are going to be the ones that are benefiting under Section 14(a).

MR. SHI: Right. It's the people who held these shares of the empty—the shell.

THE COURT: So that the affected classes would be Section 10, 10(d), and Section 14(a).

MR. SHI: Sorry, your Honor?

THE COURT: That would affect two classes, Section 10(b) class and Section 14(a) class, both treated equally.

MR. SHI: Yes. So there are shares that would be eligible under both 10(b) and 14(a). This is because—so the class period begins on January 25, 2021, and then the—this last transaction was in early July, so shares that were purchased from January to July were still—to what would still be the Spartan shares, and the Spartan shares that became the

Sunlight shares asked for the business combination.  So there's actually a pretty big overlap in the two class periods, as anyone who purchased shares from January to July would have claims under both 10(b) and 14(a).

THE COURT:  But you're not going to duplicate.

MR. SHI:  No, we're not.  So in the plan of allocation, I believe, so on ECF page 50 of 31 says that shares eligible for the 10(b) claim are not eligible for the 14(a) claim and vice versa.  So there's no double recovery.

THE COURT:  Is there a better recovery for Spartan than the ordinary purchases of stock?

MR. SHI:  Is there a better recovery?  Well, your Honor, I would not say that there's a better recovery.  Again, because the——they could have redeemed their shares for $10, and so the plan of allocation gives, given the recognized loss, the $10 minus what they ultimately sold their stock for.  That's the——

THE COURT:  So their stock was worth $10.

MR. SHI:  Yes.

THE COURT:  At the time of the closing.

MR. SHI:  It was worth $10 at the time, so they could have, instead of voting to approve the business combination——

THE COURT:  They voted it was $10.

MR. SHI:  Exactly, yes.

THE COURT:  So that's the numerator, and the

OCA1MILC

denominator is the——

MR. SHI:  Is how much they ultimately sold.

THE COURT:  $8.19 a share, which was the——

MR. SHI:  So that's the——

THE COURT:  ——difference between $10 and $1.08, which is said to be the holding value of the common stock, held at the close of trading on September 28, 2022.  What did you do, take the average price on that day?

MR. SHI:  So for subsection (b), so if they held their——if they didn't sell their stock on the day of the corrected disclosure, then they would get the $10 minus the 1.38, which was the average closing price for the 90 days.

THE COURT:  Table A?

MR. SHI:  Yes.  So it's the same number that has been used to calculate the 10(b) damages.

THE COURT:  I find the allocation to be fair, and I approve it.

The next question is the scope of the release, and a discharge.  Rule 65(d) defines the scope of an injunction.  And I'll read it out.

65(d)(2) defines the persons bound by an injunction: the parties; the officers, agents, servants, employees, and attorneys of the parties; and other persons who are in active concert or participation with anyone described above, which means either the parties or the parties' officers, agents,

OCA1MILC

servants, employees, and attorneys.  I think your release goes beyond that.  And that's why Mr. Scarlato is here to complain.  So how can I justify that?

Mr. Shi?

MR. SHI:  Yes, your Honor.

THE COURT:  How can I justify a larger scope than provided by Rule 65(d)(2)?

MR. SHI:  Judge, in the Second Circuit, these class-action settlements routinely release their parties, including, for example, auditors, attorneys, and these are the kind of release language that's routinely granted.  But the important thing here is that there are two limiting qualifications for the claims that are released and it's that they have to both relate to the purchase or sale of the Sunlight or Spartan securities, and those claims must involve, set forth——must be those that were involved, set forth, or referred to in the complaint.  So claims based on or arising out of facts that were not involved or set forth in the complaint that do not have to do with the purchase of Sunlight stocks during the class period will not be released.  And again, in our experience we——it is common here in the Second Circuit, and we understand——it is our understanding that we have the right to release the parties such as shareholders, auditors, bankers.  And your Honor, this Court, your Honor, has approved two settlements that also released shareholders as

part of the released parties——the *GreenSky* class action and the *Pareteum Securities* class action.

THE COURT:  I don't think there was an issue that was raised, though.

So it's paragraph 1.28 of the settlement agreement, found on pages 9 and 10.

Mr. Scarlato, what is the argument why this release is too broad?  You can take the podium and Mr. Shi will surrender it.

MR. SCARLATO:  Yes.  Your Honor, would you like any background as to our separate action against Cross River Bank?

THE COURT:  I'm only focused on the release language itself.

MR. SCARLATO:  Okay.  The release language itself——

THE COURT:  Mr. Shi is correct that releases commonly recite all these different entities, including the shareholders of a company that is a defendant.

MR. SCARLATO:  That is true that releases often include shareholders of the company as defendants, but the Cross River Bank is in a very different situation here.  Cross River Bank, we allege, is a separate wrongdoer in our action that is pending in the District Court of New Jersey, so we have a separate claim on behalf of Sunlight shareholders against Cross River Bank.  It is true that in the typical scenario——and counsel for——and Sunlight defendants cited two cases, two

OCA1MILC

class-action cases that your Honor approved that had shareholders in the definition of the class release, but in neither circumstance were the shareholders separate wrongdoers. So when you're considering the release language, it's important to focus on two things. One is, we allege that Cross River Bank is a separate wrongdoer; and two, that by virtue of—Cross River Bank became a shareholder of Sunlight by virtue of Sunlight's bankruptcy. It was over a year after the class period in this case ended.

THE COURT: Let me interrupt. Direct me to the language that you take issue with.

MR. SCARLATO: Sure.

THE COURT: In the release itself, not the definition. Where would I find that?

MR. SCARLATO: It's in 1.28, and if you look at the—

THE COURT: That's a defined term.

MR. SCARLATO: That's a defined term.

THE COURT: Yes, but what's the action, the substance?

MR. SCARLATO: So our issue is with the defined, including—including—we don't have an issue with including shareholders. We have an issue with including Cross River Bank, which essentially is a back-door release under the definition of shareholders, because—

THE COURT: I don't see their name in here.

MR. SCARLATO: I don't see their name in here at all.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OCA1MILC

THE COURT:  So most releases are limited to that claim that arises under or perhaps is related to the allegations of the complaint.  And you're saying that your action is a different action.

MR. SCARLATO:  It's a different action.

THE COURT:  So the release wouldn't apply.  And I'm looking for the release language that limits it by claims arising under the allegations of the complaint.

Mr. Shi, where is that; what paragraph?

MR. SHI:  Your Honor, it's Section 1.35, which specifically says that it releases claims that involved, set forth, or referring to any of the complaints filed in this action, that could have been filed in the action, or that otherwise would have been barred by *res judicata* had the action been fully litigated through final judgment, and——

THE COURT:  That's a long paragraph.  Where in the paragraph is it?

MR. SHI:  It's toward the end of the paragraph that has the two Roman numerals (i) and (ii).

THE COURT:  On the bottom of page 12, yes.  Okay.  Let me read it.

MR. SHI:  So it's towards the second half of the paragraph that says based upon——

THE COURT:  I have it.

So let me suggest the following.  There are some

things here that are broader.  Looking at 1.35, page 12, starting with the 10th line, "alleged or which could have been alleged by any released plaintiff-party against defendants or against any other of the released defendants-parties in any court of competent jurisdiction, or any other adjudicatory tribunal."  I propose no change to that language.  What follows is this: "that arise out of," which is common, "arising out of the adjudicated or settled allegations, in any court of competent jurisdiction."  So it's a good limitation.  "Or any other adjudicatory tribunal."  That's also satisfactory.  "That arise out of, are based upon," those are fine.  Next phrase, "are in any way related to."  I would take out "in any way" so it reads "are related to," and that's the classic language of the release.  The next phrase is, "or are in consequence of." That also should go out.  That's not part of a release.

And then skipping down to subparagraph (i), which reads, "involved, set forth, or referred to in any of the complaints filed in the action," then the next phrase is "that could have been filed in the action."  That's a common phrase, but since the rules of joinder are so liberal, it makes the release meaningless and extends the scope beyond that which it should be.  I propose to eliminate that language.

With those emendations, Mr. Scarlato, are you satisfied?

MR. SCARLATO:  Your Honor, I think we still have an

issue with the definition of "shareholder," given the Sunlight defendants' response to our objection.

THE COURT:  I think the shareholders are entitled to release when their company is being released, and that's what we're talking about.  What you're talking about is a theoretical situation.  I don't know if it is different or not, but you're saying it is, so I'm going to take your word.  If it's different, you'll get clear because of these eliminations that I've made to 1.35, and that would be for the next court to determine, not me.

So you're telling me you're not satisfied with the emendations.

MR. SCARLATO:  Well, given that the Sunlight defendants have taken the position——and unbeknownst to us because it's not in the settlement papers anywhere——that Cross River Bank was actually at the settlement table and negotiated and approved the settlement and was an intended releasee, we still think the definition of "shareholder" is problematic for our claims.

THE COURT:  The objection is denied.

MR. SCARLATO:  Pardon me, your Honor?

THE COURT:  The objection is denied.  The release will be emended in the way I've suggested.

And I'll ask you, Mr. Shi, to submit an amended document.

OCA1MILC

MR. SHI:  Yes, your Honor.

THE COURT:  Okay.  I think that takes up every aspect of the settlement except for fees; is that correct?

MR. SHI:  Yes, your Honor.

THE COURT:  Okay.  And so I will sign the appropriate documents given to me.  These will be held until we get a satisfactory, clean document as I expressed.  So I have the order approving the plan of allocation.  I'm going to sign that.

The proposed order of final judgment has the release terms, right?  Mr. Shi?

MR. SHI:  I am not sure if it has this exact language in there or whether it just refers to the stipulation.

Your Honor, it refers to the release in the stipulation but it doesn't repeat the actual language of the release itself.

MR. CHAPMAN:  Your Honor, for Sunlight defendants, I think we would have to sign a new stipulation.

THE COURT:  Are you objecting to what I've done?

MR. CHAPMAN:  Your Honor, I'm in a bit of a quandary here, and let me explain why.

THE COURT:  Mr. Shi, you can sit, please.

MR. CHAPMAN:  Cross River Bank——

THE COURT:  Mr. Scarlato, you can go back to your seat.

OCA1MILC

MR. CHAPMAN:  Cross River Bank, which is a shareholder and has two seats on our board, is not part of this case, and they may, you know, want to argue this release.  In fact, I'm sure they will.

Typically what I see is a court either approves a settlement or it rejects it.  It doesn't redline it sort of in realtime.  So I heard what the Court said.  What I would suggest is that since we need to sign a new stipulation of settlement, that we be given a very short period of time to consider that, and if it's satisfactory, we will do that; if it's not, we will come back before the Court.

THE COURT:  Okay.

MR. CHAPMAN:  Thank you.

THE COURT:  How much time do you need?

MR. CHAPMAN:  I would like a week, your Honor.

THE COURT:  Okay.  So give me a whole new set of documents to sign, Mr. Shi, after passing approval of Mr. Chapman.

MR. SHI:  Yes.  So assuming that the Sunlight defendants agree to the revised language, then we would file an amended stipulation containing the revised release, and then, your Honor, you would also like us to resubmit the proposed order granting the plan of allocation and the proposed order and final judgment?

THE COURT:  Yes.  I dated it, and we need a new proper

OCA1MILC

date, so please do.

MR. SHI:  Okay.  Yes, your Honor.

THE COURT:  December 19 at 10:00 will be the adjourned date.  All right?  Mr. Shi, any objection to that?

MR. SHI:  Just to clarify, you would like all the parties to reappear for a——

THE COURT:  You don't have to reappear if you agree. Just send in the papers.  If there's disagreement, I'll see you on December 19th.

I will say this, Mr. Chapman.  The emendations that I made I think cut down the scope of the release.  They cut it down in an appropriate way because they go beyond Rule 65(d)(2).  The liability comes through the corporation, and it protects the shareholders of the corporation if it dissolves or is otherwise unable to meet the obligations of the settlement.  If this is a new lawsuit, then it will be free of the discharge because it's a new lawsuit and doesn't arise from the allegations of this lawsuit.  If it arises from the allegations of this lawsuit, then it should be settled.

MR. CHAPMAN:  We appreciate that, your Honor, and I will discuss that with my client, and hopefully we will have no issue there.  Thank you.

THE COURT:  Okay.  All right.  That's as far as we go today.  Thank you, all.

MR. SHI:  Judge, if I may, one clarification.

OCA1MILC

THE COURT:  We have your fee, but I think I should——

MR. SHI:  Oh.

THE COURT:  Let's do that now.  Let's do the fee now.

MR. SHI:  I actually have a question about the December 19th, 10 a.m. date, the adjournment time.  So if we submit the revised documents, I think Mr. Chapman said a week from today, that would be December 17th, then we do not need to appear on December 19th.

THE COURT:  That's correct.

MR. SHI:  Okay.  Got it.

THE COURT:  All right.  Let's pass on to your fees now and do that, and it will be conditional on the submission of the settlement documents.

Go ahead, Mr. Shi.

MR. SHI:  I'll go back to the podium.

THE COURT:  Yes.

MR. SHI:  Your Honor, for the attorney's fees, the Second Circuit looks at the *Goldberger* factors, and they are: time and labor; risk of litigation; magnitude and complexity; the quality of the representation; the requested fee relative to the settlement; public policy considerations; and the reaction of the class.  So here, we, the plaintiff's counsel, spent over 800 hours, and, again, we were not only, again, litigating this case here, which we expended, again, over 800 hours, doing two rounds of investigations, filing two amended

OCA1MILC

complaints, including a 64-page second amended complaint, speaking to dozens of confidential witnesses, again, not only were we doing that, but we also had to litigate the Sunlight's release in bankruptcy court.  So there, the proposed plan, the proposed Chapter 11 plan would have released our claims against Sunlight that was part of the bankruptcy injunction.  So we had to file an objection there and attend an argument to preserve our claims against Sunlight, which we did.

So again, the risk of litigation, this is a contingency case.  There's of course risk that we could be litigating this case for years and lose and not be paid, at all.

The magnitude and complexity, it's a securities class action, and these types of lawsuits I would say by nature are complex.

Quality of representation, again, I think for that, probably the best proxy is to look at the results that were obtained for the class.  Here, there's a $3.5 million recovery, and it's 10.4 percent, and I know your Honor doesn't like to look at the historical recoveries, but for the parties that are negotiating a settlement, that's one of the benchmarks that we look at to value a case.  And the 10.4 percent is double the median percentage recovery of similar class actions.

And then the public policy consideration, so there's incentive—there needs to be incentive for private attorneys to

OCA1MILC

bring these cases rather——again, the SEC cannot possibly prosecute every case of securities fraud.

The reaction of the class, there were no objections to the attorney's fee request.

And then lastly, the amount of fees we ask for is 27.5 percent, which is less than the 1/3 that is commonly awarded in the Second Circuit.

And if your Honor has any specific questions, I will be happy to answer.

THE COURT:  Any other comments?

MR. CHAPMAN:  Nothing from the defendants, your Honor.

MR. CROUGH:  Nothing from Spartan defendants either.

THE COURT:  Thank you.  I'll take a 10-minute break.

(Recess)

THE COURT:  There are six *Goldberger* factors to determine a fee.  The time and labor expended by counsel is the first one.  So the time of the Rosen firm was just short of $750,000; $748,070.  And the time of the Glancy firm was a little less than 40,000, or 39,527.  These are the lodestars.

The second is the magnitude and complexities of litigation.  This is not a litigation of great magnitude or complexity, as I said before, and despite the measurement as a median of other settlements, it did not have any useful outcome. $3,500,000 divided over 12,000 people with claims, it's not going to amount to very much money, and there's no

great reward that should be given in this context.

The risk of the litigation was considerable but was known at the outset. It was known as to the size and sustainability of the company and was known in terms of how likely a success could be made out of the particular alleged misrepresentation that was in suit.

The quality of the representation, I know the Rosen firm. I think they are an excellent law firm. And without examining each aspect of representation, I believe they carried out their job of first quality. With regard to the Glancy law firm, the Glancy law firm did not much else than speak with the client. Didn't stay with the case; is that right, Mr. Shi?

MR. SHI: Yes. They initiated the action. They filed the initial complaint. And then after the Rosen law firm was appointed lead counsel, their role was mainly advising the named plaintiff, Mr. Millunchick.

THE COURT: And that person that was the plaintiff was changed during the course of the lawsuit also.

MR. SHI: Right. The plaintiff who filed the initial complaint did not move for lead plaintiff.

THE COURT: And the complaint was not a very good complaint either. It had to be amended twice. So I can't say anything positive about the quality of the Glancy representation.

The requested fee in relation to the settlement is

OCA1MILC

high.  The requested fee is $962,500 in relation to a settlement of $3,500,000.  That's a 27.5 percent fee, and I don't think it's appropriate.

Yes, Mr. Shi.  Do you want to say something?

MR. SHI:  Oh.  No, your Honor.

THE COURT:  You can sit then.  Please sit.

And I don't think there's any major public policy considerations that can apply here.

So putting these all together, I come to the following:  The Glancy firm had a client that did not stay and a complaint that did not last, and did not really contribute, as far as I can see, anything more substantial than that in the litigation.  I think it fair to cut its fee to $20,000 plus expenses, which I allow, of $825.77.  As to the Rosen fee, it carried out two amendments, they filed briefs on a motion to dismiss, pursued this case through bankruptcy and through settlements and the like, resulting in a settlement that perhaps might have been appropriate to the case, but it's not really reflecting an outstanding result or even a better-than-average result.  Their lodestar is $748,070.  I think the appropriate fee for them would be $685,000, and expenses, which I allow, of $47,634.21.  So the total fee of the two law firms will be $705,000—$20,000 to Glancy and $685,000 to Rosen.  And that fee will be paid half at the time the agreement settlement is final and half at the time of the

first distribution.  That's half the fee.  The expenses will be paid at the time of finality.

Anything further, folks?

MR. SHI:  Yes, your Honor.  You said that the first half would be paid when the final settlement, the revised settlement documents are filed.

THE COURT:  When they become final.

MR. SHI:  When it becomes final.  Okay.

THE COURT:  Yes.

MR. SHI:  And then the expenses, is that what the first payment——

THE COURT:  Finality would be I guess 30 days out.

MR. SHI:  Yes, yes.

THE COURT:  And the expenses would be paid at the same time.  You get 50 percent plus expenses and then the balance at the time of the distribution.

MR. SHI:  Judge, I think one thing that I would like to say is that there were over 12,000 claims filed, but not every claim filed is a valid——

THE COURT:  I understand.

MR. SHI:  ——is a valid claim.

THE COURT:  I understand.  Some of the claimants are investment companies that have an aggregate of claims, and some people will get something and other people will get very little.  I understand that.

OCA1MILC

MR. SHI:  Okay.  And then lastly, we also requested $3,000 each for the lead plaintiff——

THE COURT:  That is denied because the lead plaintiff has not done very much of anything.  There were no depositions, there were no interrogatories addressed to them.  And given the nature of these claims, this is very little input that they have to make.  They're stockholders, and they agreed to put up their names and their stock in order to have an action, but they can be rewarded like everyone else.

MR. SHI:  Understood.

THE COURT:  Thank you.

MR. SHI:  Thank you.

THE COURT:  All right.  We're dismissed.

MR. CHAPMAN:  Thank you, your Honor.

MR. CROUGH:  Thank you, your Honor.

THE COURT:  So I'll see you again, or not, depending on whether you come to an agreement.  I suspect there will be an agreement, right, Mr. Chapman?

MR. CHAPMAN:  Yes.

oOo